## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,    . CRIMINAL NO. 12-cr-10226-DJC-1
     Plaintiff          .
                    . BOSTON, MASSACHUSETTS
         v.        . AUGUST 9, 2012
                    .
KOSTA, et al           .
     Defendants 1, 4, 5 & 7 .
. . . . . . . . . . . . . .


TRANSCRIPT OF ARRAIGNMENT & DETENTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the Government:  UNITED STATES ATTORNEY'S OFFICE
                      BY: Leah B. Foley, Esq.
                      One Courthouse Way, Suite 9200
                      Boston, MA 02210
                      617-748-3144
                      leah.foley@usdoj.gov


For Defendant 1:    Paul J. Garrity, Esq.
John Kosta          14 Londerry Road
                      Londerry, NH 03053
                      603-434-4106
                      garritylaw@myfairpoint.net


For Defendant 4:    Timothy G. Watkins, Esq.
Dennis Novicki      Federal Defenders Office
                      51 Sleeper Street
                      5th Floor
                      Boston, MA 02210
                      timothy_watkins@fd.org


For Defendant 5:    Raymond A. O'Hara, Esq.
Alexander Napoleon  1 Exchange Place
                      Suite 2
                      Worcester, MA 01608
                      508-831-7551
                      oharalaw@hotmail.com

2

1        For Defendant 7:       Thomas J. Iovieno, Esq.
         Tamara Kosta           755 East Broadway
2                               Suite 3
                                Boston, MA 02127
3                               617-464-3300
                                tjilaw@yahoo.com
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21        Court Reporter:

22
          Proceedings recorded by electronic sound recording,
23        transcript produced by transcription service.

24

25

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

1                        <u>I N D E X</u>

2  <u>WITNESSES</u>                    <u>DIRECT</u>   <u>CROSS</u>

3  <u>Government's:</u>

4  FBI AGENT DOUGLAS R. SCHIELE      34

5  <u>EXHIBITS</u>             <u>DESCRIPTION</u>      <u>MARKED</u>      <u>IN EVIDENCE</u>

6  <u>Government's:</u>

7  (All exhibits were premarked.)

8      1   Warrant Affidavit                    37

9      2   Line Sheet                           55

10     3   Line Sheet                           63

11     4   Line Sheet                           63

12     5   Line Sheet                           65

13     6   ATF Document Regarding Tamara Kosta  73

14

15

16

17

18

19

20

21

22

23

24

25

4

1  COURT CALLED INTO SESSION

2  (11:42:50 a.m.)

3          THE CLERK:  The case of the United States versus

4  John Kosta, Dennis Novicki, Alexander Napoleon and Tamara

5  Kosta, Criminal Action No. 12-10226, will now be heard

6  before this Court.

7          Counsel, please identify themselves for the

8  record.

9          MS. FOLEY:  Good morning, Your Honor.  Leah Foley

10  for the United States.

11          THE COURT:  Good morning.

12          MR. O'HARA:  Good morning, Your Honor.  Raymond A.

13  O'Hara on behalf of Alexander Napoleon.

14          THE COURT:  Good morning.

15          MR. GARRITY:  Good morning, Your Honor.  Paul

16  Garrity for John Kosta.

17          MR. WATKINS:  Good morning.  Tim Watkins, Federal

18  Defender Office on behalf of Dennis Novicki.

19          MR. IOVIENO:  Good morning, Your Honor.  Thomas

20  Iovieno for Tamara Kosta.

21          THE COURT:  Now, were all these --

22          Ms. Foley, were all these defendants arraigned

23  before Judge Bowler?

24          MS. FOLEY:  They were not, Your Honor.  They had

25  an initial appearance, but she saved arraignment for today.

1              THE COURT:  Is that your understanding, Ms. Russo?

2  I was understanding that Judge Bowler did arraign people.

3              THE CLERK:  No, she did not.

4              THE COURT:  Okay.  Okay.  Let's do that first.

5              Okay.  There are three counts in the indictment;

6  is that correct, Ms. Foley?

7              MS. FOLEY:  Yes, Your Honor.

8              THE COURT:  All right.  All right.  Mr. Kosta,

9  would you stand, please?

10             Have you received and read the indictment, sir?

11             DEFENDANT JOHN KOSTA:  Yes.

12             THE COURT:  Do you understand what you're charged

13 with?

14             DEFENDANT JOHN KOSTA:  Yes, sir.

15             THE COURT:  Have you had an opportunity to at

16 least preliminarily discuss the charges with your attorney,

17 so you're able to enter a plea of either guilty or not

18 guilty when I call upon you?

19             DEFENDANT JOHN KOSTA:  Yes.

20             THE COURT:  Do you wish the indictment read in its

21 entirety?

22             MR. GARRITY:  No, Your Honor.

23             THE COURT:  All right.  Remain standing, please.

24             Dennis Novicki, if you'd stand, please?

25             Have you received a copy of the indictment and

1   read it?

2           DEFENDANT NOVICKI:  Yes.

3           THE COURT:  Do you understand what you're charged

4   with?

5           DEFENDANT NOVICKI:  Yes.

6           THE COURT:  Have you had an opportunity to at

7   least preliminarily discuss the charges with your attorney,

8   so you're able to enter a plea of either guilty or not

9   guilty when I call upon you?

10           DEFENDANT NOVICKI:  Yes.

11           THE COURT:  And do you wish us to read the

12   indictment in its entirety?

13           DEFENDANT NOVICKI:  No.

14           THE COURT:  All right.  Remain standing, please.

15           Alexander Napoleon?  Have you received and read

16   the indictment, sir?

17           DEFENDANT NAPOLEON:  Yes.

18           THE COURT:  Do you understand what you're charged

19   with?

20           DEFENDANT NAPOLEON:  Yes.

21           THE COURT:  Have you had an opportunity to at

22   least preliminarily to discuss the charges with your

23   attorney, so you're able to enter a plea of either guilty or

24   not guilty when I call upon you?

25           DEFENDANT NAPOLEON:  Yes.

1          THE COURT:  And do you wish us to read the

2  indictment in its entirety?

3          DEFENDANT NAPOLEON:  No.

4          THE COURT:  All right.  Remain standing, please.

5          Tamara Kosta, have you received and read the

6  indictment?

7          DEFENDANT TAMARA KOSTA:  Yes.

8          THE COURT:  Do you understand what you're charged

9  with?

10          DEFENDANT TAMARA KOSTA:  Yes.

11          THE COURT:  Have you had an opportunity to discuss

12  the charges with your attorney, so you're able to enter a

13  plea of either guilty or not guilty when I call upon you?

14          DEFENDANT TAMARA KOSTA:  Yes.

15          THE COURT:  And do you wish me to read the

16  indictment in its entirety?

17          DEFENDANT TAMARA KOSTA:  No.

18          THE COURT:  All right.  John Kosta, Dennis

19  Novicki, Alexander Napoleon and Tamara Kosta, to Count One

20  of a three-count indictment in charging that from November

21  of 2009 to the present you knowingly intentionally conspired

22  with each other and others to possess with intent to

23  distribute 100 kilograms or more of a mixture of substance

24  containing marijuana in violation of Title 21, United States

25  Code Section 846.

1          What say you, John Kosta, are you guilty or not

2  guilty?

3          DEFENDANT JOHN KOSTA:  Not guilty.

4          THE COURT:  Dennis Novicki, what say you:  guilty

5  or not guilty?

6          DEFENDANT NOVICKI:  Not guilty.

7          THE COURT:  Alexander Napoleon, what say you?  Are

8  you guilty or not guilty?

9          DEFENDANT NAPOLEON:  Not guilty.

10         THE COURT:  Tamara Kosta, what say you:  guilty or

11 not guilty?

12         MR. IOVIENO:  Your Honor, for the record, she's

13 not charged in that count.  She's only charged in Count

14 Three.

15         THE COURT:  Wait a minute.  Do we have --

16         Sorry.  Hold on.  Well, I'm looking at Count One.

17 She's --

18         She's not named.  You're correct.  I'm sorry.  I

19 was looking at the caption.  I was not looking at the actual

20 indictment.  Thank you for correcting me on that.

21         All right.  John Kosta to Count Two charging on

22 December 4, 2011 you knowingly possessed with intent to

23 distribute marijuana in violation of Title 21, United States

24 Code Section 841(a)(1), what say you, Mr. Kosta, to Count

25 Two; are you guilty or not guilty?

1          DEFENDANT JOHN KOSTA:  Not guilty.

2          THE COURT:  Alexander Napoleon, to Count Two

3 charging that on December 4, 2011 you knowingly

4 intentionally possessed with intent to distribute marijuana

5 in violation of Title 21, United States Code Section

6 841(a)(1), what say you to Count Two, Mr. Napoleon; are you

7 guilty or not guilty?

8          DEFENDANT NOVICKI:  Not guilty.

9          THE COURT:  Thank you.  All right.

10          John Kosta, to Count Three charging that you

11 conspired to conduct and attempt to conduct financial

12 transactions affecting interstate commerce knowing the

13 property was the result of unlawful activity in violation of

14 Title 18, United States Code 1956(h), what say you, John

15 Kosta, to Count Three; are you guilty or not guilty?

16          DEFENDANT JOHN KOSTA:  Not guilty.

17          THE COURT:  Tamara Kosta, to Count Three charging

18 that you conspired with others to conduct and attempt to

19 conduct financial transactions offending interstate commerce

20 knowing that they involved the proceeds of unlawful activity

21 in violation of Title 18, United States Code Section

22 1956(h), what say you; guilty or not guilty?

23          DEFENDANT TAMARA KOSTA:  Not guilty.

24          THE COURT:  All right.  Thank you.  The defendants

25 may be seated.

1           Okay.  When will the Government be prepared to

2  provide automatic disclosures?

3           MS. FOLEY:  Your Honor, the Government is still

4  cataloging.  Twenty-eight days, Your Honor.

5           THE COURT:  All right.  Automatic disclosures will

6  be due on the sixth.  Okay, thank you.

7           Now, I understood the Government has agreed to

8  move for detention at least as to some defendants.

9           Mr. Garrity, the clerk informs me that Mr. Kosta's

10  agreeing to detention without prejudice to raise at issue at

11  a later time; is that correct?

