### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA,      . CRIMINAL NO. 12-cr-10226
      Plaintiff                .
                               . BOSTON, MASSACHUSETTS
           v.                  . NOVEMBER 19, 2012
                               .
JOHN KOSTA,                    .
      Defendant (1)            .
. . . . . . . . . . . . . .    .
```

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:


For the government:  UNITED STATES ATTORNEY'S OFFICE
                     BY: Leah B. Foley, AUSA
                     One Courthouse Way, Suite 9200
                     Boston, MA 02210
                     617-748-3144
                     leah.foley@usdoj.gov




For the defendant:   Paul J. Garrity, Esq.
                     14 Londonderry Road
                     Londonderry, NH 10353
                     603-434-4106
                     garritylaw@myfairpoint.net










Court Reporter:


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.



***Judy Bond Gonsalves***
**Certified Federal Court Transcriber**
**508.984.7003**

2

1                          **I N D E X**

2  **WITNESSES**              **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

3  **Government's:**

4  AGENT DOUGLAS SCHIELE        5          13

5  **Defendant's:**

6  PETER SOUHLERIS             29          33

7  CHARLES APOSTOLOPOULOS      40          43          47

8  **EXHIBITS DESCRIPTION**                    **MARKED**    **IN EVIDENCE**

9  **Government's:**

10 G1   8/9/12 Detention Hearing Transcript     5             5

11 **Defendant's:**

12 D1   Letter from Daniel Morales              29            29

13

14

15

16

17

18

19

20

21

22

23

24

25

1 COURT CALLED INTO SESSION

2 (2:44:06 p.m.)

3          THE CLERK:  For detention hearing the United

4 States of America versus Kosta, Docket No. 12-CR-10226.

5          Will counsels please identify yourselves for the

6 record?

7          MS. FOLEY:  Good afternoon, Your Honor.  Leah

8 Foley for the United States.

9          THE COURT:  Good afternoon.

10          MR. GARRITY:  Good afternoon, Your Honor.  Paul

11 Garrity for John Kosta.

12          THE COURT:  All right.  Good afternoon.  Is the

13 government ready to go forward with the detention hearing?

14          MS. FOLEY:  Yes, Your Honor.

15          Defense counsel and the government discussed the

16 detention hearing late last week, and the government has a

17 transcript of the detention hearing that took place in front

18 of Your Honor from August 9, 2012.  Mr. Costa sat in through

19 that detention hearing as did Mr. Garrity, and it wasn't

20 until the end of the hearing where defense stipulated to

21 voluntary detention.

22          The government and the defense are in agreement,

23 if it's amenable to the Court, to introduce that transcript.

24          THE COURT:  What date was that again?

25          MS. FOLEY:  It was August 9, 2012.  The government

1 did elicit from Agent Schiele the sum and substance of the

2 entire case including the evidence against Mr. Costa,

3 because at the time the government believed that Mr. Costa

4 was contesting detention.

5         THE COURT:  Okay.

6         MS. FOLEY:  I do have the transcript.

7         THE COURT:  Okay.  That's fine.

8         MS. FOLEY:  I can hand it up to the Court.

9         There were a couple of areas that the government

10 did not ask questions about, and Mr. Garrity and I agree

11 that we can do it by stipulation, or I can ask Agent Schiele

12 a couple of more questions on the stand.  And then if Mr.

13 Garrity wants to cross examine him, he can at that point.

14         Otherwise, I could simply proffer up to the Court

15 what this information would be.

16         THE COURT:  Refresh my recollection.  Did he cross

17 examine him at the original hearing?

18         MS. FOLEY:  He did not, Your Honor.

19         MR. GARRITY:  I did not, Judge.

20         THE COURT:  Okay.

21         MR. GARRITY:  We had stipulated before Agent

22 Schiele's testimony to detention without prejudice, but Mr.

23 Costa wanted to remain --

24         THE COURT:  Oh, right.  Right.

25         MR. GARRITY:  -- at his wife's hearing.

1          THE COURT:  All right.  Let's do this.  Why don't

2  I take the testimony, and I'll consider that as evidence.

3      GOVERNMENT EXHIBIT NO. G1, ADMITTED

4          THE COURT:  Why don't you call Agent Schiele and

5  elicit whatever testimony you have, and then Mr. Garrity can

6  cross examine.

7          MS. FOLEY:  All right.  Thank you, Your Honor.  So

8  the government calls Agent Douglas Schiele.

9          THE COURT:  All right.  Mr. Danieli, if you would

10 administer the oath, please?

11              AGENT DOUGLAS SCHIELE, Sworn

12          THE COURT:  Please be seated, sir.

13          And if you'd state your full name, please?

14          THE WITNESS:  It's Douglas Schiele, S-C-H-I-E-L-E.

15          THE COURT:  Go ahead, Ms. Foley.

16                      DIRECT EXAMINATION

17 BY MS. FOLEY:

18 Q.   Agent Schiele, during the course of the investigation

19 into John Kosta and his drug trafficking business, did you

20 come across bank accounts that were in the name of John and

21 Tamara Kosta?

22 A.   We did.

23 Q.   And do you recall how many bank accounts there were?

24 A.   At least four.  I'm not sure of the exact number.

25 Q.   And do you recall whether you subpoenaed the deposit

1 records in to these bank accounts?

2 A.   We did.

3 Q.   And is it your recollection that -- were there large

4 cash deposits into these accounts?

5 A.   There were.

6 Q.   And in 2011 do you recall if there were $481,980 in

7 cash deposits into the accounts that were controlled by John

8 and Tamara Kosta?

9 A.   There were.

10 Q.   And in 2012 -- I'm sorry -- 2010 there were

11 approximately $419,770 in cash deposits into the eight

12 accounts operated by John and Tamara Kosta?

13 A.   Approximately.

14 Q.   Do you recall if any of those cash deposits were over

15 $10,000?

16 A.   No, they were not.

17 Q.   Do you recall who made the deposits?

18 A.   A wide variety of individuals.  John Kosta's father,

19 Tamara Kosta, Dayna L'Italien.

20 Q.   And do you recall when Dayna L'Italien made deposits,

21 if they were more than one -- on more than one occasion she

22 made cash deposits into those accounts?

23 A.   She did at several different branches.

24 Q.   Did she use your own name when she was making the

25 deposits into those accounts?

1  A.   No, she did not.

2  Q.   Whose name did she use?

3  A.   Tamara Kosta.

4  Q.   Do you recall whether on -- in August 2012 when you

5  executed search warrants on the properties owned by the

6  Kostas, did you also execute search warrants on safety

7  deposit boxes that were in the name of Tamara Kosta?

8  A.   We did.

9  Q.   And in Arizona was there a safety deposit box in the

10 name of Tamara Kosta?

11 A.   There was.

12 Q.   And how much money, if any, was found in that safe

13 deposit box?

14 A.   $90,000.

15 Q.   Do you recall testifying earlier about a person by the

16 name of Feto who was involved in this case?

17 A.   Yes.

18 Q.   And to refresh the Court's recollection, is Feto one of

19 John Kosta's marijuana suppliers?

20 A.   He is.

21 Q.   And where is he right now?

22 A.   Mexico.

23 Q.   Has he been arrested?

24 A.   He has not.

25 Q.   Did you intercept calls between Feto and John Kosta?

1 A.   We did.

2 Q.   Prior to intercepting John Kosta's calls, was Feto also

3 intercepted over a state wire that was being operated in

4 Arizona?

5 A.   He was.

6 Q.   And did Arizona police -- or state troopers arrest Feto

7 prior to the case against Mr. Costa being started by the

8 FBI?

9 A.   They did.

10 Q.   And at the time he was arrested, was he leaving John

11 Kosta's house?

12 A.   Yes, he was.

13 Q.   And what did he have on him when he was arrested?

14 A.   He had $285,000 in cash --

15 Q.   And was this --

16 A.   -- in the vehicle.

17 Q.   -- in December of 2010?

18 A.   Yes, I believe so.

19 Q.   And two days prior to Feto being arrested after leaving

20 John Kosta's Arizona house with $285,000; who, if anyone,

21 accessed their safety deposit box in the name of Tamara

22 Kosta?

23 A.   Tamara Kosta accessed it, but I believe it was one day

24 before.

25 Q.   Okay.  And the intercepts over John Kosta's phones, did

1 they cease around April 2012?

2 A.   Yes.

3 Q.   And this was after Donald McCormick had been stopped

4 carrying 980 pounds of marijuana after leaving John Kosta's

5 Arizona house?

6 A.   That's correct.

7 Q.   And after -- was that in January 2012 Donald McCormick

8 was arrested?

9 A.   Yes.  January 6, I believe.

10 Q.   When did the Kostas move out of their Arizona house?

11 A.   I think late -- I don't know the exact date, but late

12 January/early February.

13 Q.   So it was after McCormick's arrest.

14 A.   Yes.

15 Q.   And where did they move to?

16 A.   Their residence here in Phillipston, Massachusetts.

17 Q.   Do you know if John Kosta traveled back to Arizona

18 prior to being arrested in August of 2012?

19 A.   Yes, he did.

