*CR 12 - 10226 - DJC*

## AFFIDAVIT OF STEPHEN J. KELLEHER IN SUPPORT OF SEARCH WARRANTS

RECEIVED IN OFFICE OF
ROBERT B. COLLINGS
U.S. MAGISTRATE JUDGE

JAN 30 2013

UNITED STATES DISTRICT COURT
BOSTON, MASSACHUSETTS

I, Stephen J. Kelleher, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal

Procedure 41(a)(2)(c), that is, a government agent engaged in enforcing the criminal laws and

duly authorized by the Attorney General to request a search warrant.  I have been a Special

Agent with the Federal Bureau of Investigation (FBI)  since 2004.  I am currently assigned

to the Organized Crime Drug Enforcement Task Force Boston Strike Force which consists

of federal law enforcement agents from not only the FBI, but other federal agencies,

including the U.S. Drug Enforcement Administration ("DEA"), the Immigration and

Customs Enforcement ("ICE"), the U.S. Marshals Service ("USMS"), and other state and

local law enforcement agencies.  Prior to my current position, I was employed as a police

officer in Seekonk, Massachusetts, and East Providence, Rhode Island.

2.      Since becoming a Special Agent with the FBI, I have participated in investigations of

narcotics trafficking and money laundering, and among other things, have conducted and

participated in physical surveillance, the execution of search warrants, debriefings of

informants, and have been the affiant in Title III investigations.  Through my training,

education, and experience, I am familiar with the manner in which illegal drugs are

transported, stored, and distributed, and with the methods of payment for such drugs.

3.      I have written and/or participated in the execution of numerous search warrants resulting in

the seizures of large quantities of controlled substances; packing implements and other

paraphernalia involved in the manufacture and distribution of controlled substances; large

amounts of United States currency, ledger books, bank records, telephone books, receipts, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances. I have participated in the debriefing of defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants and executing arrests. As a result of my assignments, I have received extensive specialized training in the field of narcotics identification, investigation and enforcement.

4.      Based upon my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage and transportation of narcotics and the collection of monies that constitute the proceeds of narcotics trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that narcotics traffickers speak in vague, guarded or coded language when discussing their illegal activities, and employ a variety of counter-surveillance techniques in order to detect if their vehicles are being followed by members of law enforcement.

5.      I have been the case agent in the investigation of the marijuana drug trafficking organization ("DTO") headed by John KOSTA and others as described in detail below. During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and

2

other related cases with agents and local law enforcement officers who have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a variety of other sources, including law enforcement officers and agents, confidential sources, public records, telephone toll records, bank records, pen register and trap and trace information, and intercepted calls.

### Instant Investigation

6. Based on this investigation, which has included court-authorized electronic surveillance, physical surveillance, and arrests and drug seizures, on August 2, 2012, a Boston, Massachusetts federal grand jury returned a three-count indictment, charging 1) John KOSTA, a/k/a Costa MIHALAKAKIS; 2) Fidencio SERRANO-ESQUER, a/k/a "FITO"; 3) Nestor Antonio VERDUZCO, a/k/a "Tony"' 4) Dennis NOVICKI; 5) Alexander NAPOLEON; and 6) Donald McCORMICK with conspiracy to possess with intent to distribute, and to distribute, one hundred kilograms or more of marijuana, in violation of 21 U.S.C. §846 (Count One); John KOSTA and Alexander NAPOLEON with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1); (Count Two); and John KOSTA and Tamara KOSTA with money laundering conspiracy, in violation of 18 U.S.C. §1956(h) (Count Three) (Dkt. # 12-10226-DJC).

7. On August 6, 2012, the Honorable Marianne B. Bowler signed two search warrants, authorizing the search and seizure of evidence at two locations: 45 Riley Switch Road, Phillipston, Massachusetts and 359 Maple Street, Lynn, Massachusetts. The warrants were executed on August 7, 2012. The warrant and return information for 45 Riley Switch Road

3

is attached and incorporated herein (Attachment C). My affidavit dated August 6, 2012 in support of those search warrants is incorporated by reference herein (hereinafter, "Kelleher August 6 Affidavit"). All defendants except Fidencio SERRANO-ESQUER, a/k/a "FITO" were arrested on August 7, 2012.

8. On August 17, 2012, the Honorable Robert B. Collings signed two search warrants, authorizing the search and seizure of evidence at two locations: 45 Riley Switch Road, Phillipston, Massachusetts and 325, 339-241 Water Street, Fitchburg, Massachusetts. The warrants were executed on August 17, 2012. My affidavit dated August 17, 2012 in support of those search warrants is incorporated by reference herein (hereinafter, "Kelleher August 17 Affidavit"). No telephones, computers or storage devices were seized during the execution of the August 17, 2012 warrants.

9. On September 27, 2012, the federal grand jury returned a superseding indictment in this case, which added Tamara KOSTA to Count One (conspiracy to possess with intent to distribute, and to distribute, one hundred kilograms or more of marijuana, in violation of 21 U.S.C. §846); added new Count Four, charging John KOSTA and Tamara KOSTA with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1); added new Count Five, charging John KOSTA and Tamara KOSTA with possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c) ; and added new Count Six, charging John KOSTA with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §922(g) (Dkt. # 12-10226-DJC).

## PURPOSE OF THIS AFFIDAVIT

10. The purpose of this Affidavit is to set forth probable cause in support of my applications for

search warrants authorizing the search for and seizure of evidence of the crimes of
conspiracy to possess with intent to distribute, and to distribute, marijuana, possession with
intent to distribute marijuana and money laundering, all in violation of 21 U.S.C. §846 and
18 U.S.C. §§1956 and 1957 (herein, the "Target Offenses") from the following items, each
of which was seized by agents on August 7, 2012, and assigned an FBI non-drug exhibit
number (e.g., 1B1):

| Description | Referred to herein as: |
|---|---|
| 1. LG cell phone, serial number 201CYFT0792323, marked as Exhibit 1B5. | Telephone 1B5; Photograph in Attachment A. |
| 2. Dell Inspiron laptop, model N5040 serial number BDDJJR1, marked as Exhibit 1B7. | Computer 1B7 ; Photograph in Attachment A. |
| 3. USB Flash Drive, marked as Exhibit 1B8. | Storage Device 1B8 ; Photograph in Attachment A. |
| 4. Dell Inspiron Laptop, N5050, serial number 2M6MLR1, marked as Exhibit 1B9. | Computer 1B9 ; Photograph in Attachment A. |
| 5. Two San Disk cards, collectively marked as Exhibit 1B10. | Storage Devices 1B10; Photograph in Attachment A. |
| 6. Speeco Technologies DVR-16TN/160, marked as Exhibit 1B112. | Storage Device 1B112; Photograph in Attachment A. |
| 7. Two LG Verizon cell phones, serial numbers 202CYFT0970243 and 201CYHE0792233, collectively marked as Exhibit 1B17. | Telephones 1B17; Photograph in Attachment A. |

