**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | ) |
| | ) |
| **v.** | )    **Criminal No. 12-10226-DJC** |
| | ) |
| **JOHN KOSTA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                               **October 31, 2013**

## I.    Introduction

Defendant John Kosta ("Kosta") and six others are charged in a superseding indictment with conspiracy to possess with the intent to distribute marijuana from in or around November 2009 through August 2012 at various locations in Massachusetts, including Phillipston and elsewhere (Count I).  D. 198 at 1-2.  The superseding indictment also charges Kosta and co-defendant Alexander Napoleon with a separate count of possession with intent to distribute marijuana on December 4, 2011 (Count II).  Id. at 3.  Several counts charge Kosta and his wife and co-defendant Tamara Kosta ("Tamara") with offenses arising out of the August 7, 2012 execution of a search warrant on the Kostas' residence at 45 Riley Switch Road in Phillipston, Massachusetts (the "Phillipston residence").  Id. at 5-9.  These charges include possession with intent to distribute marijuana (Count IV), the use or carrying of a firearm in furtherance of a drug trafficking crime (Count V), and being a felon in possession of multiple firearms (Count VI), the last charge being charged only as to Kosta.  Id.   The superseding indictment also charges the

1

Kostas with participation in a money laundering conspiracy from in or about 2010 through the time of the indictment in September 2012 (Count III).  Id. at 4.  Kosta has now moved to suppress evidence seized pursuant to the search warrant executed on his Phillipston residence on the grounds that there was insufficient nexus shown between the alleged illegal conduct and the Phillipston residence and, to the extent that the search warrant affidavit contained any showing of such nexus, such information was stale.  D. 382, 383.  Tamara has filed the same motion.  D. 379, 380.  For the reasons explained below, the Court GRANTS the motions to suppress the evidence seized from the Phillipston residence on August 7, 2012.

## II.     Legal Standards

The Fourth Amendment to the U.S. Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the places to be searched, and the persons or things to be searched."  U.S. Const. amend. IV.  The presence of probable cause is an issue that can only be determined by "assessing the information provided in the four corners of the affidavit supporting the warrant application."  United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999) (citing United States v. Khounsavanh, 113 F.3d 279, 283 & n.1 (1st Cir. 1997)).  The warrant application itself "must demonstrate probable cause to believe that (1) a crime has been committed . . . and (2) enumerated evidence of the offense will be found at the place to be searched . . . ."  United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted).

Accordingly, the First Circuit has routinely rejected any suggestion by the government that additional evidence not included in the warrant can support a showing of probable cause. See United States v. Nelson-Rodriguez, 319 F.3d 12, 33 n. 3 (1st Cir. 2003) (addressing motion to suppress evidence from Title III wiretaps and noting that "[a]t oral argument it was suggested

that the government may have provided further information about [the defendant] to the issuing judge orally.  Even were this so, our review is limited to the four corners of the affidavit"); United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (noting that "[t]he issuing magistrate ordinarily considers only the facts set forth in supporting affidavits accompanying the warrant application"). This review applies to the requisite showing that there is a sufficient link between probable criminal activity and the area to be searched.  Ribeiro, 397 F.3d at 48 (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)); see also United States v. Martineau, No. 03-10298-NG, 2005 WL 5517798, at *10 (D. Mass. Feb. 23, 2005) (granting motion to suppress where "four corners" of the affidavit did not support scope of search).  "Reviewing courts, including both the district court and the court of appeals, must accord 'considerable deference' to the 'probable cause' determination by the issuing magistrate [judge]."  Id.  (internal citation omitted).  However, for the reasons discussed at length below, even applying such deferential review, this is not "a doubtful or marginal case" or one where there is a substantial basis for concluding that probable cause existed.  Id. (citations omitted).

