1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    _____

4    UNITED STATES OF AMERICA,

5                        Plaintiff,        Criminal Action
                                           No. 12-10226-DJC
6    v.
                                           September 25, 2013
7    JOHN KOSTA, et al.,                   9:12 a.m.

8                        Defendants.
     _____
9


10


11               TRANSCRIPT OF MOTION HEARING

12          BEFORE THE HONORABLE DENISE J. CASPER

13             UNITED STATES DISTRICT COURT

14          JOHN J. MOAKLEY U.S. COURTHOUSE

15                 1 COURTHOUSE WAY

16                BOSTON, MA  02210

17


18


19


20
                   DEBRA M. JOYCE, RMR, CRR
21                  Official Court Reporter
                 John J. Moakley U.S. Courthouse
22              1 Courthouse Way, Room 5204
                     Boston, MA  02210
23                 joycedebra@gmail.com

24


25

1    APPEARANCES:

2    FOR THE GOVERNMENT:

3    LEAH B. FOLEY, ESQ.
     United States Attorney's Office
4    John J. Moakley U.S. Courthouse
     Suite 9200
5    One Courthouse Way
     Boston, MA 02210
6    617-748-3144

7    FOR THE DEFENDANT JOHN KOSTA:

8    MICHAEL H. KELLY, ESQ.
     Law Office of Michael H. Kelly
9    366 Broadway
     Everett, MA 02149
10   617-387-6380

11   FOR THE DEFENDANT TAMARA KOSTA:

12   THOMAS J. IOVIENO, ESQ.
     755 East Broadway
13   3rd Floor
     South Boston, MA 02127
14   617-464-3300

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 25, 2013.

The defendant, Tamara Kosta, is present with counsel. The Assistant U.S. Attorney is present.)

THE CLERK:  Criminal action 12-10226, <u>United States v. John Kosta and Tamara Kosta</u>.

Would counsel please state your name for the record.

MS. FOLEY:  Good morning, your Honor.  Leah Foley for the United States.

THE COURT:  Good morning.

MR. IOVIENO:  Good morning, your Honor.  Thomas Iovieno for Tamara Kosta.

THE COURT:  Good morning, counsel.

Good morning, Ms. Kosta.

MS KOSTA:  Good morning.

THE COURT:  Counsel, I know that Mr. Kosta is here in the building and that we're waiting on Mr. Kosta's counsel, which we will do, but, counsel, just so I'm clear on what you wanted to argue, do I understand that you're withdrawing the motion to suppress the wiretap?

MR. IOVIENO:  Yes, your Honor.

1        THE COURT:  The wiretaps, that would be Docket 373?

2        MR. IOVIENO:  Yes.

3        THE COURT:  Okay.  That will be noted as withdrawn on

4   the record, Docket 378.  But I do understand that you'd like to

5   be heard on the motion to suppress evidence based on the search

6   warrant executed at --

7        MR. IOVIENO:  Yes, your Honor.  Just briefly, I will

8   rely primarily on the papers I submitted.  My sense is a common

9   motion with Mr. Kosta made some to sense just be heard

09:14 10   presently on it rather than have the Court do it again, should

11   the situation change between the government --

12        THE COURT:  And do I understand -- I didn't see

13   reference to a Franks motion in your papers, meaning are you

14   joining that on the nexus issue or on both issues?

15        MR. IOVIENO:  I am not joining that.

16        THE COURT:  And in terms of the motion to suppress

17   Ms. Kosta's statements, this would be Docket 376, did you want

18   to be heard on that today?

19        MR. IOVIENO:  I did not, your Honor.  I ask that that

09:14 20   be deferred to another date, if necessary.

21        THE COURT:  Okay.

22        Okay, counsel, so it's just the motion to suppress

23   evidence in regards to the residence.

24        MR. IOVIENO:  Yes, your Honor, and there's also John

25   Kosta filed a motion to sever --

       1              THE COURT:  Yes.

       2              MR. IOVIENO:  -- which I join in that motion.

       3              THE COURT:  I also have that.  You didn't have

       4     separate papers on that, but you join the motion.

       5              MR. IOVIENO:  I joined that motion, yes.

       6              THE COURT:  Okay.

       7              Counsel, anything else we should discuss logistically?

       8     Otherwise we'll wait for Mr. Kosta's counsel.

       9              MS. FOLEY:  I don't believe so, your Honor.

09:15 10              THE COURT:  Okay.

      11              MR. IOVIENO:  No, your Honor.

      12              THE COURT:  Okay.

      13              Thanks for your patience.

      14              THE CLERK:  All rise.

      15              (Recess taken.)

      16              THE CLERK:  Criminal action 12-10226, United States v.

      17     John Kosta and Tamara Kosta.

      18              And would counsel please state your name for the

      19     record.

09:33 20              MS. FOLEY:  Good morning, your Honor.  Leah Foley for

      21     the United States.

      22              MR. KELLY:  Good morning, your Honor, Attorney Michael

      23     Kelly representing John Kosta.  I apologize, Judge, for being

      24     late; I ran into unexpected traffic this morning.

      25              THE COURT:  Good morning.

1          Good morning, Mr. Kosta.

2          MR. KOSTA:  Good morning.

3          MR. IOVIENO:  Good morning, your Honor.  Thomas

4    Iovieno for Tamara Kosta.

5          THE COURT:  Good morning.

6          Counsel, I know we're here for multiple motions.

7          Mr. Kelly, I had just gone through, before you arrived

8    with counsel for Mrs. Kosta, what motions they were seeking to

9    go forward on today.

09:34 10          I understand there are two motions pending from

11   Mr. Kosta, one is the motion to suppress evidence seized

12   pursuant to a search warrant, that's Docket 382, and then there

13   is the motion to sever, Docket 388.  I'm prepared to hear

14   argument on both.

15          Why don't we begin with the motion to suppress

16   evidence.  I understand that you're seeking both a Franks

17   motion and then substantively you're raising an issue with

18   sufficient -- whether or not there is sufficient showing in the

19   affidavit for a nexus between the location, the allegations.