12           MR. GARRITY:  That's correct, Your Honor.

13           THE COURT:  Okay.  Mr. Watkins, your client has

14  not completed a Pretrial Services report?

15           MR. WATKINS:  Yes.  I'm hoping with Mr. O'Brien's

16  help to have him interviewed immediately following the

17  evidentiary portion.

18           THE COURT:  Oh, he hasn't even been interviewed

19  yet?

20           MR. WATKINS:  I'm sorry?

21           THE COURT:  He hasn't even been interviewed yet?

22           MR. WATKINS:  No.  No.  Unfortunately, time

23  constraints were not -- we weren't able to do that.

24           THE COURT:  All right.

25           Now, according to the clerk, there is an agreement

1  for conditions of release on Mr. Napoleon; is that correct,

2  Ms. Foley?

3           MS. FOLEY:  Yes, Your Honor.

4           THE COURT:  And what's the story with respect to

5  Ms. Costa?

6           MS. FOLEY:  Your Honor, the Government is asking

7  that Tamara Kosta be detained pending trial.

8           THE COURT:  Okay.

9           MS. FOLEY:  And Your Honor, if I might, when we

10 were before Judge Bowler on Tuesday, it was immediately

11 after the arrest in this case, and as the Court is aware,

12 she is charged in Count Three with money laundering.

13          Based on the information that the Government has

14 learned by looking at the evidence that was seized from

15 Tamara Kosta's house, at the time of the initial appearance

16 I was only going on what she was charged with, and the

17 Government moved for detention on the grounds of risk of

18 flight.

19          THE COURT:  Okay.

20          MS. FOLEY:  Subsequent evidence has caused the

21 Government to re-evaluate that -- those grounds and believes

22 that 3142 --

23          THE COURT:  Well, I don't think -- you know, if

24 you had a basis for asking for a detention hearing, no

25 matter what it was, that gets you the detention hearing.

1  Then under the statute I have to decide whether or not

2  there's conditions that will reasonably assure appearance

3  and the safety of other persons.

4          So I think the fact that you moved for the

5  detention hearing is -- and there was a basis for doing so

6  is all you need.  The fact that later it turned out that

7  there was another basis I don't think is material at this

8  point in time.

9          MS. FOLEY:  Very well.

10          THE COURT:  All right.  What does --

11          Mr. Iovieno what do you want to do with respect to

12  Ms. Costa?  Do you want to go forward with the hearing today

13  or --

14          MR. IOVIENO:  Yes, Your Honor.  She's been

15  interviewed.  I'm prepared to go forward today.  Also

16  interviewed was a potential third-party custodian.

17          THE COURT:  Okay.  So the Pretrial Services report

18  is done.

19          MR. IOVIENO:  Yes, Your Honor.

20          THE COURT:  Okay.  And you, Mr. Watkins, want to

21  go forward with just the Government's portion of it; is that

22  correct?

23          MR. WATKINS:  For now, Your Honor.

24          THE COURT:  Okay.  All right.  Let's --

25          Why don't we do Mr. Napoleon first.  What are the

1 conditions that --

2          Let me get the pretrial report.

3          What are the conditions the Government's

4 recommending over and above those that are recommended by

5 Pretrial?  Are there any?

6          MS. FOLEY:  Your Honor, the Government would ask

7 that the defendant be put on a curfew, and that is mainly, I

8 believe, necessary since in December of 2011 the defendant

9 was stopped after leaving the Kosta's residence with 46

10 pounds of marijuana in his car at that time.  He was charged

11 by the State.  That case dismissed to not compromise the

12 ongoing wire investigation in this case.

13          When the execution -- and the warrant was executed

14 at the place where the defendant lives -- which again is a

15 house owned by the Kostas, there were marijuana plants

16 growing --

17          THE COURT:  This was last week?

18          MS. FOLEY:  Yes, Your Honor, on Tuesday.

19          THE COURT:  On, Monday?  Oh, Tuesday.  Yeah?

20          MS. FOLEY:  Tuesday.

21          So he was arrested in December with a large amount

22 of marijuana, distribution amounts clearly; and that case

23 was dismissed to preserve the integrity of the wire.

24          But when they executed the search warrant, he had

25 additional marijuana plants growing in his yard.

1          THE COURT:  So what curfew do you recommend?

2          MS. FOLEY:  I don't know what his work schedule

3 is, but I believe Pretrial Services should be able to work

4 out a curfew that allows him to go to work as long as he

5 provides legitimate proof that he is going to work, and that

6 otherwise he be at home.

7          And the Government also asks --

8          Pretrial asks that he not have contact with named

9 defendants.  The Government asks that he not have contact

10 with other people who were involved including Dayna

11 L'Italien who was living with him at the house at 359 Maple

12 Street and is also believed to be an unindicted

13 coconspirator in this matter.

14          THE COURT:  Ms. Oxford?

15          PRETRIAL SERVICES:  I was going to advise the

16 Court that Mr. Napoleon is self-employed; and therefore, any

17 curfew that the Court felt appropriate would certainly fit

18 into his work schedule.

19          THE COURT:  All right.  Let me take a moment.

20 I'll read the Pretrial report.

21          With respect to John Kosta; Mr. Garrity, do you

22 wish to remain through these proceedings or --

23          MR. GARRITY:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. GARRITY:  Judge, if I could?  Based on my

1  understanding most, if not all, of the assets listed on his

2  affidavit will be unavailable to him.

3          THE COURT:  Oh, okay.  You mean Judge Bowler

4  didn't take care of the question of counsel?

5          MR. GARRITY:  I was called in as CJA counsel.  I

6  assume I'm going to remain on.  I was not there on Tuesday.

7  Attorney George Gormley --

8          THE COURT:  All right.  Hold on for a second --

9          MR. GARRITY:  -- covered for me Tuesday.

10          THE COURT:  Ms. Foley, did Magistrate Judge Bowler

11  find the defendants unable -- financially unable to find

12  their own attorneys?

13          MS. FOLEY:  She did, Your Honor.  But that was my

14  understanding that everyone signed the financial affidavits,

15  and everyone responded verbally that they were unable to

16  afford counsel, and so she did appoint counsel.

17          THE COURT:  But she didn't require financial

18  affidavits.

19          MS. FOLEY:  I believe that she did.  We don't get

20  a copy of -- or I didn't see a copy of it, but I do believe

21  that --

22          THE COURT:  Were they filled out at the time, and

23  then did she look at them?

24          MS. FOLEY:  I know that all the defendants met

25  with counsel prior to the hearing, and I believe that those

1  affidavits were turned over; but again, I wasn't given a

2  copy of them, so.

3           THE COURT:  Okay.

4           MR. WATKINS:  I can report that I saw -- I know

5  that Mr. Novicki submitted one.  I saw Judge Bowler leafing

6  through them as she made her --

7           THE COURT:  Okay.

8           MR. WATKINS:  -- findings of indigency.

9           I also recall her saying that that issue could be

10  revisited before the district court judge if it turned out

11  there were assets there that were available.

12          THE COURT:  Is that true with the other

13  defendants?

14          MR. IOVIENO:  With respect to my client, my memory

15  was that she temporarily assigned me, because there were

16  assets listed on the financial affidavit, Your Honor.  But

17  the affidavit was filled out before the indictment was

18  unsealed, so we didn't have the benefit of the seizure -- or

19  the forfeiture allegations.  All that property that was

20  listed on my client's affidavit is subject to now

21  forfeiture, and she has no access to the funds, so.

22          THE COURT:  Okay.  Thank you.

23          Mr. O'Hara, did your client fill out one?  Did

24  Bowler look it over?

25          MR. O'HARA:  Yes.  We filled it out and submitted

1 it, and Judge Bowler felt based upon the affidavit that he

2 qualified --

3          THE COURT:  Okay.

4          MR. O'HARA:  -- for appointment of counsel.

5          THE COURT:  Yeah.  I mean, as long as she made the

6 determination, I'm certainly not going to second guess her.

7          Now, this one for Mr. Kosta, is this just

8 presented today, or -- it's dated 8/7.

9          MR. GARRITY:  Just presented today.

10          But just so the Court knows, the hearing was at

11 two o'clock on Tuesday.  I arrived late at three.

12          THE COURT:  Okay.

13          MR. GARRITY:  But Mr. Gormley was there at two,

14 and he was in the process of filling that out.  I completed

15 filling it out.

16          But it's my understanding that those assets aren't

17 available to Mr. Kosta, and he is not currently able to

18 afford counsel.

19          But I was called in as CJA counsel on Tuesday.

20          THE COURT:  Okay.

21          MR. GARRITY:  I think a number of the properties

22 that may be listed there, Judge, are listed in some of the

23 filings the Government has done since Tuesday with respect

24 to properties that might be subject to being seized or

25 forfeited.

1          THE COURT:  All right.  All right.  I'll confirm

2 your appointment then.

3          MR. GARRITY:  Thank you.

4          THE COURT:  All right.  Give me a moment just to

5 look at Mr. Napoleon's pretrial report, please.

6          Okay.  Is this person that you don't want him to

7 have contact with the same person that he's going to be

8 looking for a place to live with and her children?  That

9 seems a bit problematic.

10          MS. FOLEY:  Well, again, Your Honor, I can explain

11 why --

12          THE COURT:  No.  I'm asking is this the same

13 person that --

14          MS. FOLEY:  If it's Dayna.

15          THE COURT:  -- according to Pretrial that when he

16 finishes --

17          MS. FOLEY:  Yes.

18          THE COURT:  -- living with his sister, he's going

19 to look for a place to live with her; and if so, how can

20 that be a condition that he have no contact?

21          Ms. Oxford?

22          PRETRIAL SERVICES:  Your Honor, I would believe

23 that that's inappropriate.  The Government's adding any --

24          Pretrial Services did not have the same

25 information that the Government has --

1           THE COURT:  Okay.

2           PRETRIAL SERVICES:  -- regarding this individual.

3 They did not have any chance to view any kind of wire taps

4 or anything like that.  So the relationship that we got was

5 a self-reported one, that this is a woman that he's been

6 residing with for ten years.