20 Q.   And on one occasion?  More than one occasion?

21 A.   I think several occasions.

22 Q.   Do you know if he went into Mexico in May 2012?

23 A.   We received information from ICE, Immigrations and

24 Customs Enforcement, that said he did travel by foot across

25 the border into Mexico with another co-defendant in the

1 case.

2 Q.   And who is that?

3 A.   Nestor Verduzco.

4 Q.   And what is Nestor Verduzco's relationship to Mr.

5 Costa?

6 A.   He is a marijuana supplier.

7 Q.   And when you were intercepting John Kosta's calls, did

8 you intercept a call with him and Feto where John Kosta

9 talked about going down to Mexico to visit Feto?

10 A.   Yes.

11 Q.   And when you cross the border on foot, do you need a

12 passport?

13 A.   I don't believe so.

14 Q.   Did you also conduct surveillance at 359 Maple Street

15 during the course of the investigation?

16 A.   Yes.

17 Q.   And who was living at 359 Maple Street in 2011 and

18 2012?

19 A.   Alexander Napoleon and Dayna L'Italien.

20 Q.   Did there come a time when agents attempted to do some

21 surveillance on a car that was parked in 359 Maple Street?

22 A.   Yes.

23 Q.   And what, if anything, did they observe at 361 Maple

24 Street?

25 A.   We observed a security camera that was attached to the

1  back of 361 Maple Street that was panned down to cover the

2  driveway of 359, the house that was set farther back.

3  Q.   And that's the house that's owned in name by Tamara

4  Kosta --

5  A.   Yes.

6  Q.   -- and was living -- was occupied by Alexander

7  Napoleon?

8  A.   Yes.

9  Q.   Prior to the wire intercepts in this case in late 2011,

10  do you know if Arizona State Police conducted trash pulls at

11  the house that was rented by John Kosta and his family in

12  Arizona?

13  A.   Yes, they did.

14  Q.   And what, if anything, did they find?

15  A.   They found vacuum seal bags and duct tape, a ledger

16  that looked like a drug ledger.  They also found tax

17  records.

18  Q.   Did they also find any records of phones that were

19  subscribed in fictitious names?

20  A.   They did.

21  Q.   And do you recall how many firearms were found in John

22  Kosta's house when you executed the search warrant in August

23  2012?

24  A.   Yes.  Twenty-five.

25  Q.   And of those 25 firearms, how many were found in the

1  room that was occupied by John Kosta?

2  A.   Six handguns.

3  Q.   Were they loaded?

4  A.   Some were.

5  Q.   Did one have any type of shooting device attached to

6  it?

7  A.   Yeah.  There was a .44 Magnum that had an optic scope

8  on the top of it.

9  Q.   And what was it attached to -- I mean, what was it near

10 when you found it?

11 A.   It was just, umm -- it was close to the closet area on

12 a box near the floor.

13 Q.   Was there any other contraband that was found in this

14 room that was near the gun with the scope?

15 A.   There were twelve smaller marijuana plants growing.

16 Q.   Was there also any type of security system that was set

17 up in this room?

18 A.   Well, throughout the house there were security cameras.

19 Well, on the exterior of the house, but there was also a

20 flat screen TV that allowed him to toggle to look at

21 different views.

22 Q.   Did you go through the evidence of the documents and

23 other evidence that was taken from the Kosta's Phillipston

24 residence?

25 A.   Yes.

1  Q.   Was there any evidence that the defendant was engaged

2  in any legal activity as a real estate dealer?

3  A.   No, not that I can recall.

4  Q.   Were there records searched in the Massachusetts

5  database to determine whether John Kosta was actually buying

6  and selling real estate, doing business as John Kosta Real

7  Estate?

8  A.   Yes.

9  Q.   Was there anything that was discovered?

10  A.   No.

11  Q.   Did you walk -- were you present when the search

12  warrant was executed in August 2012 in Phillipston?

13  A.   I was.

14  Q.   When you entered the house, was there anything that was

15  immediately noticeable?

16  A.   Yeah.  There was a strong smell of marijuana in the

17  house.

18          MS. FOLEY:  No further questions.

19          THE COURT:  Mr. Garrity?

20          MR. GARRITY:  Thank you.

21                    CROSS-EXAMINATION

22  BY MR. GARRITY:

23  Q.   Good afternoon, Agent Schiele.

24      You were present on August 6th of this year during the

25  search; is that right?

1  A.   I think it was the seventh.

2  Q.   The seventh.  I'm sorry.

3  A.   Yes, I was in Phillipston.

4  Q.   You were there from the beginning.

5  A.   Yes.

6  Q.   When all the agents arrived there, did all of the

7  agents stay outside the fence that surrounds the Phillipston

8  house?

9  A.   Well, there was --

10      The initial arrest was conducted by the FBI SWAT team.

11  They secured the location.  And then, you know, once

12  everyone -- everyone was removed from the house, we entered

13  through the fence.

14  Q.   I guess I didn't make any question clear.

15      When you arrived there, there was not an immediate

16  entry into the house; is that right?

17  A.   Well, there was by the SWAT team.  Oh, no, the initial

18  was a call-out.  They called John out of the house.

19  Q.   Called Mr. Costa out.

20  A.   Yes.

21  Q.   And he came out to the fence, the stockade surrounding

22  the house; is that right?

23  A.   Right.  Well, the SWAT team was in the perimeter of the

24  fence.  He came out to one of their vehicles.

25  Q.   And their vehicles, were they by the fence?

1  A.   They were inside the fence.  There's a kind of a

2  wrap-around driveway to the house.

3  Q.   But they were some distance away from the house.

4  A.   Yes.

5  Q.   Is that fair to say?

6  A.   Yeah, safe distance away.

7  Q.   And they called -- one of the agents or some of the

8  agents called Mr. Costa out; is that correct?

9  A.   I think on a PA system.

10  Q.   And he came out in his sleeping clothes; is that right?

11  A.   I believe.  I couldn't see.

12  Q.   Were you on the other side of the fence?

13  A.   No.  I was --

14       The SWAT team doesn't like the agent population to get

15  too close until the arrest is made, so we were down the

16  street waiting.

17  Q.   And after Mr. Costa was called out and taken into

18  custody, was Mrs. Kosta also called out?

19  A.   I believe so.

20  Q.   Could you hear the agents calling out to her?

21  A.   I could not.

22  Q.   Do you know how long it was before Mrs. Kosta exited

23  the house?

24  A.   Umm, I don't know exactly.  I mean, it wasn't -- it

25  wasn't a substantial amount of time.  I think it was

1 relatively smooth considering how many, you know, children

2 she had in the residence.

3 Q.   Would it be fair to say that none of the agents entered

4 the house until Mrs. Kosta had exited?

5 A.   That's correct.

6 Q.   And she was then taken into custody; is that right?

7 A.   Yes.

8 Q.   Was she taken into custody outside the house?

9 A.   I believe so.

10 Q.   And then brought back into the house?

11 A.   I -- I think she was taken into custody outside, but

12 then allowed --

13     I think agents might have gone back in the house with

14 her and helped her pack up things for the kids.  I'm not

15 sure about that, though.

16 Q.   But she was asked questions about some guns found in a

17 gun safe; is that right?

18 A.   She was.

19 Q.   And she indicated that those were her guns.

20 A.   Yes.  I think she said she owned the eighteen guns in

21 the gun safe.

22 Q.   Did any agent, to your knowledge, ask Mrs. Kosta about

23 the other guns found in the house, who owned those?

24 A.   I'm not sure.

25 Q.   Did any agent ask her during the delay and her exiting

1 the house after Mr. Costa exited what she may have been

2 doing inside the house with respect to the other guns found

3 in the house?

4 A.   No.  I'm not sure.

5 Q.   Have the guns found in the room separate from Mrs.

6 Kosta's, do you know whether they've been sent out for any

7 sort of fingerprint examination?

8 A.   They have.  They've been sent out for fingerprints and

9 DNA.

10 Q.   Have you seen any reports come back yet?

11 A.   We have not received results yet.

12 Q.   And Mr. Costa was under surveillance for quite a long

13 period of time; is that fair to say?

14 A.   Yes.

15 Q.   Starting in 2009?

16 A.   I think more in 2010, 2011.

17 Q.   He was under surveillance.

18 A.   Yes.

19 Q.   And his phone conversations were intercepted, as well.

20 Right?

21 A.   That's correct.

22 Q.   A number of them; fair to say?

23 A.   Yes.

24 Q.   To your knowledge, did any agent ever see Mr. Costa in

25 possession of a firearm during that period of surveillance?

1 A.   I don't believe anybody ever observed him with a

2 firearm.

3 Q.   To your knowledge, during any of the intercepted phone

4 calls was there any discussion by Mr. Costa of possessing a

5 firearm or looking to obtain a firearm?

6 A.   I don't recall any calls that focused on that.

7 Q.   And the guns found in the other room that you say was

8 Mr. Costa's, you said that they were -- one of them was

9 close to the closet.