| | **Description** | **Referred to herein as:** |
|---|---|---|
| 8. | A Verizon LG cell phone, serial number 202CYLH0940400; Verizon Motorola cell phone with DECMEID number 268435459411505441; Four San Disk Cards; Two computer memory sticks; and Three video cassettes, collectively marked as Exhibit 1B22. | Telephones and Storage Devices 1B22; Photograph in Attachment A. |
| 9. | Samsung Laptop, serial number, HJV993CRA00493B marked as Exhibit 1B25. | Computer 1B25; Photograph in Attachment A. |
| 10. | Canon camera; Sony video camera; and San disk card, collectively marked as Exhibit 1B26. | Storage Devices 1B26; Photograph in Attachment A. |
| 11. | Two cell phones seized from Tamara Kosta at the time of her arrest, collectively marked as Exhibit 1B73. | Telephones 1B73; Photograph in Attachment A. |
| 12. | A black and silver LG Virgin Mobile cell phone; a black and grey Samsung AT&T flip phone; and a black and grey LG Verizon Wireless flip phone, all seized from Dennis Novicki at the time of his arrest, collectively marked as Exhibit 1B115. | Telephones 1B115; No Photograph. |
| 13. | Hitachi Hard Drive Serial #Z2TP25LJ, marked as Exhibit 1B99. | Storage Device 1B99; Photograph in Attachment A. |
| 14. | Sprint HTC EVO cell phone, Serial #HT09PHL14070, marked as Exhibit 1B98. | Telephone 1B98; Photograph in Attachment A. |
| 15. | Innovage silver digital camera, marked as Exhibit 1B97. | Storage Devices 1B97; Photograph in Attachment A. |
| 16. | Motorola i290 Cell Phone  Serial #364VKGNKN5, marked as Exhibit 1B96. | Telephone 1B96;  Photograph in Attachment A. |

| **Description** | **Referred to herein as:** |
|---|---|
| 17. | Motorola cell phone, serial number 364VGQBCD3, marked as Exhibit 1B95. | Telephone 1B95; Photograph in Attachment A. |
| 18. | Motorola i530 cell phone, marked as Exhibit 1B94. | Telephone 1B94;  Photograph in Attachment A. |
| 19. | Motorola Cell Phone, serial number 2375593401, marked as Exhibit 1B93. | Telephone 1B93; Photograph in Attachment A. |
| 20. | Silver LG cell phone with serial number 502KSCY1561131, marked as Exhibit 1B92. | Telephone 1B92; Photograph in Attachment A. |
| 21. | Motorola ic502 Nextel cell phone, serial number 364YJJ1FBB, marked as Exhibit 1B91. | Telephone 1B91; Photograph in Attachment A. |
| 22. | Nokia AT&T Flip Phone, serial number 0544936K0Z3A1 marked as Exhibit 1B90. | Telephone 1B90; Photograph in Attachment A. |
| 23. | Sprint LG cell phone, marked as Exhibit 1B89. | Telephone 1B89; Photograph in Attachment A. |
| 24. | Blue digital camera, serial number 030-0808226370, marked as Exhibit 1B88. | Storage Device 1B88; Photograph in Attachment A. |
| 25. | Panasonic camcorder, marked as Exhibit 1B87. | Storage Device 1B87; Photograph in Attachment A. |
| 26. | Pure digital flip video camera, marked as Exhibit 1B86. | Storage Device 1B86; Photograph in Attachment A. |
| 27. | Thumb drive seized during search of 359 Maple Street, marked as Exhibit 1B81. | Storage Device 1B81; No Photograph. |
| 28. | Toshiba lap top computer, serial number 79493241Q, marked as Exhibit 1B77. | Computer 1B77; Photograph in Attachment A. |
| 29. | Samsung SCH-U820 Verizon cell phone, marked as Exhibit 1B76. | Telephone 1B76; Photograph in Attachment A. |

| Description | Referred to herein as: |
|---|---|
| 30.  Handspring Visor PDA, marked as Exhibit 1B100. | Storage Device 1B100; Photograph in Attachment A. |

As set forth in this affidavit, these items were seized incident to the execution of arrest warrants for John KOSTA, a/k/a Costa MIHALAKAKIS; Nestor Antonio VERDUZCO, a/k/a "Tony"; Dennis NOVICKI; Alexander NAPOLEON; Donald McCORMICK; and Tamara Kosta; and search warrants for 45 Riley Switch Road, Phillipston, Massachusetts (hereinafter, "Phillipston Residence") and 359 Maple Street, Lynn, Massachusetts (hereinafter, "Napoleon Residence") (collectively, "Target Locations"). In this affidavit, the telephones for which warrants are now sought are referred to as the "Target Phones"; computers and laptops, as the "Target Computers"; and audio, video and electronic data storage devices (including external hard drives, thumb drives, memory sticks/drives, digital cameras and video cameras) as the "Target Storage Devices."

11.    Also set forth below are facts that supply probable cause to believe that each of these items contains evidence of the Target Offenses.

12.    As a result of my personal participation in this investigation, through my conversations with other agents, and my analysis of reports prepared by other agents, I am familiar with all aspects of this investigation.

13.    I submit this affidavit based upon my personal knowledge derived from my participation in this investigation and upon information that I have received from a variety of other sources, including other law enforcement officers and public records.

14.    I am familiar with the methods by which drug traffickers try to launder their illicit proceeds.

8

Based on these and other experiences, I am familiar with many aspects of money laundering by narcotics traffickers. Specifically, I have investigated cases of structuring, in which a narcotics trafficker uses cash in small sums (under the $10,000 reporting requirement) as bank or credit card deposits or as a purchase price for a seemingly innocent piece of property or other item of value. I have also investigated the use of legitimate businesses or accounts as "fronts" for drug proceeds.

15.     In my training and experience, it is common for persons involved in drug trafficking and suspicious financial activities to maintain records of their activities, such as ledgers, bank account records, contact information for co-conspirators, drug proceeds, books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Furthermore, in my training and experience, it is common for persons involved in drug trafficking and money laundering to store these items in their cellular telephones, computers, cameras, homes, and in locations and electronic devices frequently used in furtherance of their drug trafficking and money laundering activities.

## FACTUAL BACKGROUND

16.     FBI agents in Massachusetts and elsewhere conducted an investigation into the marijuana trafficking and money laundering activities of John KOSTA and his criminal associates beginning in 2009. John KOSTA and his co-conspirators distributed marijuana in and around Boston, Massachusetts, until they were arrested on August 7, 2012. John KOSTA, FITO, NOVICKI, NAPOLEON, McCORMICK, and Tamara KOSTA have all been charged

in a superseding indictment with conspiracy to possess with intent to distribute marijuana in United States v. John KOSTA, et al., Case No. 12-10226-DJC. In addition, the superseding indictment charged John KOSTA, NAPOLEON, and Tamara KOSTA with possession with intent to distribute marijuana, John and Tamara KOSTA with conspiracy to launder money, John and Tamara KOSTA with possession of a firearm in furtherance of a drug trafficking crime, and John KOSTA with being a felon in possession of firearms and ammunition.

17.    During the investigation, agents monitored intercepted calls over four different phones used by John KOSTA and one phone used by NOVICKI. Through this electronic surveillance, physical surveillance, and evidence from other sources, it became clear that the DTO, including John KOSTA, NOVICKI, NAPOLEON, Tamara KOSTA and others, used cell phones and computers to further their conspiracy. Specifically, John KOSTA, NOVICKI, NAPOLEON and others used cell phones to coordinate the distribution of marijuana, the movement of drug proceeds, and money laundering. This activity continued up until their arrest. Tamara KOSTA used a computer to communicate fraudulent tax information via email with an accountant. The KOSTAs also had a sophisticated video surveillance and security system at their Phillipston Residence, which captured goings on both inside and outside the perimeter of their property.

18.    Between December 14-22, 2011, John KOSTA was intercepted calling FITO, NOVICKI, and VERDUZCO to negotiate the purchase of marijuana. Specifically, on December 16, 2011, John KOSTA called FITO to discuss obtaining marijuana from FITO that KOSTA would distribute in the United States. On December 17, 2011, John KOSTA was intercepted ordering 1,000 pounds of marijuana from VERDUZCO, which was later delivered by

VERDUZCO's couriers to John and Tamara KOSTAs' Arizona residence in multiple shipments. On December 18, 2011, John KOSTA was intercepted talking to NOVICKI about a marijuana shipment that he was arranging to be transported to Massachusetts sometime around December 28, 2011.