"[A]n affidavit supporting a search warrant must contain timely information or else it will fail."  United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996).  Whether the attestations in an affidavit are sufficiently timely to demonstrate probable cause depends on the particular circumstances of the case.  United States v. DiMuro, 540 F.2d 503, 516 (1st Cir. 1976).  "For purposes of determining whether the information on which the search warrant was based was 'stale,' courts must look to all the facts and circumstances of the case, including the nature of the criminal activity under investigation, the length of time during which the criminal activity is alleged to have occurred, and the nature of the property to be seized."  United States v. Bateman, 805 F. Supp. 1041, 1044-45 (D.N.H. 1992) (citing United States v. Dauphinee, 538 F.2d 1, 5 (1st

Cir. 1976)).   The "number of days elapsed," in itself, is not conclusive.   United States v.

Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) (considering "the nature of the information, the nature

and characteristics of the supposed criminal activity, the nature and characteristics of the place to

be searched, the nature of the items delineated in the warrant").   Instead, courts must view

supporting affidavits in a "practical, 'common sense' fashion" to determine whether information

is recent enough to amount to reliable evidence that certain items may be found in the location to

be searched.  Zayas-Diaz, 95 F.3d at 111.

Fruits of unlawful searches are presumed to be excluded from evidence before the trier of

fact at trial.  See Mapp v. Ohio, 367 U.S. 643, 655 (1961).  However, there is an exception to the

exclusionary rule where law enforcement officers act in reasonable reliance on a search warrant

ultimately found to be invalid.  United States v. Leon, 468 U.S. 897, 922 (1984).

III.    **Search Warrant for the Phillipston Residence**

On August 6, 2012, the government sought a search warrant for the Kostas' Phillipston

residence, relying on the affidavit of F.B.I. Special Agent Stephen Kelleher ("Kelleher Aff."), D.

409-1, and an aerial photograph of the Phillipston residence, D. 63.   In the affidavit, S.A.

Kelleher, an F.B.I. agent since 2004 and the case agent for the investigation of the marijuana

trafficking organization allegedly headed by Kosta, sought a search warrant for two

Massachusetts locations associated with Kosta, the Phillipston residence of the Kostas believed

to be a "storage location for evidence sought" and a residence at 359 Maple Street in Lynn,

Massachusetts also believed to be "a storage location for the evidence sought."  Id. at 3-4.  The

items to be seized at the Phillipston residence (referred to as "Target Location 1" in the Kelleher

Aff.) included, but were not limited to, U.S. currency; books and other papers relating to the

transportation ordering, sale and distribution of controlled substances; controlled substances,

packaging materials, proceeds of drug sales and records of drug trafficking; and books or papers which reflect names, addresses and/or phone numbers of drug trafficking associates.  D. 409-1 at 22-23 (Attachment B to Kelleher Aff.).

The Kelleher Aff. recites that the investigation of Kosta's organization began in 2009 when in an investigation of "FITO," a marijuana supplier, a cooperating witness informed the F.B.I. that Kosta was FITO's Massachusetts-based distributor.  Id. at 4-5.  Observations of FITO and associates in the exchange of large bundles of cash in a Burlington Mall parking lot in September 2010 led to an identification of Kosta and his phone number in FITO's phone records. Id. at 5.  Later, in December 2010, Arizona police observed FITO's motor vehicle leaving the Kostas' residence in Arizona upon the heels of an intercepted call indicating FITO was planning to pick money up from an associate.  Id. at 6.  Police stopped FITO's car after its departure from the Kostas' residence and found $285,000 in cash in a search of his car.  Id.  Bank records revealed that Tamara had accessed two safe deposit boxes two days before FITO's departure from the Kostas' Arizona residence and his stop by law enforcement.  Id.  Later trash pulls on the Kostas' Arizona residence in April 2011 and May 2011 revealed items consistent with marijuana trafficking including marijuana, packaging materials and a drug ledger.  Id.  According to the Kelleher Aff., the Kostas only rented the Arizona residence through January 2012.  Id.

As to evidence of the connection of Kosta's drug trafficking to Massachusetts, the Kelleher Aff. noted that on August 21, 2011, Kosta was stopped by law enforcement outside of Phoenix "while en route from Massachusetts to Paradise Valley, Arizona."  Id. at 6.  Kosta was found to be traveling with a significant amount of cash in excess of $10,000.  Id. at 7.  Kosta noted that he sometimes traveled with $60,000 to $70,000 and had never been hassled about it in Massachusetts.  Id.