09:34 20   Why don't I hear you on the Franks argument first.

21          MR. KELLY:  Yes, Judge.

22          Judge, in my review of the affidavit that was

23   submitted in the application for the search warrant, the issue

24   that was raised about -- most specifically, when the agent

25   applied, made comments and statements in his affidavit

1    regarding an increase in traffic in the residential area in

2    Phillipston where my client had owned property.

3        Other than showing the increase in traffic, there's no

4    connection in any way or form with seizing or seeing any

5    traffic or drug paraphernalia or drugs in and out of that

6    house.

7        With regard to the traffic, Judge, the issue comes

8    down to they're related to one certain period of time, from the

9    end of November through the first, second week in December, and

09:35 10  they left it -- the agent, in the application, left it to the

11   effect there was an increase in traffic.  Well, the facts,

12   Judge, I would hope to show to the Court, would be that prior

13   to November, even though the residence was owned by Mr. Kosta

14   and his family, they were residing in Arizona and nobody was

15   living in the house.  And when they -- Mr. Kosta arrived in

16   November, granted, naturally, there would be his cars that

17   would show up, and there would be other cars, specifically his

18   friends or his family would show up.  But I would suggest by

19   leaving it -- by saying there's an increase in traffic is not

09:36 20  sufficient to show that.  There's zero cars showing up on

21   November 20th and three cars show up on December 1st, I think

22   that would be misleading to somebody that's reviewing the

23   search warrant to show that's a dramatic increase that would

24   give any relevance towards drug trafficking happening at that

25   time.

1          From my understanding in review, there has been

2    from -- during that period of time, other than Mr. Kosta's car

3    that was showing up there, over probably a two, two-and-a-half,

4    three-week period of time, 12 cars showing up, and they are

5    unaccounted for, other than one alleged co-defendant in this

6    matter and my client's father showing up.  There could have

7    been other relatives showing up.  There were some work trucks

8    that did show up.  When somebody is not living in a residence

9    for a period of time, after they re-arrive, there may be

09:37 10   repairs, there may be yard work that has to be done, there has

11   to be cleaning up, and we have no evidence to show just who

12   those vehicles were.  So by leaving it, Judge, to just an

13   increase in traffic is misleading to somebody reviewing it to

14   show whether or not there is an actual connection between zero

15   cars and 12 cars over a two-and-a-half-week period of time.

16        THE COURT:  Counsel, I understand your argument as it

17   bears upon nexus, but in terms of the substantial preliminary

18   showing you need to make for a Franks hearing, are you claiming

19   that the statements in the affidavit about increase in traffic

09:37 20   are false?

21        MR. KELLY:  I didn't say they were false, Judge.

22        THE COURT:  Okay.

23        MR. KELLY:  Because on face value, Judge, it is true,

24   somewhat, I would suggest, that when there's an increase in

25   traffic, when there's no cars showing up on November 20th and

1   there's three cars showing up on December 2nd, there's an

2   increase in traffic.  But, again, that, I would suggest, is not

3   sufficient to show that had relation towards illegal activities

4   occurring at that residence.

5        THE COURT:  Counsel, other than the statements about

6   traffic, were there other matters that you point to for the

7   purposes of the Franks hearing; that is, whether or not there

8   are false statements knowingly, intentionally made or made with

9   reckless disregard for the truth?

09:38 10        MR. KELLY:  I can't tell you that there are any other

11   statements that are made other than the conclusions that are

12   made by the agent at the time when he applied for it, when he

13   makes a statement saying that my client had traveled to Mexico

14   and it's his conclusion that it comes down to he's engaged in

15   drug trafficking at the time, and I can't see the connection at

16   all, Judge.

17        THE COURT:  Counsel, let me just -- looking at the

18   memo of law that you submitted in support of the motion, this

19   is Docket 383, I'm looking on page 5, there's reference -- and

09:39 20   this is in the discussion of the marked increase in car

21   traffic, which you're talking about now, there's a reference

22   about two-thirds of the way down the page to see attached

23   reports, but I didn't have any attached reports.  So are those

24   reports that you're saying reflects the actual volume of

25   traffic increase?

1          MR. KELLY:  Yes, Judge.

2          THE COURT:  Okay.

3          Is there anything else you want to say further on

4      that?

5          MR. KELLY:  Not on that issue, Judge.

6          THE COURT:  Okay.

7          Before we go on, let me hear from Ms. Foley on the

8      Franks issue, just on the Franks issue.

9          MS. FOLEY:  Your Honor, I don't think anything that

09:40 10   Mr. Kelly has said today adds to what was in the affidavit, and

11     the government still believes based on the case law that he has

12     not met the requisite showing which entitles him to any type of

13     hearing on this matter.

14         He just claimed that he is now saying -- he's not

15     taking the position that any statement in the affidavit is

16     false, and if he's not challenging the truthfulness of a

17     statement, particularly whether there was an increase in

18     traffic volume or not, then he's not entitled to a hearing,

19     because he just conceded that it's not false.

09:40 20       There is no other -- there was one other issue raised

21     in the papers regarding the fact that -- challenging the fact

22     that Agent Kelleher did not discuss the other properties that

23     the Kostas owned, but there has been no -- there's been no

24     argument to support how, if any, effect that had on the

25     probable cause, and, therefore, the government believes that

that argument --

THE COURT:  And my memory is in the affidavit there's a distinction made between this location, which is the -- is it the Phillipston location?  -- that in the affidavit itself it notes that the Kostas were actually residing somewhere else; am I recalling that correctly?

MS. FOLEY:  Your Honor, the Kostas at the time of the search had been residing at the Phillipston residence.  They also owned the Maple Street residence, where co-defendant Napoleon and unindicted co-conspirator Dayna L'Italien were living.  The government did seek search warrants for both of those places.

THE COURT:  So the other one was Location 2, was Target Location 2?

MS. FOLEY:  Yes, your Honor.