7           THE COURT:  Okay.

8           PRETRIAL SERVICES:  If the Government has things

9 that -- some information that would be that this could

10 possibly be a potential risk for that person being out on

11 the street, then that would be fine.  That is why he's going

12 to be residing with another family member --

13          THE COURT:  Right.  Right.  I saw that.  The

14 sister.

15          PRETRIAL SERVICES:  So there's no objection from

16 Pretrial Services to --

17          THE COURT:  Okay.  But in other words, the

18 conditions of release would be that he would live with his

19 sister from now on and not try and find a place to live with

20 this person with whom he's to have no contact.

21          That's what the Government's position is?

22          MS. FOLEY:  Yes, Your Honor.

23          THE COURT:  Mr. O'Hara?

24          MR. O'HARA:  And we're objecting to that.

25          Mr. Napoleon has been with Ms. L'Italien for more

1 than ten years.  He raised her daughter who is currently 23

2 years old and living in New Hampshire.  She has raised his

3 two sons.  He's the sole support of Ms. L'Italien and his

4 two sons.  He has one son who's in high school, another

5 son's attending North Shore Community College.  Ms.

6 L'Italien, as I understand it, arranges for transportation.

7         For all intents and purposes, they've been living

8 together as husband and wife for ten years.  He represents

9 that they're engaged to be married but never set a date.

10         To impose a condition that he not have any contact

11 with her is tantamount to saying that he can't have contact

12 with the wife and the person who raised his own children, so

13 we would be objecting to that condition.

14         In terms of a curfew, he is self employed.  He

15 installs alarm and security systems.  He is not under any

16 kind of a salary.  It's basically he's paid job by job.

17 Sometimes his work hours require him to work weekends,

18 sometimes he has to work late at night.

19         He also has a client base that is in North and

20 Central Massachusetts and Southern New Hampshire, so I would

21 ask that the conditions of his release be amended to permit

22 him to travel for work purposes only to New Hampshire;

23 otherwise, he's willing to stay in Massachusetts only.

24         In terms of establishing a curfew, I don't know

25 what would be a reasonable time frame for a curfew.

1 Probably at least, I'd say, until eight o'clock in the

2 evening and then on weekends if it's necessary for him to

3 work.

4          But in terms of the condition that he not have any

5 contact with his common-law wife, we're objecting to that.

6          THE COURT:  Ms. Foley?

7          MS. FOLEY:  Your Honor, again, the evidence is

8 that the defendant and Ms. L'Italien were both making

9 structured payments -- cash deposits into the accounts both

10 of Tamara Kosta and John Kosta.  We have them on video from

11 the bank video making these deposits.  There was marijuana

12 growing at their house together with these kids there.

13          She might very well find herself, you know,

14 involved in this indictment.  The Government is still

15 looking through all of the evidence that was seized from

16 their house -- the house that Ms. L'Italien and Mr. Napoleon

17 lived in and all of the bank records.  Numerous documents

18 were found at the Kosta's residence in Phillipston, and she

19 very well might become an indicted coconspirator.

20          But the Government's position at this time is she

21 is an unindicted coconspirator, as is Mr. Napoleon with

22 Count Three of the indictment, and the Government objects to

23 them having communications.

24          There is still a lot of money.  In January 2012

25 there was a large seizure of marijuana that was from this

1 organization, and at that time we saw the money in their

2 accounts dwindle.  And it might have been to pay for the

3 drug debt.  It could have been just shifted to other

4 accounts, and the Government is still trying to locate those

5 accounts.  The Government believes that there are other

6 accounts out there.

7          The Kostas have $19,000 in monthly expenditures

8 which they had been paying, and the Government is extremely

9 --

10          THE COURT:  All right.  Okay.

11          MS. FOLEY:  -- concerned that --

12          THE COURT:  All right.

13          MS. FOLEY:  -- people who were involved and made

14 these structured deposits of cash might have information

15 regarding to this -- where this money is.

16          And if they can communicate, and she is on the

17 release and is not involved in the judicial system, can

18 access that money on behalf of someone who is indicted in

19 this case.

20          THE COURT:  All right.

21          MS. FOLEY:  And secondly, the Government -- the

22 self --

23          I don't know if Pretrial was able to verify the

24 self-reported self employment information, but to the extent

25 that he's self reporting that he installs security systems,

1  whether there's any proof that he actually does.  Because

2  there is a lot of evidence in this case that they say they

3  own these businesses, and there's absolutely no proof

4  whatsoever, no evidence of legitimate businesses owned by

5  any of these defendants.

6            And so the Government requests that if he's saying

7  he's going out to work --

8            THE COURT:  Well, wait a minute.  You're allowing

9  him to -- you're not requesting detention?

10           MS. FOLEY:  No, Your Honor; but I would ask that

11 if he --

12           I ask for a curfew and that he put on a bracelet,

13 and that the curfew --

14           THE COURT:  Oh, I didn't hear the bracelet.  I

15 heard curfew.

16           MS. FOLEY:  I'm sorry.  For the curfew, Your

17 Honor, if the Court believes that a bracelet is necessary,

18 also.

19           But for the curfew, that he only be allowed out

20 when he is working, but the Government is requesting that he

21 verify his work with Pretrial and that not just self report

22 "I'm going out to this job," that he produce receipts or

23 invoices or something to prove to Pretrial that when he is

24 leaving the house to go out to work, that he is actually

25 conducting legitimate business.

1          THE COURT:  All right.  Well, I think, Mr. O'Hara,

2 what I'm going to do is I'm going to impose the no contact

3 at least initially to --

4          Because I don't want to hold Mr. Napoleon in

5 custody while this whole business of contact with Ms.

6 L'Italien is worked out, and I'll schedule it for a further

7 hearing in about a week, and we can revisit that.  But I

8 think based on the Government's representations, it makes

9 sense to put that condition in at least temporarily until we

10 can sort things out.

11          And in addition, of course, he wasn't going to be

12 living with her initially anyway.  They were going to be

13 looking for a place other than where she lives now, so I

14 think it's best to put that condition in place subject to

15 later revision.

16          Now, Mr. O'Hara, what's your understanding with

17 respect to this business?  Ms. Foley is indicating she has

18 doubts as to whether it's a legitimate business, that it

19 might be a front for illegal activities.  What can you tell

20 me with respect to that?

21          MR. O'HARA:  I can only tell you what I was told

22 by my client in terms of how he's been working, where he

23 worked in the past.

24          I understand that he was privately employed by a

25 ADT Security which is a nationwide company --

1            THE COURT:  No, wait a minute.  He's self

2  employed, --

3            MR. O'HARA:  He's self employed.

4            THE COURT:  -- or he's employed by ADT?

5            MR. O'HARA:  He's been working in this industry

6  for twenty years.

7            THE COURT:  Right.

8            MR. O'HARA:  First he was employed by a large

9  company that specializes in security and alarm systems, and

10 for the past ten years he's been working on his own.

11           THE COURT:  Well, I'm sorry.  When you say

12 "working on his own," does he have a contract with someone

13 like ADT --

14           MR. O'HARA:  No.

15           THE COURT:  -- where he does work when --

16           MR. O'HARA:  My understanding is that he's

17 completely independent, and that he develops a client base

18 based on word of mouth.

19           THE COURT:  Okay.

20           MS. FOLEY:  I can confer with the agent who is

21 present in the courtroom, but I don't believe that --

22           THE COURT:  All right.  Why don't you confer --

23           MS. FOLEY:  -- information --

24           THE COURT:  Why don't you confer before you say

25 anything.

1        MR. O'HARA:  He has contractors who subcontract

2  the work to him, and he can confirm that.

3        MS. FOLEY:  Your Honor, the agent present today

4  doesn't have -- he can't say for sure.

5        THE COURT:  All right.  How long will it be when

6  you'll be -- have your ducks in a row with respect to what

7  the Government's going to do with Ms. L'Italien?

8        MS. FOLEY:  I believe in the next two weeks, Your

9  Honor.

10       THE COURT:  Okay.  All right.  Why don't I

11  schedule this for a further hearing actually in Worcester at

12  1:15 on the 23rd of August, and at that point in time the

13  Government can let me know what their latest thoughts are

14  with respect to Ms. L'Italien.

15       Mr. O'Hara, you can indicate to me what

16  arrangements have been made to secure a new location for her

17  and Mr. Napoleon to live at if I permit them to have

18  contact, and I think at that point we'll have a --

19       But in the next two weeks there's to be no

20  contact.

21       MS. FOLEY:  Your Honor, I'm scheduled to be out of

22  the office on business the 22nd and 23rd.

23       THE COURT:  Are you available by phone at 1:15?

24       MS. FOLEY:  I can be.

25       THE COURT:  Yeah, why don't you do it by phone.

1          MS. FOLEY:  At 1:15 on August 23rd?

2          THE COURT:  Yeah.

3          MS. FOLEY:  Thanks.

4          THE COURT:  Okay.  Mr. Napoleon, would you stand,

5 please?

6          I'm going to release you on conditions of release.

7 I'm going to go over those conditions of release with you

8 right now.

9          You are to live with your sister -- what's her

10 name, Noelle Travis?

11          DEFENDANT NAPOLEON:  Yes.

12          THE COURT:  You're to live with your sister at her

13 residence at Whitman, Massachusetts and in no other

14 location.

15          Do you understand that?

16          DEFENDANT NAPOLEON:  Yes.

17          THE COURT:  You're going to be under a curfew from

18 8 p.m. to 6 a.m.  You are to be in your residence during

19 that period of time.

20          Within a week you're to report to Pretrial

21 Services; that is, on or before next Wednesday.

22          August 16th you're to report to Pretrial in person

23 and present documents verifying your employment.  Contracts

24 you have where your work is done pursuant to contracts with

25 others, receipts; just documents to prove that, in fact, you

1 are engaged in a legitimate business and that it's full-time

2 self employment.

3          Do you understand that?

4          DEFENDANT NAPOLEON:  Yes.

5          THE COURT:  Your travel's restricted to

6 Massachusetts and New Hampshire.  You may travel freely

7 within those districts, but you may not travel outside them

8 without proof -- without a motion to the Court requesting

9 that your travel beyond those two states.

10          Do you understand that?

11          DEFENDANT NAPOLEON:  Yes.

12          THE COURT:  You are to submit weekly verification

13 of employment, as I say, starting next Wednesday to Pretrial

14 Services, and you are to submit to a drug test before you

15 leave today and at least weekly after that.