10 A.   Well, they -- they were all found basically on the

11 floor in the closet area.  There were like boxes and just

12 kind of -- just on basically --

13     I mean, we had to dig through.  They weren't all just

14 laying out like six in the row.  You know, we had to dig

15 through some items to find them.

16 Q.   How many closets were in this room you say was Mr.

17 Costa's?

18 A.   Umm, I think just the one closet.

19 Q.   What else was in that closet, if you recall?

20 A.   Clothes.  Just normal things that you would find in a

21 closet.

22 Q.   And the guns you're talking about were covered by other

23 items.

24 A.   Well, not all of them.  The SWAT team had warned us

25 about the .44.  They saw that as soon as they walked in,

1 because it was more easily accessible than the others.

2 Q.   There were a number of photographs taken inside the

3 house; is that right?

4 A.   There were.  We had the evidence response team helping

5 us with the search that day, and they take pictures of every

6 room before we enter and after we leave just to document it.

7 Q.   And is it fair to say that if you have an item like a

8 gun or drugs, you want to take a photo of it where you first

9 see it or locate it.  Right?

10 A.   Definitely.

11 Q.   You've seen the photos in this case; have you not?

12 A.   Yes.

13 Q.   There is no photograph, is there, of the closet with

14 guns in the closet.  Right?

15 A.   I think there's a photo of that room.

16 Q.   There's photos of that room, right, but --

17 A.   Yes, I --

18 Q.   Would you disagree with me that there's no photo of the

19 closet with guns inside it?

20 A.   I haven't looked at all the pictures from that search,

21 but I can't say that there is one.

22 Q.   And you were the agent -- one of the agents in charge;

23 is that right?

24 A.   Yes.

25 Q.   And I take it you've gone through the FBI photo log.

1 A.   The E.R.T. photo log?

2 Q.   Yes.  You've gone through that.

3 A.   Yes.  I mean, there were hundreds, I think, pictures.

4 We focus mainly on each item of evidence that we found.

5 Q.   And the room that was designated Mr. Costa's, was that

6 designated 'Room F'?

7 A.   I believe so.

8 Q.   And there were two closets in that room; is that right?

9 Not the one you talked about.

10 A.   I know there were --

11      The one that we found the weapons in, it was the first

12 one on the left.  If there were multiple, I'm not sure about

13 that.  But I know there was a big closet right on the left

14 when we walked in.

15 Q.   Well, let me ask you this.

16      Assume that guns were found in the closet.  Is there a

17 reason why they would not be photographed as where they are

18 found?

19 A.   I think -- I'd be surprised if there was not a picture

20 in there that showed that.

21           MR. GARRITY:  May I approach, Your Honor?

22           THE COURT:  Sure.

23 Q.   I show you this.  This is the E.R.T.  Right?  And I

24 know there's a number of pages here.

25      And then is this the beginning of the photo log for

1  Room F?

2  A.    It appears to be.

3  Q.    And there's a number of --

4        Can you look through that?

5  A.    Definitely.

6        Yeah, I think they were in the bottom of this closet,

7  but I'm not seeing them in that picture.

8        Oh, yeah.  Here there are.  So a lot of them were in

9  this box here, and this is actually a gun case right here.

10 This is the bottom of that closet.

11 Q.    You're pointing to a box with --

12 A.    This cardboard box here.

13 Q.    And you're saying the guns were found in there.

14 A.    Some of them, yes.  This is actually a gun case on top

15 of it.

16 Q.    Can you find me, if you could, a photo looking into

17 that box showing the guns inside it?

18 A.    So these are the entry photos.  Okay, here it is.  That

19 gun case with the Magnum was on top of the box.

20       It's hard to see the other ones that are in there, but

21 they are all in this general area.

22 Q.    And that's on page 79 of 162; is that right?

23 A.    That's correct.

24 Q.    And there's guns in that photo, you say.  I know

25 there's one here in the --

1  A.   Yeah.  We ended up taking this entire box, and that's

2  where the majority of them were as I recall.

3       Again, I mean, this is obviously after we found them

4  and spread them out.  Yeah, I mean, it's tough to see the

5  other ones in this area, but that's where they were in the

6  house.

7  Q.   And just so it's clear to me and the Court, you mean

8  all the guns you say were in Room F or in that box in the

9  cardboard box and the gun box on top of it.

10 A.   The majority of them I think were.

11 Q.   There's no photo of a gun on the floor; is that fair to

12 say?

13 A.   Yes.  I mean, there are after we took them out but not

14 in their natural state.

15 Q.   Would it be unusual to not photograph a gun in its

16 natural state?

17 A.   I mean, some of them I think we had to move items that

18 were on top of them.  I mean, it would be tough to

19 photograph a gun with a shirt lying on it.  You know, you're

20 not going to see it.

21 Q.   But it looked, from what you could see, that the guns

22 were covered or in a box or in some sort of gun box.

23 A.   Right.

24 Q.   Now, you talked about money and cash deposits; is that

25 right?

1  A.   Yes.

2  Q.   $485,000 in 2010.

3  A.   I believe so.

4  Q.   And $419 in 2011.

5       Did you look to see what kind of taxes Mr. Costa paid?

6  A.   We did look through some of the tax returns.

7  Q.   And he paid taxes commensurate with that income; did he

8  not?

9  A.   I don't believe so.

10 Q.   Didn't the IRS return show tax payments of between

11 eighty and a hundred thousand each year?

12 A.   Off the top of my head I'm not exactly sure.  They may

13 have.

14 Q.   Now, you talked about Mr. Costa going into Mexico.

15 That was on May 5.  Right?

16 A.   I believe so.

17 Q.   2012.

18 A.   I think so.  I know it was May 2012.

19 Q.   It was Cinco de Mayo that he went into Mexico?

20 A.   Okay.

21 Q.   And would it be fair to say there's a lot of foot

22 traffic going in and out of Mexico on that day?

23 A.   Oh, I'm sure.

24 Q.   And Nestor didn't walk in at the same time as Mr.

25 Costa.  Right?

1      Didn't he come in sometime after?

2  A.   They may have been separated by a few hours.

3  Q.   And just getting back to the property on Maple Street.

4      You talked about a camera at 361 Maple and that you say

5  pans the 359 Maple Street driveway.

6  A.   Yeah.  361 is located closer to the street, and 359 is

7  kind of set back behind it.  And there was just a camera --

8  security camera attached to the back of 361 that appeared to

9  be looking down onto just the rear of the house.

10  Q.   Between 361 and 356 there's a driveway, a common

11  driveway; is that right?

12  A.   Yes.

13  Q.   And the common driveway after it goes by 361 goes off

14  to the left --

15  A.   Right.

16  Q.   -- to a parking spot.

17  A.   Right.

18  Q.   And that's -- it's over that parking spot that the

19  camera is situated; is that right?

20  A.   Yeah.  It looked to be panning that area back there.  I

21  mean, there are a few parking spots, but.

22  Q.   Did you actually go and look at the camera and what

23  it's connected to to see what it's actually looking at?

24  A.   No, we did not.

25  Q.   So when you say it's panning the back yard, you're

1 saying it's on the back of 361 looking down at this common

2 driveway that it shares with 359.

3 A.   It appears to be.

4 Q.   And just dealing with the stopping of Feto, you said he

5 was stopped leaving Mr. Costa's house.

6     Is it more accurate to say he was stopped somewhere in

7 Scottsdale?

8 A.   I mean, surveillance had him at the house and followed

9 him from the house.  I'm not exactly sure where he was

10 stopped, but --

11 Q.   The surveillance had him leaving the house --

12 A.   It was pretty clear that he was coming directly from

13 John Kosta's house.

14 Q.   So surveillance watched him the entire way.

15 A.   Yes.

16 Q.   Up until the stop.

17 A.   Yes.

18          MR. GARRITY:  No further questions.

19          THE COURT:  Anything further from in witness, Ms.

20 Foley?

21          MS. FOLEY:  No, Your Honor.

22          THE COURT:  Thank you, sir.  You may step down.

23          THE WITNESS:  Thank you.

24          THE COURT:  Does the government have any further

25 evidence?

1          MS. FOLEY:  Your Honor, the other facts that the

2  defense and I had discussed and which I believe the Court

3  would like to know about before making any decision deals

4  with property that was deeded by Mr. Costa.

5          In January 17th of 2012 to January 19 -- or 20th

6  of 2012 the defendant -- and this is two weeks after Donald

7  McCormick was stopped and arrested with the marijuana load

8  -- the defendant deeded five properties that were in his

9  name to his son.  Transferred the deed from his name to his

10  son's name.  And this is --

11          I bring this up, because this is John Kosta, my

12  understanding is the person who the defendant is proposing