19. On December 23, 2012, McCORMICK arrived at John and Tamara KOSTA's Arizona residence driving his white pickup truck. On January 2, 2012, NOVICKI arrived in Arizona. On January 3, 2012, NOVICKI and John KOSTA purchased three prepaid cellular telephones with no subscriber information from a Best Buy in Scottsdale, Arizona. On January 3, 2012, McCORMICK's white pickup truck was moved into John and Tamara KOSTA's garage and the doors were closed presumably so that the pickup truck could be loaded with marijuana.

20. On January 4, 2012, surveillance agents observed KOSTA, McCORMICK, and NOVICKI depart the KOSTAS' residence in Arizona in a caravan of three vehicles. John KOSTA was driving his Chevy Silverado pickup truck; McCORMICK was driving his white pickup truck with a camper top over the bed, bearing Colorado registration 242 EUJ and equipped with a bike rack and bicycle; and NOVICKI was driving a rental car.

21. On January 6, 2012, at approximately 2:06 p.m., a trooper with the South Dakota Department of Public Safety identified two vehicles (McCORMICK's and NOVICKI's) that appeared to be traveling together, and one of which was exceeding the posted speed limit. The trooper stopped the white pickup truck speeding. A K9 was called to the scene and alerted on the truck. A search of the truck revealed approximately 980 pounds of marijuana, wrapped in white contact paper and stored in the rear of the truck.

22.     Toll records show that the prepaid phones were in contact with each other during the trip from Arizona to Massachusetts. Surveillance units observed John KOSTA's Silverado and an unidentified pickup truck arriving at the Phillipston Residence on January 9, 2012. About an hour and a half after KOSTA arrived, the pole camera captured NOVICKI's truck arrive at the Phillipston Residence.

23.     On August 7, 2012, agents searched the Phillipston Residence and, among other things, recovered 103 marijuana plants that were growing at the residence, 25 firearms, a stun gun, body armor, and approximately $4,811. Agents also recovered cell phones, computers, flash drives (1B5, 1B7, 1B8, 1B10, 1B17, 1B22, 1B25, 1B26, 1B73, 1B112), the 2009-2011 federal tax returns filed by Tamara KOSTA and the 2009 and 2011 federal tax returns filed by John KOSTA. In 2011, the KOSTAs claimed a combined income of $375,406.

24.     On or about August 7, 2012, agents executed seizure warrants for the nine bank accounts and four safe deposit boxes that were identified as being in Tamara or John KOSTAS' names. In total, approximately $158,000 was seized from these accounts.

25.     On or about August 17, 2012, agents executed a search warrant on a warehouse that John KOSTA had purchased, located at 325, 339-341 Water Street, Fitchburg, Massachusetts. No contraband or records of drug dealing were seized during this search.

26.     On August 7, 2012, agents also searched Napoleon's Residence. As the court is aware, Napoleon's Residence (359 Maple Street) is owned by Tamara and John KOSTA. During the search, agents recovered a number of cell phones, a digital camera and video devices, a computer and hard drives (1B76, 1B77, 1B81, 1B86 through 1B99).

27.     At the time of NOVICKI's arrest, agents seized three cell phones from NOVICKI's residence

12

(1B115).

## PROBABLE CAUSE

28.     This section of my affidavit is divided into two parts that set forth probable cause as to 1) the

Target Telephones seized incident to the arrest of John and Tamara KOSTA and the search

of their Phillipston Residence; the Target Telephones seized incident to the arrest of

NOVICKI, and the Target Telephones, seized pursuant to NAPOLEON's arrest and search

warrant executed at the Napoleon Residence; and 2) the Target Computers and Target

Storage Devices seized during the search warrants executed at the Phillipston and Napoleon

Residences.

29.     As set forth in detail herein, agents have conducted physical and electronic surveillance

which supplies probable cause to believe that John KOSTA, NOVICKI, NAPOLEON,

Tamara KOSTA and other members of the DTO used the Target Phones to conduct their

business.  Furthermore, based on my training and experience and for the specific reasons set

forth below, there is probable cause to believe that additional evidence of drug trafficking

and money laundering will be contained in the Target Telephones.

30.     During the course of the conspiracy, Tamara KOSTA exchanged emails with George

Mangos, the accountant who prepared and filed both Tamara and John KOSTA's tax returns.

As detailed in my Kelleher August 6 Affidavit and charged in the superseding indictment,

the KOSTAs created and maintained fictitious businesses as a manner through which to

launder their drug proceeds.  The emails from Tamara KOSTA to George Mangos detailing

expenditures and income are evidence of money laundering.  Furthermore, the investigation

revealed that John KOSTA and NAPOLEON used 45 Riley Switch Road and 359 Maple

Street to conduct the DTO's drug business.  For these reasons, the government believes that the Target Telephones, Target Computers and Target Storage Devices seized from the defendants at the time of their arrests and during the execution of search warrants likely contain evidence of drug trafficking and money laundering, such as contact information for co-conspirators, communications made in furtherance of the conspiracy, and photographs and videos of co-conspirators.   In addition, based on my training and experience, drug distributors frequently maintain records of their drug business such as ledgers, contact lists, price sheets, and related documents.  As set forth herein, there is probable cause to believe that the Defendants maintained such records on the Target Telephones, Target Computers, and Target Storage Devices.

**PART ONE:**   **Target Telephones seized incident to the arrest of John and Tamara KOSTA and the search of their Phillipston Residence (1B5, 1B17, 1B22, 1B73); Target Telephones seized incident to the arrest of NOVICKI (1B115); and Target Telephones seized incident to the arrest of NAPOLEON and the search of the Napoleon Reisdence (1B98, 1B96, 1B95, 1B94, 1B93, 1B92, 1B91, 1B90, 1B89, 1B76).**

31.      Over the course of the conspiracy, John KOSTA, FITO, NOVICKI, VERDUZCO, and other members of the DTO, and DTO customers were intercepted using cell phones to communicate in furtherance of the Target Offenses.  I believe that the below facts supply probable cause to believe that (a) the DTO used cell phones to discuss the movement of drug proceeds and money laundering, and (b) evidence of drug trafficking and money laundering will be found in the Target Phones seized at the Phillipston Residence, from NOVICKI, and from the Napoleon Residence.

32.      For example, John KOSTA and NOVICKI used their cellular telephones to coordinate the purchase and distribution of drugs.  NAPOLEON used a cellular telephone to attempt to

communicate with someone, presumably John KOSTA who was his drug supplier, when he was stopped by police with approximately 50 pounds of marijuana in his car on December 4, 2011.

33.    During the investigation, calls between John KOSTA, FITO, VERDUZCO, NOVICKI, and DTO customers were intercepted. Physical surveillance, arrests, and drug seizures confirmed that these conversations resulted in drug distribution.

*__KOSTA used cell phones to negotiate drug purchases with his Mexican supplier.__*

34.    On December 16, 2011 at approximately 8:45 p.m., KOSTA placed a call to FITO. KOSTA began the conversation, "Fito." FITO replied, "What's up buddy." KOSTA said he did not know he could "call this number on my phone." FITO laughed and said, "Those are long ass numbers man." (FITO's Mexican phone number includes a country code.) FITO asked how KOSTA had been, and KOSTA replied that everyone was well and that he had been "in Boston" for the Thanksgiving holiday. KOSTA said, "I just got back right now and I got this thing in the mail, in the mailbox." FITO replied, "Yeah, I send my daughter and my ex-wife down there and I was like just drop it there, you see any familiar cars, and she was like 'Yeah' and I said just drop it there . . . and then I didn't have no answers and I was like scared to send somebody else down there, you know, I was like shit . . . I was just saying, I was going to get your address and send you a letter to see if you were ok, man."