As to specific information regarding the Phillipston residence, the affidavit related events only up to February 2012, some six months before the August 6, 2012 Kelleher Aff.[1] See id. at 9. S.A. Kelleher noted that in late November 2011 and early December 2011, agents observed Kosta and co-defendant Donald McCormick leave Arizona and arrive at the Phillipston residence. Id. at 7. "Shortly thereafter, agents noted a marked increase in car traffic in and out of the Target Location 1." Id. On December 4, 2011,[2] Napoleon was arrested in Massachusetts with 46 pounds of marijuana after having been observed leaving the Phillipston residence. Id. at 11. There were markings on the packages including the letter "K" that the agents believed to be a reference to Kosta. Id. at 12. During the course of a Title III wiretap of four phones used by Kosta and his associates authorized between December 2011 and the end of March 2012, the government intercepted various conversations between Kosta and his co-defendants. Id. at 8. At various points in December 2011, Kosta was intercepted negotiating the purchase and subsequent transport of marijuana around December 28, 2011 with his co-defendants. Id. On December 23, 2011,[3] co-defendant McCormick arrived at the Kostas' Arizona residence in a white pickup truck. Id. On January 2, 2012, co-defendant Dennis Novicki arrived and on January 3, 2012, McCormick's van was moved into the Kostas' garage "and the doors were closed presumably so that the pickup truck could be loaded with marijuana." Id. One day later, on January 4, 2012, agents observed Kosta, McCormick and Novicki leave the Kostas' Arizona residence in a caravan of three motor vehicles. Id. On January 6, 2012, South Dakota police

---

[1] There is reference to Information and Customs Enforcement ("ICE") information that Kosta crossed into Mexico from Arizona on May 5, 2012 shortly after co-defendant Nestor Antonio Verduzco did, but no suggestion that this had any connection with the Phillipston residence.

[2] The affidavit actually says December 4, 2012, but clearly the reference to this year is a typographical error, given that the Kelleher Aff. was signed in August 2012.

[3] See supra note 2.

observed the latter two vehicles traveling together in South Dakota and stopped the white pickup truck driven by McCormick. Id. at 9. A search of the truck revealed 980 pounds of marijuana. Kosta's motor vehicle was not stopped, but cell site records revealed that one of Kosta's phones was traveling eastbound to Massachusetts between January 6 and January 8, 2012. Id. Agents later observed Kosta's vehicle and another motor vehicle arrive at the Phillipston residence shortly before Novicki's truck arrived there as well. Id. at 12.

A little over a month later, around February 15, 2012, Kosta loaded up a moving truck at the Kostas' Arizona residence and drove to the Phillipston residence where the Kostas were living at the time that the government executed its search warrant. Id.; D. 409 at 7.

The Kelleher Aff. also recited that agents observed Kosta, Tamara, Novicki, McCormick and Napoleon going in and out of the Phillipston residence "in a pattern that indicates that Kosta uses Target Location 1 to conduct drug business," D. 409-1 at 9, but it does not indicate when these observations were made or over what span of time. Although S.A. Kelleher concluded that the Phillipston residence was used "to distribute marijuana and to meet with co-conspirators," and that "drugs and evidence of drug trafficking and money laundering" would be found there, id. at 13, these conclusions are based upon the information summarized above.

The government applied for a search warrant on August 6, 2012, which the magistrate judge granted. D. 63. The government executed the search warrant on August 7, 2012 on the Phillipston residence.[4] D. 409 at 2. Agents recovered a number of items, including but not limited to, 103 marijuana plants, 25 firearms, a stun gun, body armor, cell phones, flash drives tax returns filed by both Kosta and Tamara and approximately $4,811 in cash. Id.

---

[4] The government subsequently executed a series of other search warrants in August 2012 and January 2013. D. 409 at 2 n.1.

IV.     **Discussion**

A.      <u>**There is Insufficient Showing of Nexus in the Kelleher Affidavit**</u>

A warrant application "must demonstrate probable cause to believe that:  1) a crime has been committed; and 2) enumerated evidence of the offense will be found at the place to be search – the so called 'nexus' element."  <u>United States v. Hicks</u>, 575 F.3d 130, 136 (1st Cir. 2009) (citation omitted).  This means that there must be a "fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Id.</u>  The probable cause nexus between enumerated evidence of the crime and the place to be searched "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]."  <u>Ribeiro</u>, 397 F.3d at 49.