THE COURT:  Meaning, what I'm making reference to here is at Docket 409-1, there are two target locations in the search warrant affidavit, the first, which is the Phillipston address that the motion is directed to, is identified as the residence and as a storage location; the second one, the Maple Street, is a residence, also a residence.  Am I understanding that correctly?

MS. FOLEY:  Yes, your Honor.  The Kostas owned both of the properties, both Target Location 1 and Target Location 2. As detailed in the affidavit, they resided at Target Location 1

1   and co-defendant Alexander Napoleon resided at Target Location

2   2.

3          THE COURT:  Did you want to add anything else?

4          MS. FOLEY:  No, your Honor.

5          THE COURT:  Counsel, Mr. Kelly, I have had time to

6   think about the motion papers, and I appreciate the arguments

7   today.  I do think the showing for Franks hearing is fairly

8   high.  It's been described as a substantial preliminary showing

9   that a false statement was knowingly intentionally made, or at

09:43 10   least made with reckless disregard for the truth.  I don't

11   think either the assertion that you focused on today in regards

12   to the volume of traffic or the reference that you made in the

13   papers at Docket 383 at pages 5 and 6 in regards to the other

14   real estate holdings meet that standard.

15         I understand the argument you're making about lack of

16   a nexus, and I'm going to give you an opportunity to argue

17   about that in a moment, but in terms of the Franks showing that

18   needs to be met, I don't think it's been met here to challenge

19   the validity of the affidavit in terms of the veracity of

09:43 20   statements made in that affidavit.  And here I would cite to

21   the Franks decision itself, 438 U.S., 155-56, and also United

22   States v. Ranney, 293 F.3d 74, 78 (1st Cir. 2002).

23         I also don't think that the arguments you've made

24   about the traffic or about the real estate holdings rise to the

25   level of a material omission, particularly as to the real

1    estate where, as I was pointing out, the search warrant

2    affidavit itself notes that there are at least two holdings of

3    property owned by the Kostas.  And the allegations here, which

4    I don't think are disputed, is that the Kostas lived at the

5    target location that we're talking about, the Phillipston

6    location, and a co-defendant lived at at least one of the other

7    real estate holdings.

8         All of that being said, I don't think you've made

9    enough of a showing directed at the veracity of the affiant,

09:45 10   the agent here, and for that reason I'm going to deny the

11   Franks motion, or at least as much of the motion to suppress

12   that was a request for a Franks hearing.

13        I will, Mr. Kelly, hear you now, and then I'll also

14   hear your brother on this part of the motion as well, since I

15   understand Mrs. Kosta is joining it, on your argument about the

16   nexus, if you want to be heard now.

17        MR. KELLY:  Very well, Judge.

18        Judge, the application for the complaint, once again,

19   was detailing information that the agents had received through

09:45 20   wire intercepts and security videos and information,

21   surveillance information they have received about actions that

22   have taken place allegedly involving my client, Mr. Kosta.

23   These actions, I would suggest, in the affidavit relate to all

24   incidents that had taken place with regards to any allegations

25   of controlled substances, allegedly marijuana, while my client

1   was living in Arizona.  That's where the intercepts come from,

2   that's where the surveillances are taking place, and actions

3   that were vehicles coming to and leaving from his residence out

4   there.

5          It made reference that he traveled to Massachusetts in

6   November and December of 2011 and then returned to Arizona.

7          Other than an alleged increase in traffic in November

8   or December of 2011, the last information that I see from the

9   application was my client may or may not have been involved in

09:46 10   some sort of drug activity in January of 2012 while he was in

11   Arizona.  And another indent alleged to have happened somewhere

12   in the month of May 2012 while my client was in Arizona and

13   then traveling to and from Mexico.  Other than that, there's

14   been no showing of any kind of activity taking place at the

15   residence in Phillipston since November of 2011, as sketchy as

16   that might be, Judge, and there's no action of my client's

17   activity of being involved in any sort of drug activity since

18   January of 2012.  And here we have an application for

19   complaint -- I mean application for a search warrant for August

09:47 20   of 2012, and it's at least an eight-month period of time,

21   Judge, before the affidavit was applied for and any showing of

22   my client ever being involved in any sort of alleged drug

23   activity at a location other than Phillipston, Massachusetts.

24          There's been no showing, from my review of the

25   affidavit, that shows there's any connection for at least, I

1    would suggest, a ten-month period of time that my client may

2    have been involved in any sort of drug activity with the

3    Phillipston address.

4            And I would suggest, Judge, there's no definite line

5    of time where the Court looks at which states that information

6    becomes stale or connected to a piece of property, but I would

7    suggest that there is a line that has to be drawn at some

8    point, Judge, and I would suggest at least an eight- or a

9    ten-month period of time for any activity being seen at the

09:48 10   Phillipston address to where they applied for the search

11   warrant would show that there is no nexus between any sort of

12   activity, and I would also suggest that as it relates to the

13   information that was received in November at that address there

14   being extremely stale.

15           THE COURT:  Counsel, remind me, when did your client

16   and Mrs. Kosta return to Massachusetts?

17           MR. KELLY:  I believe, Judge, from the information I

18   received, had to be somewhere in the late winter, early spring

19   2012.

09:49 20          MR. KOSTA:  Spring.

21           MR. KELLY:  Spring 2012.

22           THE COURT:  And, counsel, do I understand your

23   argument is both staleness in terms of when the last allegation

24   of drug activity related to that residence occurred, but also

25   that the -- any connection of your client to Massachusetts was

1      to Massachusetts generally and not to the specific location?

2      Meaning -- and I know -- I'm not asking you to concede

3      anything, but do I understand the second part of your argument

4      to be that the government's investigation, the wiretaps and so

5      forth, talked about Mr. Kosta's connection to Massachusetts but

6      not particularly to any particular address?

7              MR. KELLY:  That's correct, Judge.  It doesn't relate

8      to any particular address from at least my review of the

9      affidavit.

09:50 10              THE COURT:  Okay.