16          Do you understand that?

17          DEFENDANT NAPOLEON:  Yes.

18          THE COURT:  You're not to use or possess any

19 narcotic controlled substances including marijuana unless

20 prescribed by a licensed medical practitioner.

21          Do you understand that?

22          DEFENDANT NAPOLEON:  Yes.

23          THE COURT:  You are not to possess any firearms,

24 destructive devices or dangerous weapons, and there're to be

25 none in anyplace where you're residing.

1          Do you understand that?

2          DEFENDANT NAPOLEON:  Yes.

3          THE COURT:  If you are arrested or if you have any

4    contact with law enforcement of any kind, you are to report

5    that contact to Pretrial Services on the next working day.

6          Do you understand that?

7          DEFENDANT NAPOLEON:  Yes.

8          THE COURT:  You're not to use alcohol to excess.

9          Do you understand that?

10         DEFENDANT NAPOLEON:  Yes.

11         THE COURT:  You are to have no contact, either

12   directly or indirectly, except through your attorney with

13   any of the co-defendants in the case or with Ms. L'Italien.

14         Do you understand that?

15         DEFENDANT NAPOLEON:  Yes.

16         THE COURT:  In other words, you can't have someone

17   else contact them on your behalf.  That's an indirect

18   contact.  You can't contact them directly.  But you can

19   always contact your attorney, and he is free to contact any

20   of the co-defendants or Ms. L'Italien or anyone else.

21         Do you understand that?

22         DEFENDANT NAPOLEON:  Yes.

23         THE COURT:  Lastly, it's a condition of your

24   release that you not violate any federal, state or local

25   law.  You're also not to do any acts which obstruct justice.

1  You're not to intimidate, threaten or injure any witnesses.

2  You're not to intimate, threaten or injure any informants or

3  do any act to obstruct the judicial process.

4          Do you understand that?

5          DEFENDANT NAPOLEON:  Yes.

6          THE COURT:  Do you understand these conditions?

7          DEFENDANT NAPOLEON:  Yes.

8          THE COURT:  Do you agree to abide by them?

9          DEFENDANT NAPOLEON:  Yes.

10         THE COURT:  I'm obligated to advise you of the

11 consequences should you fail to comply with the conditions.

12         I don't have a date --

13         Well, I do have a date for you to come back to

14 court, actually, which will be 1:15 on the 23rd at the U.S.

15 District Court in Worcester, Massachusetts.  That's the next

16 time you're due in court.

17         After that I'm not sure there'll be a date that

18 we'll know when you'll be coming back.  But the important

19 thing that you've got to know is you've got to keep in

20 contact with Mr. O'Hara, because he'll always know whether

21 there's a court date, and he'll know whether your presence

22 is required.  There are a lot of court dates you don't have

23 to come to:  STATUS conferences, things of that sort.

24         But it's your responsibility to be here when

25 you're required to be here, and that responsibility includes

1  keeping in contact with your attorney so you know.

2  Do you understand that?

3  DEFENDANT NAPOLEON:  Yes.

4  THE COURT:  I'm obligated to advise you the

5  consequences should you fail to comply with these

6  conditions.

7  If you fail to show up on August 23rd or at any

8  other time when you're due in court, you face two

9  consequences:

10  One, a warrant issues for your arrest and upon

11  arrest you face detention;

12  And secondly, you will have committed a crime.

13  Because once you're released on conditions as I'm releasing

14  you today and you fail to show up in court, that's a

15  separate crime punishable by jail.  And it's not dependent

16  on what happens on the current charge.  You can be found not

17  guilty of all of them; but if you have failed to appear in

18  connection with them, you can be prosecuted and sent to jail

19  for failure to appear.

20  If you violate any other condition of your

21  release, a warrant issues for your arrest, and upon arrest

22  you face detention.

23  If you commit any crimes while on release and then

24  convicted, not only do you get sentenced for that crime but

25  then you get on and after -- mandatory on-and-after time in

1 federal jail, because you committed the crime while you were

2 on conditions of release.  So there's an added penalty now

3 if you commit any crime.  Do you understand?

4          DEFENDANT NAPOLEON:  Yes.

5          THE COURT:  Sir, at this point in time you're

6 being released.  Your continued release is entirely up to

7 you.  If you comply with these conditions, you'll be at

8 liberty until such time, if ever, that you're convicted of

9 the charges.  If you violate the conditions, the

10 consequences I described will occur.

11          So the ball's in your court.  Obey the conditions;

12 you'll be on release.  If you violate them, you're subject

13 to be going to jail and spending the time pending trial in

14 jail.

15          Do you understand?

16          DEFENDANT NAPOLEON:  Yes.

17          THE COURT:  Any questions?

18          DEFENDANT NAPOLEON:  No.

19          THE COURT:  All right.  Have a seat.  You're going

20 to have to sign the bail papers.  After you do that, the

21 marshals can take him down and release him, and upon release

22 you go directly to Pretrial.

23          Okay.  At this point we're going to have the

24 detention hearings with respect to Dennis Novicki, at least

25 the Government's portion of it; and with respect to Ms.

1 Costa, that will be a complete detention hearing.  So the

2 Government may go forward.

3          MS. FOLEY:  Yes, Your Honor.  Is Mr. Kosta going

4 to remain in the courtroom?

5          THE COURT:  His attorney said that he would like

6 him to; is that correct?

7          MR. GARRITY:  Judge, I may have misunderstood your

8 question.  I thought you asked if I was staying in on the

9 case in general, but --

10          THE COURT:  No, no.  I meant did you want to stay

11 for the hearings.

12          MR. GARRITY:  Oh, we do.

13          THE COURT:  Okay.  Go ahead, Ms. Foley.

14          MS. FOLEY:  Very well, Your Honor.

15          Your Honor, the Government calls FBI Agent Douglas

16 Schiele.

17          THE COURT:  You can come forward, sir.  Stand in

18 the witness box and raise your right hand.

19              FBI AGENT DOUGLAS R. SCHIELE, Sworn

20          THE COURT:  Please be seated, sir.

21                      DIRECT EXAMINATION

22 BY MS. FOLEY:

23 Q.   Good morning.  Can you please state your name for the

24 record and please spell your last name?

25 A.   It's Douglas R. Schiele, S-C-H-I-E-L-E.

1  Q.    I bungled your name, sorry.

2        Where do you work?

3  A.    I work for the FBI here in Boston.

4  Q.    How long have you been working in Boston with the FBI?

5  A.    Five and a half years.

6  Q.    All right.  And which unit are you working for right

7  now?

8  A.    Right now I'm on the OCDETF strike force, Organized

9  Crime Drug Enforcement Task Force.

10  Q.    How long have you been with that unit?

11  A.    About a year and a half.

12  Q.    And can you briefly discuss the types of cases that the

13  OCDETF strike force unit investigates?

14  A.    We investigate primarily large amounts of illegal drugs

15  transferring up from the -- a lot of cartel-based

16  trafficking.

17  Q.    All right.  And were you involved in an investigation

18  in the matter in which you're currently testifying today?

19  A.    Yes.

20  Q.    Since what date?

21  A.    Since April 2011.

22  Q.    All right.  And what was --

23        Can you briefly describe what your involvement has been

24  with this case?

25  A.    Umm, I've, you know, been the co-case agent on the case

1  supporting the main case agent.  I've done surveillance,

2  operated the Title III wire investigation.

3  Q.    Have you listened to some of the calls that were

4  intercepted during the course of this investigation?

5  A.    Yes, I have.

6  Q.    All right.  And have you also conducted surveillance?

7  A.    Yes.

8  Q.    Have you reviewed pole camera type of pictures and

9  videos?

10  A.    Yes, I have.

11  Q.    All right.  And did you review the search warrant

12  affidavit that was filed by Agent Steven Kelleher and signed

13  on August 6, 2012?

14  A.    I did.

15  Q.    And are you familiar with the contents of that

16  affidavit?

17  A.    Yes.

18  Q.    I'm going to ask you to look at this and identify it.

19  A.    Yep.  This is the affidavit that I reviewed.

20  Q.    All right.  And is this the affidavit that supported

21  the search warrants at 45 Riley Switch Road and 359 Maple

22  Street?

23  A.    It is.

24  Q.    And is everything in this affidavit, to the best of

25  your knowledge, true and accurate?

1 A.   Yes.

2 Q.   Was there any changes to the affidavit, any mistakes in

3 facts in the affidavit?

4 A.   Umm, when we reviewed it, we did see that on one page

5 there it mentioned that Tamara Kosta had visited a safe

6 deposit box two days prior to leaving Arizona.  We found out

7 -- we looked back at the records, and it was just one day

8 prior.

9      But aside from that, everything is true.

10 Q.   All right.  And if asked about the contents of the

11 affidavit, would you testify consistent with what is in the

12 affidavit?

13 A.   Yes.

14         MS. FOLEY:  Your Honor, I ask that Government

15 Exhibit 1 which is a warrant affidavit which has been

16 provided to counsel prior to today be admitted into

17 evidence.

18         THE COURT:  Any objection?

19         MR. O'HARA:  No, Your Honor.

20         MR. WATKINS:  No, Your Honor.

21         THE COURT:  All right.  It's admitted.

22     GOVERNMENT EXHIBIT NO. 1, ADMITTED

23 BY MS. FOLEY:

24 Q.   When did the FBI first become aware of the person named

25 John Kosta?

1 A.   Umm, it was in the fall of 2009.

2 Q.   And how did you first become aware of a person by the

3 name of John Kosta?

4 A.   We had a C.W., cooperating witness, who was in Mexico

5 talking to --

6 Q.   A supplier?

7 A.   Yes, a supplier in Mexico.

8      And he had mentioned that one of his contacts in the

9 Massachusetts area was an individual by the name of Kosta.

10 He ended up opening his phone, and on his phone he had a

11 picture of Kosta that the C.W. saw.  We ended up --

12 Q.   Did the supplier --

13      The drug supplier in Mexico, did he say what kind of

14 business that Kosta was apparently or purported to be

15 engaged in?

16 A.   Yes, a real estate business.

17 Q.   All right.  And go ahead.

18 A.   Oh, and said that he was -- would traffic loads of

19 marijuana from Arizona to Massachusetts.