13  that he be placed in the custody of.  And they remained in

14  his son's name until approximately June of 2012 when they

15  were deeded back to the defendant's name.

16          And the government just believes that --

17          THE COURT:  Okay.  Well, those are the facts you

18  want me to consider?

19          MS. FOLEY:  Yes, Your Honor.

20          THE COURT:  Is there objection, or am I

21  considering those facts?

22          MR. GARRITY:  No, Your Honor.

23          MS. FOLEY:  And those were properties that were

24  indicted in the indictment that was returned against the

25  defendant.

1          THE COURT:  Okay.  Anything further, Ms. Foley?

2          MS. FOLEY:  No, Your Honor.

3          THE COURT:  Okay.  Mr. Garrity, you've gone over

4   the Pretrial Services report with your client.  If so, can I

5   consider the facts contained therein as evidence, not the

6   recommendations but the facts?

7          MR. GARRITY:  Can I have one --

8          THE COURT:  Could I do that?

9          MR. GARRITY:  Can I have one second, Judge?

10         THE COURT:  Sure.

11         I'd be interested in the criminal record and parts

12  up through -- yeah, up through the prior record on page 3

13  and the prior record attached.  The assessments and the

14  recommendation obviously are something different.

15         MR. GARRITY:  Your Honor, I was given the report,

16  and I've got it in my stack of papers here.  But I'll put it

17  out --

18         THE COURT:  Do you have an extra copy, Ms. Brown?

19         MS. FOLEY:  I can give him mine, Your Honor.

20         THE COURT:  Okay.

21         MR. GARRITY:  Your Honor, I can address the

22  criminal record part of it first.

23         THE COURT:  Well, I just want to know if it's

24  accurate.  That's all.

25         MR. GARRITY:  It's accurate.

1              THE COURT:  Okay.  And how about the other facts

2   contained in the report on pages 1, 2 and up through the

3   prior record on page 3?

4              MR. GARRITY:  Can I have one second, Judge?

5              THE COURT:  Sure.

6              MR. GARRITY:  Your Honor, it is accurate.

7              THE COURT:  Okay.  Do you have any evidence to

8   present, Mr. Garrity?

9              MR. GARRITY:  Yes, Your Honor.  First of all, I

10  have a letter here from an individual, Mr. Daniel Morales.

11  He called me this morning and said he had got called away to

12  a funeral in Puerto Rico.  I showed the letter to Ms. Foley.

13  I ask that be submitted.

14             THE COURT:  Any objection?

15             MS. FOLEY:  No, Your Honor.

16             THE COURT:  All right.  Thank you.  Any further

17  evidence?

18             MR. GARRITY:  Your Honor, I've got two people to

19  provide quick testimony.

20             THE COURT:  Sure.

21             MR. GARRITY:  Peter Souhleris.

22             THE COURT:  Come forward, stand in the witness box

23  and raise your right hand, please.

24                  PETER SOUHLERIS, Sworn

25             THE COURT:  Please be seated.  You can mark this

1  as defendant's Exhibit 1, please.

2        DEFENDANT EXHIBIT NO. D1, ADMITTED

3          THE COURT:  Go ahead, Mr. Garrity.

4                    DIRECT EXAMINATION

5  BY MR. GARRITY:

6  Q.    Sir, could you give your name, and if you'd spell your

7  name?

8  A.    Sure.  Peter Souhleris.  Last name S-O-U-H-L-E-R-I-S.

9  Q.    And where do you live, sir?

10  A.    762 Main Street in Boxford, Massachusetts.

11  Q.    And do you know John Kosta?

12  A.    Yes, I do.

13  Q.    How long have you known him?

14  A.    Since we were teen-agers.

15  Q.    Did you know him by another name when you --

16  A.    Mihalakakis.  Kosta, yeah.

17  Q.    And have you stayed in touch with him since you first

18  met him when you were teen-agers?

19  A.    Yeah, over the years we talk frequently and definitely

20  communicated with him.

21  Q.    Have you been to his home in Phillipston?

22  A.    I did go to his home in Phillipston I believe when he

23  first purchased it.  I think that was several years ago.

24  Maybe nine, ten years ago.  I'm not sure exactly.

25  Q.    And have you had physical meetings with Mr. Costa since

1 then?

2 A.    Yes.  Yep.

3 Q.    And have you spoken to him over the phone, as well?

4 A.    I believe, yep, we've spoken over the phone; grabbed

5 coffee together; lunch; and had several conversations.

6 Q.    What can you tell the Court about John in terms of his

7 family, in terms of his connections to the area?

8 A.    You know, like I said, I've known John since we were

9 kids basically.  And, umm, you know, the best way to put it,

10 I remember, you know, him getting into some trouble when we

11 were -- when he was -- you know, when we were both younger.

12 I think it was around '97.  I remember that, because that's

13 the year I got married.  I think that's when he got out of

14 prison.

15     You know, the first thing he did was he looked me up

16 and started to talk to me about spiritual and ministries

17 and, you know, things of that nature which was very

18 inspiring to me.  And you know, would just I guess the best

19 way to put it would challenge me as a spiritual person to,

20 you know, read the Bible and just be a better, you know,

21 citizen.  That's the light I know him in.  That's the light

22 I've known him in, you know, since then.

23     And for me growing up with him and seeing him kind of

24 get into trouble and come out and do that and give, you

25 know, his time to just say, hey, let me knock on your door

1 and here's a Bible and, you know, I want you to take a look

2 at this.

3      You know, and then we used to have conversations about

4 how he was raising his kids and how he would get up, you

5 know, real early and make sure they read the Bible.  You

6 know, just it was inspiring, to be honest with you.  It kind

7 of --

8      You know, it made me wonder, you know, like, you know,

9 like -- it was -- it was -- it was interesting to see

10 someone that got into trouble and then was putting time into

11 bettering other people's lives.  You know, and I just felt

12 -- you know, I felt -- I don't know if you would say

13 honored.  I felt privileged that he would just take his time

14 away and just call me out of the blue and say, "Hey, can I

15 talk to you?"

16      I'd say, "Yeah, sure."  You know?  And he was very

17 inspiring to me.

18 Q.   Were you aware that John was reaching out to other

19 people aside from yourself?

20 A.    Oh, yeah.  Yep.  He used to tell me all the time that,

21 you know, this is what --

22      I remember he was telling me --

23      At one point he had asked me to -- I was --

24      I used to be a DJ, and he had asked me to mix a CD for

25 him with respect to a testimony that he would go and talk to

1 | other churches.

2 |     Again, the devotion he had, that was extraordinary.  It

3 | was -- it was not an ordinary devotion that he had to his

4 | missionary work and the spirituality for him -- for his

5 | family and for other people.  You know, and I was considered

6 | one of those people.  You know, I wasn't in trouble or

7 | anything.  He just said, hey.  Just, you know, can we just

8 | and talk about something?  I said sure.  And we were just

9 | talking about giving and helping.

10 |     And, you know, there was good conversations, and I was

11 | proud and inspired by those conversations.

12 | Q.   Have you ever seen John in possession of a firearm?

13 | A.   Never.

14 | Q.   Have you ever heard him talk about firearms?

15 | A.   No.

16 | Q.   When was it that you first found out he was facing

17 | these charges?

18 | A.   Umm, about a month ago.  Another friend who's sitting

19 | over there told me and, you know, I was -- I was just -- I

20 | was very surprised.  I -- I knew him, like I said, in the

21 | light of the conversations I just spoke about.

22 | Q.   And to your knowledge, John is devoted to his children,

23 | as well?

24 | A.   Yes.  He's a very --

25 |     I mean, you know, those are a lot of the conversations

1 we had.  He used to tell me how --

2     You know, I mean, the biggest smile I would see on his

3 face, every time he talked about his children and every time

4 how he would say, you know, one of his --

5     He would bring homework home that he was going to

6 college, and he would give them to his kids and, you know,

7 he would just -- he would tell me how proud he was when

8 these kids were doing good.  You know, just good, you know,

9 natural father, fondness of his children and the way he was

10 raising them.

11 Q.   Knowing what you know about John and his relationship

12 with his children, is it -- are you of the opinion that John

13 would be willing to leave them if he were released?

14 A.   No, I don't think he would do anything like that.  I

15 don't think he would do that to his kids.  Absolutely not.

16 Q.   Is it your opinion that he would stay here if he was

17 released?

18 A.   That's my opinion, yes.

19         MR. GARRITY:  I have no further questions.

20                   CROSS-EXAMINATION