35.    KOSTA told FITO , "I'm good . . . I'm glad I heard . . . from you cause I, I was, soon as I got back I was gonna mail you a phone to your other place up in Sedona." FITO said, "I can actually send my daughter to you." FITO said he was "worried" about KOSTA. KOSTA said he was fine and that his "whole crew is good. No one is in trouble everybody is fine.

We're ready, we're ready to rock and roll. What do you got going on?" FITO asked if KOSTA had "worked at all" and KOSTA replied, "I have worked uh, and I got something real nice and um you know but like I told you man, I always work with you . . . you got me up and running. I'll tell you the truth . . . I got somebody good that I'm happy that are good people like you're good people, real nice people. You don't meet too many good people in this business, you know?" FITO agreed. KOSTA said he had "started this thing" and asked if FITO had "something" because KOSTA was "always going to buy it from" FITO. KOSTA said he would not "jump ship" to anyone else and he wanted to "work" with FITO. FITO replied that he "had work for a couple of months" but did not know what was going on with KOSTA. FITO said he should be "able to have work. We're actually, I think we'll get work after Christmas." FITO asked what KOSTA's plan was and whether he would be around. FITO said he had been trying "to get a hold of" KOSTA but that KOSTA's phone and "numbers were always off." KOSTA replied, "I had to throw it away. I had to throw it away and I don't like, you know me man, I throw my phones away all the time."

36.    Later in the conversation, KOSTA told FITO, "As soon as you get something, just call me, cause I'll buy it and hold it, you know." FITO replied, "OK. Yeah as long as you got cash cause these guys like to get cash right away." KOSTA said, "I do have cash, but you owe me a lot of money too, you know what I mean?" FITO acknowledged, saying, "I know, I know I do buddy. . . As soon as I, as soon as I'm back on my feet, trust me I'm gonna hook you up man." FITO said he had been trying to get in touch with KOSTA so they could "do it the way we were doing it, you know, knocking off that quarter and meanwhile I get back on my feet." Agents believe FITO was referring to the $287,000 ("knocking off that quarter")

that Arizona State Police seized from him as he left KOSTA's Arizona residence on December 12, 2010.

37.   During the same conversation, FITO told KOSTA that "between February and March" he could "probably cash [him] out." KOSTA agreed. FITO talked about putting "three or four hundred in it" to hook up KOSTA. KOSTA said, "You, you got this phone. Listen this phone number is . . . I'm planning on dropping this one." FITO replied, "Yup, listen, I actually don't have this phone number. The phone you just called me doesn't show up on my phone . . . Calls I get from the US doesn't show up on my phone. This is what I'll do, um, I'll get a phone and as soon as I, I can I'll send my daughter, I, I'll send . . ." KOSTA interrupted saying, "Yeah, what if I just ah, you gonna get a phone and send somebody? Is that what you want to do? Cause I can meet, I can meet, I can go to Tucson, I can go to Tucson, too. I can drive down next week some time if you want. Or, or whatever, whatever you want to do man, I don't care." FITO said his daughter could "send a number or anything like that, ah, through, through the shuttle or they can bring it personally to me. They come down here all the time." KOSTA said, "Ok, yeah, cause we need to not say that phone number over the phone. We need to like, I need to exchange numbers with you, alright. In person."

38.   Prior to ending the call, KOSTA told FITO that he would "come over the border" to visit him. FITO replied, "I know you don't like coming down to Mexico." KOSTA told FITO, "I'm so happy you called man, that we, that you left your number man, this is, I didn't know when we would talk, you know?" KOSTA told FITO to make sure that his daughter came to his house on Sunday so he could "give her a phone and ah, and then, and then we'll be

able to talk and we'll make plans." KOSTA told FITO, "Just tell me what I gotta do man, and I can, you know I can help you, you know you can trust me.  You know what I mean. We've been doing it for eight years.  We've been working, we've known each other for over eight years now, so you know I can do anything you need, anyone you need to trust up here I can, you know what I mean. You know you can trust me with anything, you know?"  FITO agreed.

39.     On December 18, 2011, at approximately 4:20 p.m., KOSTA called FITO to confirm that FITO's daughter was still planning to pick up the phone. FITO affirmed and said he would call KOSTA back. At approximately 6:13 p.m. that evening, surveillance officers observed a car occupied by a male driver and a Hispanic woman arrive by car at the KOSTAs' residence in Arizona. The Hispanic woman got out of the car and approached the KOSTAs' residence.  After the Hispanic woman left the KOSTAs' residence in the same car, officers from the Arizona Department of Public Safety followed the car and observed the Hispanic woman in the front passengers seat. They compared their observations to a RMV photograph of Veronica Valenzuela, and confirmed it was the same person.  Valenzuela is believed to be a relative of FITO and resides in Arizona.

40.     KOSTA and FITO were never intercepted again on any of the phone.  However, there were at least three phones identified as being used by KOSTA (either by toll records or toll analysis) that showed contact with FITO's Mexican phone number.

***KOSTA used cell phones to negotiate drug purchases with his suppliers and to coordinate transportation of drugs with his associates.***

41.     On December 17, 2011, agents intercepted KOSTA in a series of calls with VERDUZCO

(over Target Telephone #2), whom KOSTA referred to by the name "Tony." VERDUZCO told KOSTA he had "good news," that his "friends from the capital" had "a thousand now." KOSTA said, "That'd be good" and asked, "How, how many do they have?" VERDUZCO replied, "Well they have ah, one big one. Yeah they're the ones you need." KOSTA said, "They got one, they got one, what do you mean one big one? One big one, big one?" VERDUZCO replied,"Yeah, a thousand, yeah." KOSTA told VERDUZCO, "Come on up man. It's time to work."

42.    In a later call that same day, VERDUZCO texted KOSTA, "Im on my way I will call you when im closed by." KOSTA replied by texts writing, "K" and then "how long u think?" VERDUZCO replied by text, "Im gonna be in town like around 6. And I just going to wait for my friend to see me with something." At approximately 6:00 p.m., VERDUZCO called KOSTA and told him he would be arriving in "like ten minutes." KOSTA asked, "Where? At my place?" VERDUZCO said yes. At approximately 6:15 p.m., VERDUZCO called KOSTA and said, "I'm here."

43.    Surveillance units, which were in place near the KOSTAs' Arizona residence, observed a Nissan Quest park in front of the KOSTAs' house around 6:15 p.m, which is believed to have been driven by Verduzco. At the same time, agents observed a van arrive at the KOSTAs home and pull into the garage. The garage doors were closed after the van entered. A short time later, surveillance observed the van leave and followed it as it drove off. Surveillance agents conducted a routine traffic stop of the van, during which agents detected a strong odor of marijuana. The driver was identified by his driver's license.

44.    On December 18, 2011, KOSTA was intercepted talking to NOVICKI about a marijuana

19

shipment that he was arranging to be transported to Massachusetts sometime around December 28, 2011.

45.     Between December 27-31, 2011, surveillance observed VERDUZCO and his couriers on four separate occasions at the KOSTAs' residence.  On each occasion, VERDUZCO, who was driving a Chevy Malibu registered in his name, escorted a courier vehicle to the KOSTAs' Arizona residence. The courier vehicle would pull into the KOSTAs' garage, after which the garage doors were closed.  VERDUZCO would then leave with the courier, only to return to the KOSTAs' garage some time later.  VERDUZCO would then depart in his Chevy Malibu with the escort vehicle.