To establish the requisite nexus, the government must rely on "timely information or else [the application] will fail.  <u>Schaefer</u>, 87 F.3d at 568.  Whether information is "stale" is a fact-intensive determination and the number of days in itself is not conclusive.  <u>Dauphinee</u>, 538 F.2d at 5 (considering "the nature of the criminal activity under investigation and the nature of what is being sought").

There is no bright line for determining the staleness of information regarding drug trafficking and a nexus to the location to be searched.  The value of such evidence, however, may turn upon whether the alleged drug activity can be appropriately described as ongoing and continuous.  <u>See, e.g.</u>, <u>United States v. Nocella</u>, 849 F.2d 33, 39-40 (1st Cir. 1988) (denying motion to suppress where there had been multiple controlled buys from the defendant over the course of months and sales in the spring not long before the search warrant was sought "showed persuasively that the defendant's criminal activity was velivolant").  Although drug trafficking is "apt to persist over relatively long periods of time," <u>id.</u>, evidence can be stale when it fails to

demonstrate a continuing pattern of drug trafficking activity.  See United States v. Santiago, No. 12-161, 2013 WL 3043381, at *3 (D.R.I. June 18, 2013) (granting motion to suppress where the court found information regarding alleged drug trafficking to be stale); cf. United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999) (concluding that information from two informants regarding first-hand observations of the defendant's drug trafficking, informant information that the defendant had sold cocaine since as early as 1985 and controlled buys from the defendant in September prior to the year-end search warrant was reason to conclude that the "drug trafficking was of a continuous and ongoing nature").

Here, the Kelleher Aff. includes no information contemporaneous with the warrant application.  The government's Title III wiretap investigation ran through March 2012, five months prior to the government's application for a warrant.  D. 409-1 at 8 (reflecting Title III wiretap intercepts through March 2012, but not citing any specific summary of intercepted conversations after December 2011).  Accordingly, there were no contemporaneous intercepts of Kosta or his co-defendants recited in the Kelleher Aff.  The Kelleher Aff. contained no actual record of surveillance of Kosta or any of the co-defendants or other associations on or near the August 6, 2012 date of the affidavit.  Indeed, the only information tying the Phillipston residence to any drug activity comes from:  sometime in late November 2011/early December 2011, after agents observed Kosta and co-defendant Donald McCormick leave Arizona and arrive at the Phillipston residence, they observed a marked increase in traffic at the Phillipston residence; December 2011, when agents stopped Napoleon after leaving the Phillipston residence and he was transporting 46 pounds of marijuana; January 2012, when Kosta (whose intercepted calls in December 2011 with some of his co-defendants concerned the purchase and transport of marijuana), Novicki and McCormick left Kosta's Arizona residence and Kosta and Novicki

arrived at the Phillipston residence, McCormick having been stopped en route in South Dakota with 980 pounds of marijuana; and February 2012, when the Kostas relocated from Arizona to the Phillipston residence. Id. at 10-12. The last of these events were at least six months prior to the government's application for a search warrant of the Phillipston residence.

The government argues strenuously that the drug trafficking here is of a "continuous and ongoing nature." D. 409 at 11 (citing Feliz, 182 F.3d at 87). Even if the government had made this showing in the Kelleher Aff., the affidavit also indicates that the alleged Kosta organization had used multiple locations in Arizona and Massachusetts to conduct business during 2011 and 2012. See D. 409-1 at 10 (discussing surveillance in Arizona). Some of the facts recited in the affidavit had as much, or more, to do with Kosta's Arizona residence as the Phillipston residence. See, e.g., id. at 6. The mere fact that the Kostas moved out of their Arizona residence in February 2012 and relocated to Massachusetts does not mean that the locus of drug operation shifted to Massachusetts in the absence of any evidence in the affidavit addressing intercepts, surveillance or other evidence of drug activity at the Phillipston residence or intended to involve the Phillipston residence after this time. Contrast with Feliz, 182 F.3d at 88 (concluding that it was reasonable to find evidence of drug trafficking at the defendant's residence where "[n]o other residence or drug dealing headquarters of his was identified in the affidavit"). That is, a drug trafficking operation is not ongoing and continuous merely because the government says it is; it must make a sufficient showing of same.[5] A showing of same was not made, even viewing