11              Thank you.

12              Counsel, I'll hear you if you wanted to add anything.

13              MR. IOVIENO:  Thank you, your Honor.

14              I did submit, obviously, the motion, and I've outlined

15      the surveillance and the investigation as that pertained to

16      Ms. Kosta in Arizona, and I think the Court kind of hit on a

17      few points I wanted to address, one being the Kostas owned

18      multiple residences in Massachusetts, in New Hampshire, and

19      some property up in Maine.  These two targets, Target 1 and

09:50 20      Target 2, are not the only residences and houses and land that

21      these people own.  So there are other properties.

22              The search in this case, the application for the

23      warrant and the search occurred in August.  Now, there's two

24      significant events that occurred, all originating from Arizona,

25      if you will.  There was a stop of McCormick's vehicle in South

1   Dakota that left Arizona of the marijuana, and that occurred

2   some eight months earlier.  And then there's another allegation

3   that another defendant, Napoleon, had come to the residence in

4   Phillipston some, I want to say, seven months earlier, and is

5   seen, according to the affidavit, at the residence for a brief

6   period of time.  But if you're confined to the four corners of

7   the affidavit, as the Court is, when addressing a warrant, all

8   it says is that the vehicle went to the residence and left and

9   it was subsequently stopped where 46 pounds of marijuana was

09:51 10   found inside that vehicle, wrapped in the same type of contact

11   paper, if you will, that's found in Arizona.

12       So the inference is not that -- the inference that the

13   government is trying to make is that, well, they loaded that

14   marijuana in Phillipston.  There's nothing in the affidavit to

15   suggest that.  The car went there, no indication where it was,

16   where it was parked or anything in the affidavit.  Again,

17   you're confined to the four corners, and that's all that's

18   there.

19       There's a conclusion by the agent, in his opinion, his

09:52 20   conclusion that's what happened there.  But agents' opinions

21   and conclusions do not substitute for a factual basis under a

22   warrant.  And that's -- the only two events that occurred are

23   over eight months, seven months earlier.

24       The only other things that happened at that residence

25   in Phillipston, which is the Target 1 residence, is I believe

1    there was an increase in traffic, as counsel has indicated.

2    Again, confining yourself to the four corners of that

3    affidavit, increase of traffic where people have not lived

4    there prior to, say, February or March of 2012 and now there

5    are people living there, there's going to be an increase in

6    traffic, people coming and going.  That in and of itself is

7    insufficient to supply a factual basis that there's drug

8    activity at that house.

9             THE COURT:  Counsel, what do you say to your sister's

09:52 10   argument, at least in the papers, and there's a line of cases

11   that talk about where it's a defendant's residence and there's

12   allegations of an ongoing drug operation, that there's some

13   reasonable expectation that evidence of the drug business will

14   be found at the residence?  I'm grossly paraphrasing, but --

15             MR. IOVIENO:  I think that's an accurate assessment of

16   what the government's position is on that.

17             I would suggest to the Court that there is not a

18   continuous, ongoing drug activity documented in the affidavit.

19   I think what you have is a termination of that activity upon

09:53 20   the seizure of the marijuana from McCormick.  Those hundreds of

21   pounds of marijuana taken out of that car in South Dakota, and

22   the family then leaving Arizona, returning to Massachusetts,

23   and no other activity since that period of time at the

24   residence would suggest that the drug activity that was alleged

25   in the affidavit stopped.  It's not ongoing, it's not

1    continuous.  There was no other indication in that affidavit of

2    anything other than John Kosta traveling to Mexico on one

3    occasion.  Again, the agent then gives his opinion and

4    conclusion on information and belief John Kosta was going to

5    Mexico to conduct drug activity.  That can't be considered a

6    factual basis either: John Kosta went and traveled to Mexico.

7    There's nothing -- that's innocent activity under the

8    circumstances, Judge.

9         But those are the only things that happened since the

09:54 10   seizure of the marijuana from McCormick in South Dakota.

11        So, essentially, the family has then, if the

12   allegations are accurate, have stopped this activity and

13   returned home to Massachusetts to live, and that's all there is

14   in the affidavit.

15        With respect to the government's other contention,

16   they maintain the money laundering counts, that there's money

17   -- activity of financial records and that should be

18   facilitated, money laundering would be located at the

19   residence.

09:55 20        This affidavit used two targets, Target 1, Target 2.

21   I think they reference paragraph 39 in the affidavit.  That

22   paragraph relates to money laundering activity at Target 2.

23   Specifically headlined under that paragraph right above the

24   paragraph is as it relates to Target 2.

25        So the government's -- again, you're confined to the

1    four corners of the affidavit, it cannot be supplemented by

2    argument either by myself or by the government, it's what's in

3    the affidavit, your Honor.  I would suggest to the Court that

4    what's in the affidavit is stale, does not support a sufficient

5    nexus for the Phillipston location.

6         Again, everything documented in my motion is set forth

7    in that memorandum and really outlines the activity in Arizona.

8         THE COURT:  Thank you.

9         Ms. Foley, I'll hear from you.

09:55  10    MS. FOLEY:  Your Honor, John Kosta did not take a trip

11   to Puerto Vallarta in May of 2011.  He went with his drug

12   supplier on foot into Mexico, his drug supplier, who had been

13   located in Arizona up until the point he sold Mr. Kosta a

14   thousand pounds of marijuana, which was picked off in South

15   Dakota.  After that happened, Mr. Kosta rounded up his entire

16   family and moved his residence from Arizona to Massachusetts.

17        THE COURT:  Counsel, how does that help you with the

18   nexus for the search warrant affidavit that is sought and

19   received in August, am I correct, August of 2012?  Meaning, I

09:56  20    understand your argument about what evidence there may be of

21   Mr. Kosta's culpability in an ongoing conspiracy as it's

22   charged in the indictment, but how does that go to what the

23   nexus is to the Phillipston address at the time that the

24   government seeks the search warrant?

25        MS. FOLEY:  Your Honor, I believe that the affidavit

1    establishes an ongoing and continuing drug trafficking

2    organization.  As the courts have held, when it is ongoing and

3    continuous, the fact that there will be documents recording

4    this ongoing and continuous activity is more likely to be found

5    at a place where the defendant resides, and that is the nexus.