20      All we knew was that his name was Kosta.  We ended up

21 identifying an individual, showed the C.W. the picture, and

22 he said that is the picture that I saw on the phone.

23 Q.   Okay.  And --

24 A.   The same individual; not the same picture.

25 Q.   In September of 2010 did you obtain court authorization

1  to obtain cell site information for a phone that was used by

2  that supplier?

3  A.   Yes.

4  Q.   And did the GPS location information from that phone

5  show that that person was in Massachusetts on September 3rd

6  and 4th of 2010?

7  A.   Yes.

8  Q.   And did agents actually observe the supplier in

9  Massachusetts with other of his associates?

10 A.   They did.

11 Q.   And can you tell the Court what those agents observed?

12 A.   Uh, they observed, uh, four vehicles at the Burlington

13 Mall.  The individuals had the trunks and backs open of the

14 vehicles.  They were exchanging bags from vehicle to

15 vehicle.

16      Umm, one of the agents saw an individual open one of

17 the bags, remove a wad of cash, look at it and then put it

18 back in the bags.

19 Q.   And based on those observations, did you obtain a pin

20 register or toll information for the phone that was known to

21 be used by that supplier?

22 A.   We did.

23 Q.   And was there contact between that supplier and John

24 Kosta from that phone?

25 A.   There was.

1  Q.   And at that time did you start conducting surveillance

2  and investigating John Kosta?

3  A.   We did.

4  Q.   Did you learn that John Kosta traveled frequently

5  between Massachusetts and Arizona?

6  A.   Yes.

7  Q.   And did he have a house located in Paradise Valley,

8  Arizona that he rented?

9  A.   Yes.

10 Q.   In November of two thousand -- I'm sorry.  Backing up.

11      Do you know if the state police in Arizona conducted a

12 trash pull located outside of the house of the residence

13 that Tamara and John Kosta rented in 2010?

14 A.   They did.

15 Q.   And was that in April and May of 2010?

16 A.   Yes, I believe so.

17 Q.   Approximately.

18      And did they conduct more than one trash pull?

19 A.   Yes.

20 Q.   And do you recall what was recovered in that trash

21 pull?

22 A.   I remember, umm, the most significant items were

23 contact paper, other wrappings of marijuana.  No marijuana

24 in it, but that had smelled like marijuana.

25 Q.   Were there any items that identified the Kostas in that

1  trash pull such as cell phone numbers or bank account

2  information or tax records?

3  A.   Umm, I'm not sure at this time.

4  Q.   All right.  That's fine.  I'm going to refer you to --

5       Is there anything that can refresh your recollection?

6  A.   Sure, I'm sure the search warrant would.

7  Q.   Okay.  I'm referring you -- ask you to look at

8  Paragraph 13 of Government Exhibit 1.

9  A.   Oh, right.  Okay.

10 Q.   All right.  So did this refresh your recollection?

11 A.   Yes.  I had forgotten that the ledger was in there

12 along with tax records and also some income analysis.

13 Q.   All right.  And did that income analysis indicate that

14 John Kosta was claiming $3,000 a month in income?

15 A.   Yes, with a $15,000 bonus.

16 Q.   And was there also marijuana packaging materials:  duct

17 tape and vacuum seal bags?

18 A.   Yes.

19 Q.   And a ledger annotating several hundred pounds of

20 marijuana.

21 A.   Yes.

22 Q.   In December of 2010 was the FBI -- was the Arizona

23 state police conducting a wire tap investigation involving

24 different targets in Arizona?

25 A.   Yes.

1  Q.   And do you know if the same supplier who had Kosta's

2  information in his phone and who was seen in Massachusetts,

3  was that person intercepted on this wire?

4  A.   He was.

5  Q.   And did Arizona State Police follow that supplier based

6  on the intercepted calls and based on the GPS location

7  information from the phone?

8  A.   They did.

9  Q.   And did they surveil that supplier to the Kosta's home

10 --

11 A.   They did.

12 Q.   -- in Arizona?

13      And did they follow the supplier after he left Kosta's

14 home in Arizona?

15 A.   Yes, they did.

16 Q.   And this in December of 2010.

17 A.   Yes.

18 Q.   All right.  And what, if anything, did they find in the

19 supplier's car after he left the Kosta's?

20 A.   Uh, they initiated a traffic stop and found $285,000 in

21 cash.

22 Q.   And was it -- and this was on December 12 of 2010.

23 A.   Yes.

24 Q.   Did bank records show that Tamara Kosta had accessed

25 the safety deposit box in Arizona the day prior to the

1  seizure of $285,000 in cash?

2  A.   Yes.

3  Q.   And at anytime did you intercept calls between Kosta

4  and the supplier?

5  A.   Yes.

6  Q.   And did the supplier reference owing Mr. Kosta a large

7  sum of money?

8  A.   He did.  He had referenced owing him a quarter.

9  Q.   Now, the pole camera, was there a pole camera situated

10 outside of the Kosta's residence in Arizona?

11 A.   Yes.

12 Q.   And was there also a pole camera situated outside of

13 their residence in Phillipston, Massachusetts?

14 A.   Yes, there was.

15 Q.   And was that pole camera operating in 2011 in Arizona?

16 A.   Yes.

17 Q.   And is there any evidence from the pole camera that

18 other co-defendants in this case were in Arizona in November

19 of 2011?

20 A.   Yes.

21 Q.   And was that co-defendant Donald McCormick?

22 A.   Yes, it is.

23 Q.   All right.  And can you tell the Court specifically if

24 you had -- what you observed on the pole camera on November

25 23rd of 2011?

1  A.    Okay.  We, uh, observed Donald McCormick's white Chevy

2  Silverado parked in John Kosta's driveway with no license

3  plates on it, and later that day it was rolled into the

4  garage, and the garage door was closed.

5  Q.    And when the truck re-emerged, did it have license

6  plates on it?

7  A.    It did.

8  Q.    And did it also have a bike rack and a bicycle attached

9  to the rear?

10  A.    Yes.

11  Q.    And did surveillance observe that truck and Kosta's

12  vehicle departing the residence at Paradise Valley?

13  A.    Yes.  I think that was on the 24th.

14  Q.    Okay.  And did the pole camera in Massachusetts -- at

15  Phillipston, Massachusetts capture the arrival of the same

16  white pickup truck with the bike rack and John Kosta's

17  vehicle?

18  A.    Yes, it did.  On the 27th a little after 11:30 in the

19  morning both vehicles arrived.

20  Q.    Did the white pickup truck still have the Colorado

21  plates?

22  A.    No.  At that time it had commercial Massachusetts

23  plates on it.

24  Q.    And thinking back to all the calls that you reviewed

25  that were intercepted on Mr. Kosta's phone, did Mr. Kosta

1 ever talk with a different supplier -- marijuana supplier

2 about having an extra set of commercial plates?

3 A.   Yes, he did.

4 Q.   Now, Mr. Kosta's vehicle and Mr. McCormick's vehicle

5 arrived on November 27th, 2011.

6 A.   Yes.

7 Q.   Was there any evidence that Dennis Novicki also arrived

8 at the Kosta's residence in Massachusetts around that time?

9 A.   Yes.  On the morning of the 28th, the day after, at

10 approximately eight in the morning we saw Dennis Novicki's

11 truck pull in through the driveway.

12 Q.   All right.  And did you also obtain a receipt from a

13 Hampton Inn hotel in Scottsdale, Arizona which showed that

14 Mr. McCormick had stayed at that Hampton Inn between

15 November 23rd and November 24th?

16 A.   We did.

17 Q.   Now, after -- can you describe the road that leads to

18 the Kosta's residence in Phillipston?

19 A.   It's a very -- the area is very country.  Umm, it's a

20 very lightly-traveled road.  You can come in two ways,

21 though, to the address but lightly traveled.

22 Q.   And is the house situated on a large piece of property?

23 A.   It is.

24 Q.   And is it surrounded by a stockade fence?

25 A.   Yes.

1 Q.    And are there any sheds or buildings located on the

2 property also?

3 A.    Umm, within the fence there is a conex box, a trailer,

4 a shed, and then on the outskirts of the fence --

5        Because it's 27 acres.  I think 25 acres

6        -- there are also several tree houses in the woods.

7 Q.    Was there any type of security system that was on the

8 perimeter inside out of the Kosta's property?

9 A.    Yeah.  Aside from the fence, they had multiple cameras

10 on the house, a pole camera in the yard, cameras in the

11 woods in tree houses, as well.

12 Q.    There was a camera in the tree house?

13 A.    Near the tree house.

14 Q.    All right.  And were those pole cameras, could they

15 observe any traffic coming in and out of -- on the road that

16 led to their property?

17 A.    I believe so.  From the road you could definitely see

18 the pole camera.

19 Q.    Did you go into the Kosta's home on August 7 when the

20 search warrant was being executed?

21 A.    I did.

22 Q.    Was there any evidence inside the house that there was

23 a type of security -- any type of equipment inside that

24 could allow someone inside to monitor the security cameras

25 on the outside?

1  A.    In the basement there was an older monitor and kind of

2  a DVR recording system that looked like it had been used in

3  the past, but upstairs there was a laptop with − −I think

4  that had, uh, newer capabilities.

5  Q.    And was there a flat screen TV --

6  A.    There was.

7  Q.    -- that was attached to some sort of joy stick that

8  allowed a person to --

9  A.    To toggle between --

10  Q.    -- view the multiple cameras?

11  A.    Yes, toggle between the cameras.

12  Q.    After you observed Kosta's vehicle, McCormick's vehicle

13  and Novicki's vehicle arrive in Phillipston between November

14  27th and November 28th, did you notice any type of increase

15  in traffic on the road that led to the Kosta's residence?

16  A.    Umm, yeah.  Several vehicles arrived on the 28th.

17  Q.    All right.  And on December 4, 2011 did you observe a

18  golden Accura MDX that was known to be operated by Alexander

19  Napoleon arrive?

20  A.    I did.

21  Q.    And was Napoleon stopped after he left the Kosta's

22  house?

23  A.    He was.

24  Q.    And do you know what was in his car when he was

25  stopped?

1  A.    Yeah.   They ended up finding 46 pounds of marijuana

2  wrapped in two bails.