21 BY MS. FOLEY:

22 Q.   Can you -- Peter Souhleris is S-O --

23 A.   S-O-U-H-L-E-R-I S.

24 Q.   E-R-I S, thank you.

25     What do you do?

1 A.    I'm in real estate.

2 Q.    What kind of real estate?

3 A.    I have a real estate brokerage firm, and I rehab

4 houses.  Buy and sell.  I'm also a disk jockey still a

5 little bit.  Not too much, but a little bit.

6 Q.    What real estate business do you work for?

7 A.    My own.  Peter Souhleris Reality.

8 Q.    And where is that based out?

9 A.    It's in Peabody, Massachusetts.

10 Q.    Do you have an office?

11 A.    I do.

12 Q.    And can you tell me the office address?

13 A.    246 Andover Street, Peabody.

14 Q.    Were you aware that John Kosta was also in the real

15 estate business?

16 A.    Yes.

17 Q.    Have you ever heard of him selling a house?

18 A.    Umm, I -- I don't recall him selling a house, no.

19 Q.    Since you've known him as teen-agers you've never known

20 him to sell a house.

21 A.    No.

22 Q.    Are you aware that he had an office?

23 A.    I do know he had his real estate license, yes.

24 Q.    His office.  Did he have an office?

25 A.    I'm not sure if he had an office.  I did know that he

1  was a licensed real estate broker.

2  Q.   Did you ever talk to him about the real estate

3  business?

4  A.   Yeah, we did.

5  Q.   Did he ever tell you about what he was doing in the

6  real estate business?

7  A.   Umm, not really, no.  No.

8  Q.   When was the last time you went to his house in

9  Phillipston?

10  A.   Probably when he bought it.  Nine, ten years ago.  I'm

11  assuming that's when it was.

12  Q.   Were there any marijuana plants growing in the house --

13  A.   No.  No.

14  Q.   -- when you went there?

15  A.   No.

16  Q.   No?  Okay.

17       Have you ever seen him around his kids?

18  A.   Umm, no.  His two older boys, yes, but not the younger

19  kids.

20  Q.   Who are his two older boys?

21  A.   Dimitri and John.

22  Q.   Do you know what Dimitri does?

23  A.   I do not know.

24  Q.   Do you know what John does?

25  A.   No.

1  Q.   You testified that he is a good father.  That's based

2  solely on the information he's provided to you; is that

3  correct?

4  A.   Yes.

5  Q.   You've never witnessed him in front of his kids?

6  A.   In front of his two older kids, yes, which were younger

7  at the time.

8  Q.   How old were they?

9  A.   Umm, it was probably around the same time that he

10  bought his house in Phillipston, so I'm assuming ten years

11  ago from now.  So I think they're around twenty, must have

12  been around ten years old.  Just, you know, average kids.  I

13  mean ...

14  Q.   You've also testified that he spoke a lot about

15  Christian values; is that correct?

16  A.   Yes.

17  Q.   Do those values -- and those are the same values that

18  you hold to?

19  A.   Yeah.  Yeah.  I'm Greek Orthodox Christian.

20  Q.   Okay.

21  A.   I believe in Jesus.

22       And like I said, he kind of -- I don't know.  He just

23  -- just made me --

24       You know, he would ask me do you read your Bible?  And

25  I wasn't really doing that.  I mean, I went to Greek

1  Orthodox church, because we had to.  It was Easter, and my

2  mom said you got to go.  And I didn't understand the

3  language, and I'd sit there.

4       And he was like listen, read this and open this.

5       You know, you just -- you wonder, and you just -- you

6  know you just start reading --

7  Q.   Do you know which church John Kosta attended?

8  A.   I do not, no.

9  Q.   Do you know if he attended church?

10  A.   Umm, I'm assuming he did.

11  Q.   But you don't know?

12  A.   No.  No.

13  Q.   You've never seen him.  Did he ever tell you about the

14  church he went to?

15  A.   Umm, no.  He -- he spoke mostly about how, umm, he did

16  a lot of reading to his children, you know, at home.  He

17  used to say to me, you know, it doesn't matter if you -- you

18  don't have to go to church every Sunday.  Just be spiritual.

19  Open your Bible, read it, look at it, so.

20  Q.   But you don't know if he ever did read to his children?

21  A.   From what he told me, that's how I know.  I never saw

22  him do that.

23  Q.   Did you ever verify that he was leading a Christian

24  life?

25  A.   Umm, no.  I didn't felt like I -- you know what I mean?

1 Just from what he told me.

2 Q.   Do the values that espouse, do they including being a

3 law abiding person?

4 A.   Yes, I would assume they would be.

5 Q.   And would having marijuana grow in your house, would

6 that be consistent with the values that you say he talked to

7 you about?

8 A.   No.

9 Q.   Would owning a number of firearms that were loaded be

10 consistent with the values that you say he told you about?

11 A.   No.

12 Q.   Knowing -- and I'm sure you've heard about the evidence

13 that was found in his house in August of 2012.

14    Do you know if his children were living there at the

15 time?

16 A.   I do not know, no.  I haven't spoken to him in years,

17 and it's -- you know, I never heard this information until I

18 stood here now and heard it now.

19 Q.   And do these revelations give you any pause as to who

20 this person is?

21 A.   It certainly, you know, doesn't sound like the guy I

22 know.

23 Q.   Is it possible he's living a double life?

24 A.   I guess anything's possible, but I don't know him in

25 that light.  The only light I know him in is --

1  Q.   Did he ever tell about using his sons to conduct

2  counter surveillance when he was going to pick up marijuana?

3  A.   No.

4  Q.   Do you know if Dimitri was actually involved in that?

5  A.   No.

6  Q.   Do you know --

7       Did he tell you about transferring property to one of

8  his older sons after one of his couriers was arrested with

9  980 pounds of marijuana?

10  A.   No.

11  Q.   Did he talk to you about that person who was arrested

12  with 980 pounds of marijuana?

13  A.   No.

14  Q.   He didn't tell you about that.

15  A.   No.

16           MS. FOLEY:  Brief indulgence?  No further

17  questions.

18           THE COURT:  All right.  Anything further of this

19  witness, Mr. Garrity?

20           MR. GARRITY:  No, Your Honor.

21           THE COURT:  Thank you, sir.  You may step down.

22           Any further evidence?

23           MR. GARRITY:  Could I have one second, Judge?

24           THE COURT:  Sure.

25           MR. GARRITY:  I call Kosta Apostolopoulos.

1          THE COURT:  Can you come forward, sir, and stand

2  in the witness stand and raise your right hand?

3               CHARLES APOSTOLOPOULOS, Sworn

4          THE COURT:  Please be seated, sir.

5                    DIRECT EXAMINATION

6  BY MR. GARRITY:

7  Q.   Sir, could you give your name and spell your name.

8  A.   First name is Charles.  Last name Apostolopoulos,

9  A-P-O-S-T-O-L-O-P-O-U-L-O-S.

10 Q.   Do you go by Kosta, as well?

11 A.   I do.

12 Q.   Do you know John Kosta?

13 A.   Yes, I do.

14 Q.   How long have you known him for?

15 A.   We've been childhood friends since the age of seven.

16 We grew up in the same neighborhood, and we were pretty much

17 childhood buddies all our lives.

18 Q.   Have you stayed in touch with him since that time?

19 A.   Yes, I have.

20 Q.   Have you done any work for John or real estate

21 projects?

22 A.   Umm, I've done some consulting for him.

23 Q.   Where and when was that if you could tell us?

24 A.   That was recently in New Hampshire.

25 Q.   And what were you consulting on?

1 A.   He just asked me questions on, you know, what he could

2 do on the property that he owned.

3 Q.   So he had you look at a piece of property.

4 A.   Yes.

5 Q.   Have you known John to sell real estate?

6 A.   I've known John all my life.  I know that John was in

7 the painting business, and he was also -- he had a yellow

8 page business.

9 Q.   Was that My Phone Book?

10 A.   Yes.

11 Q.   And how long did he do that sort of work?  Do you know?

12 A.   Umm, I really don't have a track on that, how long he

13 did that work.  But those are the businesses that I knew

14 that John was in.

15 Q.   Was he also selling lumber or firewood, to your

16 knowledge?

17 A.   From time to time he was telling me that he would log.

18      That's -- that's been a family trait since we grew up.

19 His dad does that still to this date of it.

20 Q.   Would it be fair to say that John has a number of

21 ongoing business enterprises?

22 A.   I would believe so.

23 Q.   And have you had contact with John with his family?

24 Have you seen him interact with his family?

25 A.   John always talks about his family.  Umm, we grew up to

1  together.  So, you know, John's been a family guy since I've

2  known him.  We went to church together.  We were alter boys

3  together.

4  Q.   Did you see John specifically this summer with his

5  family?

6  A.   Excuse me?

7  Q.   Did you have dinner with John this summer with his

8  family?

9  A.   I've had dinner with him and his kids at a restaurant,

10 yes.

11 Q.   Have you seen how John interacts with his children?

12 A.   Very well behaved, mannered.  Like a normal dad would.