46.     On December 23, 2012, McCORMICK arrived at John and Tamara KOSTA's Arizona residence driving his white pickup truck.  On January 2, 2012, NOVICKI arrived in Arizona. On January 3, 2012, NOVICKI and John KOSTA purchased three prepaid cellular telephones with no subscriber information from a Best Buy in Scottsdale, Arizona.  On January 3, 2012, McCORMICK's white pickup truck was moved into John and Tamara KOSTA's garage and the doors were closed presumably so that the pickup truck could be loaded with marijuana.

47.     On January 4, 2012, surveillance agents observed KOSTA, McCORMICK, and NOVICKI depart the KOSTAS' residence in Arizona in a caravan of three vehicles. John KOSTA was driving his Chevy Silverado pickup truck; McCORMICK was driving his white pickup truck with a camper top over the bed, bearing Colorado registration 242 EUJ and equipped with a bike rack and bicycle; and NOVICKI was driving a rental car.

48.     On January 6, 2012, at approximately 2:06 p.m., a trooper with the South Dakota Department

20

of Public Safety identified two vehicles (McCORMICK's and NOVICKI's) that appeared to be traveling together, and one of which was exceeding the posted speed limit. The trooper stopped the white pickup truck speeding. A K9 was called to the scene and alerted on the truck. A search of the truck revealed approximately 980 pounds of marijuana, wrapped in white contact paper and stored in the rear of the truck.

49.     Toll records show that the prepaid phones were in contact with each other during the trip from Arizona to Massachusetts. Surveillance units observed John KOSTA's Silverado and an unidentified pickup truck arriving at the Phillipston Residence on January 9, 2012. About an hour and a half later, the pole camera captured NOVICKI's truck arrive at the Phillipston Residence.

50.     There were no further calls intercepted between KOSTA and VERDUZCO. However, On May 5, 2012, the Bureau of Immigrations and Customs Enforcement (ICE) was alerted that KOSTA had crossed into the United States from Mexico in Nogales, Arizona. An analysis of the crossings at the same time showed that VERDUZCO had crossed the same border two minutes prior to KOSTA.

51.     As described herein and in the August 6 Kelleher Affidavit, KOSTA was intercepted telling his defendant suppliers that he would provide them with a network of clean cell phones over which the defendants could discuss their drug operations. This ensured that agents could not obtain the numbers from phone records, effectively thwarting surveillance. In addition to these phones, during the course of the conspiracy, agents identified over ten different cell phones that were being used by either John or Tamara KOSTA through toll analyses and phone records. Not a single one of the phones identified as being used by John or Tamara

KOSTA was registered in either of their names or addresses.

*__NOVICKI used a cell phone to communicate with John KOSTA and his drug customers__*

52.     Afer the January 9, 2012 seizure, John KOSTA abandoned the phone over which the government was intercepting calls and the phones he and NOVICKI had purchased at Best Buy. The government then obtained authorization to intercept NOVICKI's phone. On February 15, 2012, NOVICKI received an incoming call from KOSTA . KOSTA said he was calling to "touch base" and to see how NOVICKI was doing. NOVICKI said, "I'm above ground, you know, so I'm doing alright, I guess." KOSTA asked if NOVICKI had "work" going on. Based on previous intercepted calls, "work" is a code word KOSTA and NOVICKI use for drugs. NOVICKI replied, "No. It's really depressing man." NOVICKI asked how KOSTA was doing, to which KOSTA replied, "I'm doing good, man. I'm out here. I'm just [unintelligible] just moving, just moving things, you know?" KOSTA told NOVICKI, "Everything's fine. Same, same thing here, man, just you know, the earning stuff . . . bothers me but I, I try, I try not to just stay on it. It doesn't help if I stay on the topic all the time, and . . . I'm a worker too man. If there's work, I'm working, you know." NOVICKI said, "If there's ever any work, you let me know, man." KOSTA said, "I didn't hold the other phone number or I would have called you on the other line. If you want to call me back, you can." NOVICKI replied, "No, don't worry about it buddy. That phone ain't shut off. I'm not, I have that, you know, unless you want me to. It's not a big deal for me, buddy." KOSTA replied, "Same here." KOSTA said, "This is a brand new phone, so I'm just letting you know."

53.     As indicated above, on December 18, 2011, agents first intercepted KOSTA and NOVICKI

(NOVICKI's phone was subscribed to in his own name). KOSTA asked for NOVICKI's number and said he was going to mail NOVICKI his (KOSTA's) new phone number. KOSTA told NOVICKI he had "just got back" home and that he and NOVICKI were "on for, you know, we're on for anyways but I'm not gonna talk much but um the 28th ok?" NOVICKI said, "I'm whenever you're ready man, you know." Agents believe KOSTA was telling NOVICKI that he was back in Arizona and that he was planning to send a drug shipment of marijuana to Massachusetts around December 28, 2011. KOSTA said, "We're right there. That's the day, that's the day and call me when you get the phone number." NOVICKI told KOSTA to "make sure [you] send the phone," and KOSTA replied, "I'm sending it, it's going in the mail tonight, in the mailbox tonight but it's coming from way out . . ." KOSTA again told NOVICKI, he did not "want to talk on this line" but that he wanted to talk to NOVICKI when he got "that other number" and that they needed to "talk to the other guy there." NOVICKI said he would "go by and see him." KOSTA replied, "Yes . . .go by and see that guy. I don't care if . . . when you get a chance maybe you can call me back on this line, actually, and I can talk to him on this line, you know." NOVICKI told KOSTA he would call if he found "him." Agents believe the "guy" was a drug associate of KOSTA's, possibly Alexander NAPOLEON, and that KOSTA was asking NOVICKI to locate the "guy" so that KOSTA could talk to him. KOSTA told NOVICKI to call him so he could "talk to the guy for a second."

54.     KOSTA told NOVICKI, "Everything's good man, um, no news on the other guy, I don't even want to, you know, actually just call me when you get that number anyways, that other number, you know? I don't even want to stay on this phone too long, you know, I like to be

just quick and sweet, short and sweet." The following day, toll records show that NOVICKI called KOSTA on his new phone, which was not being intercepted at that time. Agents never intercepted further calls between NOVICKI and KOSTA prior to NOVICKI's arrival in Arizona on January 2, 2012. Agents believe that between December 18, 2011 and January 2, 2012, NOVICKI and KOSTA were communicating either on phones that were not identified, by email, or some other unidentified mode of communication.

### *NAPOLEON used a cell phone at the time he was arrested with marijuana after leaving the KOSTAs residence*

55.     Footage from a pole camera installed near the KOSTAs' Arizona residence revealed that on November 23, 2011, a white Chevy pickup truck with no license plates was moved from the KOSTAs' driveway into their garage. On November 24, 2011, at approximately 8:15 a.m., John KOSTA left his residence in his silver Chevy Silverado pickup truck and returned home at approximately 9:15 a.m. with an unidentified white male. The white male removed a duffle bag and a suitcase from KOSTA's truck and went inside the KOSTAs' home. Approximately ten minutes later, KOSTA moved his Silverado pickup truck to the driveway in a position that blocked any view of the interior of his garage. At approximately 10:00 a.m., KOSTA's Silverado pickup truck and the white Chevy pickup truck, which then had Colorado license plates and a bike rack and bicycle, exited the driveway and garage and drove off together. Footage from a pole camera installed near the Phillipston Residence revealed that the same pickup trucks arrived at the Phillipston Residence on November 27, 2011. At this time, the white Chevy pickup truck that left Arizona with Colorado license plates was displaying a Massachusetts commercial license plate (N23581)

56.     On or about December 4, 2011, agents observed from the pole camera a marked increase in

vehicular traffic to and from the Phillipston Residence. Agents identified NAPOLEON's car as it arrived and later left the Phillipston Residence. On December 4, 2011, at the direction of the FBI, a MSP trooper stopped NAPOLEON after he left the Phillipston Residence. NAPOLEON's car was one of many that were seen arriving at the KOSTAs' residence and then leaving shortly thereafter. As the trooper approached NAPOLEON's car, he observed NAPOLEON appear to be texting on his phone. After a K9 alerted on NAPOLEON's car during a traffic stop, Troopers searched NAPOLEON's car and recovered approximately 46 pounds of marijuana, which was wrapped in two packages. One package had "22.05" written in black marker and the letter "K" encircled on it in blue marker. Agents believe the "K" was a reference to KOSTA. The other package had "24.0" written in black marker and "19" encircled in red marker. Photographs of the packages were sent to the Arizona Department of Public Safety, who confirmed that the contact paper was similar to or the same as the contact paper they retrieved during a trash pull at the KOSTAs' Arizona residence.