---

[5] The Court has considered the factual averments in the Kelleher Aff. in light of the special agent's training and experience regarding drug trafficking organizations and their practices. S.A. Kelleher had been a Special Agent with the F.B.I. for eight years prior to submitting the affidavit in question. D. 409-1 at 1. As part of his duties, he "participated in investigations of narcotics trafficking and money laundering, and . . . conducted and participated in physical surveillance, the execution of search warrants, debriefings of informants, and have been the affiant in Title III investigations . . . . Through [his] training, education, and experience, [Kelleher is] familiar with the manner in which illegal drugs are transported, stored, and

the totality of circumstances provided in the Kelleher Aff. in a commonsensical manner, within

the four corners of the Kelleher Aff., where by measure of that affidavit, the investigation of the

drug trafficking organization had stopped and there was no factual basis (or freshened probable

cause) for believing that the drug trafficking organization continued or had any continued nexus

to the Phillipston residence.   Ultimately, the fact that this case arises out of a long-term

investigation cannot obscure whether the affidavit demonstrates a sufficient nexus between

criminal activity and the Phillipston residence.

At oral argument, the Court pointedly asked counsel for the government what evidence

there was in the Kelleher Aff. that indicated the existence of drug activity at the Phillipston

residence in the six months prior to the government's application.  See D. 441.  The government

identified the existence of bank accounts and safe deposit boxes that were maintained by the

Kostas, which the government has not tied to drug activity allegedly occurring at the Phillipston

residence.  The government also identified a trip taken by Kosta, McCormick and Napoleon to

Arizona to meet with Kosta's drug supplier, after which the government says Kosta returned to

the Phillipston residence.  Nevertheless, the affidavit does not contain any information about any

such trip in the six months prior to the application.[6]  As discussed above, the Court cannot

---

distributed . . . . and the methods of operation employed by narcotics traffickers."  Id. at 1-2.
Although training and experience can illuminate the meaning of certain facts, it cannot be the
substitute for a lack of probable cause.  United States v. Rosario, 918 F. Supp. 524, 530 (D.R.I.
1996) (quoting United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994) (noting that "[w]hile
an officer's training and experience' may be considered in determining probable cause, it cannot
substitute for the lack of evidentiary nexus") (citation omitted)); see also United States v.
Gianelli, 585 F. Supp. 2d 150, 167 (D. Mass. 2008) (noting that "probable cause cannot rest
entirely on a law officer's experience and training," even as it might provide some support for
same), aff'd sub nom. United States v. Albertelli, 687 F.3d 439 (1st Cir. 2012).

[6] Although the government represented at oral argument that this trip took place within
six months of the government's application for a warrant, the government may have been
referring to Kosta's trip from Arizona to the Phillipston residence in January 2012.  D. 409-1 at
9.

consider allegations outside the four corners of the affidavit.   Ribeiro, 397 F.3d at 48.[7]

Accordingly, nearly all of the pieces of evidence cited by the government in support of their

argument that there was sufficient nexus, both in their memorandum, D. 409 at 15, and at oral

argument were either well before the application for a search warrant or not enumerated in the

Kelleher Aff.

Certainly there could be an argument that the timeframe for showing a nexus between

alleged drug trafficking and the location in which the government was likely to find documentary

evidence of historical drug dealing is longer than the timeframe for showing nexus as to the

drugs themselves, particularly for marijuana in the quantities alleged.   Compare United States v.

Ostrowki, 822 F. Supp. 2d 66, 72 (D. Mass. 2011) (noting that "[b]usiness and financial records

tend to defy claims of staleness") (citing United States v. Procopio, 88 F.3d 21, 26 (1st Cir.