6    He resided in Phillipston for six months prior to the search

7    warrant being executed.  He moved his operation from Arizona,

8    exclusively, to Phillipston.

9         THE COURT:  And so in that six months what evidence is

09:57 10  there in the affidavit about drug activity that's connected to

11   the Phillipston address?

12        MS. FOLEY:  There is -- well, after he arrives in

13   Massachusetts with co-defendant McCormick and co-defendant

14   Napoleon, there is his trip to Arizona with his drug supplier,

15   Verduzco, where he returns back to his Phillipston residence.

16        There are the bank accounts, the eight bank accounts

17   and safe deposit boxes that continue to be maintained by the

18   defendant and his wife.

19        And there is no other loads of marijuana or suspicious

09:58 20  activity that is observed, but the government maintains,

21   according to case law, that we did not have to show that he was

22   going to have drugs on his premises at the time the search was

23   executed in August of 2011.  There was no indication that he

24   had abandoned his activity as being a drug dealer.  Whether he

25   had obtained a new load or not I believe is irrelevant, because

1    the documents that were searched for, the documents that the

2    magistrate judge believed would be found at his residence, are

3    documents that the courts have held are maintained for a lot

4    longer time, it's not a perishable item, as drugs and money

5    are.  And the fact that the government sought the search

6    warrants to obtain documents and records and phones which are

7    used in the ongoing and continuous drug trafficking activities

8    is well-established in the affidavit.

9         THE COURT:  Are the wiretaps ongoing during the

09:59 10   six-month period when he's back at the Phillipston address?

11   And is that referenced in the affidavit?

12        MS. FOLEY:  Your Honor, the last -- the wiretaps ended

13   in April of 2012, and I'm not -- give me a brief moment.

14        (Pause.)

15        MS. FOLEY:  I don't believe that the time where the

16   wiretaps ceased is mentioned in the affidavit.

17        THE COURT:  Counsel, I'll go back and look at the

18   affidavit again more carefully.

19        In regards to the money laundering argument, I see

10:00 20   your brother's point about the affidavit, and here I'm looking

21   at page 14, paragraph 39, that the references to evidence of

22   money laundering are directed to Location 2, as opposed to the

23   location that we're talking about now.

24        MS. FOLEY:  Well, your Honor, in paragraph 38 --

25   everything in the affidavit is laid out with the factual basis

1    to establish the conspiracy, not only for drug trafficking but

2    also money laundering, and 39 is just explaining why there's

3    probable cause for Target Location 2.  But in paragraph 38, it

4    says, "Based on bank and business records, physical

5    surveillance, and a drug seizure, I believe that evidence of

6    records of drug distribution and money laundering are stored at

7    Target Location 2."

8              THE COURT:  Yeah, but not Location 1.

9              MS. FOLEY:  I'm sorry, when you go back to -- I'm

10:01  10    sorry, paragraph 35, "documents and records of Kostas' drug

11    trafficking and money laundering activities are stored at

12    Target Location 1."

13             The fact that I discuss the money laundering

14    specifically that related to Target Location 2 in the second

15    half of the affidavit does not in any way affect whether there

16    was probable cause that these documents would also be found at

17    Target Location 1, which is the residence of Tamara and John

18    Kosta, who were the people who were money laundering the

19    substantial funds that are indicated in the document.  And also

10:02  20    earlier in the affidavit, in the summary section, the

21    government does detail the number of bank accounts that were

22    identified as being owned and maintained by both of the Kostas.

23             The fact that when they were in Arizona Mrs. Kosta had

24    visited a safe deposit box, two days later another one of the

25    drug suppliers who was leaving their residence, which was in

1    Arizona at the time but nevertheless their residence, of not

2    only one defendant but both defendants and their entire family,

3    was stopped with $285,000 in his car.

4            It is established over the years that they keep their

5    residence -- in their residence money and drugs, and the fact

6    that they moved their residence from Arizona to Phillipston is

7    significant, not only to show that they were using the

8    residence in Phillipston the same way that they had used

9    another residence in the past, but also the cases make clear

10:03 10   that the residence is a place where it is likely that

11   trafficking records and important records that detail the

12   criminal activity are going to be found.  And in this case,

13   that is exactly -- everything we asked for in the affidavit was

14   found in their residence.  And also, for Target Location 2,

15   there were -- the detailed facts in here to establish that

16   Target Location 2 would have also had records of drug

17   trafficking and money laundering, the government detailed the

18   participation of Mr. Napoleon and Mr. L'Italien in the

19   conspiracy to commit money laundering.  But it in no way states

10:04 20   anywhere that those records were only being stored at Maple

21   Street.  It was only to establish that they would also -- there

22   was a nexus to Maple Street, not to the exclusion of

23   Phillipston.

24            THE COURT:  And, counsel, to the extent that you

25   mentioned the wiretap had ended in April of 2012, does that

1   mean the surveillance by the agents that usually accompanies

2   wiretaps had also stopped?

3          MS. FOLEY:  No, your Honor.

4          THE COURT:  So that continued through -- is there

5   reflection of that in this affidavit, that surveillance of

6   Mr. Kosta and the other targets continued through the time of

7   this affidavit?

8          MS. FOLEY:  Well, it's clear at least they were

9   surveilling him, because they knew that he had gone to Mexico

10:05 10   in May of 2012, three months before the execution of the search

11   warrant.  And also, the pole camera was still active, which is

12   evident in our -- can be inferred from the affidavit because

13   there was an attachment to the search warrant itself that

14   showed that there was a large Conex box that was in the

15   backyard of the Kostas' residence, and there was a truck that

16   was suspiciously backed up to the Conex box to prevent it from

17   being opened.  That photograph was a recent photograph, and it

18   was attached to that search warrant.