3  Q.    Do you know --

4        How was it packaged?

5  A.    It was wrapped in contact paper that was white with

6  golden specs on it.

7  Q.    And did one of them have the letter "K" marked on it

8  with a circle around it?

9  A.    Yes, they both had the number of pounds on one side and

10 then one had a "K" wrapped in a circle.

11 Q.    And for the record, John Kosta spells his name with a

12 K.

13 A.    He does.

14 Q.    Was the contact paper that the marijuana was wrapped in

15 that was seized from Napoleon, was that sent to Arizona to

16 determine whether it was the same type of contact paper that

17 was pulled from the Kosta's residence in Arizona?

18 A.    It was.

19 Q.    And did they conclude that it was?

20 A.    Yes.

21 Q.    After -- did Mr. Napoleon have any phones with him when

22 he was stopped?

23 A.    He did.

24 Q.    Can you tell the Court like what kind of phones they

25 were?

1  A.    Yeah, they had -- one was a smart phone type of phone

2  that looked like, you know, anybody's personal phone.

3  Contacts, you know.

4       And then one phone was a simple flip phone.  No

5  contacts in it.  The phone had only been in touch with one

6  other phone, and there were just a couple of texts on it.

7  Q.    All right.  And did it have one text that was written

8  but not sent?

9  A.    Right.

10 Q.    What did it say?

11 A.    When he was pulled over, surveillance units said that

12 they saw him trying to send a text or texting, and he ended

13 up sending -- or not sending, but typing dies, D-I-E-S.

14 Q.    Now, did you pull the phone records that was associated

15 with that phone?

16 A.    We did.

17 Q.    And it only had contact with one other phone?

18 A.    Yes.

19 Q.    Did you pull the phone records from that phone?

20 A.    Yes.

21 Q.    Was there a subscriber?

22 A.    No.

23 Q.    Did it have contact with anybody other than the phone

24 that was in the possession of Napoleon?

25 A.    No.

1  Q.   Were there other texts sent from the phone that

2  Napoleon had in his -- Alexander Napoleon had in his

3  possession?

4  A.   There were.

5  Q.   And do you recall in general?

6  A.   One was to the effect of quarter bag is ready.

7  Something to that effect.

8  Q.   Okay.  After this -- Napoleon's arrest and stop --

9  arrest in December 4, 2011; do you know if John Kosta went

10  back to Arizona?

11  A.   Uh, he did.

12  Q.   And were you intercepting his calls on December 17,

13  2011?

14  A.   Yes.

15  Q.   And did he have a conversation that was intercepted

16  with the same supplier who had originally shown the C.W.

17  John Kosta's photograph?

18  A.   He did.

19  Q.   And during that call did John Kosta tell the supplier

20  that he would -- the supplier was going to send his daughter

21  to Kosta's house?

22  A.   He did.

23  Q.   And that Kosta was going to supply him two phones, and

24  that he had effectively bought a three network of phones,

25  and that the phones would be pre-programmed with a new phone

1  number?

2  A.    Right.

3  Q.    And on the next day when the supplier was supposed to

4  be sending the daughter, at the same time of day did

5  surveillance observe a woman arrive at John Kosta's Paradise

6  Valley home?

7  A.    They did.

8  Q.    In that same call did John Kosta refer to -- reference

9  a note that he had received from the supplier --

10  A.    He did.

11  Q.    -- asking him to call?

12        And did he, in fact, call a person in Mexico?

13  A.    He did.

14  Q.    And that was the call that was intercepted.

15  A.    Yes.

16  Q.    Did you find that note during the search of John

17  Kosta's house?

18  A.    We -- we think that we did.

19  Q.    It seemed to --

20  A.    I mean, it definitely fit the situation.  You know, I

21  can't say if it's the same note, but.

22  Q.    Did it have a Mexican phone number?

23  A.    It did, and the name of the supplier.

24  Q.    Who you know to be the same person --

25  A.    Yes.

1  Q.   -- that we've been talking about.

2       And is that the person who has not been arrested in

3  this case?

4  A.   Right.

5          MS. FOLEY:  I'm sure the Court understood why I

6  wasn't saying his name, that it's still under seal.

7          THE COURT:  Okay.

8  Q.   On December 17th did Mr. Kosta also have contact in

9  intercepted calls with a person who he referred to as

10 "Tony"?

11 A.   Yes.

12 Q.   And is that indicted defendant Nestor Antonia Verduzco?

13 A.   It is.

14 Q.   And what was the gist of that conversation?

15 A.   Umm, they discussed, umm, uh, Tony having -- being able

16 to access a thousand pounds.  We inferred it was a thousand

17 pounds of marijuana.  They didn't say that explicitly, but

18 he did say a thousand.

19 Q.   And did he say that he was going to be sending a sample

20 over to John Kosta's house --

21 A.   He did.

22 Q.   -- in Paradise Valley, Arizona?

23 A.   Yes.

24 Q.   And did he ask where he was supposed to go?

25 A.   No.

1  Q.   Did he appear to know where Kosta lived?

2  A.   Yes.

3  Q.   And did you -- Arizona State Police observe a van

4  arriving at John Kosta's house --

5  A.   They did.

6  Q.   -- later that day?

7       And was that person stopped as he was leaving?

8  A.   Yes.

9  Q.   And was there a strong odor of marijuana detected from

10 the van?

11 A.   There was.

12 Q.   And between December 18th and I believe the 22nd did

13 surveillance in pole camera capture what the FBI believes is

14 the delivery of the 1,000 pounds?

15 A.   Yes.

16 Q.   And the last part of the delivery was on December 31,

17 2011.

18 A.   I believe so.

19 Q.   All right.  I'm going to show you what's been marked

20 for identification as Government Exhibit 2.

21      Have you reviewed this?

22 A.   I have.

23 Q.   And can you tell the Court what it is?

24 A.   Yes.  That's a call between John Kosta and -- and

25 Dennis Novicki discussing --

1      Yeah, Kosta informed him -- asked Novicki if he could

2 have his address.  He needed to send him a new phone number,

3 because he didn't feel comfortable talking on the one he

4 had.  He asked him not to name the street, but just to

5 refresh his memory on the number.

6 Q.   All right.  And did Novicki say that's what I've been

7 waiting for?

8 A.   I know they -- they talked about a load moving on the

9 28th still being ready for the 28th.

10 Q.   And if you look on the line sheet --

11 A.   Oh, yeah.  "That's what I've been waiting for, buddy."

12 Q.   Okay.  And did Kosta talk about going to check

13 something out when he finishes this next job?

14 A.   Yes.

15 Q.   All right.  And at some point did Kosta say I don't

16 want to talk on this line.  Call me back when you get the

17 other number?

18 A.   That sounds right.  I just want to be sure.  Which page

19 is this?

20 Q.   I'm going to direct your attention to about two thirds

21 of the way down.

22 A.   Oh, there you go, yeah.

23 Q.   Where he says, "That's right.  That's right.  I don't

24 even want to talk on this line.  I just wanted to call you

25 --

1 A.   "...call you real quick."

2 Q.   -- real quick."

3 A.   Yes.

4 Q.   And then he says can you get -- "When you get the other

5 number, can you also go?  We got to talk to the other guy

6 there."

7 A.   Uh-Huh.

8 Q.   And Dennis Novicki says, "I'll go by and see him," and

9 Kosta replies, "Yes, you can," or, "Yes, you can go by and

10 see that guy.  I don't care.  If I don't know -- when you

11 get a chance, maybe you can call me back on this line

12 actually, and I can talk to him on this line," and Novicki

13 replies that he will call him back tomorrow.

14 A.   Yes.

15 Q.   And this conversation was on December 18th, a couple of

16 weeks after Alexander Napoleon had been arrested.

17 A.   It was.

18          MS. FOLEY:  Your Honor, I ask that Government

19 Exhibit No. 2 be admitted.

20          THE COURT:  Any objection?

21          MR. O'HARA:  No.

22          MR. WATKINS:  No objection.

23          THE COURT:  All right.  It's admitted.

24      GOVERNMENT EXHIBIT NO. 2, ADMITTED

25 BY MS. FOLEY:

1  Q.    So that call referenced something that was going to

2  happen on December 28.

3       Do you know what Dennis Novicki did -- or where he was

4  on December 31st?

5  A.    No.

6  Q.    Did you make any -- did he travel anywhere --

7  A.    Yes.

8  Q.    I'm sorry -- on January 2nd?

9  A.    Yes.  Yeah, on the second he drove to Providence

10 airport and flew to Indianapolis.

11 Q.    And what did he do when he got to Indianapolis?

12 A.    He drove to -- well, actually it might have been a few

13 days before that, because he ended up driving from

14 Indianapolis to Arizona, and I think he arrived on either

15 the second or the third.

16 Q.    So he left Massachusetts, drove to Rhode Island, --

17 A.    Yes.

18 Q.    -- flew to Indianapolis, --

19 A.    Right.

20 Q.    -- and then drove from Indianapolis to Arizona.

21 A.    That's correct.  He rented a dodge Durango in

22 Indianapolis and drove to Arizona.

23 Q.    And when he arrived in Arizona, who did he meet with?

24 A.    He stayed at the Country Inn and Suites in Scottsdale,

25 and on the morning of the third, I believe, John Kosta

1 picked him up.

2 Q.    Did you observe Mr. Novicki making any purchases while

3 he was in Arizona?

4 A.    Yes.  On January 3rd surveillance units followed him to

5 a Best Buy where he purchased a Boost Mobile prepaid cell

6 phone.

7 Q.    Who was it subscribed to?

8 A.    Umm, I don't think it had a subscriber name.

9 Q.    And did surveillance -- also surveillance units also

10 see John Kosta go to that same Best Buy after Mr. Novicki?

11 A.    They did.  I think on the fourth they saw John Kosta go

12 to the Best Buy and buy two prepaid phones, cell phones.

13 Q.    Subscribed in his name?

14 A.    No.  Umm, made up names, I think, or no name.

15 Q.    All right.  And was Mr. McCormick --

16      Was there any evidence that Mr. McCormick was also in

17 Arizona on January 3rd/4th, 2012?

18 A.    Yes.  The McCormick's same white Chevy Silverado was in

19 the driveway or arrived in the driveway I think on the

20 third, in John Kosta's driveway.