13 Q.   Have you been to the house in Phillipston?

14 A.   I have.

15 Q.   How many times have you been there?

16 A.   I haven't been there too many times, but over the

17 course of the years we've known each other when he purchased

18 the home and on occasion here and there when we'd get

19 together.

20 Q.   During the years you've known John, have you seen him

21 in possession of a firearm?

22 A.   I have not.

23 Q.   Have you ever heard him talk about firearms?

24 A.   No.

25 Q.   What can you tell the Court about John in terms of what

1 kind of person he is and whether if he is released whether

2 you are of the opinion he would stay here?

3 A.   John is, you know, all about his family and his ten

4 kids.  I don't see him going anywhere.

5         MR. GARRITY:  I have no further questions.

6         THE COURT:  Ms. Foley?

7                 CROSS-EXAMINATION

8 BY MS. FOLEY:

9 Q.   Were you aware that he was arrested in 2005 and charged

10 with possession of a firearm without a permit?

11 A.   I'm not.

12 Q.   You're not.

13     Were you aware that he was arrested in 2009 and charged

14 with A&B dangerous weapon?

15 A.   I'm not.

16 Q.   Are you aware that there were 27 firearms found in his

17 house when it was searched in August of 2012?

18 A.   I'm not.

19 Q.   When was the last time you went to his house in

20 Phillipston?

21 A.   Sometime in the spring.

22 Q.   Spring of 2012?

23 A.   I believe so.

24 Q.   Did you ever see marijuana in the house?

25 A.   No.

1  Q.   Did you ever smell marijuana in the house?

2  A.   No.

3  Q.   Did you walk --

4       Were you allowed to walk around the house?

5  A.   We met outside, and we went to dinner.

6  Q.   Oh, so you didn't go inside the house; you met outside.

7            THE COURT:  You'll have to answer, sir.  Your

8  shaking of your head doesn't -- it's not reflected on the

9  record.

10           THE WITNESS:  I understand.

11           THE COURT:  So please answer the question.

12           THE WITNESS:  Sure.

13 Q.   Did you go inside the Phillipston house in the spring

14 of 2012?

15 A.   I have not.

16 Q.   Other than having dinner with John Kosta and his family

17 in the summer of 2012, when was the last time you saw him

18 with his family, with his children?

19 A.   I've seen Kosta over the years many times.  I -- I

20 don't count how many times I see Kosta during the course of

21 a year.  Sometimes it's once, sometimes it's twice,

22 sometimes it's not for a year or so.  But over the -- you

23 know, over our relationship we've seen each other all along.

24 Q.   Okay.  So my question specifically thinking back over

25 the course of the last year in 2012, this year, how many

1  times have you seen John Kosta in the presence of his

2  children?

3  A.   Several.

4  Q.   Where?  One time was at dinner.  Any other times?  At

5  church?

6  A.   We haven't been to church together, no.

7  Q.   Where did you see him with his children -- with his

8  children present with him?

9  A.   At his dad's house.

10  Q.   When?

11  A.   Sometime in the spring.  I don't have an actual date.

12  Q.   Of 2012.  So it was the spring of 2012 he was with his

13  children.

14       How many of his children?

15  A.   A few.

16  Q.   A few of them.

17       And where was this?

18  A.   Like I said, at his dad's home.

19  Q.   Where's that?

20  A.   In Middleton.

21  Q.   Okay.  And any other time that you can recall?

22  A.   No.

23  Q.   Have you ever heard John Kosta yelling at his kids?

24  A.   No.

25  Q.   No.  Would you be surprised if you learned that he did?

1 A.   Yes.

2 Q.   So if we were to play a recorded call for you with John

3 Kosta talking to one of his sons, would you be surprised to

4 hear the way he talked to him and elevated his voice and

5 yelled at him?

6 A.   I would be.

7 Q.   Would that change your opinion as to whether he's a

8 good father?

9 A.   No.

10 Q.   Or the fact that there were over a hundred marijuana

11 plants growing in his house, the house that eight of his

12 children lived in, would that change your opinion as to

13 whether he's a good father?

14 A.   No.

15 Q.   You still think he would be a good father.

16      And Mr. Garrity asked you, question, had you ever

17 talked to the defendant or known of the defendant to sell

18 property, and you replied that he's been in the painting

19 business and the phone book business.

20      I don't know if you misunderstood the question, so let

21 me ask you.

22      Have you ever known Mr. Costa, John Kosta, to sell a

23 piece of property?

24 A.   Early on in maybe the early 2000s he had mentioned to

25 me about properties he was fixing and selling.

1  Q.   Other than him telling you in the early 2000s that he

2  was fixing up and selling property, have you ever known him

3  to sell a piece of property?

4  A.   I know that he had a real estate brokerage license.

5  Q.   How do you know that?

6  A.   He told me.  He has told me.

7  Q.   Have you ever seen -- do you know if he had an office,

8  a real estate office?

9  A.   At one point he did, yes.

10  Q.   Where was that?

11  A.   That, I can't recall, but I know he had a physical

12  office.

13  Q.   When?

14  A.   I would not remember the year of that.

15  Q.   Do you know what town?

16  A.   It would be in reading, I believe.

17  Q.   In the past year?

18  A.   That, I don't know.  But the time that I knew of his

19  office in Reading, that's the office I knew.

20  Q.   Past five years?

21  A.   I can't put a number to it.

22          MS. FOLEY:  No further questions, Your Honor.

23          MR. GARRITY:  Very briefly,

24                      REDIRECT EXAMINATION

25  BY MR. GARRITY:

*Judy Bond Gonsalves*
**Certified Federal Court Transcriber**
**508.984.7003**

1  Q.   Sir, did you go four wheeling with Mr. Costa and his

2  children this summer in Phillipston?

3  A.   Not that I can recall.

4  Q.   Did you ever -- did you go to Phillipston this summer

5  and go over some drawings inside the house with Mr. Costa?

6  A.   I believe I did, yes.

7  Q.   Was that inside the house or outside the house?

8  A.   That was inside and outside.  We met outside.  We went

9  inside, looked at the drawings, then we came outside.

10 Q.   And were the drawings of properties that he was trying

11 to work on?

12 A.   Yes, they were.

13 Q.   And that was this summer.

14 A.   Correct.

15 Q.   When you were inside the house this summer going over

16 the drawings, did you smell any odor of marijuana?

17 A.   No.

18 Q.   Well, let me ask you this.  Are you familiar with the

19 odor of marijuana?

20 A.   No.

21 Q.   Have you ever smelled it before?

22 A.   No.

23 Q.   Did you detect any unusual odors when you were inside

24 the house?

25 A.   No.

1  Q.   And did you accompany John and some of his children to

2  a gym in Fitchburg on one occasion this year?

3  A.   I did.

4  Q.   And did you see how he interacted with his children at

5  the gym?

6  A.   Absolutely.

7  Q.   And how did he interact with them?

8  A.   Like a normal dad.

9           MR. GARRITY:  I have no further questions.

10          THE COURT:  All right.  Thank you, sir.  You may

11 step down.

12          Any further evidence, Mr. Garrity?

13          MR. GARRITY:  No, Your Honor.

14          THE COURT:  Do you have any evidence to proffer?

15          MR. GARRITY:  Argument, Judge, in terms of what

16 our proposal is.

17          THE COURT:  Well, let's hear your proposal, so

18 when Ms. Foley argues she will be aware of what you're

19 suggesting.

20          MR. GARRITY:  Yes, Your Honor.

21          I sent an email to Ms. Foley with my proposal, but

22 it's this.

23          We're asking that Mr. Costa be released into the

24 third-party custody of his father and his son John, his

25 oldest son John.

1          When I sent the email to Ms. Foley, we were

2  suggesting that Mr. Costa if he was released enter the

3  third-party custody of his father and his son, that he live

4  at property on Maple Street in Lynn, the property that

5  you've heard some testimony about:  361 Maple Street.  His

6  parents own that property outright.

7          And I had suggested that, because it was my

8  understanding that Mr. Costa -- the father -- runs a

9  painting business and had to live nearby the Lynn area.  In

10 speaking to him this afternoon he indicates he could live

11 with John as well and John's son John at the residence in

12 Phillipston, and I guess that's what our proposal would be.

13 That he be released --

14          THE COURT:  Wait a minute.  Isn't his father the

15 third-party custodian of Mrs. Kosta living at 5 Hemlock

16 Circle in Middleton?

17          MR. GARRITY:  I think the father and mother --

18          THE COURT:  Yeah.

19          MR. GARRITY:  -- of Mrs. Kosta.  So we're asking

20 the Court to --

21          THE COURT:  No.  Aren't John and Virginia

22 Mihalakakis her in laws?

23          MR. GARRITY:  They are, Judge.

24          THE COURT:  And isn't John the defendant's father?

25          MR. GARRITY:  It is.