57.     NAPOLEON had two phones at the time of his arrest, one of which was a prepaid LG phone which had no contact information saved in the phone. A review of the text messages revealed coded texts that were sent on December 2, 2011. A draft text with the message "dies" was saved in the phone but had not been sent. It is believed that this is the text that NAPOLEON appeared to be drafting after he was stopped. There were incoming and outgoing calls from this phone to only one other number, all which had been placed on December 4, 2011. A review of the phone records for the phone that NAPOLEON's LG had contact with revealed that that phone only had contact with NAPOLEON's phone. This is consistent with KOSTA's known technique of purchasing and supplying a network of phones

to certain drug associates and only communicating drug business within that network to avoid electronic surveillance.

58.     During the dates charged in the conspiracy, NAPOLEON and his girlfriend, Dayna L'Italien, resided at the Napoleon Residence (359 Maple Street, Lynn), which is owned by Tamara KOSTA. Both NAPOLEON and L'Italien were captured on bank security cameras making cash deposits into Tamara KOSTA's bank accounts in Tamara KOSTA's name. In January-February 2011, NAPOLEON made two cash deposits totaling $9,120 into Tamara KOSTA's personal account. Between November 2010-August 2011, L'Italien made nine cash deposits totaling $28,000 into the same account. Neither NAPOLEON nor L'Italien were ever intercepted over KOSTA's phones.

*Tamara KOSTA used pre-paid cell phones subscribed to in fictitious names to communicate with John KOSTA and others*

59.     On three occasions in April and May 2011, the Arizona Department of Public Safety conducted trash pulls at the KOSTAs' Paradise Valley, Arizona residence. Among items recovered from these trash pulls was marijuana, marijuana packaging materials, including duct tape and vacuum sealed bags; odor masking materials; sawdust; bank statements; a ledger that annotated several hundred pounds of marijuana; and additional financial records and tax return information that indicated that KOSTA was claiming $3,000 a month in income, and an additional $15,000-18,000 in bonus/gift income.

60.     Between September 23, 2011, and November 24, 2011, there were 313 contacts, 113 of which were text messages, between John KOSTA (Target Telephone #2) and (413) 834-0746, Tamara KOSTA's cell phone. The phone is subscribed to in the name of "Mrs.

Pumpkin" with a fictitious address. Agents identified this number after discovering the number hand-written on a piece of paper with the notation, "My MA phone number," during a trash pull from the KOSTA's Paradise Valley residence.

61.   On March 12, 2012, John KOSTA sent a text message (from Target Telephone #8) to 480-202-7270, a phone identified as being used by Tamara KOSTA.[1] John KOSTA directed Tamara KOSTA, "put me back on deed." In response, Tamara texted, "OK. Diff atty?" John KOSTA replied, "No." As the court is aware from detention hearings in this case, between January 17-20, 2012 (about two weeks after the January 2012 marijuana seizure), John KOSTA deeded at least five of the thirteen properties identified as being owned by the KOSTAs to their son, John KOSTA, Jr.   On April 13, 2012, a property located in Moultonborough, New Hampshire was deeded back from John Kosta, Jr. to John KOSTA. In addition, four other properties were deeded back from John Kosta, Jr. to John KOSTA on or about June 6, 2012.

### *Seizure of the Target Phones*

62.   Each of the Target Phones was seized incident to arrest and/or during the execution of the search warrants on the Target Locations, as follows.

   a.   Five telephones marked as exhibits 1B5, 1B17, and 1B22, were seized from inside the KOSTAs' Phillipston Residence during the execution of the search warrant.

   b.   Two telephones marked collectively as exhibit 1B73 were seized from Tamara KOSTA at the time of her arrest.

---

[1] Agents identified this number as being used by Tamara KOSTA through toll analysis and phone records.

    c.    Three telephones marked collectively as exhibit 1B115 were seized from NOVICKI's possession at the time of his arrest.

    d.    Nine telephones marked 1B89, 1B90, 1B91, 1B92, 1B93, 1B94,1B95, 1B96, and 1B98 were seized from inside NAPOLEON's Residence during the execution of a search warrant.

63.    I believe that each of the Target Phones found in the KOSTA's, NAPOLEON's, and NOVICKI's Residences will contain evidence of the Target Offenses because they were used by the defendants in furtherance of the conspiracy. I believe there is probable cause to believe that these phones will also contain, for example, recently called telephone numbers, pictures of members of the DTO, address books, contact information, and other information that is evidence of the Target Offenses, such as emails and text messages.

**PART TWO: <u>Use of Target Computers and Storage Devices in furtherance of the conspiracy</u>**

64.    As detailed in the Search Warrant Affidavit and herein, during the investigation, the defendants were engaged in large scale drug trafficking over a prolonged period and engaged in business transactions designed to launder drug proceeds.

65.    A financial investigation identified at least nine bank accounts and four safe deposit boxes in the names of or controlled by John and Tamara KOSTA. In 2010, there were $422,270 in cash deposits into nine accounts opened by John or Tamara KOSTA. In 2011, there were $461,890 in cash deposits into these accounts. The information for 2012 has not been updated, but as of February 2012, there were $21,100 in cash deposits.

66.    As described in detail in my Kelleher August 6 Affidavit, a thorough investigation indicated that John Kosta Real Estate, MyPhoneBook, and Precision Services were shell companies

designed to conceal the nature and identity of drug proceeds and to promote John KOSTA's

drug trafficking business. John and Tamara KOSTAs' 2011 tax returns list these entities as

sources of income, and the mortgage payment for Target Location 2 is traced to a bank

account opened by John KOSTA under the name John KOSTA Real Estate.

67.     However, despite cash deposits of $461,890 into John and Tamara KOSTAs' accounts in

2011, and monthly expenses conservatively totaling approximately $18,000, only

approximately $158,000 was seized from the bank accounts and safe deposit boxes that were

searched on or about August 7, 2012.

68.     Pursuant to a subpoena, agents obtained email communications between Tamara KOSTA

and George Mangos, the KOSTAs' accountant, dating back to March 2009. The emails

detailed expenditures and claimed income of the KOSTAs and are evidence of money

laundering. I believe, based on the evidence seized during this investigation, facts known

to me through this investigation, and my training and experience that there is probable cause

to believe that evidence of John and Tamara  KOSTA's drug trafficking and money

laundering activities will be found on the Target Computers and Target Storage Devices.

69.     As indicated in my August 6 Affidavit and herein, the Phillipston Residence was equipped

with a high-tech security system that had cameras scattered around the perimeter of the

property and a control panel from where footage from the cameras could be observed and

recorded (1B112).