1996)) with Santiago, 2013 WL 3043381, at *3.  As to "[drug] ledgers and documents to record

the proceeds from their drug activities," S.A. Kelleher attested that based upon "evidence

gathered through physical surveillance, trash pulls, and a review of bank records, and my

analysis of dozens of intercepted calls in which John KOSTA negotiated drug deals with

suppliers, coordinated the transportation of marijuana with his associates and couriers," he

expected that Kosta and his co-conspirators maintained such records.   Id. at 16-17.   If this

evidence (the date(s) of which are not provided) refers to evidence other than that otherwise

specified in the Kelleher Aff., it does not say so.   He further noted that in his training and

experience, "it is common for narcotics traffickers to maintain books, records, [etc.] where the

traffickers have ready access to them . . . [and] in secure locations within their residences."   Id. at

_____

[7] Similarly, the Court cannot consider the government's unsworn, undated allegations that "co-conspirators Novicki, Napoleon, and McCormick were observed at the Phillipston Residence at times when agents believe Kosta had transported or attempted to transport a load of marijuana from Arizona to the Phillipston Residence."  D. 409 at 15.

17-18. In addition, S.A. Kelleher attests that narcotics traffickers maintain evidence pertaining to their concealment of proceeds of illegal activities (such as jewelry, currency, bank checks, etc.) at their residences. Id. at 18. Finally, S.A. Kelleher attests that narcotics traffickers conceal the source of their income on their tax returns, which they retain in their residences. Id. at 19. Nevertheless, there is no distinction made between historical documents and documents regarding ongoing drug trafficking and in the absence of any argument about that distinction here, the court is loathe to make that distinction given the failure to show the ongoing, continuous nature of the drug trafficking itself.[8]   In addition, S.A. Kelleher's conclusions apparently rely on the assumption that "[b]ecause the members of the conspiracy use [the Phillipston residence] as a base of operation for drug trafficking, as described above, I believe there is probable cause that all of the items [sought] . . . will be found in [the Phillipston residence]." Id. at 17. However, any reliance on this assumption is misplaced given the Court's findings above regarding the failure to show the ongoing nature of the enterprise.

As the Court finds the Kelleher Aff.'s recitation of observations from late 2011 and early 2012 insufficient to show the ongoing and continuous nature of the operation at the time the search warrant was sought, the Court is left only with the government's contemporaneous observations about the property itself. D. 409-1 at 10, 13, 20. Specifically, the affidavit notes that the "Kostas had a sophisticated and extensive security system at the Phillipston residence," D. 409 at 15 (citing D. 409-1 at 10, 20), and a Connex storage box on the property,[9] as of July

---

[8] There is a single line in the Kelleher Aff. that says that evidence of money laundering will also be found at the Phillipston residence, D. 409-1 at 13, but the factual averments regarding same are shown only as to Target Location 2, the other Massachusetts residence associated with Kosta. D. 409-1 at 13-16.

[9] S.A. Kelleher, "based on [his] experience and knowledge of this investigation," attested that he believed that Kosta "may use" this box to store marijuana, but the affidavit does not

31, 2012, which a truck with a covered bed was pulled up to, and that the security camera would capture anyone attempting to enter the box.  D. 409-1 at 12-13.  Even considering these facts within the totality of circumstances, the Court cannot rest upon this information about the property to find that there was sufficient nexus between the Phillipston residence and alleged drug activity in the absence of evidence of continuing drug activity as discussed above. Accordingly, the Court finds that the warrant authorizing search of the Phillipston residence was not supported by probable cause.

### B.      The Good Faith Exception to the Exclusionary Rule Does Not Apply Here

The government has not argued that the good faith exception, see Leon, 468 U.S. at 922, saves from exclusion the evidence seized at the Phillipston residence.  However, even reaching this issue, the Court finds that the good faith exception does not apply here.

The government bears a "heavy burden" of proving that the good faith exception applies. United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 1995).  The touchstone of the exception is law enforcement officers' reasonable reliance on warrants, see Leon, 468 U.S. at 922, statutes, see Illinois v. Krull, 480 U.S. 340, 353 (1987), or settled appellate precedent, Davis v. United States, --- U.S. ----, 131 S. Ct. 2419, 2429 (2011), that courts later invalidate.  Even where the Supreme Court has applied the good faith exception to negligent conduct, it has done so only where such negligence is isolated and attenuated from the seizure in question.  Herring v. United States, 555 U.S. 135, 137 (2009).  The reason for this is that the purpose of the exclusionary rule is to deter police misconduct and application of the exclusionary rule cannot serve to deter conduct that the Court deems reasonable.  See id. at 140.