19          THE COURT:  Counsel, anything else you want to add?

10:06 20          MS. FOLEY:  Just to the extent that the argument has

21   been made that the increase in traffic was somehow due to the

22   fact that the Kostas had recently moved back into Phillipston,

23   the government takes issue with that argument.  They had not

24   just moved back into Phillipston, they had been there for

25   several months.  And the surveillance was not only an increase

in traffic, like they watched it one day and the next day they
saw traffic and so, therefore, they were just using a two-day
span of time to conclude this, the surveillance was ongoing and
continuous, and throughout the entire period where they were
surveilling the house, they were not surveilling a house where
nobody was living in.  They surveilled it because the Kostas
were living there.  And to suggest that the agents were too
stupid to be watching an empty house is just ridiculous.

The surveillance records clearly are from the time
that the defendant and his family were residing at their house
in Phillipston, and that is why it is important.  He drives up
with his co-defendant in a truck that had mysteriously changed
license plates between Arizona, leaving one residence, and
arriving at his second residence.  This truck had changed from
Colorado license plates to a Massachusetts commercial license
plate and with the defendant in a truck that had a cab over the
back to preclude anyone from seeing what was inside of it.

And there was notes in the affidavit that the
defendant's main supplier, Fidencia Serrano-Esquer, that the
investigation had showed that this was the preferred method of
the drug trafficking organization when they were trafficking
drugs to sort of deflect any type of law enforcement suspicion.

So those two trucks arrive at his Phillipston
residence.  The next day there were a number of cars that were
not identified as belonging to the defendant --

1          THE COURT:  Counsel, remind me again, are we talking

2     about January of 2012?

3          MS. FOLEY:  Yes, we are, your Honor.

4          MR. KELLY:  No.

5          MS. FOLEY:  No, this is in November of 2011.  But to

6     the extent that the challenge has been made that this increase

7     in traffic signified nothing, I disagree.  I think it signified

8     a lot.  Again, this was the preferred method of transporting

9     drugs used by the defendant and his supplier.  And the fact

10:08 10    that surveillance observed a number of cars arriving at that

11    house the next day that did not belong to either the defendant

12    or his wife, the fair and reasonable inference can be drawn

13    from that information that a load of marijuana or drugs had

14    just arrived at the residence, and that this ongoing activity

15    of the defendant, which is documented back to 2009, the fact

16    that there was no observable activity at that residence for a

17    few months' period, the case law is clear that when there's an

18    ongoing and continued pattern of criminal activity, which is

19    clearly laid out in the affidavit, that the basis to believe

10:09 20    that there will be documents and records and evidence of that

21    long and ongoing drug trafficking will be found at the

22    residence, and that is why Target Location 1 and Target

23    Location 2 were targeted.

24          THE COURT:  Thank you.

25          Counsel, I'll give you a brief moment to reply, if

1    you'd like.

2              MR. KELLY:  Yes.

3              THE COURT:  I'll give you both a chance.

4              MR. KELLY:  Judge, again, just not to repeat too much

5    on it, this is all information that the government is showing

6    from actions that had taken place in November and December of

7    2011.  Everything after that is all speculation.

8              This affidavit is void of any information that

9    anything had taken place at the Phillipston address after

10:10 10   December of 2011, other than the fact that my client moved back

11   there.  There's no surveillance that's shown in the affidavit,

12   there's no wiretaps, Judge.  Bank records that they show there

13   were withdrawals or deposits made stopped earlier than February

14   of 2012.  And I suggest a more reasonable inference can be made

15   that after a seizure of drugs that was made in South Dakota in

16   November of 2011, stopped all drug activity because there was

17   nothing else that the government can point to show that there

18   was drug activity taking place.

19             They point to a Conex box, which is a storage shed at

10:11 20   the residence, the end of a driveway that a car was parked in

21   front of, I suggest that is consistent with innocent behavior,

22   just as much as anything else portrayed by the government.

23             I would suggest, Judge, there's no nexus to

24   Phillipston after December of 2011, and because of the period

25   of time that has elapsed, it's all stale information, Judge.

1          THE COURT:  Thank you.

2          Counsel, did you want to add something?

3          MR. IOVIENO:  I do, your Honor, briefly, and just

4     following up with that.

5          Again, I think the government is a little bit off its

6     mark here because the issue is what's in the four corners of

7     the affidavit?  And the government has responded with

8     suggestions of this happening and this had happened that's not

9     in the affidavit.  It says increase in traffic.  It doesn't say

10:11  10    increase in traffic with a changed license plate from Colorado,

11    Arizona.  They are confined and the Court is confined to look

12    at the affidavit and it is confined to those four corners and

13    what's in that affidavit.

14          The only other thing I wanted to mention was we

15    reference on page 14, as the Court noted, refers to Target 2,

16    that's the financial allegations.  Counsel for the government

17    points out that paragraph 34, the agent says, last sentence,

18    "Accordingly, I believe drugs and evidence of drug trafficking

19    and money laundering are present at Target 1 location."  That's

10:12  20    the only comment the agent has, the only averment in the

21    affidavit about Target 1 and financial documents.  Again, that

22    is a conclusion and an opinion and a belief by an agent, it is

23    not an factual averment.  And there's ample case law on that

24    that indicates that the Court cannot consider the opinions and

25    beliefs of an agent.  So I'd ask the Court to look at the

1    affidavit in light of that.

2         Thank you, your Honor.

3         THE COURT:  Counsel, I'll hear you now on the motion

4    to sever.

5         Mr. Kelly, I'll hear from you first, although I know

6    Mrs. Kosta also joins this motion.

7         MR. KELLY:  Yes, Judge.  There was a motion that has

8    been filed on behalf of John Kosta with regards to the

9    severance of this matter, and it's specifically with regards to

10:13  10   at the time of the execution of the warrant and the arrest of

11   Tamara Kosta, there were statements that were made to the

12   agents at the time of her arrest that I would suggest, Judge,

13   are -- could be construed as being inculpatory against my

14   client, and if introduced at the time of a trial will be

15   prejudicial to my client with no way or means of ability to

16   cross-examine the --

17        THE COURT:  Counsel, just so we can narrow the focus

18   here, my memory is that in the government's opposition, the

19   government was not intending to offer the second portion,

10:13  20   perhaps, of that allegedly inculpatory statement or inculpatory

21   as to your client.