21 Q.    And this was a week after surveillance observed

22 Verduzco and his couriers bringing the marijuana -- or what

23 appeared --

24      Well, can you describe to the Court what surveillance

25 observed with regard to Verduzco and the people he was with?

1 A.   Right.   Surveillance I think it was four different

2 times they witnessed Verduzco or one of Verduzco's

3 associates escorting a van or some type of vehicle that

4 would arrive at Kosta's house, pull into the driveway, pull

5 into the garage.   The driver would leave and hop in

6 Verduzco's car, and they would --

7 Q.   Would the doors remain open on the garage?

8 A.   No, no.   The doors would shut.

9      And then they would be gone for an hour, or a time

10 about maybe approximately an hour they would come back,

11 retrieve the vehicle, and then both vehicles would leave.

12 Q.   And surveillance observed that it was actually Verduzco

13 who was driving the car that accompanied the other car that

14 was pulled into Kosta's --

15 A.   Yes.

16 Q.   -- garage.

17 A.   I think it was a Chevy Malibu driven by Verduzco.

18 Q.   And this same thing happened on four occasions when the

19 car would be pulled into the Kosta's garage, the garage door

20 would close and then later leave.

21 A.   Yes.

22 Q.   And then about a week later Mr. Novicki arrives --

23 A.   Uh-Huh.   Correct.

24 Q.   -- with Mr. McCormick's truck.

25      Now, was there ever a time when Mr. McCormick's white

1 truck was pulled into the garage?

2 A.    Yes, I believe on the third it was pulled in.

3 Q.    And when it came out of the garage, did it have

4 anything different attached to it?

5 A.    Uh, it had the bike rack and the bicycle on the back as

6 it did in late November.

7 Q.    And was the back bed of the pickup truck exposed?

8 A.    It was not.  It was covered with one of the camper

9 shells that tinted out the vehicle.

10 Q.    And on January 4, 2012 did surveillance observe Kosta's

11 vehicle, McCormick's vehicle and Novicki departing Arizona?

12 A.    They did.  They witnessed the -- Kosta's silver --

13 Chevy Silverado, McCormick's white Silverado with the camper

14 shell and the mountain bike on the back, and Novicki's

15 rented Durango all leave the residence kind of in convoy.

16 Q.    Was the FBI intercepting the calls on the phones that

17 Novicki and Kosta had purchased in the Best Buy?

18 A.    Uh, we were not.

19 Q.    Were you attempting to?

20 A.    We were attempting to, but we could not get

21 authorization.

22 Q.    Was authorization pending?

23 A.    Yes.

24 Q.    Were you obtaining cell site location information and

25 pin register or toll information from those three phones?

1  A.   That we were, because we were authorized.

2  Q.   Were the phones communicating with each other?

3  A.   They were.

4  Q.   And were the phones --

5       Did you have cell site information from those phones?

6  A.   We did.

7  Q.   And did the cell site information show that the phones

8  were traveling --

9  A.   Yes.

10  Q.   -- from Arizona going it up north --

11  A.   Yep.

12  Q.   -- to South Dakota?

13  A.   South Dakota before they began to turn east.

14  Q.   Right.  And on January 6, 2012 --

15  A.   Yes.

16  Q.   -- was Mr. McCormick's truck stopped in --

17  A.   It was.

18  Q.   -- South Dakota for speeding?

19  A.   Yes, it was.

20  Q.   And did the trooper observe that truck to be traveling

21  with any other car?

22  A.   He did.

23  Q.   Was that car stopped?

24  A.   It was not.

25  Q.   Did the FBI tell South Dakota not to stop that other

1 car?

2 A.    Umm, no.  No, we didn't tell them not to stop it.  They

3 just, you know, zeroed in on the one car because of the

4 speed.

5 Q.    Okay.  And what was Mr. McCormick traveling with?

6 A.    He was traveling with 980 pounds of marijuana tucked in

7 the bed of the pickup truck.

8 Q.    Did the cell site information from John Kosta's phone

9 reveal that within hours of the stop of McCormick, he too,

10 was in South Dakota?

11 A.    It did.

12 Q.    And on January 9, 2012 did the pole camera capture John

13 Kosta arriving at his Phillipston home?

14 A.    Yes, it did.

15 Q.    And did an hour and a half later it also show Dennis

16 Novicki arriving?

17 A.    It did.

18 Q.    Do you know how Dennis Novicki got back to Boston after

19 being in South Dakota?

20 A.    It appears that he came back the same way he left.  He

21 drove to Indianapolis, I'm assuming returned the rental car

22 and flew from Indianapolis back to Providence.

23 Q.    And then an hour and a half after Mr. Kosta arrived,

24 Dennis Novicki arrived.

25 A.    Yes.

1  Q.   Do you know if any phones were identified as being used

2  by Tamara Kosta during the course of the investigation?

3  A.   Yes.

4  Q.   Do you know how many?

5  A.   Umm, --

6  Q.   Was there more than one?

7  A.   There was more than one.

8  Q.   Were those phones subscribed to her in her name?

9  A.   No.

10 Q.   Were they fictitious names?

11 A.   Yeah.  One was Mrs. Pumpkin.

12 Q.   Do you know --

13 A.   That I recall.

14 Q.   -- how many phones Tamara Kosta had in her possession

15 when she was arrested on August 7, 2012?

16 A.   Two phones.

17 Q.   Do you know how many phones were found in the Kosta's

18 house?

19 A.   Umm, I believe at least five.  I think I counted five.

20 Q.   After the January 6th stop of Napoleon and the seizure

21 of the marijuana, do you know -- did you intercept Mr. Kosta

22 and Mr. Novicki talking again?

23 A.   We did.

24 Q.   All right.  And after that stop did you begin

25 intercepting Dennis Novicki's phones --

1 A.   Yes, we did.

2 Q.   -- or a phone that he used?

3      I'm showing you what's been marked for identification

4 as 3, 4 and 5.

5      Did you intercept Mr. Novicki's phones for

6 approximately a month?

7 A.   Yes.

8 Q.   I'm show you something that's been marked for

9 identification as Government Exhibit 3.

10      Do you recognize this?

11 A.   Uh, yes, I do.

12 Q.   Is this a line sheet from the phone -- or the

13 conversation which summarizes the phone conversation that

14 Dennis Novicki had on January 30, 2012?

15 A.   Yes.

16 Q.   And can you just tell the Court --

17           MS. FOLEY:  The Government moves Government

18 Exhibit 3 into evidence.

19           THE COURT:  Any objection?

20           MR. O'HARA:  No object -- oh, sorry.

21           MR. WATKINS:  No objection at 3, 4 or 5.

22           THE COURT:  Is that true of you, also?

23           MR. O'HARA:  Yes, Your Honor.

24           THE COURT:  All right.  Foley.

25      GOVERNMENT EXHIBIT NO. 3, ADMITTED

63

1 BY MS. FOLEY:

2 Q.   And as the gist of that conversation with --

3      Was the person with whom he was speaking identified?

4 A.   No.   Unidentified male.

5 Q.   Was the gist of that conversation about purchasing

6 drugs?

7 A.   It appeared to be.

8 Q.   All right.   I'm showing you Government Exhibit 4.   Do

9 you recognize this?

10 A.   Yes.

11 Q.   Is this a transcript of a call involving Dennis Novicki

12 and another individual by the name of Kevin Downey he that

13 was intercepted?

14 A.   Yes, it is.

15        MS. FOLEY:   Your Honor, the Government asks that

16 Government Exhibit 4 be admitted into evidence.

17        THE COURT:   All right.   Yeah, three and four are

18 admitted.

19      GOVERNMENT EXHIBIT NO. 4, ADMITTED

20 BY MS. FOLEY:

21 Q.   And in Government Exhibit 4, does Novicki talk about

22 the stop that happened in South Dakota?

23 A.   He does.

24 Q.   And does he say that he was there when it happened?

25 A.   He does.   He, uh --

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

1      They were talking about why the individual got pulled

2 over -- or why McCormick got pulled over.  They didn't name

3 McCormick.  Dennis Novicki said speeding.  Umm, you know, he

4 ends up saying I was speeding, but he wasn't.  He had 980

5 reasons not to speed.

6 Q.   All right.  And prior to that does he talk about how

7 things went bad and went really bad?

8 A.   Yeah.

9 Q.   Okay.

10 A.   Yeah, he said they went bad, but I was able to keep

11 going.

12 Q.   And in the beginning of the conversation did he talk

13 about losing a lot?

14 A.   He does.  He says he lost a lot.  "Lost a lot, buddy."

15 Q.   All right.  And the last -- Government Exhibit 5, do

16 you recognize this?

17 A.   I do.

18 Q.   And is this another conversation that was intercepted

19 between Dennis Novicki and an unknown person?

20 A.   It is.

21 Q.   And in that conversation did Dennis Novicki refer to

22 the South Dakota seizure?

23 A.   He did.  He --

24 Q.   Go ahead.

25 A.   No.  He said he lost a lot of money, and during the

1 discussion he said if you want to Google it, you can Google

2 the Ipswich man that was arrested in South Dakota.

3 Q.   All right.  And was Donald McCormick, in fact, from

4 Ipswich?

5 A.   He is.

6 Q.   When you executed --

7        THE COURT:  Excuse me.  Are you moving to admit 5?

8        MS. FOLEY:  I'm sorry, Your Honor, yes.

9 Government exhibit -- moves Government Exhibit 5 into

10 evidence.

11        THE COURT:  All right.  It's without objection, so

12 it's admitted.

13     GOVERNMENT EXHIBIT NO. 5, ADMITTED.

14 BY MS. FOLEY:

15 Q.   The Kosta's residence.  Who lived at 45 Riley Switch

16 Road?

17 A.   Umm, on the morning of the seventh it was John Kosta,

18 Tamara Kosta and eight of their children.

19 Q.   Do you know how long Tamara Kosta had been living

20 there?