```
 1            THE COURT:  On the condition of release he's in

 2  the third party -- she's in the third-party custody of her

 3  in-laws living in Middleton.

 4            MR. GARRITY:  I understand, Judge --

 5            THE COURT:  So are you suggesting that he not live

 6  in Middleton where he's acting as third-party custodian for

 7  Mr. Costa's wife?

 8            MR. GARRITY:  I put that proposal forward, Judge,

 9  because I've never had a situation where I've asked the

10  Court to release a parent into the third-party custody of a

11  child.  But if that's the only alternative --

12            THE COURT:  Well, I mean --

13            I'm just wondering.  You're saying that Mr. -- the

14  defendant's father is not going to live at the location

15  where he's third-party custodian of the wife.  That's the

16  thing I'm wondering.

17            Are you saying that he no longer is going to be

18  third-party custodian to the wife -- the defendant's wife?

19            MR. GARRITY:  If the Court went along with our

20  proposal --

21            THE COURT:  All right.  You wanted the third-party

22  custodian under his father and --

23            MR. GARRITY:  His oldest son John.

24            THE COURT:  -- his older son John.

25            And how old is John?
```

1          MR. GARRITY:  He's twenty-one, Judge.

2          THE COURT:  And you want him to live where?

3          MR. GARRITY:  At the home in Phillipston.  They

4 still own that property.  It's vacant at this point in time.

5          THE COURT:  Where does John live now?

6          MR. GARRITY:  He lives on Hemlock Circle in

7 Middleton.  All the children live there, Judge.

8          THE COURT:  Okay.

9          MR. GARRITY:  We're asking that it be supplemented

10 by a bracelet on Mr. Costa.

11          And we're suggesting the home in Phillipston,

12 because given the amount of children Mr. Costa has, having

13 them visit him at the house in Lynn would be problematic.

14 So the house in Phillipston would be the best.

15          And we're asking also that it be supplemented with

16 400,000 in surety by way of real estate.

17          THE COURT:  What real estate is that?

18          MR. GARRITY:  The parents have, they tell me,

19 200,000 in equity on the home in Hemlock Circle.

20          THE COURT:  That's already pledged.

21          MR. GARRITY:  But there's 200,000 left in equity,

22 they tell me, along with the buildings at 361 Maple Street.

23          THE COURT:  And what's that assessed at?

24          MR. GARRITY:  Mrs. Kosta tells me 200,000.

25          THE COURT:  Anything else in connection with your

1 proposal?

2          MR. GARRITY:  Well, any other conditions the Court

3 saw fit to impose.

4          THE COURT:  Okay.

5          MR. GARRITY:  But those are the primary ones.

6          THE COURT:  Okay.

7          MR. GARRITY:  And, Judge, if I could say with

8 respect to --

9          Do you want to hear argument, or?

10          THE COURT:  I'm going to hear Ms. Foley first.

11 Then I'm going to hear you.

12          Go ahead, Ms. Foley.

13          MS. FOLEY:  Your Honor, the government continues

14 to agree with Pretrial Service that detention is appropriate

15 in this case.

16          The defendant is facing a fifteen-year-mandatory

17 minimum.  He has a prior conviction for drug distribution

18 which makes the five-year-charged term in the indictment a

19 ten-year with the 924(c) that was in the superseding

20 indictment, so he's looking at a term of fifteen years

21 minimum.

22          He's also possibly a career offender.  We don't

23 have the date in which he was released from the 1993

24 conviction, but if it was in 1997, it is in the fifteen

25 years which would make him a career offender.

1          He is facing a lot of time.

2          There's also -- during the course of this

3 investigation --

4          I mean, just starting with the firearms and the

5 fire power that was in the house.  As the Court recalls, it

6 wasn't only the firearms in the house.  There is also

7 bullet-proof vests.  There's an elaborate security system

8 and a stun gun.

9          Coupled with the fact that his supplier in Mexico

10 who has outstanding warrants for his arrest in the United

11 States was seen with the defendant -- leaving the

12 defendant's Arizona house a year and a half ago -- or almost

13 two years ago now with $285,000.  The fact that that person

14 is still on the lam, the fact that the defendant transferred

15 at least five properties to the son who now he's asking to

16 be placed into the custody of, and then when this was --

17 government argues not coincidental that it was a week and a

18 half after his courier had been stopped with 980 pounds.

19          And as the Court recalls, as the surveillance --

20 the government was -- had a cell site order on the

21 defendant's phone when this McCormick person -- defendant

22 was arrested in South Dakota.  And not only did surveillance

23 see Mr. Costa leaving with Mr. McCormick and another

24 do-defendant, Dennis Novicki; but the cell phone pings that

25 were coming from his phone placed him also in South Dakota

1  at that time.

2          So the government's evidence against the defendant

3  is incredibly strong, and he is facing a fifteen-year

4  minimum.

5          Over the course of the investigation I can't even

6  count how many cell phones the defendant used and was

7  intercepted overall in fictitious names.  He had I believe

8  --

9          THE COURT:  Was that evidence presented at the

10  earlier hearing?

11          MS. FOLEY:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MS. FOLEY:  And as far as the bank accounts go,

14  that information was at the prior hearing and also in the

15  submissions when Tamara Kosta was arguing for release.

16          There were nine bank accounts and four safe

17  deposit boxes that were identified.  He --

18          A bracelet and a son won't even come close to

19  ensuring this defendant's reappearance in this court, nor

20  can the Court have any confidence that the safety of the

21  community will not be in jeopardy if this defendant a

22  released.

23          I don't believe that he has come close to meeting

24  that burden.

25          THE COURT:  Well, just a burden of production.

1          MS. FOLEY:  Yes.  Well, rebutting the

2    recommendation that he is a danger --

3          THE COURT:  He rebuts it merely by presenting --

4    meeting a burden of production, and then the burden switches

5    to you to prove by a preponderance of the evidence that he

6    will flee or clear and convincing that he'd be a danger.

7          MS. FOLEY:  Considering his prior record which is

8    old but long and considering the nature of these offenses,

9    the fact that he has been between Massachusetts and Arizona

10   many times in the past during the course of this

11   investigation, the fact that he was in Mexico in May and the

12   government suggests that it wasn't for Cinco de Mayo, that

13   he had been intercepted discussing going to Mexico to meet

14   Feto --

15         And again, I don't believe it's a coincidence that

16   on the same day and in the same mode -- you know, on foot --

17   that his other supplier, Verduzco, also travels on foot

18   through the same, you know, port of entry into Mexico and

19   returns.  They both returned on that same day too.

20         The government believes that he -- it has met its

21   burden that this defendant is a risk of flight, and he is a

22   danger to the community, and that no conditions including a

23   bracelet or his father or his son --

24         Who also, as the Court has heard, the defendant's

25   father was making cash deposits during the course of this

1 investigation into accounts that were controlled by the

2 defendant.

3          And his son was used, I guess, you know, to

4 transfer property at a time where the defendant could have

5 very reasonably feared that he was under investigation.  And

6 then he waited several months, believed that any jeopardy

7 had passed, and then transferred his properties back into

8 his name.

9          The fact that even the two people he called at

10 this hearing have -- other than the defendant's telling them

11 that he was a good person and a family man, there is

12 absolutely no evidence, because these people have not

13 witnessed him with his children on any type of consistent

14 basis.  And one had never been to his house -- inside his

15 house, and the other only with some, I guess, you know, help

16 recalled being in his house once.

17          And the government again believes that the

18 evidence is overwhelming against the defendant and that --

19          THE COURT:  What's the status of these properties

20 that were transferred back into his name?

21          MS. FOLEY:  They are all under indictment, and so

22 they're subject to forfeiture.

23          THE COURT:  Does the government's investigation

24 reveal that this defendant has access to any other sums of

25 money that you haven't attached or encumbered?

1          MS. FOLEY:  The government has not identified any

2   other bank accounts, but the government can say that after

3   the --

4          And I can submit things if the Court wants to see

5   them.

6          But when Donald McCormick was arrested earlier

7   this year, the balances in the checking accounts that were

8   identified by the government dwindled like -- substantially.

9   And the government --

10         THE COURT:  Do you know where the money went?

11         MS. FOLEY:  No.

12         THE COURT:  And what's the amount that was -- what

13  was the amount of the dwindle?

14         MS. FOLEY:  Well, in the previous year in 2011

15  there were over 450,000 -- or $480,000 in cash deposits.  In

16  February of 2012 I believe there was only $21,000.

17         THE COURT:  All right.  McCormick was stopped in

18  January?

19         MS. FOLEY:  January 9th -- 6th, 2012.

20         THE COURT:  And what's the evidence of withdrawals

21  after that?

22         MS. FOLEY:  I would have to consult with the U.S.

23  Marshals and my office, but as of --

24         THE COURT:  Do we know how much was in the -- do

25  we know how much were in the accounts as of the day

1  McCormick was arrested and how much was withdrawn

2  thereafter, or had they dwindled before McCormick's arrest?

3        MS. FOLEY: My recollection and the agent's

4  recollection is that it happened after the arrest, but I

5  don't have that information with me right now.

6        THE COURT: All right. I'd like to see that,

7  because then if there's a large --

8        It's of consequence if there's a large withdrawal

9  of cash from the accounts in January that you don't have any

10  -- the government has no knowledge as to where the money

11  went.

12        MS. FOLEY: No.

13        THE COURT: And if it was in amounts that were

14  significant enough not to have been needed for personal use,

15  an inference could be drawn that there's money there

16  somewhere.

17        MS. FOLEY: Yes, Your Honor. I can consult with,

18  --

19        Like I said, the U.S. Marshal Service was helping

20  our office identify these assets and track the assets for

21  forfeiture.

22        THE COURT: Thank you. Is that it? Do you have

23  anything more? I'm sorry. I didn't mean to interrupt you.

24        MS. FOLEY: I don't believe so, Your Honor.

25        THE COURT: Okay. Go ahead, Mr. Garrity.

1            MR. GARRITY:  Your Honor, just dealing with the

2   last point in terms of moneys this year, I'm trying to

3   locate the exact language in agent Kelleher's affidavit, but

4   he talked about only updating materials through February of

5   this year and talked about, I think, 21,000 in deposits but

6   made no indication of withdrawals.

7            But I think his indication was they only checked

8   through February and nothing beyond that.

9            THE COURT:  All right.  Well, Ms. Foley's going to

10  get the information.  She'll pass it on to you, so you'll

11  have it.  And if you have any problems with it or think it's

12  inaccurate, let me know.

13           MR. GARRITY:  That's fine.

14           THE COURT:  But I'll hear your argument.

15           MR. GARRITY:  Judge, with respect to the risk of

16  flight, I think Mr. Costa's record is probably the best

17  evidence that he doesn't pose a risk of flight.

18           It's got a lot of pages on it, but the last

19  conviction that I can see on it is from February 3rd of '94.

20           I know Ms. Foley talked about Mr. Costa perhaps

21  being a career offender.  I don't read it the same way.  I