70.     Furthermore, the investigation revealed that John KOSTA and NAPOLEON used 45 Riley

Switch Road and 359 Maple Street to conduct the DTO's drug business. For example,

KOSTA owned 359 Maple Street, NAPOLEON and his girlfriend, Dayna L'Italien both

made structured cash deposits in Tamara and John KOSTAs' names into accounts controlled

by the KOSTAs, KOSTA listed 359 Maple Street as business address for more than one of

the fictitious businesses he created to launder drug proceeds, and NAPOLEON had a

marijuana grow at 359 Maple Street at the time of his arrest. Accordingly, I believe evidence

of the conspiracy's money laundering and drug trafficking business will be found on the

Target Computers and Storage Devices found inside of 359 Maple Street at the time the

search warrants were executed.

### *Target Computers and Storage Devices seized during execution of search warrants at the Phillipston Residence*

71.    As stated above, at the time of John and Tamara KOSTA's arrests on August 7, 2012, agents

executed a search warrant for their residence. The search yielded drugs, drug paraphernalia,

U.S. currency, and firearms. The search of the KOSTAs' Residence also yielded the

following:

a.    Target Computers 1B7; 1B9; and 1B25; and

b.    Storage Devices 1B8 (USB flash drive); 1B10 (two San Disk cards); 1B112 (DVR

connected to security system); 1B22 (four San Disk cards, two computer memory

sticks, three video cassettes); and 1B26 (Canon camera; SONY video camera, and

San Disk card).

### *Target Computers and Target Storage Devices seized during execution of search warrant for NAPOLEON's Residence*

72.    At the time NAPOLEON was arrested, agents executed a search warrant for his residence.

The search yielded drugs and drug paraphernalia. The search of NAPOLEON's Residence

also yielded the following:

a.      Storage Devices 1B99 (Hitachi hard drive); 1B97 (digital camera); 1B88 (digital
        camera); 1B87 (digital camcorder); 1B86 (digital video camera); 1B81 (thumb drive);
        1B100 (Handspring visor PDA); and

b.      Target Computer 1B77.

c.      Computer N-38 was found in a spare bedroom near a computer table.

73.     I believe that there is probable cause to believe that the Target Computers and Target Storage
        Devices listed above were used by John KOSTA, Tamara KOSTA, and NAPOLEON
        because the items were found in their residences or in their possession at the time of their
        arrests. I also believe that there is probable cause to believe that the Target Computers and
        Target Storage Devices were used by the Defendants in furtherance of the conspiracy and
        will contain evidence of the Target Offenses, including records of drug trafficking and money
        laundering activities, contact information for members of the DTO, pictures of members of
        the DTO or contraband, correspondence and other information.

74.     The investigation revealed that John KOSTA performed counter surveillance techniques to
        avoid law enforcement detection. The KOSTAs' Phillipston Residence and property were
        equipped with high-tech surveillance cameras that were capable of recording events within
        the perimeter of the property, including the arrival, unloading, storage and distribution of
        drug loads. Despite the lucrative and extensive drug business, drug and money ledgers were
        not found at the KOSTAs' or NAPOLEON's Residences.

75.     Additionally, the investigation revealed that KOSTA used a number of cellular telephones
        to conduct his drug business and law enforcement was not able to intercept or identify all of

John KOSTA's phones.  For example, NAPOLEON was never intercepted over a Target Telephone, although it is clear from the evidence that he communicated with John KOSTA because he knew when a load of marijuana had arrived at the KOSTAs' Phillipston Residence in December 2011.  Likewise, Tamara KOSTA was never intercepted over any of John KOSTA's phones, yet it is clear that Tamara KOSTA played an integral role in the drug trafficking and money laundering operation.  I believe John and Tamara KOSTA talked on phones that law enforcement were not aware of and used other electronic communications to conduct their drug trafficking and money laundering activities.

76.    Accordingly, I believe the Target Phones, Target Computers and Target Storage Devices likely contain evidence in the form of audio, video, and photographic images as well as text communications that can help establish the full nature of the defendants' relationships and the frequency with which they communicated as well as direct evidence of the Target Offenses.

77.    In addition, based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that:

a.    narcotics traffickers must maintain, on hand, large amounts of U.S. Currency in order to maintain and finance their on-going narcotics business;

b.    it is common for narcotics traffickers to maintain paper and electronic books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned paper and electronic books, records, receipts, notes, ledgers, etc., are

maintained where the traffickers have ready access to them;

c.      it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their cell phones, computers, cameras, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d.      narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of these assets by government agencies;

e.      even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them;

f.      it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers checks, bank checks, safe deposit box keys and money wrappers.  These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over;

g.      narcotics traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines and telephone answering

machines to generate, transfer, count, record and or store the information described above. I have also encountered beepers, cell phones, smart phones, billing records pertaining to beeper accounts, telephones, and ledgers containing beeper code numbers, customers and stash locations, all of which facilitate drug distribution;

h.      when drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Traffickers often commingle narcotics proceeds with money generated by legitimate businesses;

i.      narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences, businesses, and other storage locations;

j.      traffickers commonly maintain electronic and paper books or documents which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

34

k.      traffickers take or cause to be taken photographs of themselves, their associates, and their property. That these traffickers usually maintain these photographs in their possession;

78.    Based on this training and experience, the investigation in this case, my analysis of intercepted calls, and physical surveillance conducted up until today, I believe that evidence of the Target Offenses will be found in the Target Telephones, Target Computers, and Target Storage Devices.

## SEIZURE OF COMPUTER EQUIPMENT AND DATA

79.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I know that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer equipment, software, peripherals, and related documentation be seized and subsequently processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a.      <u>The volume of evidence</u>. Computer storage devices (such as hard disks, flash drives, magnetic and optical disks) can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process can take weeks or months, depending on the volume of data stored, and it would be

impractical to attempt this analysis on-site.

b.     Technical requirements.  Analyzing computer systems for criminal evidence is a
highly technical process requiring expertise and a properly controlled environment.
The vast array of computer hardware and software available requires even computer
experts to specialize in some systems and applications.  Thus, it is difficult to know,
before the search, which expert possesses sufficient specialized skill to best analyze
the system and its data.  Furthermore, data analysis protocols are exacting procedures,
designed to protect the integrity of the evidence and to recover even "hidden,"
deleted, compressed, password-protected, or encrypted files.  Many commercial
computer software programs also save data in unique formats that are not conducive
to standard data searches.  Additionally, computer evidence is extremely vulnerable
to tampering or destruction (both from external sources and destructive code
imbedded in the system as a "booby trap").

80.    In light of the volume of data at issue and these technical requirements, it is generally
necessary that data, hardware, software, and storage media, be seized and subsequently
processed by a qualified computer specialist in a laboratory setting rather than in the location
where it is seized.   It is also generally necessary for agents to seize most or all of a computer
system's input/output peripheral devices, software, and computer-related documentation, in
order for a qualified computer expert to accurately retrieve the system's data in a laboratory
or other controlled environment.

81.    Attachments B, C and D to the proposed warrant, which contain sections relating to the
search and seizure of computer equipment and data, are appended to my affidavit and

36

incorporated by reference.

## **CONCLUSION**

Based on all of the foregoing, I believe that on and in the property described above as Target

Telephones, Target Computers, and Target Storage Devices, more fully described in Attachment A,

there is probable cause to believe that the items set forth in Attachment C will be found.


_____
Stephen J. Kelleher
Special Agent
Federal Bureau of Investigation

Signed and sworn to before me this ___ day of January, 2013.