---

indicate that this unit was used in this manner previously or even when the box appeared on the property.

Although reviewing courts afford search warrants a significant amount of deference, Zayas-Diaz, 95 F.3d at 111, the good faith exception does not apply "where the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" and . . . where a warrant is 'so facially deficient—*i.e.* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.'" United States v. Owens, 167 F.3d 739, 745 (1st Cir.1999) (quoting Leon, 468 U.S. at 923). Consistent with that principle, the First Circuit has reversed denials of suppression orders where the warrant affidavit failed to establish an adequate nexus between criminal activity and evidence to be seized. United States v. Ricciardelli, 998 F.2d 8, 12-13 (1st Cir. 1993). In Ricciardelli, the Court invalidated an "anticipatory search warrant" because they "failed to forge a sufficient link between [alleged criminal activity] and the search of the defendant's abode." Id. at 12. After doing so, the Court declined to apply the good faith exception because "the warrant, as issued, contained non-technical defects readily observable to experienced [law enforcement officers]." Id. at 16. The Court went on to note that "principal omission in the warrant . . . was both glaring and easily correctible." Id. "A reasonably prudent officer should have known that the procured warrant was substantially defective on its face." Id. at 17. Accordingly, suppression was warranted.

Here, the affidavit's failure to demonstrate sufficient nexus between the alleged criminal activity and the Phillipston residence appears on the face of the Kelleher Aff. The Kelleher Aff. suffers from a lack of contemporaneous information connecting the Phillipston residence to ongoing drug trafficking activity or, at minimum, lacks information from which a reasonable inference about sufficient nexus could be reached. Although S.A. Kelleher asserts that "[e]vidence indicates that [Kosta] has been trafficking marijuana since at least 2009 and

15

continues to do so," id. at 13, he provides no information connecting this "continu[ing]" activity to the Phillipston residence.  See Santiago, 2013 WL 3043381, at *4 (declining to apply good faith exception where agent "presumably knew the dates of the controlled buys").  Accordingly, unlike Leon, Krull or Herring, this is not a case where the errors of law enforcement were somehow obscured.  Ricciardelli, 998 F.2d at 16.  Even to the extent that Herring has lowered the bar for the government to assert this exception, it is difficult to characterize this case as the sort of conduct that can be insulated from the exclusionary rule, where the warrant's deficiency goes to the heart of the nexus requirement.  Cf. Herring, 555 U.S. at 137 (finding suppression unwarranted where negligent police error was both "isolated" and "attenuated" in that the officer conducting the unlawful search was a different officer than he who made the negligent error).

Consequently, this is a case where suppression still serves the purpose of the exclusionary rule.  See Ricciardelli, 998 F.2d at 16.  Although the government's Title III investigation had ended by the time of the government's application, nothing prevented government agents from reinitiating their investigation and surveillance of the Phillipston residence and incorporating in the Kelleher Aff. fresh information that would not only provide contemporaneous information, but would also connect the earlier observations of criminal activity to more timely observations that would suggest an ongoing, continuous drug enterprise tied to the Phillipston residence at the time the government sought the search warrant.  Yet the government did not do so (or at least did not include such information in the Kelleher Aff. submitted to the magistrate judge).  As the exclusionary rule serves to deter police misconduct, it should so apply here to encourage officers to act as diligently as possible even at the end of a long-term investigation.  See Herring, 555 U.S. at 153 (Ginsburg, J., dissenting) (noting that the exclusionary rule is capable of deterring negligent conduct to "create[] an incentive to act with greater care").

## V.      Conclusion

For the foregoing reasons, Kosta's and Tamara's motions to suppress, D. 382 and D. 379,

the fruits of the search conducted at the Phillipston residence on August 7, 2012 are GRANTED.


**So Ordered.**

/s/ Denise J. Casper
United States District Judge