22        Ms. Foley, is that correct?

23        MS. FOLEY:  Yes, your Honor.

24        The government believes that the first part of her

25   statement, when she's referring to "those guys" and herself

leaving, "those guys" is not a <u>Bruton</u> -- doesn't rise to a

<u>Bruton</u> type of statement because there are five other

co-defendants in the case, it's not specific to John Kosta.

THE COURT:  Actually, what I was asking about is --

here it is -- on page 21 of Docket 409, which is the

government's opposition, the government will not seek to

introduce Ms. Kosta's statement that she was not as involved as

her husband; is that right?

MS. FOLEY:  That is correct, your Honor.

THE COURT:  So, Mr. Kelly, we're focused on the first

part of it, which is, when these guys came over, she,

Ms. Kosta, would leave, and that Mr. Kosta told her to leave

the house when his associates came over.

MR. KELLY:  That's correct.

Well, Judge, even with regards to the second portion

of that statement, that her husband, John Kosta, told her to

leave the house when the associates came over, again, I would

suggest that is construed to be an inculpatory statement and

evidence against Mr. Kosta with regards to any activities that

were taking place at the house.  Again, without the ability to

cross-examine the person who had made the statements, unless

the government is willing to go further in their excision of

redaction --

THE COURT:  Counsel, was the statement "she was told"

or was it that "she was told by Mr. Kosta"?

         1          MR. KELLY:  That's correct, she was told -- that her

         2   husband told her to leave the house when his associates came

         3   into the house.  And I would suggest, Judge, making that

         4   statement with regards to all the other evidence coming in with

         5   the allegation that there was conspiracies going on, that

         6   Mr. Kosta was involved in the conspiracies.

         7          THE COURT:  And what is it about the statement that

         8   makes it inculpatory as to the drug conspiracy?

         9          MR. KELLY:  Well, I'm sure, Judge, that during the

10:16   10   course of the trial the government is going to be asking and

        11   showing, presenting evidence to infer that there was a

        12   conspiracy going on between John Kosta and his co-defendants at

        13   the time.  And if you couple that -- if you're investigating,

        14   you know, why these guys would come over would lead to a

        15   connection between them coming over the house and some sort of

        16   criminal activity that was taking place.

        17          And further, the statement then coming in that her

        18   husband, John Kosta, told her to leave would suggest that John

        19   Kosta would know what was taking place at the time and that

10:17   20   there was alleged to be criminal activity that would infer his

        21   knowledge about criminal activity, not wanting Tamara Kosta to

        22   know anything about it at that particular instance.

        23          I would suggest couple them together, Judge, it

        24   connects the dots more tightly to John Kosta, and I would

        25   suggest without any opportunity for my client to cross-examine

1    or make the other statement.

2         THE COURT:  Even though there's no reference to who

3    these associates are or who these guys are?

4         MR. KELLY:  Well, I'm anticipating the government is

5    going to be showing who these individuals are as being the

6    co-defendants or associates of the co-defendants in order to

7    tie it together.  So my anticipation, Judge, is that they're

8    going to lay it out in a certain form or fashion saying these

9    people came over with vehicles and they would disappear into

10:17 10   the garage, the door would come down, and Tamara Kosta would be

11   told to leave, and so forth.  And I would suggest it's just

12   another connection that -- without any ability for me to

13   cross-examine Ms. Kosta.

14        THE COURT:  Thank you.

15        MR. KELLY:  And there's -- also, another issue with

16   regards to the severance, Judge, that was the motion that I had

17   received on behalf of Tamara Kosta that was filed by

18   Mr. Iovieno that I received last week, Judge, again, now

19   knowing what Mrs. Kosta's defenses are going to be, I would

10:18 20   suggest after reviewing of that document, that would be

21   extremely prejudicial against Mr. Kosta.  And I think for those

22   reasons -- and I'll leave it for my brother to argue to the

23   Court -- I think it would subject my client to an unfair

24   ability to defend himself at the time of trial knowing that

25   these defenses are going to be put forth by a co-defendant.

```
 1              THE COURT:  Counsel?

 2              MR. IOVIENO:  Thank you, your Honor.  I did file that

 3     motion to join in August, August 23rd, I think it's document

 4     number 428.  I don't know if the Court has that.

 5              THE COURT:  Counsel, let me just pull it up here.

 6              (Pause.)

 7              THE COURT:  Counsel, I have it now.

 8              MR. IOVIENO:  Your Honor, in that document I think

 9     that amply demonstrates the defense I am going to advance on

10:20 10   behalf of Tamara Kosta.  Under I believe it's Rule 14, the

11     issue is whether there's prejudice to a defendant, not

12     necessarily my defendant.  And I believe that document

13     demonstrates that John Kosta cannot have a fair trial if it is

14     tried along with Tamara Kosta because of the allegations and

15     the specific instances of conduct that I've set forth in that

16     document.  It would be extremely prejudicial to Mr. Kosta to go

17     forward with Ms. Kosta.

18              THE COURT:  Understood.

19              Ms. Foley, I'll hear from you.  Obviously, I'm focused

10:20 20   on both the bases for severance, but I've also now had a chance

21     to consider Ms. Kosta's filing.

22              MS. FOLEY:  Yes, your Honor --

23              THE COURT:  Maybe we could start there.

24              MS. FOLEY:  I believe that this is premature because I

25     don't -- it's unclear whether any of this evidence would be
```

admissible at trial, first of all.  So I think if the Judge --

if your Honor would find that this evidence would be admissible

at trial, then whether there would be undue prejudice to John

Kosta could be determined at that time.

I do believe that some of the allegations in here --

unless there is a showing that she was not guilty because of

diminished capacity or that she was not guilty because of

duress, that that would be -- these specific allegations and

defenses would be, I believe, affirmative defenses, and prior

to trial your Honor would have to --

THE COURT:  But doesn't it go to *mens rea* -- I mean,

doesn't it go to -- I mean, perhaps a showing of duress is

fairly high as a defense at trial, but doesn't it go to that?