21 A.   I don't know exactly how long.  Umm, --

22 Q.   Did you ever know her --

23 A.   I'm not sure.

24 Q.   -- to spend time at a different residence?

25 A.   Umm, just the residence in Arizona.

1  Q.   When did the Kostas stop renting the residence in

2  Arizona?  Was it in February of 2012?

3  A.   Earlier this year.  Yeah, late January or early

4  February I believe.

5  Q.   Was it after the seizure of the 980 pound of marijuana?

6  A.   It was.

7  Q.   And did they move their entire family to Massachusetts?

8  A.   Umm, we believed that they did.  Now we think that two

9  of their sons may still be in Arizona.

10 Q.   Okay.  How many firearms were found at the residence

11 that was occupied by John and Tamara Kosta?

12 A.   Twenty-five.

13 Q.   Was there a gun safe that was located in the house?

14 A.   There was.

15 Q.   How many firearms were in the gun safe?

16 A.   Eighteen.

17 Q.   And can you describe the room in which that gun safe

18 was located?

19 A.   It was located in the closet of a room that, umm, was

20 set up partially as a bedroom and partially as a -- maybe an

21 office.

22 Q.   Did it have any indicia inside that led you to believe

23 that it was Tamara Kosta's room?

24 A.   Yeah.  I mean, some of her stuff was in there, clothes.

25      In the bed there were two --

1      There was a bed in there and then a smaller bed.

2  Q.   A toddler bed?

3  A.   Yes.

4  Q.   And of their eight kids who were living at 45 Riley

5  Switch Road, was one a girl?

6  A.   Yes.

7  Q.   And the rest were boys.

8  A.   Yes.

9  Q.   And is it your understanding that the boys lived

10  together in one room, and the girl slept in that room --

11  A.   That's my understanding.

12  Q.   -- where the gun safe was?

13      Did that room have a lock on the door, if you know?

14  A.   I mean, I think it was a normal doorknob, so you

15  probably could lock it.

16  Q.   Did it say "Tamara's Office" on the door?

17  A.   It did.

18  Q.   Inside was -- were there any firearms in that room

19  other than the ones that were in the safe?

20  A.   There was a loaded Glock handgun in kind of the

21  dresser/armoire.

22  Q.   Was that locked in any way?

23  A.   No.

24  Q.   Was there also candy found in the drawer surrounding

25  where the loaded Glock was?

1 A.   There was.

2 Q.   Were there six additional guns located in a different

3 room?

4 A.   Yes, in the front room -- I guess the master bedroom

5 area, -- there were six handguns.

6 Q.   Whose stuff was in that room?

7 A.   That appeared to be John Kosta's room.

8 Q.   Were there also marijuana plants growing in there?

9 A.   There were.

10 Q.   Twelve marijuana plants?

11 A.   Approximately twelve I believe.

12 Q.   And the six handguns that were in this room, were any

13 of them locked?

14 A.   No, I don't believe so.

15 Q.   Were any of them loaded?

16 A.   Yes.

17 Q.   Did one actually have a loaded .44 caliber with a scope

18 on it?

19 A.   Yeah, a quick scope.

20 Q.   Was there also additional 90 marijuana plants found

21 growing in the basement?

22 A.   Yes.

23 Q.   And was there any type of system set up to make sure

24 that these plants flourished?

25 A.   Yeah, they had the -- you know, the lights set up, the

1 converters, the timers for the lights.

2 Q.   Tamara Kosta's purse, do you know if that was found

3 inside the room where she appeared to sleep?

4 A.   I believe it was.

5 Q.   And was there $3800 in cash and loose rounds of

6 ammunition found in her purse?

7 A.   Yes.

8 Q.   Was there also a bulletproof vest found in that room?

9 A.   There was.

10 Q.   Was there a stun gun found in that room?

11 A.   Yes.

12 Q.   Underneath the bed?

13 A.   Yes.

14 Q.   Easily accessible by a child?

15 A.   Yes.

16 Q.   Was there ammunition found in the search of the house?

17 A.   There was.

18 Q.   Small amounts?  Large amounts?

19 A.   Large amounts, I would say.  Some in the safe; some not

20 in the safe.

21 Q.   Were there actually fireworks that were found in the --

22 outside of the house?

23 A.   There were.

24 Q.   And was there any concern that was raised by anyone

25 during trying to remove these fireworks?

1 A.   Yeah.  We had to call the state police in -- the

2 Massachusetts State Police -- one of their bomb techs into

3 the area, and he had -- he wasn't even sure he wanted to

4 transport them.  He had to make some calls.  He said they

5 were very sensitive to static electricity.

6 Q.   Were they professional-grade fireworks?

7 A.   They were.

8 Q.   The 90 plants that were growing in the basement, was

9 there also marijuana that had been cultivated and packaged

10 found in the basement?

11 A.   There were.  There were some stems hanging that were

12 still drying; and then, uh, there was a Tupperware bowl

13 about this big that was stuffed with buds that were ready to

14 go.

15 Q.   And the plants that were hanging --

16            THE COURT:  Stuffed with what?

17            THE WITNESS:  Oh, umm, just the buds of the

18 marijuana.

19            THE COURT:  Buds.  Thank you.

20            THE WITNESS:  Sorry.

21 BY MS. FOLEY:

22 Q.   And the plants where were hanging, were they hanging --

23 were they tacked to poles that were -- or wooden beams in

24 the basement?

25 A.   Uh, yes.

1  Q.    And was there any evidence of kids being in the

2  basement?

3  A.    Umm, there were kids' names on some of the 2 x 4s, the

4  structure of the basement, the supports.

5  Q.    And was that like sort of tracking their growth, or was

6  it just their names signed?

7  A.    I didn't see any markings for growth.

8          THE COURT:  Excuse me.  How much more do you have,

9  Ms. Foley?

10         MS. FOLEY:  Very briefly, Your Honor.

11         THE COURT:  Because I've got to do two grand jury

12 returns and be at Fanuel Hall at 1:30 do a actualization,

13 so.  I'd like to complete your examination, and then we'll

14 continue it to two o'clock.  So move it right along, please.

15         MS. FOLEY:  Yes.

16 Q.    When Tamara Kosta was arrested, did she make any

17 statements about the guns that were in her house?

18 A.    Uh, she said that she owned the 18 guns that were in

19 the safe.

20 Q.    Did she say anything about the additional guns?

21 A.    She did not.

22 Q.    Do you know if Tamara Kosta has an F.I.D. card which

23 allows her to possess firearms?

24 A.    No, she doesn't.

25 Q.    Does she have an expired license to carry in

1 Massachusetts?

2 A.   Yes.

3 Q.   Did you find Jet Blue airline firearm's claim checks

4 for the flights in which she's checking -- or somebody is

5 checking firearms?

6 A.   We did.  They were the tags -- the firearm declaration

7 tags.

8 Q.   How many bank accounts have been identified as being

9 opened by or in the name of Tamara Kosta?

10 A.   Umm, four that we know of now, I believe.

11 Q.   Were there also safety deposit boxes?

12 A.   Yes.

13 Q.   Have you reviewed any of the bank records or business

14 records that were obtained during the financial

15 investigation of Tamara Kosta?

16 A.   Umm, can you be more specific?

17 Q.   That's okay.

18          MS. FOLEY:  Your Honor, that stuff is in the

19 affidavit which is in Government Exhibit 1.

20 Q.   Was there anything --

21    Of the cash deposits that were made into the bank

22 accounts that were known to be used by the Kostas, do you

23 know if the deposits were in cash?

24 A.   Yes.

25 Q.   And do you know if any deposits were over $10,000?

1 A.   No, not that I know of.

2 Q.   All right.  I'm just --

3        MS. FOLEY:  Government Exhibit 6.  Your Honor, I

4 ask that Government Exhibit 6 be moved into evidence.  It's

5 a document presented by the ATF which shows that there is no

6 record in Massachusetts of an F.I.D. or license to carry for

7 Tamara Kosta.

8        THE COURT:  Thank you.  Any objection?

9        MR. IOVIENO:  No.

10     GOVERNMENT EXHIBIT NO. 6, ADMITTED.

11        MS. FOLEY:  No further questions, Your Honor.

12        THE COURT:  All right.  We'll recess now.

13        Are you able to resume at two o'clock?

14        MR. WATKINS:  Your Honor, I have a matter before

15 Judge Casper that I expect will be short.  It's a Rule 11

16 hearing, so it would not --

17        I would not be back here right at two.  Perhaps

18 two-thirty.

19        THE COURT:  I've got something else at two-thirty,

20 I've got something at 2:45, 3:00.

21        MS. FOLEY:  And Your Honor, I have -- I was

22 planning to be out of the office at 3:30 today.  I can try

23 to rearrange that.  If not, the Government asks that maybe

24 we can finish this tomorrow.

25        THE COURT:  Do you want to continue this tomorrow

1  by which time you'll have your report?

2          MR. WATKINS:  I think that makes the most sense,

3  Your Honor.

4          THE COURT:  How about -- what's your situation,

5  Mr. Iovieno?

6          MR. IOVIENO:  I'm available this afternoon, Your

7  Honor.  I'd like to proceed.  I can proceed at two o'clock

8  with my version of a brief cross-examination.  Maybe two or

9  three questions.  That's it.

10         THE COURT:  All right.  Why can't we then continue

11  Mr. Watkins' client until tomorrow, and continue and

12  complete the detention hearing with respect to Mr. Iovieno's

13  client at two o'clock?

14         MR. GARRITY:  Your Honor, I don't mean to

15  interrupt, but with respect to Mr. Kosta, could I have one

16  second to speak to him about our continued involvement in

17  this hearing?

18         THE COURT:  All right.  Go ahead.

19         MR. GARRITY:  Thank you, Your Honor.

20         THE COURT:  Okay.  So we'll continue with a

21  detention hearing with respect to Ms. Kosta at two.

22         And is three o'clock tomorrow okay, Mr. Watkins?

23         MR. WATKINS:  Yes.

24         THE COURT:  We'll continue the matter with respect

25  to Mr. Novicki tomorrow at three.

1          So the marshals may remove the defendants from the

2   courtroom, and then we'll do the grand jury returns.

3          MS. FOLEY:  Thank you.

4      (Court adjourned at 1:07:48 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2        I, Judy Bond Gonsalves, a court approved transcriber,

3    certify that the foregoing is a correct transcript from the

4    official electronic sound recording of the proceedings in

5    the above-entitled matter.

6

7

8    _____    November 16, 2012
     Judy Bond Gonsalves

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**