22  think he times out on what might be the second predicate

23  being the one out of Lawrence District Court back in October

24  of 1993.

25           THE COURT:  Where he got the indefinite Concord

1  sentence.

2          MR. GARRITY:  No, Judge.  I'm looking -- there was

3  an October 18, '93 guilty filed.

4          THE COURT:  October '93.

5          MR. GARRITY:  October 18, '93.

6          THE COURT:  I don't see anything -- I see a

7  November of '92 in the Lawrence District Court --

8          MR. GARRITY:  And Judge, I'm looking at the

9  disposition date.  The arrest date November 9, '92.

10          THE COURT:  Oh, I'm sorry.

11          MR. GARRITY:  And then there's the --

12          THE COURT:  Wait a minute.  Wait a minute.  Wait a

13  minute.  Hold it.  Hold it.

14          Okay.  I see a possession with intent to

15  distribute Class D.  In October of '93 he got an indefinite

16  Concord sentence.  Is that --

17          MR. GARRITY:  Right.  Right above that there's a

18  guilty filed.

19          THE COURT:  Yeah.

20          MR. GARRITY:  It looks like it's out of the same

21  --

22          THE COURT:  It is.  It sounds like -- it looks

23  like the same thing.

24          MR. GARRITY:  Right.  And that one, Judge, I think

25  he -- that may not be within the fifteen year time period.

1          THE COURT:  And what he has to -- if he was

2  released prior is that it --

3          Is it a question of his release date?

4          MR. GARRITY:  It's got to be within fifteen years,

5  and I think the indictment talks about November of '09.

6          THE COURT:  Do we know, Ms. Brown, when he was

7  released on that Concord sentence?

8          PRETRIAL SERVICES:  No, Your Honor.  I don't know

9  the exact date.  I'm estimating, and I would say 1997.  I

10  think he served four years on the sentence.  There are

11  several above it, also, the five to seven years.

12          THE COURT:  Yeah.

13          PRETRIAL SERVICES:  My belief is they ran

14  concurrently.  Although I believe the very top of that page

15  that we were referring to also has a two and a half year.

16          THE COURT:  House of correction.

17          PRETRIAL SERVICES:  Yes.

18          THE COURT:  From and after.

19          PRETRIAL SERVICES:  On a from and after sentence

20  serving, which is I believe -- well, it was --

21          THE COURT:  Yeah, he was getting a lot in October

22  of '93, because he's got the Lynn District Court where he

23  was committed for violation of probation.

24          PRETRIAL SERVICES:  Combined.  I would say he did

25  four years on all of those.

1        THE COURT:  But there's no way of finding out

2 specifically when he was released from the Concord sentence?

3        PRETRIAL SERVICES:  It would take some time.  The

4 clerks offices unfortunately are not very responsive.

5        THE COURT:  Okay.  Well, if you would make an

6 effort to find that, please.

7        PRETRIAL SERVICES:  Yes, Your Honor.

8        THE COURT:  Thank you.

9        MR. GARRITY:  Your Honor, putting aside the career

10 offender issue --

11        THE COURT:  Well, what's the other predicate that

12 would have to be relied on besides that one?

13        MR. GARRITY:  The A&B I believe.  And/or the

14 mayhem.  That might be.  He also got a breaking and entering

15 at the same time he got five to seven on.  That would be a

16 predicate.

17        THE COURT:  Okay.  Thank you.  In other words, the

18 mayhem and the breaking and entering, you agree, would be a

19 predicate.  It's the question as to the second one --

20        MR. GARRITY:  Yes, Your Honor.

21        THE COURT:  -- which would be the drug case.

22        MR. GARRITY:  That's correct, Your Honor.

23        THE COURT:  Okay.  Go ahead.

24        MR. GARRITY:  Your Honor, if you look at his

25 record, in 1998 he was charged with a number of offenses in

1 Norfolk Superior Court including assault with attempt to

2 murder.  He was released on bail on that.  He was out on

3 bail for approximately two years until he was found not

4 guilty on June 8 of 2000.

5            He had every motivation to flee at that time.  The

6 same motivations existed then as they do now.  He didn't

7 flee.  He stayed in the area, stood trial knowing that he

8 could go back to prison and did not do so -- did not flee.

9            THE COURT:  Do you know what kind of bail he was

10 on for that case?

11            MR. GARRITY:  I think it was -- he tells me two or

12 three thousand dollars cash bail.

13            And the one on October 13th of '05, possession of

14 a firearm without a permit, that was dismissed almost

15 immediately.  Nevertheless, he went in clear default -- he

16 was summonsed to court, clear default.  And then showed up,

17 and it was dismissed within --

18            THE COURT:  How did it come to be defaulted?

19            MR. GARRITY:  The summons went out, and his

20 recollection is he didn't get notice of it until sometime

21 after the summons date, and then went in and cleared it with

22 his attorney.

23            THE COURT:  What about the default in January of

24 -- the assault and battery, the assault and battery with a

25 dangerous weapon in Winchendon?  It looks like there's a

1 default there, too.

2          MR. GARRITY:  He tells me that -- Judge, I can

3 check this other myself, but it appears that might be the

4 same sort of situation.  He was summonsed in, went with his

5 attorney, cleared the default --

6          THE COURT:  Why would he be defaulted if the first

7 time he's asked to come to court, he's summoned, and goes?

8          MR. GARRITY:  Judge, I can't tell the Court the

9 mechanics of why he may have defaulted.  He was in Arizona

10 back and forth around that time period.  But went in and

11 cleared the default within weeks, and then that matter was

12 dismissed, as well.

13          THE COURT:  Okay.

14          MR. GARRITY:  He was released on bail on that,

15 also.

16          But I think the most telling one is how he dealt

17 with the assault with attempt to murder.  Knowing what he

18 was looking at, he showed up in court, and I'm assuming

19 there were multiple hearings there.

20          THE COURT:  Did that case originate in the

21 district court, or was it a direct indictment?  I was just

22 looking for the --

23          I don't see anything in Norfolk preceding it.

24          MR. GARRITY:  It must have been a direct

25 indictment, Judge.  I don't see any --

1          THE COURT:  Yeah, I don't either.  Okay.  Okay.

2  Continue.

3          MR. GARRITY:  Judge, I mean, all his family is

4  here.  His children are here.  His wife is required to be

5  here.  His parents.

6          I know he was moving back and forth over the last

7  few years between Arizona and Massachusetts, but now his

8  family is situated here.  He's got every motivation to stay

9  here.

10          I think his conduct in these older cases shows he

11  will show up.  The bracelet will make sure he stays in the

12  area.

13          His father who's not going anywhere will make sure

14  -- or his son will make sure he's here.

15          It can be supplemented with whatever other

16  condition the Court sees fit to impose.

17          And the real estate posting, as far as I'm aware

18  of, that's the entirety of his parents' real estate

19  holdings.  I can't imagine he would abscond and put that at

20  risk.

21          So we're asking the Court to release him on the

22  conditions we've asked to be set.  I understand the

23  statutory presumptions that apply, but we're asking the

24  Court to let him remain free --

25          THE COURT:  Well, the presumption only means --

1            Well, it means two things.  It means you have the

2    burden of production, and then it does retain some weight

3    after you've rebutted the presumption to the extent that Mr.

4    Costa's case resembles the Congressional paragon.

5            MR. GARRITY:  Judge, one thing I would say about

6    the firearms.  I think it's telling that he was under

7    surveillance for years both physically and by way of wire,

8    and there's no indication whatsoever that he's talking about

9    firearms, about obtaining one, possession of one.  And I

10   think the agent's testimony with respect to how they were

11   located, it doesn't --

12           THE COURT:  Yeah, but you haven't given me any

13   explanation for that arsenal.  I mean, why would someone

14   have that amount of fire power, a number of the guns loaded,

15   in his house?

16           MR. GARRITY:  I know his wife liked to go shooting

17   with the children.

18           THE COURT:  How many goes can she shoot at once?

19           MR. GARRITY:  Well, they have ten children, too,

20   Judge.  I know some of them are much younger, but --

21           THE COURT:  Well, I hope the younger ones aren't

22   shooting.

23           MR. GARRITY:  That's my understanding --

24           THE COURT:  All right.  I'll take the matter under

25   advisement.

1          I'm going to ask Pretrial Services to do an

2 interview of John the son, and see if they can find out that

3 information I asked them about as to when he was released

4 from the Concord sentence.

5          I'd also be interested if you are able to -- and I

6 understand the problems with the district courts -- is find

7 out about those defaults in Winchendon in 2005 and 2010, and

8 how he came to be defaulted in those, please.

9          MS. FOLEY:  And Your Honor, for the record, --

10          THE COURT:  Yeah.

11          MS. FOLEY:  -- I'm going through his --

12          Going further from the 2000 arrest there are a

13 number of defaults.

14          THE COURT:  I understand.  The record speaks for

15 itself.

16          MS. FOLEY:  In addition -- okay.

17          THE COURT:  I'm interested in the more recent ones

18 because of the testimony that there had been somewhat of a

19 change in his conduct after he got out of jail from those

20 1990 offenses.  So I'm just interested -- I'm more

21 interested --

22          I saw all the other defaults.

23          MS. FOLEY:  Okay.  And I also wanted because the

24 Court raised the issue about the arsenal of weapons, in the

25 indictment -- the superseding indictment there were also

1   1700 rounds of ammunition in the house.

2          THE COURT:  Okay.  All right.  Thank you very

3   much.

4          And you'll get me that information, and you'll get

5   it to Mr. Garrity with respect to withdrawals after the

6   South Dakota arrests.

7          MS. FOLEY:  I will, Your Honor.  I --

8          THE COURT:  Is the fact that he was in South

9   Dakota at the time in the -- was that bought out at the

10  original hearing?  You said the pings indicated that Mr.

11  Costa was also in South Dakota.

12         MS. FOLEY:  I'm not absolutely sure.

13         THE COURT:  All right.  It's either --

14         MS. FOLEY:  But they were in the affidavits that

15  were filed in this case for the Title III applications.

16         THE COURT:  Well, I've never seen the Title III,

17  but I don't issue them.

18         MS. FOLEY:  That's true.

19         It is.  Your Honor, the agent just said that it is

20  -- it was in the transcript.

21         THE COURT:  In the transcript?

22         MS. FOLEY:  Yes.

23         THE COURT:  Okay, very good.  And do we have that,

24  Mr. Danieli, the transcript?  Did Ms. Foley --

25         THE CLERK:  Yes.

1          THE COURT:  Okay, very good.

2          MS. FOLEY:  Yes.  I can email it to you, Your

3 Honor, as well.

4          THE COURT:  No, no.  That's fine.  I don't need

5 it.

6          MS. FOLEY:  Your Honor, there's one other issue as

7 far as scheduling.  I was scheduled to be out starting

8 tomorrow for the rest of the week.

9          THE COURT:  Well, I don't think it's going to be

10 decided before --

11          MS. FOLEY:  Okay.  I just wanted to let the Court

12 know that I will inquire --

13          THE COURT:  With the district courts a couple of

14 days before a holiday, I'm asking you to do some research?

15          MS. FOLEY:  Okay.

16          THE COURT:  I don't think so.  All right.  Thanks

17 very much.

18          MR. GARRITY:  Thank you, Your Honor.

19          THE COURT OFFICER:  All rise.  Court is in recess.

20     (Court adjourned at 4:08:56 p.m.)

21

22

23

24

25

1                        CERTIFICATION

2       I, Judy Bond Gonsalves, a court approved transcriber,

3   certify that the foregoing is a correct transcript from the

4   official electronic sound recording of the proceedings in

5   the above-entitled matter.

6

7

8   _____   January 8, 2012
    Judy Bond Gonsalves
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25