_____
Robert B. Collings
United States Magistrate Judge

37

## ATTACHMENT A

## ITEMS TO BE SEARCHED

| Description | Referred to herein as: |
|---|---|
| 1. LG cell phone, serial number 201CYFT0792323, marked as Exhibit 1B5. | Telephone 1B5; Photograph in Attachment A. |
| 2. Dell Inspiron laptop, model N5040 serial number BDDJJR1, marked as Exhibit 1B7. | Computer 1B7 ; Photograph in Attachment A. |
| 3. USB Flash Drive, marked as Exhibit 1B8. | Storage Device 1B8 ; Photograph in Attachment A. |
| 4. Dell Inspiron Laptop, N5050, serial number 2M6MLR1, marked as Exhibit 1B9. | Computer 1B9 ; Photograph in Attachment A. |
| 5. Two San Disk cards, collectively marked as Exhibit 1B10. | Storage Devices 1B10; Photograph in Attachment A. |
| 6. Speeco Technologies DVR-16TN/160, marked as Exhibit 1B112. | Storage Device 1B112; Photograph in Attachment A. |
| 7. Two LG Verizon cell phones, serial numbers 202CYFT0970243 and 201CYHE0792233, collectively marked as Exhibit 1B17. | Telephones 1B17; Photograph in Attachment A. |
| 8. A Verizon LG cell phone, serial number 202CYLH0940400; Verizon Motorola cell phone with DECMEID number 268435459411505441; Four San Disk Cards; Two computer memory sticks; and Three video cassettes, collectively marked as Exhibit 1B22. | Telephones and Storage Devices 1B22; Photograph of phones in Attachment A. |

| Description | Referred to herein as: |
|---|---|
| 9. Samsung Laptop, serial number, HJV993CRA00493B marked as Exhibit 1B25. | Computer 1B25; Photograph in Attachment A. |
| 10. Canon camera; SONY video camera; and San disk card, collectively marked as Exhibit 1B26. | Storage Devices 1B26; Photograph in Attachment A. |
| 11. Two cell phones seized from Tamara Kosta at the time of her arrest, collectively marked as Exhibit 1B73. | Telephones 1B73; Photograph in Attachment A. |
| 12. A black and silver LG Virgin Mobile cell phone; a black and grey Samsung AT&T flip phone; and a black and grey LG Verizon Wireless flip phone, all seized from Dennis Novicki at the time of his arrest, collectively marked as Exhibit 1B115. | Telephones 1B115; No Photograph. |
| 13. Hitachi Hard Drive Serial #Z2TP25LJ, marked as Exhibit 1B99. | Storage Device 1B99; Photograph in Attachment A. |
| 14. Sprint HTC EVO cell phone, Serial #HT09PHL14070, marked as Exhibit 1B98. | Telephone 1B98; Photograph in Attachment A. |
| 15. Innovage silver digital camera, marked as Exhibit 1B97. | Storage Devices 1B97; Photograph in Attachment A. |
| 16. Motorola i290 Cell Phone Serial #364VKGNKN5, marked as Exhibit 1B96. | Telephone 1B96; Photograph in Attachment A. |
| 17. Motorola cell phone, serial number 364VGQBCD3, marked as Exhibit 1B95. | Telephone 1B95; Photograph in Attachment A. |
| 18. Motorola i530 cell phone, marked as Exhibit 1B94. | Telephone 1B94; Photograph in Attachment A. |
| 19. Motorola Cell Phone, serial number 2375593401, marked as Exhibit 1B93. | Telephone 1B93; Photograph in Attachment A. |

| **Description** | **Referred to herein as:** |
|---|---|
| 20. Silver LG cell phone with serial number 502KSCY1561131, marked as Exhibit 1B92. | Telephone 1B92; Photograph in Attachment A. |
| 21. Motorola ic502 Nextel cell phone, serial number 364YJJ1FBB, marked as Exhibit 1B91. | Telephone 1B91; Photograph in Attachment A. |
| 22. Nokia AT&T Flip Phone, serial number 0544936K0Z3A1 marked as Exhibit 1B90. | Telephone 1B90; Photograph in Attachment A. |
| 23. Sprint LG cell phone, marked as Exhibit 1B89. | Telephone 1B89; Photograph in Attachment A. |
| 24. Blue digital camera, serial number 030-0808226370, marked as Exhibit 1B88. | Storage Device 1B88; Photograph in Attachment A. |
| 25. Panasonic camcorder, marked as Exhibit 1B87. | Storage Device 1B87; Photograph in Attachment A. |
| 26. Pure digital flip video camera, marked as Exhibit 1B86. | Storage Device 1B86; Photograph in Attachment A. |
| 27. Thumb drive seized during search of 359 Maple Street, marked as Exhibit 1B81. | Storage Device 1B81; No Photograph. |
| 28. Toshiba lap top computer, serial number 79493241Q, marked as Exhibit 1B77. | Computer 1B77; Photograph in Attachment A. |
| 29. Samsung SCH-U820 Verizon cell phone, marked as Exhibit 1B76. | Telephone 1B76; Photograph in Attachment A. |
| 30. Handspring Visor PDA, marked as Exhibit 1B100. | Storage Device 1B100; Photograph in Attachment A. |

## ATTACHMENT B
## DEFINITIONS

For the purpose of this Warrant:

1.      "Computer hardware" means: electronic devices capable of data processing (such as laptop and desktop computers, personal digital assistants ("PDAs"), and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, monitors, and drives intended for removable storage media); related communications devices (such as wireless cards, modems, cables, and connections), and security devices, (such as electronic data security hardware and physical locks and keys).

2.      "Computer software" means: programs, program codes, information and data stored in any form (such as operating systems, applications, utilities, communications and data security software; log, history and backup files; encryption codes; user names; and passwords), whether deliberately, inadvertently, or automatically stored.

3.      "Computer-related documentation" means: any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

4.      "Storage media" means: any media capable of collecting, storing, retrieving, or transmitting data (such as hard disks, floppy diskettes, CDs, DVDs, tapes and memory cards).

5.      "Data" means: all information stored on storage media of any form (such as documents, tables, metadata, audio and visual files, their drafts and their modifications, whether deliberately, inadvertently, or automatically stored).

6.      "A Record" is: any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## ATTACHMENT C

### ITEMS TO BE SEIZED

A. All records, in whatever form, and tangible objects that constitute evidence, fruits, and/or instrumentalities of drug distribution and money laundering, as set forth below:

1. Records of personal or business activities relating to the operation or ownership of any computer hardware, software, storage media, or data (such as user names, passwords, telephone records, notes, books, diaries, and reference materials).

2. Records pertaining to accounts held with companies providing Internet access or remote storage of either data or storage media.

3. Records relating to ownership, occupancy, or use of the premises searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs, insurance documentation, receipts and check registers).

4. Records relating to drugs, drug proceeds, drug distribution, drug importation, money laundering, money transfers, ledgers, contact lists, price sheets, and related documents.

5. Records and information identifying contact information for co-conspirators, communications made in furtherance of the conspiracy, and photographs and videos of co-conspirators.

B. All computer hardware; computer software; computer-related documentation; and storage media. Off-site searching of such hardware, software, documentation, and storage media, shall be limited to searching for the items described in paragraph A of this attachment and shall be done according to the procedures set out in Attachment D.

**ATTACHMENT D**

**PROCEDURES FOR SEIZING COMPUTERS AND RELATED DEVICES**

1.      Seizing hardware and software
Agents are authorized to seize and remove from the premises the computer hardware, software, related documentation, and storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.  The retrieval process does not need to be completed within 10 days after the date of the warrant or before the return of the written inventory required by Fed. R. Crim. P. 41(a).

2.      Returning hardware and software
If, after inspecting a seized computer system, the agents and computer analysts determine that these items are no longer necessary to retrieve and preserve electronic evidence, the prosecutor determines that they need not be preserved as evidence, fruits or instrumentalities of a crime, and these items do not contain contraband, they should be returned within a reasonable time, upon written request.

If the computer system cannot be returned, agents should, upon written request, make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that are neither the fruits nor instrumentalities of crime nor contraband.