MS. FOLEY:  I am not sure, your Honor.  I was -- I

apologize.  I was not aware that a substantive motion had been

filed by Iovieno.  I was under the impression that he had just

joined the motion, so I apologize for not having replied

specifically to this.

THE COURT:  Well --

MS. FOLEY:  I still believe --

THE COURT:  Counsel, I think on this motion, obviously

I'm going to take it under advisement.  If the government

chooses to take a different position in regards to the

severance in light of the filing, I'd ask you to file something

with the Court within the week.

|   | |
|---|---|
| 1 | MS. FOLEY:  I will, your Honor. |
| 2 | THE COURT:  Do you want to be heard briefly on the |
| 3 | other argument that Mr. Kelly made? |
| 4 | MS. FOLEY:  Yes, your Honor. |
| 5 | Tamara Kosta's statement to the police that, in sum |
| 6 | and substance, when she was confronted with the facts that she |
| 7 | had been under constant surveillance that she responded, "Well, |
| 8 | then you would know that when those guys arrived, I left." |
| 9 | There was no -- the inference can be drawn that she left |
| 10:23 10 | because she was directed to do so by John Kosta, but that was |
| 11 | not her statement. |
| 12 | THE COURT:  So what exact statement would the |
| 13 | government plan to elicit at trial? |
| 14 | MS. FOLEY:  That in response to being confronted with |
| 15 | the fact that she had been under surveillance, she replied, |
| 16 | "Well, then you would know that when those guys arrived, I |
| 17 | left." |
| 18 | THE COURT:  What about the suggestion that she was |
| 19 | directed to do so by Mr. Kosta? |
| 10:24 20 | MS. FOLEY:  Your Honor, I'm not aware that -- the |
| 21 | second part of her statement where she said, "I would leave, |
| 22 | and that her husband told her to leave the house when his |
| 23 | associates came over and that she was not as involved as her |
| 24 | husband," the government has already agreed to not use that |
| 25 | part of her statement, that it was him who told her to leave |

1 | when the associates came over.

2 | THE COURT:  So you're not planning to offer that part?

3 | MS. FOLEY:  Not unless she testifies.  If she

4 | testifies, then, yes.

5 | THE COURT:  But not in your case in chief?

6 | MS. FOLEY:  Not in our case in chief unless -- yes.

7 | And the government, as indicated in -- or cited in its

8 | brief, the fact that a jury could conclude from other evidence

9 | that Tamara Kosta was directed to leave and that it was John

10:25 10 | Kosta who ordered her to do so is not enough to preclude her

11 | statement because, quote, statements that are incriminating

12 | only when linked to other evidence in the case do not trigger

13 | application of Bruton's preclusionary rule, and the government

14 | cited to you U.S. v. Richardson in its motion, our reply.  And

15 | the government believes, therefore, based on that case and the

16 | case law that is particular to Bruton-types of allegations,

17 | that her -- the first part of her statement is not Bruton and

18 | should not be excluded.

19 | THE COURT:  Thank you.

10:25 20 | Mr. Kelly, do you want to add anything, given that it

21 | sounds like the government's --

22 | MR. KELLY:  Nothing further, Judge.

23 | MR. IOVIENO:  Just briefly, your Honor.

24 | THE COURT:  Yes.

25 | MR. IOVIENO:  That statement that the Court has just

heard is subject to that motion to suppress, which is deferred,
it's the motion that was on today, so that statement is part of
that.

The other issue I just wanted to mention is that in a
joint trial, obviously the defendants, as the Court pointed
out, noted was this was is a conspiracy, money laundering.
Part of the government's proof will be that there was an
agreement, if you will.

The defense is no secret; in my defense, there was no
agreement, that's the defense for Ms. Kosta.  To be able to
present that defense requires evidence into those allegations.
In a joint trial, I'm not sure the Court would allow that,
which would deprive Ms. Kosta of the right to a fair trial.  In
the alternative, if the Court does allow that and allows her to
pursue that defense in a joint trial, it prejudices Mr. Kosta.
So either way there's prejudice.  And it's not an affirmative
defense that I have to raise.  It is a defense as to the *mens
rea*, as the Court has indicated.  It goes to the agreement, was
there an agreement?  A party can't agree if the party is under
duress, and that's the defense.

THE COURT:  Thank you.

Counsel, I think based on what I asked you at the
outset, I think we've now covered all of the motions that you
wanted to be heard on today; is that correct?

MR. KELLY:  Yes, Judge.

1          THE COURT:  Counsel?

2          MR. IOVIENO:  Yes, your Honor.

3          THE COURT:  Counsel, with that said, I'm going to take

4    both of the motions under advisement.  I need to think about

5    the nexus argument.

6          And on the motion to sever, Ms. Foley, I'll give you

7    the week if you want to think about what the government's

8    position is based on the substance in Mrs. Kosta's motion.

9          For the time being, I will defer hearing you on

10:27 10   Mrs. Kosta's motion to suppress statements, Docket 376, and as

11   noted at the beginning, the motion to suppress the wiretap was

12   withdrawn.

13         Counsel, I think that would cover all of the motions

14   presently pending; is that correct?

15         MR. IOVIENO:  That's correct.

16         MS. FOLEY:  I believe so.

17         THE COURT:  Counsel, anything else I should address

18   with you before we recess?

19         MS. FOLEY:  No, your Honor.

10:28 20   MR. KELLY:  No, your Honor.

21         MR. IOVIENO:  No.

22         THE COURT:  Thank you.

23         Thank you.

24         (Court adjourned at 10:28 a.m.)

25              - - - - - - - - - - - -

1                            CERTIFICATION

2           I certify that the foregoing is a correct transcript

3    of the record of proceedings in the above-entitled matter to

4    the best of my skill and ability.

5

6

7

8    /s/Debra M. Joyce              November 18, 2013
     Debra M. Joyce, RMR, CRR       Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25