EX-99.1 6 d637238_ex99-1.htm SALE AND SERVICING AGREEMENT

BEAR STEARNS ASSET BACKED SECURITIES I LLC,
as Depositor


GREENPOINT MORTGAGE FUNDING TRUST 2007-HE1,
as Issuing Entity


CITIBANK, N.A.,
as Indenture Trustee


LASALLE BANK NATIONAL ASSOCIATION,
as Master Servicer and Securities Administrator


and


EMC MORTGAGE CORPORATION,
as Sponsor


_____

SALE AND SERVICING AGREEMENT

_____

Dated as of March 6, 2007


Bear Stearns Asset Backed Securities I LLC
Greenpoint Mortgage Funding Trust 2007-HE1,
Mortgage-Backed Notes, Series 2007-HE1

ARTICLE I.
DEFINITIONS

Section 1.01.        Definitions
Section 1.02.        Other Definitional Provisions.


ARTICLE II.
CONVEYANCE OF HELOCS

Section 2.01.        Conveyance of HELOCs; Obligation to Fund Advances Under Credit Line Agreements.
Section 2.02.        Acceptance of HELOCs by the Issuing Entity.
Section 2.03.        Assignment of Interest in the Mortgage Loan Purchase Agreement
Section 2.04.        Substitution of HELOCs
Section 2.05.        Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases.
Section 2.06.        Representations and Warranties Concerning the Depositor
Section 2.07.        Representations and Warranties Regarding the Master Servicer
Section 2.08.        Assignment of Agreement


ARTICLE III.
[RESERVED]


ARTICLE IV.
ADMINISTRATION AND MASTER SERVICING OF HELOCS

Section 4.01.        Master Servicer
Section 4.02.        Monitoring of Servicers
Section 4.03.        Fidelity Bond
Section 4.04.        Power to Act; Procedures
Section 4.05.        Due-on-Sale Clauses; Assumption Agreements
Section 4.06.        Release of Mortgage Files
Section 4.07.        Documents, Records and Funds in Possession of Master Servicer To Be Held for Issuing Entity and Indenture Trustee.
Section 4.08.        Standard Hazard Insurance and Flood Insurance Policies.
Section 4.09.        Presentment of Claims and Collection of Proceeds
Section 4.10.        Maintenance of the Insurance Policies.
Section 4.11.        Indenture Trustee to Retain Possession of Certain Insurance Policies and Documents.
Section 4.12.        Realization Upon Defaulted HELOCs
Section 4.13.        Compensation for the Master Servicer and the Indenture Trustee.
Section 4.14.        REO Property.
Section 4.15.        Annual Statement as to Compliance.
Section 4.16.        Assessments of Compliance and Attestation Reports.
Section 4.17.        Reports Filed with Securities and Exchange Commission.
Section 4.18.        UCC
Section 4.19.        Optional Purchase of Certain HELOCs.


ARTICLE V.
ACCOUNTS

Section 5.01.        Protected Accounts
Section 5.02.        Master Servicer Collection Account
Section 5.03.        Permitted Withdrawals and Transfers from the Master Servicer Collection Account
Section 5.04.        Payment Account
Section 5.05.        Permitted Withdrawals and Transfers from the Payment Account
Section 5.06.        Net WAC Cap Rate Carryover Reserve Account.
Section 5.07.        The Certificate Distribution Account.


ARTICLE VI.
THE MASTER SERVICER

Section 6.01.        Liabilities of the Master Servicer
Section 6.02.        Merger or Consolidation of the Master Servicer.
Section 6.03.        Indemnification of the Indenture Trustee, Owner Trustee, the Master Servicer and the Securities Administrator.
Section 6.04.        Limitations on Liability of the Master Servicer and Others
Section 6.05.        Master Servicer Not to Resign
Section 6.06.        Successor Master Servicer
Section 6.07.        Sale and Assignment of Master Servicing


ARTICLE VII.
DEFAULT

Section 7.01.        Master Servicer Events of Default
Section 7.02.        Indenture Trustee to Act; Appointment of Successor
Section 7.03.        Notification to Noteholders and the Note Insurer
Section 7.04.        Waiver of Defaults


ARTICLE VIII.
MISCELLANEOUS PROVISIONS

Section 8.01.        Amendment
Section 8.02.        Recordation of Agreement
Section 8.03.        Governing Law
Section 8.04.        Notices

Section 8.05.          Severability of Provisions
Section 8.06.          Successors and Assigns
Section 8.07.          Article and Section Headings
Section 8.08.          Counterparts
Section 8.09.          Notice to Rating Agencies and the Note Insurer
Section 8.10.          Termination
Section 8.11.          No Petition
Section 8.12.          No Recourse
Section 8.13.          Additional Terms Regarding Indenture
Section 8.14.          Third Party Beneficiary
Section 8.15.          Limitation of Liability
Section 8.16.          Benefit of Agreement

EXHIBITS

Exhibit A          -     Mortgage Loan Schedule
Exhibit B          -     Request for Release of Documents
Exhibit C-1        -     Form of GreenPoint Servicing Agreement and Assignment, Assumption and Recognition Agreement
Exhibit C-2        -     Form of Mortgage Loan Purchase Agreement
Exhibit D          -     Form of Company Certification
Exhibit E          -     [Reserved]
Exhibit F          -     Servicing Criteria to Be Addressed in Assessment of Compliance
Exhibit G          -     Form 10-D, Form 8-K and Form 10-K Reporting Responsibility
Exhibit H          -     Additional Disclosure Notification

SALE AND SERVICING AGREEMENT

Sale and Servicing Agreement dated as of March 6, 2007 (the "Agreement"), among Bear Stearns Asset Backed Securities I LLC, a Delaware limited liability company, as depositor (the "Depositor"), GPMF Trust 2007-HE1, a Delaware statutory trust, as issuing entity (the "Issuing Entity"), Citibank, N.A., a national banking association, not in its individual capacity but solely as indenture trustee (the "Indenture Trustee"), LaSalle Bank National Association ("LaSalle Bank"), as master servicer (in that capacity, the "Master Servicer") and as securities administrator (in that capacity, the "Securities Administrator"), and EMC Mortgage Corporation, as seller and sponsor (the "Sponsor").

PRELIMINARY STATEMENT

WHEREAS, the Sponsor has acquired the HELOCs from the Originator and at the Closing Date is the owner of the HELOCs and the other property being conveyed by it to the Issuing Entity hereunder for inclusion in the Trust Estate;

WHEREAS, such HELOCs consist of certain home equity lines of credit ("HELOCs");

WHEREAS, on the Closing Date, the Depositor will acquire the HELOCs from the Sponsor in consideration for its transfer to the Sponsor of the Certificates and the proceeds from the sale of the Notes;

WHEREAS, on the Closing Date, the Depositor will acquire the Notes and the Certificates from the Issuing Entity, as consideration for its transfer to the Issuing Entity of the HELOCs and the other property constituting the Trust Estate;

WHEREAS, the Depositor has duly authorized the execution and delivery of this Agreement to provide for the conveyance to the Issuing Entity of the HELOCs and the other property constituting the Trust Estate;

WHEREAS, pursuant to the Indenture, the Issuing Entity will pledge the HELOCs and the other property constituting the Trust Estate to the Indenture Trustee as security for the Notes;

WHEREAS, the HELOCs will have an Outstanding Principal Balance as of the Cut-off Date, after deducting all Scheduled Principal due on or before the Cut-off Date, of $666,016,193.09;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, each of the Depositor, the Issuing Entity, the Indenture Trustee, the Master Servicer, the Securities Administrator and the Sponsor undertakes and agrees to perform their respective duties hereunder as follows:

ARTICLE I.

Definitions

Section 1.01.    Definitions. For all purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms used in this Agreement and not defined herein shall have the meanings assigned in Appendix A to the Indenture, which is incorporated by reference herein. All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02.    Other Definitional Provisions.

(a)    All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(b)    As used in this Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Agreement or in any such certificate or other document, and accounting terms partly defined in this Agreement or in any such certificate or other document, to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms in this Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Agreement or in any such certificate or other document shall control.

(c)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; Section and Exhibit references contained in this Agreement are references to Sections and Exhibits in or to this Agreement unless otherwise specified; and the term "including" shall mean "including without limitation".

(d)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as the feminine and neuter genders of such terms.

(e)    Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

ARTICLE II.

Conveyance of HELOCs

Section 2.01.    Conveyance of HELOCs; Obligation to Fund Advances Under Credit Line Agreements.

(a)    As of the Closing Date, in consideration of the Issuing Entity's delivery of the proceeds from the sale of the Notes and the Certificates to the Sponsor, and concurrently with the execution and delivery of this Agreement, the Sponsor does hereby sell, transfer, assign, set over, deposit with and otherwise convey to the Depositor, without recourse, and the Depositor does hereby sell, transfer, assign, set over, deposit with and otherwise convey to the Issuing Entity, without recourse, and the Issuing Entity, pursuant to the Indenture, is granting to the Indenture Trustee, all of its right, title and interest in and to the HELOCs. Such conveyances include, without limitation, (i) each HELOC, including its principal balance (including the right to make Draws related thereto) and all collections in respect thereof received after the Cut-off Date (excluding interest collections due on or prior to the Cut-off Date); (ii) property that secured a HELOC that is acquired by foreclosure or deed in lieu of foreclosure; (iii) the related Originator's rights under the Insurance Policies; (iv) the Master Servicer Collection Account and the Payment Account; and (v) any proceeds of the foregoing and any other property owned by the Trust and all other assets included or to be included in the Issuing Entity for the benefit of the Noteholders, the Note Insurer and the Certificateholders;

*provided, however*, none of the Indenture Trustee, the Securities Administrator, the Master Servicer nor the Issuing Entity assumes or shall assume the obligation under any Credit Line Agreement that provides for the funding of Draws to the Mortgagor thereunder, and none of the Securities Administrator, the Master Servicer nor the Indenture Trustee shall be obligated or permitted to fund any such Draws. With respect to the HELOCs, Draws shall be part of the related principal balance and are hereby transferred to the Issuing Entity on the Closing Date pursuant to this Section 2.01(a), and are therefore part of the Trust Estate. The Indenture Trustee declares that, subject to the Custodian's review provided for in Section 2.02, it, or the Custodian on its behalf, has received and shall hold the Trust Estate, as Indenture Trustee, in trust, for the benefit and use of the Noteholders and the Note Insurer and for the purposes and subject to the terms and conditions set forth in this Agreement and the Indenture, and, concurrently with such receipt, the Issuing Entity has issued and delivered the Notes to or upon the order of the Depositor, in exchange for the Trust Estate. The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Issuing Entity without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests and the other assets of REMIC II for the benefit of the Holders of the Notes, the Note Insurer, the Class E Certificates and the Class R Certificates. The Issuing Entity acknowledges receipt of the REMIC I Regular Interests (which are uncertificated) and the other assets of REMIC II and declares that it holds and will hold the same in trust for the exclusive use and benefit of the holders of the Holders of the Notes, the Note Insurer, the Class E Certificates and the Class R Certificates.

(b)     The Securities Administrator does hereby agree to direct funds from the holder of the Class S Certificates to reimburse Servicer advances made to fund additional Draws on the HELOCs. Each additional balance during the Managed Amortization Period shall first be funded from collections of principal deposited in an account managed by the Servicer. On a designated remittance date, as described in this Agreement and the Servicing Agreement, the Servicer shall, to the extent set forth in this Agreement and the Servicing Agreement, then deliver to the holder of the Class S Certificate, with a copy to the Master Servicer, its monthly remittance report, which shall indicate the aggregate additional balance funded by the Servicer. To the extent that the purchase price for any additional balance exceeds such principal amount on deposit in such collection account on such day, during the Managed Amortization Period, the difference shall be funded by the Class S Certificateholder. During the Rapid Amortization Period, the entire balance of additional Draws shall be funded by the Class S Certificateholder. The Holder of the Class S Certificate, by accepting such Certificate, hereby agrees to reimburse the Servicer for such aggregate advances, which is the amount by which the principal balance of the Class S Certificate shall accumulate each month. The Master Servicer and the Securities Administrator have no liability or obligation to reimburse the Servicer for any additional Draws to the extent that the holder of the Class S Certificate fails to do so.

(c)     It is agreed and understood by the Sponsor, the Depositor and the Issuing Entity (and the Depositor so represents and recognizes) that it is not intended that any HELOC be included in the Trust Estate be (i) a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003, (ii) a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004, (iii) a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004; (iv) a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective January 1, 2005; or (v) a High Cost Loan or Covered Loan, as applicable (as such terms are defined in the then current Standard & Poor's LEVELS® Glossary which is now Version 5.7 Revised, Appendix E attached as Exhibit 6 to the Mortgage Loan Purchase Agreement).

(d)     In connection with such transfers and assignments of the HELOCs, the Sponsor shall deliver to, and deposit with, or cause to be delivered to and deposited with, the Indenture Trustee, and/or the Custodian acting on the Indenture Trustee's behalf, the following documents or instruments with respect to each HELOC so transferred and assigned on or before the Closing Date:

     (i)    the original Credit Line Agreement;

     (ii)   if such HELOC is not a MERS Mortgage Loan, an original Assignment of Mortgage in blank signed by the Sponsor;

     (iii)  (A) if such HELOC is not a MERS Mortgage Loan, the original recorded Mortgage or, if in connection with such HELOC, the original recorded Mortgage with evidence of recording thereon cannot be delivered on or prior to the Closing Date because of a delay caused by the public recording office where such original Mortgage has been delivered for recordation or because such original Mortgage has been lost, the Sponsor shall deliver or cause to be delivered to the Custodian, a true and correct copy of such Mortgage, together with (i) in the case of a delay caused by the public recording office, a certification of the Originator, title company, escrow agent or closing attorney stating that such original Mortgage has been dispatched to the appropriate public recording official or (ii) in the case of an original Mortgage that has been lost, a certificate by the appropriate county recording office where such Mortgage is recorded, and (B) if such HELOC is a MERS Mortgage Loan, the original Mortgage, noting the presence of the "Mortgage Identification Number" of such MERS Mortgage Loan;

     (iv)  if such HELOC is not a MERS Mortgage Loan, if applicable, the original Intervening Assignments, if any, with evidence of recording thereon, showing a complete chain of title to the related Mortgage from the Mortgagor to the related Originator (and endorsed in blank in accordance with clause (ii) above) or, if any such original Intervening Assignment has not been returned from the applicable recording office or has been lost, a true and correct copy thereof, together with (i) in the case of a delay caused by the public recording office, a certification of the Originator, title company, escrow agent or closing attorney stating that such original Intervening Assignment has been dispatched to the appropriate public recording official for recordation or (ii) in the case of an original Intervening Assignment that has been lost, a certificate by the appropriate county recording office where such Mortgage is recorded;

     (v)   either a title insurance policy or guaranty title with respect to the related Mortgaged Property;

     (vi)  the original of any guaranty executed in connection with such HELOC;

     (vii)  the original of each assumption, modification, consolidation or substitution agreement, if any, relating to such HELOC; and

     (viii)  any security agreement, chattel mortgage or equivalent instrument executed in connection with the related Mortgage.

(e)    (i) Upon the occurrence of a Recordation Event, the Sponsor shall submit to the appropriate recording offices Assignments of Mortgage to the Indenture Trustee on behalf of the Trust, which may be blanket assignments if permitted by applicable law, for the HELOCs. In lieu of recording any such Assignments of Mortgage, the Sponsor may provide to the Indenture Trustee and the Note Insurer an Opinion of Counsel in a form reasonably acceptable to the Indenture Trustee, to the effect that recordation of an Assignment of Mortgage in the state where the related Mortgaged Property is located is not necessary to protect the interests of the Owner Trustee, the Indenture Trustee or the Securityholders in the related Mortgage. In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the Sponsor shall promptly prepare a substitute Assignment of Mortgage or cure such defect, as the case may be, and thereafter the Sponsor shall submit each such Assignment of Mortgage for recording.

     (ii)   In instances where a title insurance policy is required to be delivered to the Indenture Trustee or the Custodian on behalf of the Indenture Trustee under clause (d)(v) above and is not so delivered, the Sponsor shall provide a copy of such title insurance policy to the Indenture Trustee, or to the Custodian on behalf of the Indenture Trustee, as promptly as practicable after the execution and delivery hereof, but in any case within 180 days of the Closing Date.

     (iii)  For HELOCs that have been prepaid in full after the Cut-off Date and prior to the Closing Date, the Depositor, in lieu of delivering the above documents, herewith shall deliver to the Indenture Trustee, or to the Custodian on behalf of the Indenture Trustee and the Master Servicer, an Officer's Certificate which shall include a statement to the effect that all amounts received in connection with such prepayment that are required to be deposited in the related Collection Account pursuant to this Agreement or the Servicing Agreement have been so deposited. All original documents that are not delivered to the Indenture Trustee or the Custodian on behalf of Indenture Trustee shall be held by the Servicer in trust for the benefit of the Indenture Trustee and the Securityholders.

Section 2.02.    <u>Acceptance of HELOCs by the Issuing Entity</u>.

(a)     The Issuing Entity acknowledges the sale, transfer, assignment and receipt of the Trust Estate to it by the Depositor, subject to further review by the Custodian and the exceptions which may be noted by the Custodian on behalf of the Indenture Trustee, pursuant to the procedures described below, and the Issuing Entity will cause the Custodian to hold the documents (or certified copies thereof) delivered to the Custodian pursuant to Section 2.01, and any amendments, replacements or supplements thereto and all other assets of the Trust Estate delivered to it, in trust for the use and benefit of (i) all present and future Holders of the Notes issued pursuant to the Indenture and the Certificates issued pursuant to the Trust Agreement and (ii) the Note Insurer. On the Closing Date, with respect to the HELOCs, in accordance with the Custodial Agreement, the Custodian shall acknowledge receipt of the Mortgage File with respect to each HELOC by delivery to the Depositor, the Sponsor, the Master Servicer, the Indenture Trustee and the Note Insurer of an Initial Certification, but without review of such Mortgage File, except to the extent necessary to confirm that such Mortgage File contains the related Mortgage Note or lost note affidavit. No later than 90 days after the Closing Date (or with respect to any Substitute HELOC, within five Business Days after the receipt by the Custodian thereof), the Custodian, in accordance with the Custodial Agreement, shall review each Mortgage File delivered to it and shall execute and deliver to the Depositor, the

Sponsor, the Master Servicer, the Indenture Trustee and the Note Insurer an Interim Certification. In conducting such review, the Custodian will ascertain whether all documents required to be reviewed by it have been executed and received, and based on the Mortgage Loan Schedule, whether the Mortgage Notes relate, determined on the basis of the Mortgagor name, original principal balance and loan number, to the HELOCs it has received, as identified in the Mortgage Loan Schedule. In performing any such review, the Custodian may conclusively rely on the purported due execution and genuineness of any such document and on the purported genuineness of any signature thereon. If the Custodian finds any document constituting part of the Mortgage File has not been executed or received, or is unrelated, determined on the basis of the Mortgagor name, original principal balance and loan number, to the HELOCs identified in Exhibit A, or does not conform on its face to the review criteria specified in this Section (a "Material Defect"), the Custodian shall notify the Depositor, the Sponsor, the Master Servicer, the Indenture Trustee and the Note Insurer of such Material Defect in writing. In accordance with the Mortgage Loan Purchase Agreement, the Sponsor shall correct or cure any such Material Defect within ninety (90) days from the date of notice from the Custodian of the defect and if the Sponsor fails to correct or cure the Material Defect within such period, the Indenture Trustee shall enforce the Sponsor's obligation under the Mortgage Loan Purchase Agreement to provide a Substitute HELOC or purchase such HELOC at the Repurchase Price; provided, however, that if such Material Defect relates solely to the inability of the Sponsor to deliver the original Security Instrument or intervening assignments thereof, or a certified copy because the originals of such documents, or a certified copy have not been returned by the applicable jurisdiction, the Sponsor shall not be required to purchase or replace such HELOC if the Sponsor delivers such original documents or certified copy promptly upon receipt, but in no event later than 360 days after the Closing Date. The foregoing repurchase or substitution obligation shall not apply in the event that the Sponsor cannot deliver such original or copy of any document submitted for recording to the appropriate recording office in the applicable jurisdiction because such document has not been returned by such office; provided that the Sponsor shall instead deliver a recording receipt of such recording office or, if such receipt is not available, a certificate confirming that such documents have been accepted for recording, and delivery to the Custodian shall be effected by the Sponsor within thirty days of its receipt of the original recorded document.

No later than 180 days after the Closing Date, the Custodian, in accordance with the Custodial Agreement, will review the Mortgage Files delivered to it and will execute and deliver or cause to be executed and delivered to the Depositor, the Sponsor, the Master Servicer, the Indenture Trustee and the Note Insurer a Final Certification. In conducting such review, the Custodian will ascertain whether an original of each document required to be recorded has been returned from the recording office with evidence of recording thereon or a certified copy has been obtained from the recording office. If the Custodian finds a Material Defect, the Custodian shall promptly notify the Sponsor, the Depositor, the Master Servicer, the Issuing Entity, the Note Insurer and the Indenture Trustee in writing (provided, however, that with respect to those documents described in subsections (b)(iv), (v) and (vii) of Section 2.01, the Custodian's obligations shall extend only to the documents actually delivered to the Custodian pursuant to such subsections). In accordance with the Mortgage Loan Purchase Agreement, the Sponsor shall correct or cure any such Material Defect within 90 days from the date of notice from the Custodian or the Indenture Trustee of the Material Defect and if the Sponsor is unable to cure such Material Defect within such period, and if such Material Defect materially and adversely affects the interests of the Noteholders, Certificateholders or the Note Insurer in the related HELOC, the Indenture Trustee shall enforce the Sponsor's obligation under the Mortgage Loan Purchase Agreement to provide a Substitute HELOC or purchase such HELOC at the Repurchase Price; provided, however, that if such defect relates to the inability of the Sponsor to deliver the original Mortgage or intervening assignments thereof, or a certified copy, because the originals of such documents or a certified copy, have not been returned by the applicable jurisdiction, the Sponsor shall not be required to purchase such HELOC, if the Sponsor delivers such original documents or certified copy promptly upon receipt, but in no event later than 360 days after the Closing Date. If the Custodian finds any Mortgage Note missing or defective, the Custodian shall include such exceptions in the Final Certification pursuant to the Custodial Agreement. The Sponsor shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect if such defect materially interferes with the Master Servicer's ability to foreclose on the related Mortgaged Property and, if the Sponsor does not correct or cure such defect within such period, the Sponsor shall either (A) if the time to cure such defect expires prior to the end of the second anniversary of the Closing Date, substitute for the related HELOC a Substitute HELOC, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.04, or (B) purchase such HELOC from the Trust Estate within 90 days from the date the Sponsor was notified of such defect in writing at the Repurchase Price of such HELOC; provided that any such substitution pursuant to (A) above or repurchase pursuant to (B) above shall not be effected prior to the delivery to the Indenture Trustee of the Opinion of Counsel required by Section 2.05 hereof and any substitution pursuant to (A) above shall not be effected prior to the additional delivery to the Indenture Trustee, or the Custodian on its behalf, of a Request for Release substantially in the form of Exhibit B. No substitution will be made in any calendar month after the Determination Date for such month. The Repurchase Price for any such HELOC shall be remitted by Sponsor to the Master Servicer for deposit in the Collection Account and, upon receipt of such deposit and certification with respect thereto in the form of Exhibit B hereto, the Custodian shall release the related Mortgage File to the Sponsor and shall execute and deliver at the Sponsor's request such instruments of transfer or assignment as the Seller has prepared, in each case without recourse, as shall be necessary to vest in the Sponsor, or a designee, the Indenture Trustee's interest in any HELOC released pursuant hereto. If pursuant to the foregoing provisions the Sponsor repurchases a HELOC that is a MERS® Mortgage Loan, the Master Servicer shall cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to the Seller and shall cause such Mortgage to be removed from registration on the MERS® System in accordance with MERS' rules and regulations. It is understood and agreed that the obligation of the Sponsor to substitute for or to purchase any HELOC that does not meet the requirements of this Section 2.02 above shall constitute the sole remedy respecting such defect available to the Indenture Trustee, the Issuer, the Depositor and any Noteholder against the Sponsor. The foregoing repurchase or substitution obligations shall not apply in the event that the Sponsor cannot deliver such original or copy of any document submitted for recording to the appropriate recording office in the applicable jurisdiction because such document has not been returned by such office; provided that the Sponsor shall instead deliver a recording receipt of such recording office or, if such receipt is not available, a certificate confirming that such documents have been accepted for recording, and delivery to the Custodian on behalf of the Indenture Trustee shall be effected by the Sponsor within thirty days of its receipt of the original recorded document.

(b)     In the event that a HELOC is purchased by the Sponsor in accordance with Subsections 2.02(a) or (b) above, the Sponsor shall remit to the Master Servicer the Repurchase Price for deposit in the Master Servicer Collection Account and the Sponsor shall provide to the Master Servicer, Securities Administrator, the Note Insurer and the Indenture Trustee written notification detailing the components of the Repurchase Price. Upon deposit of the Repurchase Price in the Master Servicer Collection Account, the Depositor shall notify the Indenture Trustee, the Note Insurer and the Custodian, and the Indenture Trustee (upon receipt of a Request for Release in the form of Exhibit B, as applicable, attached hereto with respect to such HELOC and certification that the Repurchase Price has been deposited in the Master Servicer Collection Account) shall cause the Custodian to release to the deposit Mortgage File and the Indenture Trustee shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty, furnished to it by the Sponsor, as are necessary to vest in the Sponsor similar title to and rights under the HELOC. Such purchase shall be deemed to have occurred on the date on which the Repurchase Price in available funds is deposited in the Master Servicer Collection Account. The Master Servicer shall amend the Mortgage Loan Schedule, which was previously delivered to it by the Depositor, the Indenture Trustee and the Custodian, to reflect such repurchase and shall promptly deliver to the Rating Agencies, the Indenture Trustee, the Note Insurer, the Custodian and the Issuing Entity a copy of such amendment. The obligation of the Sponsor to repurchase or substitute for any HELOC a Substitute HELOC as to which such a Material Defect in a constituent document exists shall be the sole remedy respecting such Material Defect available to the Issuing Entity, the Noteholders, the Certificateholders or to the Indenture Trustee or Owner Trustee, as applicable, on their behalf.

Section 2.03.    <u>Assignment of Interest in the Mortgage Loan Purchase Agreement</u>. (a)The Depositor hereby assigns to the Issuing Entity, all of its right, title and interest in the Mortgage Loan Purchase Agreement, including but not limited to the Depositor's rights and obligations pursuant to the Servicing Agreement or this Agreement (noting that the Sponsor has retained the right in the event of breach of the representations, warranties and covenants, if any, with respect to the HELOCs of the Servicer under the Servicing Agreement to enforce the provisions thereof and to seek all or any available remedies). The Depositor hereby acknowledges that such right, title and interest in the Mortgage Loan Purchase Agreement will be pledged by the Issuing Entity to the Indenture Trustee pursuant to the Indenture. The obligations of the Sponsor to substitute or repurchase, as applicable, a HELOC shall be the Issuing Entity's, the Indenture Trustee's and the Noteholders' and the Certificateholder's sole remedy for any breach thereof. At the request of the Issuing Entity or the Indenture Trustee, the Depositor shall take such actions as may be necessary to enforce the above right, title and interest on behalf of the Issuing Entity, the Indenture Trustee, the Noteholders, the Certificateholders and the Note Insurer and shall execute such further documents as the Issuing Entity or the Indenture Trustee may reasonably require in order to enable the Indenture Trustee to carry out such enforcement.

(b)     If the Depositor, the Securities Administrator, the Master Servicer, the Custodian, the Issuing Entity, the Note Insurer or the Indenture Trustee discovers a breach of any of the representations and warranties set forth in the Mortgage Loan Purchase Agreement, which breach materially and adversely affects the value of the interests of the Issuing Entity, the Noteholders, the Certificateholders, the Note Insurer or the Indenture Trustee in the related HELOC, the party discovering the breach shall give prompt written notice of the breach to the other parties. The Sponsor, within 90 days of its discovery or receipt of notice that such breach has occurred (whichever occurs earlier), shall cure the breach in all material respects or, subject to the Mortgage Loan Purchase Agreement, shall purchase the HELOC or any property acquired with respect thereto from the Issuing Entity; provided, however, that if there is a breach of any representation set forth in the Mortgage Loan Purchase Agreement, and the HELOC or the related property acquired with respect thereto has been sold, then the Sponsor shall pay, in lieu of the Repurchase Price, any excess of the Repurchase Price over the Net Liquidation Proceeds received upon such sale. If the Net Liquidation Proceeds exceed the Repurchase Price, any excess shall be paid to the Sponsor to the extent not required by law to be paid to the borrower. Any such purchase by the Sponsor shall be made by providing an amount equal to the Repurchase Price to the Master Servicer for deposit in the Master Servicer Collection Account and written notification detailing the components of such Repurchase Price. The Depositor shall submit to the Indenture Trustee and the Custodian a Request for Release, and the Indenture Trustee shall cause the Custodian to release, upon receipt of certification from the Master Servicer that the Repurchase Price has been deposited in the Master Servicer Collection Account, to the Sponsor the related Mortgage File and the Indenture Trustee shall execute and deliver all instruments of transfer or assignment furnished to it by the Sponsor, without recourse, representation or warranty as are necessary to vest in the Sponsor title to and rights under the HELOC or any property acquired with respect thereto. Such purchase shall be deemed to have occurred on the date on which the Repurchase Price in available funds is deposited in the Master Servicer Collection Account. The Master Servicer shall amend the Mortgage Loan Schedule to reflect such repurchase and shall promptly deliver to the Rating Agencies, Indenture Trustee, Note Insurer, Securities Administrator, the Note Insurer, the Custodian and the Rating Agencies a copy of such amendment. Enforcement of the obligation of the Sponsor to purchase (or substitute a Substitute HELOC for) any HELOC or any property acquired with respect thereto (or pay the Repurchase Price as set forth in the above proviso) as to which a breach has occurred and is continuing shall constitute the sole remedy respecting such breach available to the Issuing Entity, the Noteholders or the Indenture Trustee on their behalf.

Section 2.04.    <u>Substitution of HELOCs</u>. Notwithstanding anything to the contrary in this Agreement, in lieu of purchasing a HELOC pursuant to the Mortgage Loan Purchase Agreement or Sections 2.02 or 2.03 of this Agreement, the Sponsor may, no later than the date by which such purchase by the Sponsor would otherwise be required, tender to the Indenture Trustee a Substitute

HELOC, if such substitution occurs within two years following the Closing Date, accompanied by a certificate of an authorized officer of the Sponsor that such Substitute HELOC conforms to the requirements set forth in the definition of "Substitute HELOC" in this Agreement. The Indenture Trustee shall cause the Custodian to examine the Mortgage File for any Substitute HELOC in the manner set forth in Section 2.02(a) and the Indenture Trustee shall cause the Custodian to notify the Sponsor, in writing, within five Business Days after receipt, whether or not the documents relating to the Substitute HELOC satisfy the requirements of Section 2.02. Within two Business Days after such notification, the Sponsor shall provide to the Master Servicer for deposit in the Master Servicer Collection Account the amount, if any, by which the Outstanding Principal Balance as of the next preceding Due Date of the HELOC for which substitution is being made, after giving effect to the Scheduled Principal due on such date, exceeds the Outstanding Principal Balance as of such date of the Substitute HELOC, after giving effect to Scheduled Principal due on such date, which amount shall be treated for the purposes of this Agreement as if it were the payment by the Sponsor of the Repurchase Price for the purchase of a HELOC by the Sponsor. After such notification to the Sponsor and, if any such excess exists, upon receipt of certification from the Master Servicer that such excess has been deposited in the Master Servicer Collection Account, the Indenture Trustee shall accept such Substitute HELOC which shall thereafter be deemed to be a HELOC hereunder. In the event of such a substitution, accrued interest on the Substitute HELOC for the month in which the substitution occurs and any Principal Prepayments made thereon during such month shall be the property of the Trust Estate and accrued interest for such month on the HELOC for which the substitution is made and any Principal Prepayments made thereon during such month shall be the property of the Sponsor. The Scheduled Principal Balance on a Substitute HELOC due on the Due Date in the month of substitution shall be the property of the Sponsor and the Scheduled Principal Balance on the HELOC for which the substitution is made due on such Due Date shall be the property of the Trust Estate. Upon acceptance of the Substitute HELOC (and delivery to the Indenture Trustee and the Custodian of a Request for Release for such HELOC), the Indenture Trustee shall cause the Custodian to release to the Sponsor the related Mortgage File related to any HELOC released pursuant to the Mortgage Loan Purchase Agreement or Section 2.04 of this Agreement, as applicable, and shall execute and deliver all instruments of transfer or assignment, without recourse, representation or warranty in form as provided to it as are necessary to vest in the Sponsor title to and rights under any HELOC released pursuant to the Mortgage Loan Purchase Agreement or this Section 2.04, as applicable. The Sponsor shall deliver to the Custodian the documents related to the Substitute HELOC in accordance with the provisions of the Mortgage Loan Purchase Agreement and Subsection 2.02(b) of this Agreement, as applicable, with the date of acceptance of the Substitute HELOC deemed to be the Closing Date for purposes of the time periods set forth in those Subsections. The representations and warranties set forth in the Mortgage Loan Purchase Agreement shall be deemed to have been made by the Sponsor with respect to each Substitute HELOC as of the date of acceptance of such HELOC by the Indenture Trustee. The Master Servicer shall amend the Mortgage Loan Schedule to reflect such substitution and shall provide a copy of such amended Mortgage Loan Schedule to the Issuing Entity, the Indenture Trustee, the Custodian and the Rating Agencies. Notwithstanding anything to the contrary, no substitution shall occur unless such substitution takes place prior to two years following the Closing Date.

        Section 2.05.    Delivery of Opinion of Counsel in Connection with Substitutions and Repurchases.

        (a)    Notwithstanding any contrary provision of this Agreement, with respect to any HELOC that is not in default or as to which default is not reasonably foreseeable, no repurchase or substitution pursuant to Sections 2.02, 2.03 or 2.04 shall be made unless the Sponsor delivers to the Indenture Trustee, the Note Insurer, the Securities Administrator and the Owner Trustee an Opinion of Counsel, addressed to the Indenture Trustee, the Note Insurer, the Securities Administrator and the Owner Trustee to the effect that such repurchase or substitution would not (i) result in the imposition of the tax on "prohibited transactions" of any REMIC created pursuant to the Indenture or contributions after the Closing Date, as defined in sections 860F(a)(2) and 860G(d) of the Code, respectively, or (ii) cause any REMIC created pursuant to the Indenture to fail to qualify as a REMIC at any time that any Notes or Certificates are outstanding. Any HELOC as to which repurchase or substitution was delayed pursuant to this paragraph shall be repurchased or the substitution therefor shall occur (subject to compliance with Sections 2.02, 2.03 or 2.04) upon the earlier of (a) the occurrence of a default or reasonably foreseeable default with respect to such HELOC and (b) receipt by the Indenture Trustee and Owner Trustee of an Opinion of Counsel addressed to the Indenture Trustee, the Note Insurer and the Owner Trustee to the effect that such repurchase or substitution, as applicable, will not result in the events described in clause (i) or clause (ii) of the preceding sentence.

        (b)    Upon discovery by the Depositor, the Sponsor or the Master Servicer that any HELOC does not constitute a "qualified mortgage" within the meaning of section 860G(a)(3) of the Code, the party discovering such fact shall promptly (and in any event within 5 Business Days of discovery) give written notice thereof to the other parties and the Indenture Trustee, the Note Insurer and the Owner Trustee. In connection therewith, the Indenture Trustee and the Owner Trustee shall require the Sponsor, at its option, to either (i) substitute, if the conditions in Section 2.04 with respect to substitutions are satisfied, a Substitute HELOC for the affected HELOC, or (ii) repurchase the affected HELOC within 90 days of such discovery in the same manner as it would a HELOC for a breach of representation or warranty in accordance with Section 2.03. The Indenture Trustee shall reconvey to the Sponsor the HELOC to be released pursuant hereto (and the Custodian shall deliver the related Mortgage File) in the same manner, and on the same terms and conditions, as it would a HELOC repurchased for breach of a representation or warranty in accordance with Section 2.03.

        Section 2.06.    Representations and Warranties Concerning the Depositor. The Depositor hereby represents and warrants to the Issuing Entity, the Indenture Trustee, the Note Insurer the Master Servicer and the Securities Administrator as follows:

        (i)    the Depositor (a) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and (b) is qualified and in good standing as a foreign company to do business in each jurisdiction where such qualification is necessary, except where the failure so to qualify would not reasonably be expected to have a material adverse effect on the Depositor's business as presently conducted or on the Depositor's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

        (ii)    the Depositor has full corporate power to own its property, to carry on its business as presently conducted and to enter into and perform its obligations under this Agreement;

        (iii)    the execution and delivery by the Depositor of this Agreement have been duly authorized by all necessary corporate action on the part of the Depositor; and neither the execution and delivery of this Agreement, nor the consummation of the transactions herein contemplated, nor compliance with the provisions hereof, will conflict with or result in a breach of, or constitute a default under, any of the provisions of any law, governmental rule, regulation, judgment, decree or order binding on the Depositor or its properties or the certificate of formation or by-laws of the Depositor, except those conflicts, breaches or defaults which would not reasonably be expected to have a material adverse effect on the Depositor's ability to enter into this Agreement and to consummate the transactions contemplated hereby;

        (iv)    the execution, delivery and performance by the Depositor of this Agreement and the consummation of the transactions contemplated hereby do not require the consent or approval of, the giving of notice to, the registration with, or the taking of any other action in respect of, any state, federal or other governmental authority or agency, except those consents, approvals, notices, registrations or other actions as have already been obtained, given or made;

        (v)    this Agreement has been duly executed and delivered by the Depositor and, assuming due authorization, execution and delivery by the other parties hereto, constitutes a valid and binding obligation of the Depositor enforceable against it in accordance with its terms (subject to applicable bankruptcy and insolvency laws and other similar laws affecting the enforcement of the rights of creditors generally);

        (vi)    there are no actions, suits or proceedings pending or, to the knowledge of the Depositor, threatened against the Depositor, before or by any court, administrative agency, arbitrator or governmental body with respect to any of the transactions contemplated by this Agreement; or

        (vii)    with respect to any other matter which in the judgment of the Depositor will be determined adversely to the Depositor and will if determined adversely to the Depositor materially and adversely affect the Depositor's ability to enter into this Agreement or perform its obligations under this Agreement; and the Depositor is not in default with respect to any order of any court, administrative agency, arbitrator or governmental body so as to materially and adversely affect the transactions contemplated by this Agreement;

        (viii)    immediately prior to the transfer and assignment to the Issuing Entity, each Mortgage Note and each Mortgage were not subject to an assignment or pledge, and the Depositor had good and marketable title to and was the sole owner thereof and had full right to transfer and sell such HELOC to the Issuing Entity free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest; and

        (ix)    the Depositor has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the Depositor was required to file such reports) and it has been subject to such filing requirement for the past 90 days.

        Section 2.07.    Representations and Warranties Regarding the Master Servicer. The Master Servicer represents and warrants to the Issuing Entity, the Depositor, the Sponsor, the Note Insurer and the Indenture Trustee for the benefit of the Noteholders, as follows:

(i)    The Master Servicer is a national banking association duly organized, validly existing and in good standing under the laws of the United States of America and has the corporate power to own its assets and to transact the business in which it is currently engaged. The Master Servicer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned or leased by it requires such qualification and in which the failure to so qualify would have a material adverse effect on the business, properties, assets, or condition (financial or other) of the Master Servicer or the validity or enforceability of this Agreement;

(ii)    The Master Servicer has the power and authority to make, execute, deliver and perform this Agreement and all of the transactions contemplated under this Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement. When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Master Servicer enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies;

(iii)    The Master Servicer is not required to obtain the consent of any other Person or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except for such consent, license, approval or authorization, or registration or declaration, as shall have been obtained or filed, as the case may be;

(iv)    The execution and delivery of this Agreement and the performance of the transactions contemplated hereby by the Master Servicer will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Master Servicer or any provision of the certificate of incorporation or bylaws of the Master Servicer, or constitute a material breach of any mortgage, indenture, contract or other agreement to which the Master Servicer is a party or by which the Master Servicer may be bound; and

(v)    No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending (other than litigation with respect to which pleadings or documents have been filed with a court, but not served on the Master Servicer), or to the knowledge of the Master Servicer threatened, against the Master Servicer or any of its properties or with respect to this Agreement or the Notes or the Certificates which, to the knowledge of the Master Servicer, has a reasonable likelihood of resulting in a material adverse effect on the transactions contemplated by this Agreement.

The foregoing representations and warranties shall survive any termination of the Master Servicer hereunder.

Section 2.08.    Assignment of Agreement. The Sponsor, the Depositor and the Master Servicer hereby acknowledge and agree that the Issuing Entity may assign its interest under this Agreement to the Indenture Trustee, for the benefit of the Noteholders and the Note Insurer, as may be required to effect the purposes of the Indenture, without further notice to, or consent of, the Sponsor, the Depositor or the Master Servicer, and the Indenture Trustee shall succeed to such of the rights of the Issuing Entity hereunder as shall be so assigned. The Issuing Entity shall, pursuant to the Indenture, assign all of its right, title and interest in and to the HELOCs and all its right to exercise the remedies created by Article II of this Agreement for breaches of the representations, warranties, agreements and covenants of the Sponsor contained in the Mortgage Loan Purchase Agreement, to the Indenture Trustee, for the benefit of the Noteholders and the Note Insurer. The Sponsor agrees that, upon such assignment to the Indenture Trustee, such representations, warranties, agreements and covenants will run to and be for the benefit of the Indenture Trustee and the Note Insurer, and the Indenture Trustee may enforce, without joinder of the Depositor or the Issuing Entity, the repurchase obligations of the Sponsor set forth herein and in the Mortgage Loan Purchase Agreement with respect to breaches of such representations, warranties, agreements and covenants. Any such assignment to the Indenture Trustee shall not be deemed to constitute an assignment to the Indenture Trustee of any obligations or liabilities of the Issuing Entity under this Agreement.

ARTICLE III.

[RESERVED]

ARTICLE IV.

Administration and Master Servicing of HELOCs

Section 4.01.    Master Servicer. The Master Servicer, beginning on the Closing Date, shall supervise, monitor and oversee the obligations of the Servicer to service and administer the HELOCs in accordance with the terms of the Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with Accepted Master Servicing Practices. Furthermore, the Master Servicer shall oversee and consult with the Servicer as necessary from time-to-time to carry out the Master Servicer's obligations hereunder, shall receive and review certain reports, information and other data provided to the Master Servicer by the Servicer and shall enforce the obligations, conditions and covenants of the Servicer to the extent set forth in the Servicing Agreement. The Master Servicer shall monitor the Servicer's servicing activities with respect to the HELOCs, reconcile the results of such monitoring with such information provided in the previous sentence on a monthly basis and coordinate corrective adjustments to the Servicer's and Master Servicer's records, and based on such reconciled and corrected information, the Master Servicer shall provide such information to the Securities Administrator as shall be necessary in order for it to prepare the statements specified in Section 7.03 of the Indenture, and prepare any other information and statements required to be forwarded by the Master Servicer hereunder. The Master Servicer shall reconcile the results of its HELOC monitoring with the actual remittances of the Servicer pursuant to the Servicing Agreement. The Master Servicer shall be entitled to conclusively rely on the HELOC data provided to it by the Servicer and shall have no liability for any errors in such HELOC data.

The Indenture Trustee shall furnish the Servicer and the Master Servicer with any powers of attorney and other documents in form as provided to it necessary or appropriate to enable the Servicer to service and administer the HELOCs and REO Property. The Indenture Trustee shall not be liable for the Servicer's or the Master Servicer's use or misuse of such powers of attorney.

The Master Servicer, Securities Administrator and Indenture Trustee shall provide access to the records and documentation in their possession regarding the related HELOCs and REO Property to the Noteholders, the Note Insurer, the FDIC, and the supervisory agents and examiners of the FDIC, such access being afforded only upon reasonable prior written request and during normal business hours at the office of the Master Servicer, Securities Administrator and Indenture Trustee, as the case may be; provided, however, that, unless otherwise required by law, the Master Servicer, Securities Administrator and Indenture Trustee shall not be required to provide access to such records and documentation to the Noteholders if the provision thereof would violate the legal right to privacy of any Mortgagor. The Master Servicer, Securities Administrator and Indenture Trustee shall allow representatives of the above entities to photocopy any of the records and documentation and shall provide equipment for that purpose at a charge that covers the Master Servicer, Securities Administrator and Indenture Trustee's actual costs.

The Indenture Trustee, at the request of the Servicer or Master Servicer, as applicable, shall execute and deliver to the Servicer or the Master Servicer, as the case may be, any court pleadings, requests for trustee's sale or other documents necessary or reasonably desirable to (i) effect the foreclosure or trustee's sale with respect to a Mortgaged Property; (ii) take any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Security Instrument; (iii) obtain a deficiency judgment against the Mortgagor; or (iv) enforce any other rights or remedies provided by the Mortgage Note or Security Instrument or otherwise available at law or equity.

Section 4.02.    Monitoring of Servicers. (a) In the review of the Servicer's activities, the Master Servicer may rely upon an officer's certificate of the Servicer (or similar document signed by an officer of the Servicer) with regard to the Servicer's compliance with the terms of the Servicing Agreement. In the event that the Master Servicer, in its judgment, determines that the Servicer should be terminated in accordance with the Servicing Agreement or this Agreement, or that a notice should be sent pursuant to the Servicing Agreement or this Agreement with respect to the occurrence of an event that, unless cured, would constitute grounds for such termination, the Master Servicer shall notify the Depositor, the Issuing Entity, the Securities Administrator, the Note Insurer and the Indenture Trustee thereof and the Master Servicer shall issue such notice or take such other action as it deems appropriate.

(b)    The Master Servicer, for the benefit of the Issuing Entity, the Indenture Trustee, the Noteholders, the Certificateholders and the Note Insurer shall enforce the respective obligations of

the Servicer under the Servicing Agreement and shall, in the event that the Servicer fails to perform its obligations in accordance with the Servicing Agreement, subject to the preceding paragraph and with the prior written consent (such consent not to be unreasonably withheld) of the Note Insurer (so long as no Note Insurer Default exists), terminate the rights and obligations of the Servicer thereunder and act as servicer of the HELOCs or cause the Issuing Entity and the Indenture Trustee to enter into a new servicing agreement with a successor servicer selected by the Master Servicer and approved by the Note Insurer in writing; provided, however, it is understood and acknowledged by the parties hereto that there will be a period of transition (not to exceed 90 days) before the actual servicing functions can be fully transferred to such successor servicer, provided further, if the Servicer has failed to make any payment such that the Master Servicer had to advance funds, the Master Servicer may terminate the Servicer. Such enforcement, including, without limitation, the legal prosecution of claims, termination of the Servicing Agreement and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the HELOCs. The Master Servicer shall pay the costs of such enforcement at its own expense, subject to its right of reimbursement pursuant to the provisions of this Agreement or the Servicing Agreement, as applicable, provided that the Master Servicer shall not be required to prosecute or defend any legal action except to the extent that the Master Servicer shall have received reasonable indemnity for its costs and expenses in pursuing such action.

(c)    To the extent that the costs and expenses of the Master Servicer related to any termination of the Servicer, appointment of a successor servicer or the transfer and assumption of servicing by the Master Servicer with respect to the Servicing Agreement or this Agreement (including, without limitation, (i) all out of pocket legal costs and expenses and all due diligence costs and expenses associated with an evaluation of the potential termination of the Servicer as a result of an event of default by the Servicer and (ii) all costs and expenses associated with the complete transfer of servicing, including all servicing files and all servicing data and the completion, correction or manipulation of such servicing data as may be required by the successor servicer to correct any errors or insufficiencies in the servicing data or otherwise to enable the successor servicer to service the HELOCs in accordance with the Servicing Agreement) are not fully and timely reimbursed by the terminated Servicer, the Master Servicer shall be entitled to reimbursement of such costs and expenses from the Master Servicer Collection Account as Extraordinary Trust Fund Expenses.

(d)    The Master Servicer shall require the Servicer to comply with the remittance requirements and other obligations set forth in the Servicing Agreement.

(e)    If the Master Servicer acts as a servicer, it will not assume liability for the representations and warranties of the Servicer it replaces.

(f)    No later than four (4) Business Days (or at a time and date as is mutually agreed upon by the Securities Administrator and the Master Servicer) prior to each Payment Date, the Master Servicer shall provide data to the Securities Administrator (in a format mutually agreed upon) sufficient for the Securities Administrator to make payments on the Notes and, in its role as Certificate Paying Agent, distributions on the Certificates and prepare the monthly statement to Securityholders.

Section 4.03.    Fidelity Bond. The Master Servicer, at its expense, shall (i) maintain in effect a blanket fidelity bond and an errors and omissions insurance policy, affording coverage with respect to all directors, officers, employees and other Persons acting on such Master Servicer's behalf, and covering errors and omissions in the performance of the Master Servicer's obligations hereunder or (ii) self insure if LaSalle Bank National Association maintains with any Rating Agency the equivalent of a long term unsecured debt rating of "A". The errors and omissions insurance policy and the fidelity bond referred to in (i) above shall be in such form and amount generally acceptable for entities serving as master servicers or trustees.

Section 4.04.    Power to Act; Procedures. The Master Servicer shall master service the HELOCs and shall have full power and authority to do any and all things that it may deem necessary or desirable in connection with the master servicing and administration of the HELOCs, including but not limited to the power and authority (i) to execute and deliver, on behalf of the Issuing Entity, Noteholders and the Indenture Trustee, customary consents or waivers and other instruments and documents, (ii) to consent to transfers of any Mortgaged Property and assumptions of the Mortgage Notes and related Mortgages, (iii) to collect any Insurance Proceeds and Liquidation Proceeds, and (iv) to effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing any HELOC, in each case, in accordance with the provisions of this Agreement; provided, however, that the Master Servicer shall not (and, consistent with its responsibilities under Section 4.02, shall not permit the Servicer to) knowingly or intentionally take any action, or fail to take (or fail to cause to be taken) any action reasonably within its control and the scope of duties more specifically set forth herein, that, under the REMIC Provisions, if taken or not taken, as the case may be, would cause REMIC I or REMIC II to fail to qualify as a REMIC or result in the imposition of a tax upon the Trust Fund (including but not limited to the tax on prohibited transactions as defined in Section 860F(a)(2) of the Code and the tax on contributions to a REMIC set forth in Section 860G(d) of the Code) unless the Master Servicer has received an Opinion of Counsel (but not at the expense of the Master Servicer) to the effect that the contemplated action, or failure to take action, will not cause REMIC I or REMIC II to fail to qualify as a REMIC or result in the imposition of a tax upon REMIC I or REMIC II , as the case may be. The Indenture Trustee shall furnish the Master Servicer, upon written request from a Servicing Officer, with any powers of attorney empowering the Master Servicer or the Servicer to execute and deliver instruments of satisfaction or cancellation, or of partial or full release or discharge, and to foreclose upon or otherwise liquidate Mortgaged Property, and to appeal, prosecute or defend in any court action relating to the HELOCs or the Mortgaged Property, in accordance with the Servicing Agreement and this Agreement, and the Indenture Trustee shall execute and deliver such other documents, as the Master Servicer may request, to enable the Master Servicer to master service and administer the HELOCs and carry out its duties hereunder, in each case in accordance with Accepted Master Servicing Practices (and the Indenture Trustee shall have no liability for use or misuse of any such powers of attorney by the Master Servicer or the Servicer). If the Master Servicer or the Indenture Trustee has been advised that it is likely that the laws of the state in which action is to be taken prohibit such action if taken in the name of the Indenture Trustee or that the Indenture Trustee would be adversely affected under the "doing business" or tax laws of such state if such action is taken in its name, the Master Servicer shall join with the Indenture Trustee in the appointment of a co-trustee pursuant to Section 6.11 of the Indenture. In the performance of its duties hereunder, the Master Servicer shall be an independent contractor and shall not, except in those instances where it is taking action in the name of the Issuing Entity or the Indenture Trustee, be deemed to be the agent of the Issuing Entity or the Indenture Trustee.

Section 4.05.    Due-on-Sale Clauses; Assumption Agreements. To the extent provided in the Servicing Agreement, to the extent HELOCs contain enforceable due-on-sale clauses, the Master Servicer shall enforce the obligation of the Servicer to enforce such clauses in accordance with the Servicing Agreement. If applicable law prohibits the enforcement of a due-on-sale clause or such clause is otherwise not enforced in accordance with the Servicing Agreement, and, as a consequence, a HELOC is assumed, the original Mortgagor may be released from liability in accordance with the Servicing Agreement.

Section 4.06.    Release of Mortgage Files. (a) Upon becoming aware of the payment in full of any HELOC, or the receipt by the Servicer of a notification that payment in full has been escrowed in a manner customary for such purposes for payment to related Noteholders on the next Payment Date, the Servicer will, if required under the Servicing Agreement, promptly furnish to the Indenture Trustee and the Custodian two copies of a certification substantially in the form of Exhibit B hereto signed by a Servicing Officer or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer (which certification shall include a statement to the effect that all amounts received in connection with such payment that are required to be deposited in the Protected Account maintained by the Servicer pursuant to the Servicing Agreement have been so deposited) and shall request that the Indenture Trustee deliver or cause the Custodian to deliver to the Servicer the related Mortgage File. Upon receipt of such certification and request, the Indenture Trustee shall promptly release or cause the Custodian to release the related Mortgage File to the Servicer and the Indenture Trustee shall have no further responsibility with regard to such Mortgage File. Upon any such payment in full, the Servicer is authorized, to give, as agent for the Indenture Trustee, as the mortgagee under the Mortgage that secured the HELOC, an instrument of satisfaction (or assignment of mortgage without recourse) regarding the Mortgaged Property subject to the Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of such payment, it being understood and agreed that no expenses incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the Protected Account.

(b)    From time to time and as appropriate for the servicing or foreclosure of any HELOC and in accordance with the Servicing Agreement or this Agreement, the Indenture Trustee shall execute such documents as shall be prepared and furnished to the Indenture Trustee by the Servicer or the Master Servicer (in form reasonably acceptable to the Indenture Trustee) and as are necessary to the prosecution of any such proceedings. The Indenture Trustee shall, upon the request of the Servicer or the Master Servicer, and delivery to the Indenture Trustee and the Custodian of two copies of a request for release signed by a Servicing Officer substantially in the form of Exhibit B (or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer), release or cause the Custodian to release the related Mortgage File held in its or the Custodian's possession or control to the Servicer or the Master Servicer, as applicable. The Servicer or the Master Servicer shall be obligated to return the Mortgage File to the Indenture Trustee or the Custodian when the need therefor by the Servicer or the Master Servicer, as it reasonably determines, no longer exists unless the related HELOC shall be liquidated, in which case, upon receipt of a certificate of a Servicing Officer similar to that hereinabove specified, the Mortgage File shall be released by the Indenture Trustee or the Custodian to the Servicer or the Master Servicer.

Section 4.07.    Documents, Records and Funds in Possession of Master Servicer To Be Held for Issuing Entity and Indenture Trustee.

(a)    The Master Servicer shall transmit and the Servicer (to the extent required by the Servicing Agreement) shall transmit to the Indenture Trustee, or to the Custodian on behalf of the Indenture Trustee, such documents and instruments coming into the possession of the Master Servicer or the Servicer from time to time as are required by the terms hereof, or in the case of the Servicer, the Servicing Agreement to be delivered to the Indenture Trustee. Any funds received by the Master Servicer or by the Servicer in respect of any HELOC which otherwise are collected by the Master Servicer or by the Servicer as Liquidation Proceeds or Insurance Proceeds in respect of any HELOC shall be held for the benefit of the Issuing Entity, the Indenture Trustee and the Owner Trustee subject to the Master Servicer's right to retain or withdraw from the Master Servicer Collection Account the Master Servicing Compensation and other amounts provided in this Agreement and

the right of the Servicer to retain its Servicing Fee and other amounts as provided in the Servicing Agreement. The Master Servicer shall, and (to the extent provided in the Servicing Agreement or this Agreement) enforce the obligation of the Servicer to, provide access to information and documentation regarding the HELOCs to the Issuing Entity, the Securities Administrator, the Indenture Trustee, and their respective agents and accountants at any time upon reasonable request and during normal business hours and, to Noteholders that are savings and loan associations, banks or insurance companies, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of such Office and Corporation or examiners of any other federal or state banking or insurance regulatory authority if so required by applicable regulations of the Office of Thrift Supervision or other regulatory authority, such access to be afforded without charge but only upon reasonable request in writing and during normal business hours at the offices of the Master Servicer designated by it. In fulfilling such a request the Master Servicer shall not be responsible for determining the sufficiency of such information.

(b)     All Mortgage Files and funds collected or held by, or under the control of, the Master Servicer, in respect of any HELOCs, whether from the collection of principal and interest payments or from Liquidation Proceeds or Insurance Proceeds, shall be held by the Master Servicer for and on behalf of the Issuing Entity, the Indenture Trustee, the Noteholders and the Certificateholders shall be and remain the sole and exclusive property of the Issuing Entity, subject to the pledge to the Indenture Trustee; provided, however, that the Master Servicer shall be entitled to setoff against, and deduct from, any such funds any amounts that are properly due and payable to the Master Servicer under this Agreement.

Section 4.08.     Standard Hazard Insurance and Flood Insurance Policies.

(a)     For each HELOC, the Master Servicer shall enforce any obligation of the Servicer under the Servicing Agreement to maintain or cause to be maintained standard fire and casualty insurance and, where applicable, flood insurance, all in accordance with the provisions of the Servicing Agreement. It is understood and agreed that such insurance shall be with insurers meeting the eligibility requirements set forth in the Servicing Agreement and that no earthquake or other additional insurance is to be required of any Mortgagor or to be maintained on property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

(b)     Pursuant to Sections 5.04 and 5.05, any amounts collected by the Servicer or the Master Servicer, under any insurance policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage or released to the Mortgagor in accordance with the Servicing Agreement or this Agreement) shall be deposited into the Master Servicer Collection Account, subject to withdrawal pursuant to Sections 5.05 and 5.06. Any cost incurred by the Master Servicer or the Servicer in maintaining any such insurance should the Mortgagor defaults in its obligation to do so, shall be added to the amount owing under the related HELOC where the terms of such HELOC so permit; provided, however, that the addition of any such cost shall not be taken into account for purposes of calculating the distributions to be made to Noteholders and shall be recoverable by the Master Servicer or the Servicer pursuant to Sections 5.05 and 5.06.

Section 4.09.     Presentment of Claims and Collection of Proceeds. The Master Servicer shall (to the extent provided in the Servicing Agreement or this Agreement) enforce the obligations of the Servicer to prepare and present on behalf of the Issuing Entity, the Indenture Trustee, the related Noteholders and the related Certificateholders all claims under the Insurance Policies and take such actions (including the negotiation, settlement, compromise or enforcement of the insured's claim) as shall be necessary to realize recovery under such policies. Any proceeds disbursed to the Master Servicer (or disbursed to the Servicer and remitted to the Master Servicer) in respect of such policies, bonds or contracts shall be promptly deposited in the Master Servicer Collection Account upon receipt, except that any amounts that are to be applied upon receipt to the repair or restoration of the related Mortgaged Property, which repair or restoration the owner of such Mortgaged Property has agreed to make as a condition precedent to the presentation of its claims on the related HELOC under the applicable Insurance Policy, need not be so deposited (or remitted).

Section 4.10.     Maintenance of the Insurance Policies.

(a)     The Master Servicer shall enforce any provision under the Servicing Agreement prohibiting the Servicer from taking any action that would result in noncoverage under any applicable Insurance Policy of any loss which, but for the actions of the Servicer, would have been covered thereunder. The Master Servicer shall use its best reasonable efforts to enforce any obligation of the Servicer under the Servicing Agreement to keep in force and effect (to the extent that the HELOC requires the Mortgagor to maintain such insurance), insurance applicable to each HELOC in accordance with the provisions of this Agreement and the Servicing Agreement. The Master Servicer shall enforce any provision under the Servicing Agreement prohibiting the Servicer from canceling or refusing to renew any such Insurance Policy that is in effect at the date of the initial issuance of the HELOC and is required to be kept in force thereunder except in accordance with the provisions of the Servicing Agreement.

(b)     The Master Servicer agrees to enforce the obligation of the Servicer (to the extent required under the Servicing Agreement) to present, on behalf of the Issuing Entity, the Indenture Trustee, the Noteholders and the Certificateholders, claims to the insurer under any Insurance Policies and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any Insurance Policies respecting defaulted HELOCs. Pursuant to Sections 5.04 and 5.05, any amounts collected by the Master Servicer or the Servicer under any Insurance Policies shall be deposited in the Master Servicer Collection Account, subject to withdrawal pursuant to Sections 5.01 and 5.02.

Section 4.11.     Indenture Trustee to Retain Possession of Certain Insurance Policies and Documents.

The Indenture Trustee shall retain or shall cause the Custodian to retain possession and custody of the originals (to the extent available) of any Insurance Policies, or certificate of insurance if applicable, and any certificates of renewal as to the foregoing as may be issued from time to time as contemplated by this Agreement. Until all amounts distributable in respect of the Notes have been distributed in full and the Indenture has been satisfied and discharged in accordance with the Indenture, the Indenture Trustee shall also retain, or shall cause the Custodian to retain, possession and custody of each Mortgage File in accordance with and subject to the terms and conditions of this Agreement. The Master Servicer shall promptly deliver or cause to be delivered to the Indenture Trustee, or to the Custodian on behalf of the Indenture Trustee, upon the execution or receipt thereof the originals of any Insurance Policies, any certificates of renewal, and such other documents or instruments that constitute portions of the Mortgage File that come into the possession of the Master Servicer from time to time.

Section 4.12.     Realization Upon Defaulted HELOCs. For each HELOC that comes into and continues in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, the Master Servicer shall enforce the obligation of the Servicer (to the extent required under the Servicing Agreement) to foreclose upon, repossess or otherwise comparably convert the ownership of Mortgaged Properties securing such HELOCs, all in accordance with the Servicing Agreement. Pursuant to the Servicing Agreement, the Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings or sale; provided, however, that such costs and expenses will be recoverable as Servicing Advances by the Servicer as contemplated in the Servicing Agreement.

Section 4.13.     Compensation for the Master Servicer and the Indenture Trustee.

On each Payment Date, the Master Servicer shall be entitled to receive a fee equal to 1/12 of the Master Servicing Fee Rate multiplied by the Stated Principal Balance of the HELOCs as of the Due Date in the month preceding the month in which such Payment Date occurs (the "Master Servicer Compensation"). The Master Servicer will pay the fees of the Indenture Trustee from the Master Servicer Compensation. The Master Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder and shall not be entitled to reimbursement therefor except as otherwise provided in this Agreement.

Section 4.14.     REO Property.

(a)     In the event the Trust Estate acquires ownership of any REO Property in respect of any related HELOC, the deed or certificate of sale shall be issued to the Indenture Trustee, or to its nominee, on behalf of the Noteholders, the Certificateholders or the Note Insurer. The Master Servicer shall, to the extent provided in this Agreement, cause the Servicer to sell any REO Property as expeditiously as possible and in accordance with the provisions of the Servicing Agreement. The Master Servicer shall enforce any obligations of the Servicer to protect and conserve, such REO Property in the manner and to the extent required by this Agreement and the Servicing Agreement, in accordance with the REMIC Provisions and in a manner that does not result in a tax on "net income from foreclosure property" or cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code.

(b)     The Master Servicer shall, to the extent required by this Agreement, enforce the obligation of the Servicer to deposit all funds collected and received in connection with the operation of any REO Property in the Protected Account.

Section 4.15.     Annual Statement as to Compliance.

Each of the Securities Administrator and the Master Servicer shall deliver to the Securities Administrator and the Depositor not later than March 15th of each calendar year beginning in 2008, an officer's certificate (an "Annual Statement of Compliance") stating, as to each signatory thereof, that (i) a review of the activities of each such party during the preceding calendar year and of its performance under this Agreement and/or other applicable servicing agreement has been made under such officer's supervision and (ii) to the best of such officer's knowledge, based on such review, each such party has fulfilled all of its obligations under this Agreement in all material respects throughout such year or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status of the cure provisions thereof. Such Annual Statement of Compliance shall contain no restrictions or limitations on its use. In the event that the Securities Administrator or the Master Servicer has delegated any servicing responsibilities with respect to the HELOCs to a subservicer or subcontractor, the Master Servicer or the Securities Administrator (as the case may be) shall cause to be delivered a similar Annual Statement of Compliance by that subservicer or subcontractor to the Depositor and the Securities Administrator described above as and when required with respect to the Securities Administrator and the Master Servicer.

Failure of the Master Servicer to comply with this Section 4.15 (including with respect to the time frames required in this Section) shall be deemed a Master Servicer Event of Default with respect to such party, and the Indenture Trustee at the direction of the Depositor shall, in addition to whatever rights the Indenture Trustee may have under this Agreement and at law or equity or to damages, including injunctive relief and specific performance, upon notice immediately terminate all of the rights and obligations of the Master Servicer under this Agreement and in and to the HELOCs and the proceeds thereof without compensating the Master Servicer for the same; provided, that such limitation shall not prohibit any payment of compensation for services rendered prior to such termination. Failure of the Securities Administrator to comply with this Section 4.15 (including with respect to the timeframes required in this Section) shall be deemed a default and the Indenture Trustee at the direction of the Depositor shall, in addition to whatever rights the Indenture Trustee may have under this Agreement and at law or equity or to damages, including injunctive relief and specific performance, upon notice immediately terminate all of the rights and obligations of the Securities Administrator under this Agreement and in and to the HELOCs and the proceeds thereof without compensating the Securities Administrator for the same; provided, that such limitation shall not prohibit any payment of compensation for services rendered prior to such termination. This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

In the event the Master Servicer, the Securities Administrator or any subservicer or subcontractor engaged by either such party is terminated or resigns pursuant to the terms of the Agreement, or any other applicable agreement in the case of a subservicer or subcontractor, as the case may be, such party shall provide an Annual Statement of Compliance pursuant to this Section 4.15 or to the related section of such other applicable agreement, as the case may be, as to the performance of its obligations with respect to the period of time it was subject to this Agreement or any other applicable agreement, as the case may be, notwithstanding any such termination or resignation.

Section 4.16.    Assessments of Compliance and Attestation Reports.

Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, each of the Master Servicer, the Securities Administrator and the Custodian (each, an "Attesting Party") shall deliver to the Securities Administrator and the Depositor on or before March 15th of each calendar year beginning in 2008, a report regarding such Attesting Party's assessment of compliance (an "Assessment of Compliance") with the Servicing Criteria during the preceding calendar year. The Assessment of Compliance, as set forth in Regulation AB, must contain the following:

(a)    A statement by an authorized officer of such Attesting Party of its authority and responsibility for assessing compliance with the Servicing Criteria applicable to the related Attesting Party;

(b)    A statement by an authorized officer that such Attesting Party used the Servicing Criteria attached as Exhibit F hereto, and which will also be attached to the Assessment of Compliance, to assess compliance with the Servicing Criteria applicable to the related Attesting Party;

(c)    An assessment by such officer of the related Attesting Party's compliance with the applicable Servicing Criteria for the period consisting of the preceding calendar year, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities such Attesting Party performs with respect to asset-backed securities transactions taken as a whole involving the related Attesting Party, that are backed by the same asset type as the HELOCs;

(d)    A statement that a registered public accounting firm has issued an attestation report on the related Attesting Party's Assessment of Compliance for the period consisting of the preceding calendar year; and

(e)    A statement as to which of the applicable Servicing Criteria on Exhibit F hereto, if any, are not applicable to the related Attesting Party, which statement shall be based on the activities such Attesting Party performs with respect to asset-backed securities transactions taken as a whole involving such Attesting Party, that are backed by the same asset type as the HELOCs.

Such report at a minimum shall address each of the Servicing Criteria specified on Exhibit F hereto which are indicated as applicable to the related Attesting Party.

On or before March 15th of each calendar year beginning in 2008, each Attesting Party specified in this Section shall furnish to the Securities Administrator and the Depositor a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the related Attesting Party, as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

The Master Servicer shall cause any subservicer, and each subcontractor determined by it to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to the Securities Administrator and the Depositor an Assessment of Compliance and Attestation Report as and when provided above along with an indication of what Servicing Criteria are addressed in such assessment.

The Securities Administrator shall confirm that the assessments, taken as a whole, address all of the Servicing Criteria and taken individually address the Servicing Criteria for each party as set forth on Exhibit F and notify the Depositor of any exceptions. Notwithstanding the foregoing, as to any subcontractor, an Assessment of Compliance is not required to be delivered unless it is required as part of a Form 10-K with respect to the Trust Fund.

Failure of the applicable party to comply with this Section 4.16 (including with respect to the timeframes required in this Section) shall be deemed an Event of Default with respect to such party, and the Master Servicer or the Indenture Trustee at the direction of the Depositor shall, in addition to whatever rights the Master Servicer or the Indenture Trustee may have under this Agreement and at law or equity or to damages, including injunctive relief and specific performance, upon notice immediately terminate all the rights and obligations of the applicable party under this Agreement and in and to the HELOCs and the proceeds thereof without compensating the applicable party for the same. This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary.

The Securities Administrator shall also provide an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the Servicing Criteria specified on Exhibit F hereto which are indicated as applicable to the "securities administrator." In addition, the Custodian shall deliver to the Securities Administrator and the Depositor an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the Servicing Criteria specified on Exhibit F hereto which are indicated as applicable to a "custodian." Notwithstanding the foregoing, as to the Securities Administrator and the Custodian, an Assessment of Compliance is not required to be delivered unless it is required as part of a Form 10-K with respect to the Trust Fund.

In the event the Master Servicer, the Custodian, the Securities Administrator or any subservicer or subcontractor engaged by any such party is terminated, assigns its rights and obligations under, or resigns pursuant to, the terms of the Agreement, the Custodial Agreement, or any other applicable agreement in the case of a subservicer or subcontractor, as the case may be, such party shall provide an Assessment of Compliance and cause to be provided an Attestation Report pursuant to this Section 4.16 or to the related section of such other applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation.

Section 4.17.    Reports Filed with Securities and Exchange Commission.

(a)    (i) (A) Within 15 days after each Payment Date (subject to permitted exceptions under the Exchange Act), the Securities Administrator shall, in accordance with industry standards,

prepare and file with the Commission via the Electronic Data Gathering and Retrieval System ("EDGAR"), a Form 10-D, signed by the Master Servicer, with a copy of the monthly statement to be furnished by the Securities Administrator to the Securityholders for such Payment Date, provided that the Securities Administrator shall have received no later than five (5) calendar days after the related Payment Date all information required to be provided to the Securities Administrator as described in clause (a)(iv) below. Any disclosure in addition to the monthly statement that is required to be included on Form 10-D ("Additional Form 10-D Disclosure") shall be, pursuant to the paragraph immediately below, reported by the parties set forth on Exhibit G and the Indenture Trustee to the Securities Administrator and the Depositor and approved by the Depositor, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Additional Form 10-D Disclosure absent such reporting (other than in the case where the Securities Administrator is the reporting party as set forth in Exhibit G) and approval.

Within seven (7) calendar days after the related Payment Date, (i) the parties set forth in Exhibit G and the Indenture Trustee shall be required to provide, pursuant to Section 4.17(a)(iv) below, to the Securities Administrator and the Depositor, to the extent known by a responsible officer thereof, in EDGAR-compatible format, or in such other form as otherwise agreed upon by the Securities Administrator and the Depositor and such party, the form and substance of any Additional Form 10-D Disclosure, if applicable, and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Additional Form 10-D Disclosure on Form 10-D. Subject to the foregoing, the Securities Administrator has no duty under this Agreement to monitor or enforce the performance by the other parties listed on Exhibit G or by the Indenture Trustee of their duties under this paragraph or to proactively solicit or procure from such parties any Additional Form 10-D Disclosure information. The Depositor will be responsible for any out-of-pocket expenses incurred by the Securities Administrator in connection with including any Additional Form 10-D Disclosure on Form 10-D pursuant to this Section.

(B) After preparing the Form 10-D, the Securities Administrator shall forward electronically a draft copy of the Form 10-D to the Depositor and the Master Servicer for review. No later than two (2) Business Days prior to the 15th calendar day after the related Payment Date, a duly authorized officer of the Master Servicer shall sign the Form 10-D and return an electronic or fax copy of such signed Form 10-D (with an original executed hard copy to follow by overnight mail) to the Securities Administrator. If a Form 10-D cannot be filed on time or if a previously filed Form 10-D needs to be amended, the Securities Administrator will follow the procedures set forth in Section 4.17(a)(v). Promptly (but no later than one (1) Business Day) after filing with the Commission, the Securities Administrator will make available on its internet website identified in Section 7.04 of the Indenture a final executed copy of each Form 10-D. The signing party at the Master Servicer can be contacted as set forth in Section 8.04. Form 10-D requires the registrant to indicate (by checking "yes" or "no") that it "(1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. The Depositor shall notify the Securities Administrator in writing, no later than the fifth calendar day after the related Payment Date with respect to the filing of a report on Form 10-D, if the answer to either question should be "no." The Securities Administrator shall be entitled to rely on the representations made by the Depositor in Section 2.06(ix) in preparing, executing and/or filing any such Form 10-D. The parties to this Agreement acknowledge that the performance by the Securities Administrator of its duties under Sections 4.17(a)(i), (iv) and (v) related to the timely preparation, execution and filing of Form 10-D is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under such Sections. The parties to this Agreement acknowledge that the performance by each of the Master Servicer and the Securities Administrator of its duties under this Section 4.17(a)(i) related to the timely preparation, execution and filing of Form 10-D is also contingent upon the Servicer, the Custodian and any subservicers or subcontractors strictly observing deadlines no later than those set forth in this paragraph if the deadlines set forth in this Agreement or the Servicing Agreement, as applicable, the Custodial Agreement or any other applicable agreement. The Securities Administrator shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, arrange for execution and/or timely file such Form 10-D, where such failure results from the Securities Administrator's inability to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-D, not resulting from its own negligence, bad faith or willful misconduct.

(ii) (A) Within four (4) Business Days after the occurrence of an event requiring disclosure on Form 8-K (each such event, a "Reportable Event"), the Securities Administrator shall prepare and file, at the direction of the Depositor, on behalf of the Trust any Form 8-K, as required by the Exchange Act; provided that, the Depositor shall file the initial Form 8-K in connection with the issuance of the Securities. Any disclosure or information related to a Reportable Event or that is otherwise required to be included on Form 8-K ("Form 8-K Disclosure Information") shall be, pursuant to the paragraph immediately below, reported by the parties set forth on Exhibit H and by the Indenture Trustee to the Securities Administrator and the Depositor approved by the Depositor, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Form 8-K Disclosure Information absent such reporting (other than in the case where the Securities Administrator is the reporting party as set forth in Exhibit G) and approval.

(B) For so long as the Trust is subject to the Exchange Act reporting requirements, no later than 12:00 noon New York City time on the 2nd Business Day after the occurrence of a Reportable Event (i) the parties set forth in Exhibit H and the Indenture Trustee shall be required pursuant to Section 4.17(a)(iv) below to provide to the Securities Administrator and the Depositor, to the extent known by a responsible officer thereof, in EDGAR-compatible format, or in such other form as otherwise agreed upon by the Securities Administrator and the Depositor and such party, the form and substance of any Form 8-K Disclosure Information, if applicable, and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Form 8-K Disclosure Information on Form 8-K. Subject to the foregoing, the Securities Administrator has no duty under this Agreement to monitor or enforce the performance by the other parties listed on Exhibit G or by the Indenture Trustee of their duties under this paragraph or to proactively solicit or procure from such parties any Form 8-K Disclosure Information. The Depositor will be responsible for any reasonable out-of-pocket expenses incurred by the Securities Administrator in connection with including any Form 8-K Disclosure Information on Form 8-K pursuant to this Section.

(C) After preparing the Form 8-K, the Securities Administrator shall forward electronically a draft copy of the Form 8-K to the Depositor and the Master Servicer for review. No later than the close of business, New York City time on the 3rd Business Day after the Reportable Event, a duly authorized officer of the Master Servicer shall sign the Form 8-K and return an electronic or fax copy of such signed Form 8-K (with an original executed hard copy to follow by overnight mail) to the Securities Administrator. If a Form 8-K cannot be filed on time or if a previously filed Form 8-K needs to be amended, the Securities Administrator will follow the procedures set forth in Section 4.17(a)(v). Promptly (but no later than one Business Day) after filing with the Commission, the Securities Administrator will, make available on its internet website identified in Section 7.04 of the Indenture a final executed copy of each Form 8-K. The signing party at the Master Servicer can be contacted as set forth in Section 8.04. The parties to this Agreement acknowledge that the performance by the Securities Administrator of its duties under this Section 4.17(a)(ii), (iv) and (v) related to the timely preparation, execution and filing of Form 8-K is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under such Sections. It is understood by the parties hereto that the performance by each of the Master Servicer and the Securities Administrator of its duties under this Section 4.17(a)(ii) related to the timely preparation, execution and filing of Form 8-K is also contingent upon the Servicer, the Custodian and any subservicers or subcontractors strictly observing deadlines no later than those set forth in this paragraph that are applicable to the parties to this Agreement in the delivery to the Securities Administrator of any necessary Form 8-K Disclosure Information pursuant to this Agreement or the Servicing Agreement, as applicable, the Custodial Agreement or any other applicable agreement. The Securities Administrator shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, arrange for execution and/or timely file such Form 8-K, where such failure results from the Securities Administrator's inability to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 8-K, not resulting from its own negligence, bad faith or willful misconduct.

(iii) (A) On or prior to the 90th day after the end of each fiscal year of the Trust or such earlier date as may be required by the Exchange Act (the "10-K Filing Deadline") (it being understood that fiscal year for the Trust ends on December 31st of each year), commencing in March 2007, the Securities Administrator shall prepare and file on behalf of the Trust a Form 10-K, in form and substance as required by the Exchange Act. Each such Form 10-K shall include the following items, in each case to the extent they have been delivered to the Securities Administrator within the applicable time frames set forth in this Agreement, (I) an Annual Statement of Compliance for the Master Servicer, the Securities Administrator, the Servicer and any subservicer or subcontractor (to the extent Regulation AB requires the Annual Statement of Compliance of any such subservicer or subcontractor to be attached to Form 10-K), as described under Section 4.15, (II)(A) the Assessment of Compliance with Servicing Criteria for the Master Servicer, the Servicer, each subservicer and subcontractor participating in the servicing function, the Securities Administrator and the Custodian, as described under Section 4.16, and (B) if the Assessment of Compliance of the Master Servicer, the Servicer, each subservicer and subcontractor, the Securities Administrator or the Custodian described under Section 4.15 identifies any material instance of noncompliance, disclosure identifying such instance of noncompliance, or if the Assessment of Compliance of the Master Servicer, the Servicer, the subservicer, the subcontractor, the Securities Administrator or the Custodian described under Section 4.15 is not included as an exhibit to such Form 10-K, disclosure that such report is not included and an explanation why such report is not included, (III)(A) the registered public accounting firm Attestation Report for the Master Servicer, the subservicer, the subcontractor, the Servicer, the Securities Administrator and the Custodian, as described under Section 4.15, and (B) if any registered public accounting firm Attestation Report described under Section 4.15 identifies any material instance of noncompliance, disclosure identifying such instance of noncompliance, or if any such registered public accounting firm Attestation Report is not included as an exhibit to such Form 10-K, disclosure that such report is not included and an explanation why such report is not included, and (IV) a Sarbanes-Oxley Certification ("Sarbanes-Oxley Certification") as described in this Section 4.17(a)(iii)(D) below. Any disclosure or information in addition to (I) through (IV) above that is required to be included on Form 10-K ("Additional Form 10-K Disclosure") shall be reported by the parties set forth on Exhibit G and by the Indenture Trustee to the Securities Administrator and the Depositor and, pursuant to the paragraph immediately below, approved by the Depositor, and the Securities Administrator will have no duty or liability for any failure hereunder to determine or prepare any Additional Form 10-K Disclosure absent such reporting (other than with respect to when it is the reporting party as set forth in Exhibit G) and approval.

(B) No later than March 15th of each year that the Trust is subject to the Exchange Act reporting requirements, commencing in 2007, (i) the parties set forth in Exhibit G and the Indenture Trustee shall be required to provide pursuant to Section 4.17(a)(iv) below to the Securities Administrator and the Depositor, to the extent known, in EDGAR-compatible format, or in such other form as otherwise agreed upon by the Securities Administrator and the Depositor and such party, the form and substance of any Additional Form 10-K Disclosure, if applicable, and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Additional Form 10-K Disclosure on Form 10-K. Subject to the foregoing, the Securities Administrator has no duty under this Agreement to monitor or enforce the performance by the other parties listed on Exhibit G and the Indenture Trustee of their duties under this paragraph or to proactively solicit or procure from such parties any Addition Form 10-K Disclosure information. The Depositor will be responsible for any reasonable out-of-pocket expenses incurred by the Securities Administrator in connection

with including any Additional Form 10-K Disclosure on Form 10-K pursuant to this Section.

(C) After preparing the Form 10-K, the Securities Administrator shall forward electronically a draft copy of the Form 10-K to the Depositor and the Master Servicer for review. Form 10-K requires the registrant to indicate (by checking "yes" or "no") that it (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. The Depositor shall notify the Securities Administrator in writing, no later than the 15th calendar day of March in any year in which the Trust is subject to the reporting requirements of the Exchange Act, if the answer to either question should be "no." The Securities Administrator shall be entitled to rely on the representations made by the Depositor in Section 2.06(ix) in preparing, executing and/or filing any such Form 10-K. No later than 12:00 p.m. New York City time on the 4th Business Day prior to the 10-K Filing Deadline, a senior officer of the Master Servicer in charge of the master servicing function shall sign the Form 10-K and return an electronic or fax copy of such signed Form 10-K (with an original executed hard copy to follow by overnight mail) to the Securities Administrator. If a Form 10-K cannot be filed on time or if a previously filed Form 10-K needs to be amended, the Securities Administrator will follow the procedures set forth in Section 4.17(a)(v). Promptly (but no later than one Business Day) after filing with the Commission, the Securities Administrator will make available on its internet website identified in Section 7.04 of the Indenture a final executed copy of each Form 10-K. The signing party at the Master Servicer can be contacted as set forth in Section 8.04. The parties to this Agreement acknowledge that the performance by the Securities Administrator of its duties under Sections 4.16(a)(iii), (iv) and (v) related to the timely preparation, execution and filing of Form 10-K is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under Section 4.15 and Section 4.16. It is understood by the parties hereto that the performance by the Master Servicer and the Securities Administrator of its duties under this Section 4.17(a)(iii) related to the timely preparation, execution and filing of Form 10-K is also contingent upon the Servicer, the Custodian and any subservicer or subcontractor strictly observing deadlines no later than those set forth in this paragraph that are applicable to the parties to this Agreement in the delivery to the Securities Administrator of any necessary Additional Form 10-K Disclosure, any annual statement of compliance and any Assessment of Compliance and attestation pursuant to this Agreement or the Servicing Agreements, as applicable, the Custodial Agreement or any other applicable agreement. The Securities Administrator shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, arrange for execution and/or timely file such Form 10-K, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-K, not resulting from its own negligence, bad faith or willful misconduct.

(D) Each Form 10-K shall include a certification (the "Sarbanes-Oxley Certification"), required to be included therewith pursuant to the Sarbanes-Oxley Act. The Master Servicer and the Securities Administrator shall cause any subservicer or subcontractor engaged by it to, provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 15th of each year in which the Trust is subject to the reporting requirements of the Exchange Act and otherwise within a reasonable period of time upon request, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit D, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely; provided, however, that the Securities Administrator shall not be required to undertake an analysis of any accountant's report attached as an exhibit to the Form 10-K. The senior officer of the Master Servicer in charge of the master servicing function shall serve as the Certifying Person on behalf of the Trust. Such officer of the Certifying Person can be contacted as set forth in Section 8.04. In the event the Securities Administrator is terminated or resigns pursuant to the terms of this Agreement or any subcontractor or subservicer is terminated pursuant to the Servicing Agreement, the Securities Administrator, subcontractor or subservicer, as applicable, shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 4.17(a)(iii) with respect to the period of time it was subject to this Agreement or the Servicing Agreement, as applicable. Notwithstanding the foregoing, (i) the Master Servicer and the Securities Administrator shall not be required to deliver a Back-Up Certification to each other if both are the same Person and the Master Servicer is the Certifying Person and (ii) the Master Servicer shall not be obligated to sign the Sarbanes-Oxley Certification in the event that it does not receive any Back-Up Certification required to be furnished to it pursuant to this section or the Servicing Agreement or the Custodial Agreement.

(iv) With respect to any Additional Form 10-D Disclosure, Additional From 10-K Disclosure or any Form 8-K Disclosure Information (collectively, the "Additional Disclosure") relating to the Trust Fund, the Securities Administrator's obligation to include such Additional Information in the applicable Exchange Act report is subject to receipt from the entity that is indicated in Exhibit G as the responsible party for providing that information, if other than the Securities Administrator, as and when required pursuant to Section 4.16(a)(i) through (iii) above. Such Additional Disclosure shall be accompanied by a notice substantially in the form of Exhibit H. Each of the Master Servicer, Sponsor and Depositor hereby agree to notify and provide to the extent known to the Securities Administrator and the Depositor all Additional Disclosure relating to the Trust Fund, with respect to which such party is indicated in Exhibit H as the responsible party for providing that information.

So long as the Depositor is subject to the filing requirements of the Exchange Act with respect to the Trust Fund, the Indenture Trustee shall notify the Securities Administrator and the Depositor of any bankruptcy or receivership with respect to the Indenture Trustee or of any proceedings of the type described under Item 1117 of Regulation AB that have occurred as of the end of the related Due Period, together with a description thereof, no later than the date on which such information is required to be reported to the Securities Administrator and the Depositor by the other parties hereto as set forth under this Section 4.17. In addition, the Indenture Trustee shall notify the Securities Administrator and the Depositor of (i) any affiliations or relationships that develop after the Closing Date between the Indenture Trustee and the Depositor, the Sponsor, the Securities Administrator, the Master Servicer, the Note Insurer or the Custodian of the type described under Item 1119 of Regulation AB, and (ii) the occurrence of an Event of Default (with respect to the Master Servicer) actually known to a Responsible Officer of the Indenture Trustee together, in each case, with a description thereof, no later than the date on which such information is required to be reported to the Securities Administrator and the Depositor by the other parties hereto as set forth under this Section 4.17. Should the identification of any of the Depositor, the Seller, the Securities Administrator, the Master Servicer or the Custodian change, the Depositor shall promptly notify the Indenture Trustee.

(v) (A) On or prior to January 30th of the first year in which the Securities Administrator is able to do so under applicable law, the Securities Administrator shall prepare and file a Form 15 relating to the automatic suspension of reporting in respect of the Trust under the Exchange Act.

(B) In the event that the Securities Administrator is unable to timely file with the Commission all or any required portion of any Form 8-K, Form 10-D or Form 10-K required to be filed by this Agreement because required disclosure information was either not delivered to it or after the delivery deadlines set forth in this Agreement or for any other reason, the Securities Administrator will promptly notify the Depositor and the Master Servicer. In the case of Form 10-D and Form 10-K, the parties hereto will cooperate to prepare and file a Form 12b-25 and a 10-D/A and 10-K/A as applicable, pursuant to Rule 12b-25 of the Exchange Act. In the case of Form 8-K, the Securities Administrator will, upon receipt of all required Form 8-K Disclosure Information and upon the approval and direction of the Depositor, include such disclosure information on the next Form 10-D. In the event that any previously filed Form 8-K, 10-D or 10-K needs to be amended, the Securities Administrator will notify the Depositor and the Master Servicer and the parties hereto will cooperate to prepare any necessary 8-K/A, 10-D/A or 10-K/A. Any Form 15, Form 12b-25 or any amendment to Form 8-K, Form 10-D or Form 10-K shall be signed by an appropriate officer of the Master Servicer. The parties hereto acknowledge that the performance by the Securities Administrator of its duties under this Section 4.17(a)(v) related to the timely preparation and filing of Form 15, a Form 12b-25 or any amendment to Form 8-K, Form 10-D or Form 10-K is contingent upon such parties performing their duties under this Section. The Securities Administrator shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare, arrange for execution and/or timely file any such Form 15, Form 12b-25 or any amendments to Forms 8-K, 10-D or 10-K, where such failure results from the Securities Administrator's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 15, Form 12b-25 or any amendments to Forms 8-K, 10-D or 10-K, not resulting from its own negligence, bad faith or willful misconduct.

The parties hereto agree to promptly furnish to the Securities Administrator, from time to time upon request, such further information, reports and financial statements within its control related to this Agreement, the HELOCs as the Securities Administrator reasonably deems appropriate to prepare and file all necessary reports with the Commission. The Securities Administrator shall have no responsibility to file any items other than those specified in this Section 4.17; provided, however, the Securities Administrator shall cooperate with the Depositor in connection with any additional filings with respect to the Trust Fund as the Depositor deems necessary under the Exchange Act. Copies of all reports filed by the Securities Administrator under the Exchange Act shall be sent to: the Depositor c/o Bear, Stearns & Co. Inc., Attn: Managing Director Analysis and Control, One Metrotech Center North, Brooklyn, New York 11202-3859. Fees and expenses incurred by the Securities Administrator in connection with this Section 4.17 shall not be reimbursable from the Trust Fund. The Depositor shall be responsible for any reasonable fees and expenses assessed or incurred by the Securities Administrator to the extent set forth in this Section 4.17.

(b) The Securities Administrator shall indemnify and hold harmless the Depositor and the Master Servicer (if the Master Servicer is unaffiliated with the Securities Administrator) and their respective officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach of the Securities Administrator's obligations under Sections 4.15, 4.16 and 4.17 or the Securities Administrator's negligence, bad faith or willful misconduct in connection therewith. In addition, the Securities Administrator shall indemnify and hold harmless the Depositor and the Master Servicer (if the Master Servicer is unaffiliated with the Securities Administrator) and each of their officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any Back-Up Certification, the Annual Statement of Compliance, the Assessment of Compliance, the Exchange Act disclosure or other information provided by the Securities Administrator pursuant to Section 4.15, 4.16 and 4.17 (the "Securities Administrator Information"), or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading; provided, by way of clarification, that clause (ii) of this paragraph shall be construed solely by reference to the Securities Administrator Information and not to any other information communicated in connection with the Notes or Certificates, without regard to whether the Securities Administrator Information or any portion thereof is presented together with or separately from such other information.

The Depositor shall indemnify and hold harmless the Securities Administrator and the Master Servicer and their officers, directors and affiliates from and against any losses, damages, penalties,

fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach of the obligations of the Depositor under Sections 4.15, 4.16 and 4.17 or the Depositor's negligence, bad faith or willful misconduct in connection therewith.

The Master Servicer shall indemnify and hold harmless the Securities Administrator (if the Securities Administrator is unaffiliated with the Master Servicer) and the Depositor and their respective officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach of the obligations of the Master Servicer under Sections 4.15, 4.16 and 4.17or the Master Servicer's negligence, bad faith or willful misconduct in connection therewith. In addition, the Master Servicer shall indemnify and hold harmless the Depositor and each of its officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon (i) any untrue statement or alleged untrue statement of any material fact contained in any Annual Statement of Compliance, any Assessment of Compliance, any Attestation Report, any Additional Disclosure or other information provided by the Master Servicer pursuant to Section 4.15, 4.16 and 4.17 (the "Master Servicer Information"), or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading; provided, by way of clarification, that clause (ii) of this paragraph shall be construed solely by reference to the Master Servicer Information and not to any other information communicated in connection with the Notes or Certificates, without regard to whether the Master Servicer Information or any portion thereof is presented together with or separately from such other information.

If the indemnification provided for herein is unavailable or insufficient to hold harmless the Depositor, the Securities Administrator or the Master Servicer, as applicable, then the defaulting party, in connection with any conduct for which it is providing indemnification for under this Section 4.17(b), agrees that it shall contribute to the amount paid or payable by the other parties as a result of the losses, claims, damages or liabilities of the other party in such proportion as is appropriate to reflect the relative fault and the relative benefit of the respective parties.

The indemnification provisions set forth in this Section 4.17(b) shall survive the termination of this Agreement or the termination of any party to this Agreement.

(c)    [reserved];

(d)    Nothing shall be construed from the foregoing subsections (a), (b) and (c) to require the Securities Administrator or any officer, director or Affiliate thereof to sign any Form 10-K or any certification contained therein. Furthermore, the inability of the Securities Administrator to file a Form 10-K as a result of the lack of required information as set forth in Section 4.16(a) or required signatures on such Form 10-K or any certification contained therein shall not be regarded as a breach by the Securities Administrator of any obligation under this Agreement.

(e)    Notwithstanding the provisions of Section 8.01, this Section 4.17 may be amended without the consent of the Noteholders.

(f)    Any report, notice or notification to be delivered by the Master Servicer or the Securities Administrator to the Depositor pursuant to this Section 4.17, may be delivered via facsimile to Reg AB Compliance Manager, via email to RegABNotifications@bear.com or, in the case of a notification, telephonically by calling Reg AB Compliance Manager at 212-272-7525.

Section 4.18.    UCC. The Master Servicer shall file any financing statements, continuation statements or amendments thereto required by any change in the Uniform Commercial Code.

Section 4.19.    Optional Purchase of Certain HELOCs.

A HELOC is "delinquent" if any payment due on that HELOC is not made pursuant to the terms of such HELOC by the close of business of the day such payment is scheduled to be due. A HELOC is "30 days delinquent" if such payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such payment was due, or, if there is no such corresponding day (e.g., as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month), then on the last day of such immediately succeeding month. Similarly for "60 days delinquent," "90 days delinquent" and so on.

With respect to any HELOC which as of the first day of a Fiscal Quarter is delinquent in payment by 91 days or more or is an REO Property, EMC shall have the right to purchase any HELOC from the Trust which becomes 91 days or more delinquent or becomes an REO Property at a price equal to the Repurchase Price; provided however (i) that such HELOC is still 91 days or more delinquent or is an REO Property as of the date of such purchase and (ii) this purchase option, if not theretofore exercised, shall terminate on the date prior to the last day of the related Fiscal Quarter. This purchase option, if not exercised, shall not be thereafter reinstated unless the delinquency is cured and the HELOC thereafter again becomes 91 days or more delinquent or becomes an REO Property, in which case the option shall again become exercisable as of the first day of the related Fiscal Quarter. Notwithstanding the foregoing, purchases of HELOCs cannot exceed in the aggregate more than 2.00% of the aggregate Stated Principal Balance of the HELOCs as of the Cut-off Date; provided, however, such limitation will not apply to any HELOC required to be repurchased by the Sponsor due to a Mortgage Loan defect or a breach of any representation or warranty relating to such HELOC.

If at any time EMC remits to the Master Servicer a payment for deposit in the Master Servicer Collection Account covering the amount of the Repurchase Price for such HELOC, and EMC provides to the Master Servicer, Securities Administrator and Indenture Trustee an Officer's Certificate stating that the amount of such payment has been deposited in the Master Servicer Collection Account, then the Indenture Trustee shall execute the assignment of such HELOC prepared and delivered to the Indenture Trustee, at the request of EMC, without recourse, representation or warranty, to EMC which shall succeed to all the Indenture Trustee's right, title and interest in and to such HELOC, and all security and documents relative thereto. Such assignment shall be an assignment outright and not for security. EMC will thereupon own such Mortgage, and all such security and documents, free of any further obligation to the Indenture Trustee, the Noteholders and the Certificateholders with respect thereto.

Section 4.20.    Information Required by the Internal Revenue Service and Reports Regarding Mortgaged Property. The Servicer shall prepare for and deliver to the Securities Administrator a statement with respect to each Mortgaged Property that has been rented showing the aggregate rental income received and all expenses incurred in connection with the management and maintenance of such Mortgaged Property at such times as is necessary to enable the Securities Administrator to comply with the reporting requirements of the REMIC Provisions. The net monthly rental income, if any, from such Mortgaged Property shall be deposited by the Servicer in the Protected Account no later than the close of business on each Determination Date. The Servicer shall perform the tax reporting and withholding related to foreclosures, abandonments and cancellation of indebtedness income as specified by Sections 1445, 6050J and 6050P of the Code by preparing and filing such tax and information returns, as may be required.

ARTICLE V.

Accounts

Section 5.01.    Protected Accounts. (a) The Master Servicer shall enforce the obligation of the Servicer under the Servicing Agreement to establish and maintain a Protected Account in accordance with the Servicing Agreement, with records to be kept with respect thereto on a HELOC by HELOC basis, into which account shall be deposited within two (2) Business Days (or as of such other time specified in the Servicing Agreement) of receipt, all collections of principal and interest on any HELOC and any REO Property received by the Servicer, including Principal Prepayments, Insurance Proceeds, Liquidation Proceeds, Subsequent Recoveries, and advances made from the Servicer's own funds (less servicing compensation as permitted by the Servicing Agreement) and all other amounts to be deposited in the related Protected Account. Each Protected Account shall be an Eligible Account. The Servicer is authorized under the Servicing Agreement to make withdrawals from and deposits to the related Protected Account for purposes required or permitted by the Servicing Agreement. To the extent provided in the Servicing Agreement, the Protected Account shall be held by a Designated Depository Institution and segregated on the books of such institution in the name of the Indenture Trustee for the benefit of the Noteholders.

To the extent set forth in the Servicing Agreement, the Servicer will establish and maintain one or more custodial accounts (referred to herein as "Protected Accounts") into which it will deposit daily or at such other time as specified in the Servicing Agreement, all collections of principal and interest on any HELOCs, including principal prepayments, Insurance Proceeds, Liquidation Proceeds, Recoveries and Subsequent Recoveries, less the applicable servicing fee, and net monthly rental income from Mortgage Properties in accordance with the Servicing Agreement. All Protected Accounts and amounts at any time credited thereto shall comply with the requirements of the Servicing Agreement and shall meet the requirements of the rating agencies.

(b) On the date specified in the Servicing Agreement, the Servicer will withdraw from its Protected Account amounts on deposit therein and will remit them to the Master Servicer for deposit in

the Master Servicer Collection Account.

(c) To the extent provided in the Servicing Agreement, amounts on deposit in the Protected Account may be invested in Permitted Investments in the name of the Indenture Trustee for the benefit of the Noteholders, the Certificateholders and the Note Insurer and, except as provided in the preceding paragraph, not commingled with any other funds. Such Permitted Investments shall mature, or shall be subject to redemption or withdrawal, no later than the date on which such funds are required to be withdrawn for deposit in the Master Servicer Collection Account, and shall be held until required for such deposit. The income earned from Permitted Investments made pursuant to this Section 5.01 shall be paid to the Servicer under the Servicing Agreement, and the risk of loss of moneys required to be distributed to the Noteholders and Certificateholders resulting from such investments shall be borne by and be the risk of the Servicer. The Servicer (to the extent required by the Servicing Agreement) shall deposit the amount of any such loss in the Protected Account within two Business Days of receipt of notification of such loss but not later than the second Business Day prior to the Payment Date on which the moneys so invested are required to be distributed to the Noteholders and Certificateholders.

To the extent required by the Servicing Agreement, on or before the Servicer Remittance Date, the Servicer shall withdraw or shall cause to be withdrawn from its Protected Account and shall immediately deposit or cause to be deposited in the Master Servicer Collection Account amounts representing the following collections and payments (other than with respect to principal of or interest on the HELOCs due on or before the Cut-off Date):

(i)     Payments on the HELOCs received or advanced by the Servicer pursuant to the Servicing Agreement which were due on or before the related Due Date, net of the amount thereof comprising the Servicing Fee or any fees with respect to any lender-paid primary mortgage insurance policy;

(ii)     Principal Prepayments in full, any Liquidation Proceeds, Subsequent Recoveries or Insurance Proceeds in excess of amounts payable or reimbursable to the Servicer received by the Servicer with respect to the HELOCs in the related Prepayment Period, with interest to the date of prepayment or liquidation, net of the amount thereof comprising the Servicing Fee; and

(iii)     Principal Prepayments in part received by Greenpoint Mortgage Funding, Inc. for the HELOCs in the related Prepayment Period.

(d)     To the extent set forth in the Servicing Agreement, withdrawals may be made from the Protected Account to make remittances as described in Section 5.01(c); to reimburse the Servicer for unreimbursed Servicing Advances which have been recovered by subsequent collections from the related Mortgagor; to remove amounts deposited in error; to remove fees, charges or other such amounts deposited on a temporary basis; or to clear and terminate the account at the termination of the Servicing Agreement. As provided in Section 5.01(a) certain amounts otherwise due to the Servicer may be retained by it and need not be remitted to the Master Servicer for deposit in the Master Servicer Collection Account.

Section 5.02.     Master Servicer Collection Account. (a) The Master Servicer shall establish and maintain in the name of the Indenture Trustee, for the benefit of the Noteholders and the Note Insurer, the Master Servicer Collection Account as a segregated trust account or accounts. The Master Servicer Collection Account shall be an Eligible Account. The Master Servicer will deposit in the Master Servicer Collection Account as received by the Master Servicer, the following amounts:

(i)     Any amounts withdrawn from the Protected Account;

(ii)     Any Insurance Proceeds, Subsequent Recoveries or Net Liquidation Proceeds received by or on behalf of the Master Servicer or which were not deposited in the Protected Account;

(iii)     The Repurchase Price with respect to any HELOCs purchased by the Seller pursuant to the Mortgage Loan Purchase Agreement or Sections 2.02 or 2.03 hereof, any amounts which are to be treated pursuant to Section 2.04 of this Agreement as the payment of a Repurchase Price in connection with the tender of a Substitute HELOC by the Seller and the Repurchase Price with respect to any HELOCs purchased by the Class E Certificateholder pursuant to Section 4.19;

(iv)     Any amounts required to be deposited by the Master Servicer with respect to losses on investments of deposits in the Master Servicer Collection Account or Payment Account; and

(v)     Any other amounts received by or on behalf of the Master Servicer and required to be deposited in the Master Servicer Collection Account pursuant to this Agreement.

(a)     All amounts deposited to the Master Servicer Collection Account shall be held by the Master Servicer in the name of the Indenture Trustee in trust for the benefit of the Noteholders, the Certificateholders and the Note Insurer in accordance with the terms and provisions of this Agreement and the Indenture. The requirements for crediting the Master Servicer Collection Account or the Payment Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of (i) prepayment or late payment charges or assumption, tax service, statement account or payoff, substitution, satisfaction, release and other like fees and charges and (ii) the items enumerated in Subsections 4.05(a)(i), (ii), (iii), (iv), (vi), and (vii), need not be credited by the Master Servicer or the Servicer to the Master Servicer Collection Account or remitted by the Master Servicer or Servicer to the Securities Administrator for deposit in the Payment Account, as applicable. In the event that the Master Servicer shall remit or cause to be remitted to the Securities Administrator for deposit to the Payment Account any amount not required to be credited thereto, the Securities Administrator, upon receipt of a written request therefor signed by a Servicing Officer of the Master Servicer, shall promptly transfer such amount to the Master Servicer, any provision herein to the contrary notwithstanding.

(b)     The amount at any time credited to the Master Servicer Collection Account may be invested, in the name of the Indenture Trustee, or its nominee, for the benefit of the Noteholders, the Certificateholders and the Note Insurer, in Permitted Investments as directed by Master Servicer. All Permitted Investments shall mature or be subject to redemption or withdrawal on or before, and shall be held until, the next succeeding Payment Account Deposit Date. Any and all investment earnings on amounts on deposit in the Master Servicer Collection Account from time to time shall be for the account of the Master Servicer. The Master Servicer from time to time shall be permitted to withdraw or receive distribution of any and all investment earnings from the Master Servicer Collection Account. The risk of loss of moneys required to be distributed to the Noteholders and Certificateholders resulting from such investments shall be borne by and be the risk of the Master Servicer. The Master Servicer shall deposit the amount of any such loss in the Master Servicer Collection Account within two Business Days of receipt of notification of such loss but not later than the second Business Day prior to the Payment Date on which the moneys so invested are required to be distributed to the Noteholders.

Section 5.03.     Permitted Withdrawals and Transfers from the Master Servicer Collection Account. (a) The Master Servicer will, from time to time on demand of the Servicer or the Securities Administrator, make or cause to be made such withdrawals or transfers from the Master Servicer Collection Account as the Master Servicer has designated for such transfer or withdrawal pursuant to this Agreement and the Servicing Agreement. The Master Servicer may clear and terminate the Master Servicer Collection Account pursuant to Section 8.10 and remove amounts from time to time deposited in error.

(c)     On an ongoing basis, the Master Servicer shall withdraw from the Master Servicer Collection Account (i) any expenses, costs and liabilities recoverable by the Master Servicer or the Securities Administrator pursuant to Sections 4.02 and 5.04 hereof and Section 6.07 of the Indenture and (ii) any amounts payable to the Master Servicer as set forth in Section 4.13; provided however, that the Master Servicer shall be obligated to pay from its own funds any amounts which it is required to pay under Section 6.03.

(d)     No later than 3:00 p.m. New York time on each Payment Account Deposit Date, the Master Servicer will transfer all Available Funds on deposit in the Master Servicer Collection Account with respect to the related Payment Date to the Securities Administrator for deposit in the Payment Account.

Section 5.04.     Payment Account. (a) The Securities Administrator shall establish and maintain in the name of the Indenture Trustee, for the benefit of the Noteholders and the Note Insurer, and in the name of the Certificate Paying Agent, for the benefit of the Certificateholders, the Payment Account as a segregated trust account or accounts.

(b) All amounts deposited to the Payment Account shall be held by the Securities Administrator in the name of the Indenture Trustee in trust for the benefit of the Noteholders and the Note Insurer, and in the name of the Certificate Paying Agent for the benefit of the Certificateholders in accordance with the terms and provisions of this Agreement.

(c)     The Payment Account shall constitute a non-interest bearing trust account of the Trust Estate segregated on the books of the Securities Administrator and held by the Securities Administrator in trust, and the Payment Account and the funds deposited therein shall not be subject to, and shall be protected from, all claims, liens, and encumbrances of any creditors or depositors of the Securities Administrator (whether made directly, or indirectly through a liquidator or receiver of the Securities Administrator). The Payment Account shall be an Eligible Account.

(d)     The amount at any time credited to the Payment Account shall be (i) held in cash or (ii) invested, in the name of the Indenture Trustee, for the benefit of the Noteholders and the Note Insurer, and in the name of the Securities Administrator, for the benefit of the Certificateholders, but only in Permitted Investments as directed by Securities Administrator. All Permitted Investments shall mature or be subject to redemption or withdrawal on or before, and shall be held until, the next succeeding Payment Date if the obligor for such Permitted Investment is the Securities Administrator, or if such obligor is any other Person, the Business Day preceding such Payment Date. All investment earnings on amounts on deposit in the Payment Account or benefit from funds uninvested therein from time to time shall be for the account of the Securities Administrator. The Securities Administrator shall withdraw all investment earnings from the Payment Account on each Payment Date. If there is any loss on a Permitted Investment, the Securities Administrator shall deposit the amount of the loss in the Payment Account.

(e)     The Securities Administrator or its Affiliates are permitted to receive additional compensation that could be deemed to be in the Securities Administrator's economic self-interest for (i) servicing as investment advisor, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain of the Permitted Investments, (ii) using Affiliates to effect transactions in certain Permitted Investments and (iii) effecting transactions in certain Permitted Investments. Such compensation shall not be considered an amount that is reimbursable or payable pursuant to Section 4.13.

Section 5.05.     Permitted Withdrawals and Transfers from the Payment Account. (a) The Securities Administrator will, from time to time on demand of the Master Servicer, make or cause to be made such withdrawals or transfers from the Payment Account as the Master Servicer has designated for such transfer or withdrawal pursuant to the Indenture, this Agreement and the Servicing Agreement or as the Securities Administrator has instructed hereunder for the following purposes (limited in the case of amounts due the Master Servicer to those not withdrawn from the Master Servicer Collection Account as certified by the Securities Administrator in accordance with the terms of this Agreement) but not in any order of priority:

(i)     to reimburse the Master Servicer or the Servicer from Insurance Proceeds or Liquidation Proceeds relating to a particular HELOC for amounts expended by the Master Servicer or such Servicer in good faith in connection with the restoration of the related Mortgaged Property which was damaged by an Uninsured Cause or in connection with the liquidation of such HELOC;

(ii)     to reimburse the Master Servicer or the Servicer from Insurance Proceeds relating to a particular HELOC for insured expenses incurred with respect to such HELOC and to reimburse the Master Servicer or the Servicer from Liquidation Proceeds from a particular HELOC for Liquidation Expenses incurred with respect to such HELOC; provided that the Master Servicer shall not be entitled to reimbursement for Liquidation Expenses with respect to a HELOC to the extent that (i) any amounts with respect to such HELOC were paid as Excess Liquidation Proceeds pursuant to clause (viii) of this Section 5.05 (a) to the Master Servicer; and (ii) such Liquidation Expenses were not included in the computation of such Excess Liquidation Proceeds;

(iii)     to pay the Master Servicer as set forth in Section 4.13; provided however, that the Master Servicer shall be obligated to pay from its own funds any amounts which it is required to pay under Section 6.03;

(iv)     to reimburse the Master Servicer for expenses, costs and liabilities incurred by and reimbursable to it pursuant to Sections 4.02, 6.04(c) and (d), to the extent that the Master Servicer has not already reimbursed itself for such amounts from the Master Servicer Collection Account;

(v)     [Reserved]

(vi)     to reimburse or pay the Servicer any such amounts as are due thereto under the Servicing Agreement and have not been retained by or paid to the Servicer, to the extent provided in the Servicing Agreement;

(vii)     to reimburse or pay the Indenture Trustee, the Master Servicer and the Securities Administrator any amounts due or expenses, costs and liabilities incurred by and reimbursable to it pursuant to this Agreement, the Indenture, the Custodial Agreement, the Administrative Agreement and the Trust Agreement, to the extent such amounts have not already been previously paid or reimbursed to such party from the Master Servicer Collection Account, as Extraordinary Trust Fund Expenses, subject to the Extraordinary Trust Fund Expenses Cap;

(viii)     to remove amounts deposited in error; and

(ix)     to clear and terminate the Payment Account pursuant to Section 8.10.

The Master Servicer shall keep and maintain separate accounting, on a HELOC by HELOC basis, for the purpose of accounting for any reimbursement from the Payment Account pursuant to subclauses (i) through (iv) or with respect to any such amounts which would have been covered by such subclauses had the amounts not been retained by the Master Servicer without being deposited in the Payment Account under Section 5.02(b).

On each Payment Date, pursuant to Section 3.02 of the Indenture, the Securities Administrator shall distribute the Available Funds to the extent on deposit in the Payment Account to the Holders of the Notes and to the Certificate Paying Agent for distribution to the Certificates, in accordance with Section 3.02 of the Indenture.

Section 5.06.     Net WAC Cap Rate Carryover Reserve Account.

(a)     On or before the Closing Date, the Securities Administrator shall establish a Net WAC Cap Rate Carryover Reserve Account on behalf of the Holders of the Notes and Class E Certificates. On the Closing Date, the Depositor shall cause an amount equal to the Net WAC Cap Rate Carryover Reserve Account Deposit to be deposited in the Net WAC Cap Rate Carryover Reserve Account. The Net WAC Cap Rate Carryover Reserve Account shall be an Eligible Account. The Net WAC Cap Rate Carryover Reserve Account shall be entitled "Net WAC Cap Rate Carryover Reserve Account, LaSalle Bank National Association, as Securities Administrator, on behalf of Citibank, N.A., as Indenture Trustee, for the benefit of the Securityholders. On each Payment Date as to which there is a Net WAC Cap Rate Carryover Amount payable to any Class of Notes, the Securities Administrator shall deposit the amounts distributable pursuant to Section 3.02(a)(viii) of the Indenture into the Net WAC Cap Rate Carryover Reserve Account and the Securities Administrator has been directed by the Class E Certificateholder to distribute amounts then on deposit in the Net WAC Cap Rate Carryover Reserve Account to the Holders of the applicable Class of Notes in respect of the Net WAC Cap Rate Carryover Amounts in the priorities set forth in Sections 3.02(a)(viii) of the Indenture. Any amount paid to the Holders of Notes pursuant to the preceding sentence in respect of Net WAC Cap Rate Carryover Amounts shall be treated as distributed to the Class E Certificateholder in respect of the Class E Certificates and paid by the Class E Certificateholder to the applicable Holders of Notes. Any payments to the Holders of Notes in respect of Net WAC Cap Rate Carryover Amounts pursuant to the second preceding sentence shall not be payments with respect to a "regular interest" in a REMIC within the meaning of Section 860(G)(a)(1) of the Code.

(b)     The Net WAC Cap Rate Carryover Reserve Account is an "outside reserve fund" within the meaning of Treasury Regulation Section 1.860G-2(h) and shall be an asset of the Trust Estate but not an asset of any REMIC. The Securities Administrator on behalf of the Trust shall be the nominal owner of the Net WAC Cap Rate Carryover Reserve Account. The Class E Certificateholder shall be the beneficial owner of the Net WAC Cap Rate Carryover Reserve Account. Amounts on deposit in the Net WAC Cap Rate Carryover Reserve Account shall, subject to the direction of the Securities Administrator to transfer amounts under this Section 5.06. Amounts in the Net WAC Cap Rate Carryover Reserve Account shall, at the written direction of the Class E Certificateholder, be invested in Permitted Investments that mature no later than the Business Day prior to the next succeeding Payment Date. In the absence of written instructions, amounts on deposit in the Net WAC Cap Rate Carryover Reserve Account shall remain uninvested. All net income and gain from such investments shall be distributed to the Class E Certificateholder, not as a distribution in respect of any interest in any REMIC, on such Payment Date. All amounts earned on amounts on deposit in the Net WAC Cap Rate Carryover Reserve Account shall be taxable to the Class E Certificateholder. Any losses on such investments shall be deposited in the Net WAC Cap Rate Carryover Reserve Account by the Class E Certificateholder out of its own funds immediately as realized.

Section 5.07.     The Certificate Distribution Account.

(a)     The Securities Administrator, for the benefit of the Certificateholders, shall establish and maintain in the name of the Securities Administrator on behalf of the Certificateholders an

account (the "<u>Certificate Distribution Account</u>") entitled "Certificate Distribution Account, LaSalle Bank National Association, as Securities Administrator, in trust for the holders of GPMF Trust 2007-HE1, Certificates." The Certificate Distribution Account may be a subaccount of the Payment Account

(b)   On each Payment Date, the Securities Administrator shall withdraw from the Payment Account all amounts required to be deposited in the Certificate Distribution Account pursuant to Section 5.05(vi) and deposit such amount into the Certificate Distribution Account. On each Payment Date, the Securities Administrator shall distribute all amounts on deposit in the Certificate Distribution Account to the Certificateholders in respect of the Certificates as provided in the Trust Agreement. On the Payment Date on which the Note Balance is reduced to zero, the Securities Administrator shall distribute all amounts remaining on deposit in the Certificate Distribution Account to the Certificateholders in respect of the Certificates in order to clear and terminate the Certificate Distribution Account in connection with the termination of this Agreement.

(c)   All distributions made on the Certificates shall be made by wire transfer of immediately available funds to the account of such Certificateholders. The final distribution on the Certificates will be made in like manner, but only upon presentment and surrender of such Certificates at the location specified in the notice to the Certificateholders of such final distribution.

(d)   The Securities Administrator may (but is under no obligation to) invest, or cause to be invested, funds held in the Certificate Distribution Account in Eligible Investments (which may be obligations of the Securities Administrator). All such investments must be payable on demand or mature no later than one Business Day prior to the next Payment Date, and shall not be sold or disposed of prior to their maturity. All such Eligible Investments will be made in the name of the Securities Administrator (in its capacity as such) or its nominee. The amount of any losses incurred in respect of any such investments shall be paid by the Securities Administrator for deposit in the Certificate Distribution Account out of its own funds, without any right of reimbursement therefore, immediately as realized. All income and gain realized from any such investment shall be compensation to the Securities Administrator and shall be subject to its withdrawal on order from time to time.


ARTICLE VI.

The Master Servicer

Section 6.01.   <u>Liabilities of the Master Servicer</u>. The Master Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by it herein.

Section 6.02.   <u>Merger or Consolidation of the Master Servicer</u>.

(a)   The Master Servicer will keep in full force and effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Notes or any of the HELOCs and to perform its duties under this Agreement.

(b)   Any Person into which the Master Servicer may be merged or consolidated, or any corporation resulting from any merger or consolidation to which the Master Servicer shall be a party, or any Person succeeding to the business of the Master Servicer, shall be the successor of the Master Servicer hereunder, without the execution or filing of any paper or further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

Section 6.03.   <u>Indemnification of the Indenture Trustee, Owner Trustee, the Master Servicer and the Securities Administrator</u>.

(a)   The Master Servicer agrees to indemnify the Indemnified Persons for, and to hold them harmless against, any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or relating to, any claim or legal action relating to this Agreement (i) related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as to any such loss, liability or expense that shall be otherwise reimbursable pursuant to this Agreement) or (ii) incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder, provided, in each case, that with respect to any such claim or legal action (or pending or threatened claim or legal action), the Indemnified Person shall have given the Master Servicer and EMC written notice thereof promptly after such Indemnified Person shall have with respect to such claim or legal action knowledge thereof; provided, however that the failure to give such notice shall not relieve the Master Servicer of its indemnification obligations hereunder except to the extent the Master Servicer is prejudiced thereby. This indemnity shall survive the resignation or removal of the Indenture Trustee, Master Servicer or the Securities Administrator and the termination of this Agreement.

(b)   [reserved].

(c)   The Sponsor agrees to indemnify the Owner Trustee for any loss, liability or expense for which the Depositor is required to indemnify the Owner Trustee pursuant to Section 7.02 of the Trust Agreement, other than (x) any loss liability or expense required to be covered by the Master Servicer pursuant to this Section 6.03 and (y) any loss, liability or expense already paid by the Depositor in accordance with Section 7.02 of the Trust Agreement.

Section 6.04.   <u>Limitations on Liability of the Master Servicer and Others</u>. Subject to the obligation of the Master Servicer to indemnify the Indemnified Persons pursuant to Section 6.03:

(a)   Neither the Master Servicer nor any of the directors, officers, employees or agents of the Master Servicer shall be under any liability to the Indemnified Persons, the Depositor, the Trust Estate or the Noteholders for taking any action or for refraining from taking any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Master Servicer or any such Person against any breach of warranties or representations made herein or any liability which would otherwise be imposed by reason of such Person's willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties hereunder.

(b)   The Master Servicer and any director, officer, employee or agent of the Master Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.

(c)   The Master Servicer and LaSalle Bank National Association in its individual capacity and any director, officer, employee or agent of the Master Servicer shall be indemnified by the Trust Estate and held harmless thereby against any loss, liability or expense (including reasonable legal fees and disbursements of counsel) incurred on their part that may be sustained in connection with, arising out of, or related to, any claim or legal action (including any pending or threatened claim or legal action) relating to, or the performance of its obligation under, this Agreement, the Indenture, the Custodial Agreement, the Notes, the Assignment Agreement or the Servicing Agreement (except to the extent that the Master Servicer is indemnified by the Servicer thereunder), other than (i) any such loss, liability or expense related to the Master Servicer's failure to perform its duties in compliance with this Agreement (except as any such loss, liability or expense shall be otherwise reimbursable pursuant to this Agreement), or (ii) any such loss, liability or expense incurred by reason of the Master Servicer's willful misfeasance, bad faith or gross negligence in the performance of duties hereunder or by reason of reckless disregard of obligations and duties hereunder. This indemnity shall survive the resignation or removal of the Indenture Trustee, the Master Servicer or the Securities Administrator and the termination of this Agreement.

(d)   The Master Servicer shall not be under any obligation to appear in, prosecute or defend any legal action that is not incidental to its duties under this Agreement and that in its opinion may involve it in any expense or liability; provided, however, the Master Servicer may in its discretion undertake any such action which it may deem necessary or desirable with respect to this Agreement, the Trust Agreement or the Indenture and the rights and duties of the parties hereto and the interests of the Noteholders and Certificateholders hereunder and thereunder. In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities of the Trust Estate as Extraordinary Trust Fund Expenses, and the Master Servicer shall be entitled to be reimbursed therefor out of the Master Servicer Collection Account as provided by Section 5.06. Nothing in this Subsection 6.04(d) shall affect the Master Servicer's obligation to supervise, or to take such actions as are necessary to ensure, the servicing and administration of the HELOCs pursuant to Section 4.01.

(e)     In taking or recommending any course of action pursuant to this Agreement, unless specifically required to do so pursuant to this Agreement, the Master Servicer shall not be required to investigate or make recommendations concerning potential liabilities which the Trust Estate might incur as a result of such course of action by reason of the condition of the Mortgaged Properties but shall give written notice to the Indenture Trustee if it has notice of such potential liabilities.

(f)      The Master Servicer shall not be liable for any acts or omissions of the Servicer.

(g)     The Master Servicer may perform any of its duties hereunder or exercise its rights hereunder either directly or through Affiliates, agents or attorneys.

Section 6.05.     Master Servicer Not to Resign. Except as provided in Section 6.07, the Master Servicer shall not resign from the obligations and duties hereby imposed on it except upon a determination that any such duties hereunder are no longer permissible under applicable law and such impermissibility cannot be cured. Any such determination permitting the resignation of the Master Servicer shall be evidenced by an Opinion of Counsel addressed to the Indenture Trustee, the Note Insurer, the Securities Administrator and the Issuing Entity to such effect delivered to the Indenture Trustee, the Note Insurer and the Issuing Entity. No such resignation by the Master Servicer shall become effective until the Indenture Trustee or a successor to the Master Servicer reasonably satisfactory to the Indenture Trustee and the Note Insurer shall have assumed the responsibilities and obligations of the Master Servicer in accordance with Section 7.02 hereof. The Indenture Trustee shall notify the Rating Agencies of the resignation of the Master Servicer. Any resignation of the Master Servicer shall result in the automatic resignation of the Securities Administrator.

Section 6.06.     Successor Master Servicer. In connection with the appointment of any successor master servicer or the assumption of the duties of the Master Servicer, the Note Insurer must consent in writing, so long as no Note Insurer Default exists, and the Indenture Trustee may make such arrangements for the compensation of such successor master servicer out of payments on the HELOCs as the Indenture Trustee and such successor master servicer shall agree. If the successor master servicer does not agree that such market value is a fair price, such successor master servicer shall obtain two quotations of market value from third parties actively engaged in the servicing of single-family mortgage loans. Notwithstanding the foregoing, the compensation payable to a successor master servicer may not exceed the compensation which the Master Servicer would have been entitled to retain if the Master Servicer had continued to act as Master Servicer hereunder.

Section 6.07.     Sale and Assignment of Master Servicing. The Master Servicer may sell and assign its rights and delegate its duties and obligations in its entirety as Master Servicer under this Agreement and the Sponsor may, with the written consent (such consent not to be unreasonably withheld) of the Note Insurer, so long as no Note Insurer Default exists, terminate the Master Servicer without cause and select a new Master Servicer; provided, however, that: (i) the purchaser or transferee accepting such assignment and delegation (a) shall be a Person which shall be qualified to service mortgage loans for Fannie Mae or Freddie Mac; (b) shall have a net worth of not less than $15,000,000 (unless otherwise approved by each Rating Agency pursuant to clause (ii) below); (c) shall be reasonably satisfactory to the Indenture Trustee and the Note Insurer; and (d) shall execute and deliver to the Indenture Trustee an agreement, in form and substance reasonably satisfactory to the Issuing Entity and the Indenture Trustee, which contains an assumption by such Person of the due and punctual performance and observance of each covenant and condition to be performed or observed by it as master servicer under this Agreement; (ii) each Rating Agency shall be given prior written notice of the identity of the proposed successor to the Master Servicer and each Rating Agency's rating of the Notes in effect immediately prior to such assignment, sale and delegation (without regard to the Policy) will not be downgraded, qualified or withdrawn as a result of such assignment, sale and delegation, as evidenced by a letter to such effect delivered to the Master Servicer, Issuing Entity, Note Insurer and Indenture Trustee; (iii) the Master Servicer assigning and selling the master servicing shall deliver to the Issuing Entity, the Note Insurer and the Indenture Trustee an Officer's Certificate and an Opinion of Counsel addressed to the Issuing Entity, Note Insurer, the Securities Administrator and Indenture Trustee, each stating that all conditions precedent to such action under this Agreement have been completed and such action is permitted by and complies with the terms of this Agreement; and (iv) in the event the Master Servicer is terminated without cause by the Sponsor, the Sponsor shall pay the terminated Master Servicer a termination fee equal to 0.25% of the aggregate Scheduled Principal Balance of the HELOCs at the time the master servicing of the HELOCs is transferred to the successor Master Servicer. No such assignment or delegation shall affect any liability of the Master Servicer arising prior to the effective date thereof.

ARTICLE VII.

Default

Section 7.01.     Master Servicer Events of Default. "Master Servicer Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Master Servicer Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body) and only with respect to the defaulting Master Servicer:

(i)      The Master Servicer fails to cause to be deposited in the Payment Account any amount so required to be deposited pursuant to this Agreement (other than a Servicing Advance), and such failure continues unremedied for a period of one Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer; or

(ii)     The Master Servicer fails to observe or perform in any material respect any other material covenants and agreements set forth in this Agreement to be performed by it, which covenants and agreements materially affect the rights of Noteholders, Certificateholders or the Note Insurer, and such failure continues unremedied for a period of 30 days after the date on which written notice of such failure, properly requiring the same to be remedied, shall have been given to the Master Servicer by the Indenture Trustee or to the Master Servicer and the Indenture Trustee by the Note Insurer or the Holders of Notes aggregating at least 25% of the Note Principal Balance of the Notes; or

(iii)    There is entered against the Master Servicer a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings, or for the winding up or liquidation of its affairs, and the continuance of any such decree or order is unstayed and in effect for a period of 60 consecutive days, or an involuntary case is commenced against the Master Servicer under any applicable insolvency or reorganization statute and the petition is not dismissed within 60 days after the commencement of the case; or

(iv)    The Master Servicer consents to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Master Servicer or substantially all of its property; or the Master Servicer admits in writing its inability to pay its debts generally as they become due, files a petition to take advantage of any applicable insolvency or reorganization statute, makes an assignment for the benefit of its creditors, or voluntarily suspends payment of its obligations; and

(v)     The Master Servicer assigns or delegates its duties or rights under this Agreement in contravention of the provisions permitting such assignment or delegation under Sections 6.05 or 6.07.

In each and every such case, so long as such Master Servicer Event of Default with respect to the Master Servicer shall not have been remedied, either the Indenture Trustee or the Note Insurer, or, if a Note Insurer Default exists, the Holders of Notes aggregating at least 51% of the Note Principal Balance of the Notes, by notice in writing to the Master Servicer (and to the Indenture Trustee if given by the Note Insurer or such Noteholders), with a copy to the Rating Agencies, and with the consent of the Note Insurer (so long as no Note Insurer Default exists) in writing, may terminate all of the rights and obligations (but not the liabilities) of the Master Servicer under this Agreement and in and to the HELOCs and/or the REO Property serviced by the Master Servicer and the proceeds thereof. Upon the receipt by the Master Servicer of the written notice, all authority and power of the Master Servicer under this Agreement, whether with respect to the Notes, the HELOCs, REO Property or under any other related agreements (but only to the extent that such other agreements relate to the HELOCs or related REO Property) shall, subject to Section 7.02, automatically and without further action pass to and be vested in the Indenture Trustee pursuant to this Section 7.01; and, without limitation, the Indenture Trustee is hereby authorized and empowered to execute and deliver, on behalf of the Master Servicer as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the HELOCs and related documents, or otherwise. The Master Servicer agrees to cooperate with the Indenture Trustee in effecting the termination of the Master Servicer's rights and obligations hereunder, including, without limitation, the transfer to the Indenture Trustee of (i) the property and amounts which are then or should be part of the Trust Estate or which thereafter become part of the Trust Estate; and (ii) originals or copies of all documents of the Master Servicer reasonably requested by the Indenture Trustee to enable it to assume the Master Servicer's duties thereunder. In addition to any other amounts which are then, or, notwithstanding the termination of its activities under this Agreement, may become payable to the Master Servicer under this Agreement, the Master Servicer shall be entitled to receive, out of any amount received on account of a HELOC or related REO Property, that portion of such payments which it would have received as reimbursement under this Agreement if notice of termination had not been given. The termination of the rights and obligations of the Master Servicer shall not affect any obligations incurred by the Master Servicer prior to such termination.

Section 7.02.  Indenture Trustee to Act; Appointment of Successor. (a) Upon the receipt by the Master Servicer of a notice of termination pursuant to Section 7.01 or an Opinion of Counsel pursuant to Section 6.05 to the effect that the Master Servicer is legally unable to act or to delegate its duties to a Person which is legally able to act, the Indenture Trustee shall automatically become the successor in all respects to the Master Servicer in its capacity under this Agreement and the transactions set forth or provided for herein and shall thereafter be subject to all the responsibilities, duties, liabilities and limitations on liabilities relating thereto placed on the Master Servicer by the terms and provisions hereof; provided, however, that the Sponsor shall have the right to either (a) immediately assume the duties of the Master Servicer or (b) select a successor Master Servicer meeting the criteria of Section 6.07 herein; provided further, however, that the Indenture Trustee shall have no obligation whatsoever with respect to any liability (including advances deemed recoverable and not previously made with respect to the relevant Payment Date giving rise to the Master Servicer Event of Default which shall be made by such successor Master Servicer) incurred by the Master Servicer at or prior to the time of termination. As compensation therefor, but subject to Sections 6.09 and 6.10, the Indenture Trustee shall be entitled to compensation which the Master Servicer would have been entitled to retain if the Master Servicer had continued to act hereunder, except for those amounts due the Master Servicer as reimbursement permitted under this Agreement for advances previously made or expenses previously incurred. Notwithstanding the above, the Indenture Trustee may, if it shall be unwilling to so act, or shall, if it is legally unable to so act, appoint or petition a court of competent jurisdiction to appoint, any established housing and home finance institution which is a Fannie Mae- or Freddie Mac-approved servicer, and with respect to a successor to the Master Servicer only, meeting the criteria set forth in Section 6.07 herein, as the successor to the Master Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Master Servicer hereunder; provided, that the Indenture Trustee shall obtain a letter from each Rating Agency that the ratings, if any, on each of the Notes (without regard to the Policy) will not be lowered as a result of the selection of the successor to the Master Servicer. Pending appointment of a successor to the Master Servicer hereunder, the Indenture Trustee shall be the successor and act in such capacity as hereinabove provided. In connection with such appointment and assumption, the Indenture Trustee may make such arrangements for the compensation of such successor out of payments on the HELOCs as it and such successor shall agree; provided, however, that the provisions of Section 6.06 shall apply, the compensation shall not be in excess of that which the Master Servicer would have been entitled to if the Master Servicer had continued to act hereunder, and that such successor shall undertake and assume the obligations of the Master Servicer to pay compensation to any third Person acting as an agent or independent contractor in the performance of master servicing responsibilities hereunder. The Indenture Trustee and such successor shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

(b)  If the Indenture Trustee shall succeed to any duties of the Master Servicer respecting the HELOCs as provided herein, it shall do so in a separate capacity and not in its capacity as Indenture Trustee and, accordingly, the provisions of Article VI of the Indenture shall be inapplicable to the Indenture Trustee in its duties as the successor to the Master Servicer in the servicing of the HELOCs (although such provisions shall continue to apply to the Indenture Trustee in its capacity as Indenture Trustee); the provisions of Article V, however, shall apply to it in its capacity as successor master servicer.

Section 7.03.  Notification to Noteholders and the Note Insurer. Upon any termination or appointment of a successor to the Master Servicer, the Indenture Trustee shall give prompt written notice thereof to Noteholders and Certificateholders at their respective addresses appearing in the Note Register and to the Rating Agencies and the Note Insurer at its address appearing in the Insurance Agreement.

Section 7.04.  Waiver of Defaults. The Indenture Trustee shall transmit by mail to all Noteholders, Certificateholders and the Note Insurer, within 60 days after the occurrence of any Master Servicer Event of Default of which a Responsible Officer of the Indenture Trustee received written notice or has actual knowledge, unless such Master Servicer Event of Default shall have been cured, notice of each such Master Servicer Event of Default. The Note Insurer or, if a Note Insurer Default exists, Holders of Notes aggregating at least 51% of the Note Principal Balance of the Notes may, on behalf of all Noteholders, waive any default by the Master Servicer in the performance of its obligations hereunder and the consequences thereof, except a default in the making of or the causing to be made any required distribution on the Notes, which default may only be waived by the Note Insurer and the Holders of Notes aggregating 100% of the Note Principal Balance of the Notes. Upon any such waiver of a past default, such default shall be deemed to cease to exist, and any Master Servicer Event of Default arising therefrom shall be deemed to have been timely remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived. The Indenture Trustee shall give notice of any such waiver to the Rating Agencies and the Note Insurer.

ARTICLE VIII.

Miscellaneous Provisions

Section 8.01.  Amendment. (a) This Agreement may be amended from time to time by the Issuing Entity, the Depositor, the Master Servicer, the Securities Administrator, the Indenture Trustee, without notice to or the consent of any of the Noteholders or Certificateholders, but with the prior written consent of the Note Insurer (so long as no Note Insurer Default exists) not to be unreasonably withheld, to cure any ambiguity, to correct or supplement any provisions herein or therein that may be defective or inconsistent with any other provisions herein or therein, to comply with any changes in the Code or to make any other provisions with respect to matters or questions arising under this Agreement which shall not be inconsistent with the provisions of this Agreement; provided, however, that such action shall not, as evidenced by an Opinion of Counsel, addressed to the Indenture Trustee and Owner Trustee, adversely affect in any material respect the interests of any Noteholder, Certificateholder or the Note Insurer.

Notwithstanding the foregoing, without the prior written consent of the Noteholders, Certificateholders or the Note Insurer (so long as no Note Insurer Default exists), the parties hereto may at any time and from time to time amend this Agreement to modify, eliminate or add to any of its provisions to such extent as shall be necessary or appropriate to maintain the qualification of any REMIC created pursuant to the Indenture as a REMIC under the Code or to avoid or minimize the risk of the imposition of any tax on any REMIC created pursuant to the Indenture pursuant to the Code that would be a claim against any such REMIC at any time prior to the final redemption of the Notes, provided that the Indenture Trustee and Owner Trustee have been provided an Opinion of Counsel addressed to the Indenture Trustee, the Note Insurer, Securities Administrator and Owner Trustee, which opinion shall be an expense of the party requesting such opinion but in any case shall not be an expense of the Indenture Trustee, the Note Insurer, the Owner Trustee or the Trust Estate, to the effect that such action is necessary or appropriate to maintain such qualification or to avoid or minimize the risk of the imposition of such a tax.

(b)  This Agreement may also be amended from time to time by the Issuing Entity, the Master Servicer, the Depositor, the Securities Administrator, the Indenture Trustee, with the prior written consent of the Note Insurer (so long as no Note Insurer Default exists) and Holders of Notes aggregating at least 51% of the Note Principal Balance of the Notes, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Noteholders; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, payments received on HELOCs which are required to be distributed on any Note or Certificate without the consent of the Holder of such Note or Certificate, (ii) reduce the aforesaid percentage of Notes or Certificates the Holders of which are required to consent to any such amendment, without the consent of the Holders of all Notes or Certificates then outstanding or (iii) cause any REMIC created pursuant to the Indenture to cease to qualify as a REMIC. Notwithstanding any other provision of this Agreement, for purposes of the giving or withholding of consents pursuant to this Section 8.01(b), Notes registered in the name of or held for the benefit of the Issuing Entity, the Depositor, the Securities Administrator, the Master Servicer, the Note Insurer or the Indenture Trustee or any Affiliate thereof shall be entitled to vote their Percentage Interests with respect to matters affecting such Notes.

(c)  Promptly after the execution of any such amendment, the Securities Administrator shall furnish a copy of such amendment or written notification of the substance of such amendment to each Noteholder, Certificateholder and the Note Insurer, with a copy to the Rating Agencies.

(d)  In the case of an amendment under Subsection 8.01(b) above, it shall not be necessary for the Noteholders or Certificateholders to approve the particular form of such amendment. Rather, it shall be sufficient if the Noteholders or Certificateholders approve the substance of the amendment. The manner of obtaining such consents and of evidencing the authorization for the execution thereof by Noteholders shall be subject to such reasonable regulations as the Indenture Trustee may prescribe.

(e)  Prior to the execution of any amendment to this Agreement, the Indenture Trustee or Owner Trustee shall be entitled to receive and rely upon an Opinion of Counsel addressed to the Indenture Trustee, Owner Trustee and Note Insurer stating that the execution of such amendment is authorized or permitted by this Agreement. The Indenture Trustee, the Owner Trustee, the Master Servicer and the Securities Administrator may, but shall not be obligated to, enter into any such amendment which affects its own respective rights, duties or immunities under this Agreement.

(f)  Any amendment affecting the rights of the Owner Trustee shall require the Owner Trustee's written consent, which consent shall not be unreasonably withheld.

Section 8.02.  Recordation of Agreement. To the extent permitted by applicable law, this Agreement is subject to recordation in all appropriate public offices for real property records in all the

counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere. The Depositor shall effect such recordation, at the expense of the Trust Estate upon the request in writing of a Noteholder or Certificateholder, but only if such direction is accompanied by an Opinion of Counsel (provided at the expense of the Noteholder or Certificateholder requesting recordation) to the effect that such recordation would materially and beneficially affect the interests of the Noteholders or Certificateholders or is required by law.

Section 8.03.   Governing Law. THIS AGREEMENT AND THE NOTES SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REFERENCE TO ITS CONFLICT OF LAWS RULES (OTHER THAN SECTION 5–1401 OF THE GENERAL OBLIGATIONS LAW, WHICH THE PARTIES HERETO EXPRESSLY RELY UPON IN THE CHOICE OF SUCH LAW AS THE GOVERNING LAW HEREUNDER) AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 8.04.   Notices. All demands and notices hereunder shall be in writing and shall be deemed given when delivered at (including delivery by facsimile) or mailed by registered mail, return receipt requested, postage prepaid, or by recognized overnight courier, to (i) in the case of the Depositor, 383 Madison Avenue, New York, New York 10179, Attention: General Counsel, or to such other address as may hereafter be furnished to the other parties hereto in writing; (ii) in the case of the Indenture Trustee, at the Corporate Trust Office or such other address as may hereafter be furnished to the other parties hereto in writing; (iii) in the case of the Master Servicer or Securities Administrator, LaSalle Bank National Association, 135 South LaSalle Street, Suite 1511, Chicago, Illinois 60603, Attention: Global Securities and Trust Services - GPMF Trust 2007-HE1, facsimile: (312) 904-1368, or such other address as may hereafter be furnished to the other parties hereto in writing; or (iv) in the case of the Issuing Entity, GPMF Trust 2007-HE1 c/o Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19801; Attention: Corporate Trust Administration, or such other address as may hereafter be furnished to the other parties hereto in writing; (v) in the case of the Owner Trustee, to Wilmington Trust Company, 1100 North Market Street, Wilmington, Delaware 19801; Attention: Corporate Trust Administration; or such other address as may hereafter be furnished to the other parties hereto in writing, (vi) in the case of the Rating Agencies, Standard & Poor's, a division of The McGraw-Hill Companies, Inc., 55 Water Street, New York, New York 10041, and Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007 and (vii) in the case of the Note Insurer, XL Capital Assurance Inc., 1221 Avenue of the Americas, New York, New York 10020-1001, Attention: Surveillance (GPMF Trust 2007-HE1, Policy No. CA03607A), with a copy to the General Counsel at the above address, and in each case in which a demand, notice or other communication to the Note Insurer refers to a Default, an Event of Default or any event with respect to which such failure on the part of the Note Insurer to respond shall be deemed to constitute consent or acceptance, then such demand, notice or other communication shall be marked to indicate "URGENT MATERIAL ENCLOSED"; or such other address as may hereafter be furnished to the other parties hereto in writing. Any notice delivered to the Depositor, the Master Servicer, the Securities Administrator, the Indenture Trustee, the Issuing Entity or the Owner Trustee under this Agreement shall be effective only upon receipt. Any notice required or permitted to be mailed to a Noteholder, unless otherwise provided herein, shall be given by first-class mail, postage prepaid, at the address of such Noteholder as shown in the Note Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given when mailed, whether or not the Noteholder receives such notice.

Section 8.05.   Severability of Provisions. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severed from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement or of the Notes or Certificates or the rights of the Noteholders or Certificateholders thereof.

Section 8.06.   Successors and Assigns. The provisions of this Agreement shall be binding upon the parties hereto, the Noteholders, the Certificateholders and their respective successors and assigns. The Indenture Trustee shall have the right to exercise all rights of the Issuing Entity under this Agreement.

Section 8.07.   Article and Section Headings. The article and section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

Section 8.08.   Counterparts. This Agreement may be executed in two or more counterparts each of which when so executed and delivered shall be an original but all of which together shall constitute one and the same instrument.

Section 8.09.   Notice to Rating Agencies and the Note Insurer. The Indenture Trustee, with respect to (a), (b) and (c), and the Securities Administrator, with respect to (d) shall promptly provide notice to each Rating Agency and the Note Insurer with respect to each of the following of which a Responsible Officer of the Indenture Trustee has actual knowledge or written notice:

(a)   Any material change or amendment to this Agreement;

(b)   The occurrence of any Master Servicer Event of Default that has not been cured;

(c)   The resignation or termination of the Master Servicer, the Indenture Trustee, the Owner Trustee or the Securities Administrator; and

(d)   Any change in the location of the Master Servicer Collection Account.

Section 8.10.   Termination. The respective obligations and responsibilities of the parties hereto created hereby shall terminate upon the satisfaction and discharge of the Indenture pursuant to Section 4.10 thereof and, if applicable, the optional redemption of the Notes pursuant to Section 8.06 thereof. In the event that this Agreement is terminated by reason of the payment or liquidation of all HELOCs or the disposition of all property acquired with respect to all HELOCs under this Section, the Master Servicer shall deliver to the Securities Administrator for deposit in the Payment Account all distributable amounts remaining in the Master Servicer Collection Account. Upon the presentation and surrender of the Notes and Certificates, the Securities Administrator shall distribute to the remaining Noteholders, Certificateholders and the Note Insurer, in accordance with their respective interests, all distributable amounts remaining in the Payment Account. Upon deposit by the Master Servicer of such distributable amounts, and following such final Payment Date, the Indenture Trustee shall, or shall cause the Custodian to, release promptly to the Issuing Entity or its designee the Mortgage Files for the remaining HELOCs, and the Master Servicer Collection Account and the Payment Account shall terminate, subject to the Securities Administrator's obligation to hold any amounts payable to the Noteholders in trust without interest pending final distributions pursuant to the Indenture.

Section 8.11.   No Petition. Each party to this Agreement (and with respect to LaSalle Bank, solely in its capacities as Master Servicer and Securities Administrator and not in its individual or corporate capacity) by entering into this Agreement, hereby covenants and agrees that it will not at any time institute against the Issuing Entity, or join in any institution against the Issuing Entity, any bankruptcy proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations of the Issuing Entity. This section shall survive the termination of this Agreement by one year.

Section 8.12.   No Recourse. The Master Servicer acknowledges that no recourse may be had against the Issuing Entity, except as may be expressly set forth in this Agreement.

Section 8.13.   Additional Terms Regarding Indenture. The Indenture Trustee shall have only such duties and obligations under this Agreement as are expressly set forth herein, and no implied duties on its part shall be read into this Agreement. In entering into and acting under this Agreement, the Indenture Trustee shall be entitled to all of the rights, immunities, indemnities and other protections set forth in Article VI of the Indenture.

Section 8.14.   Third Party Beneficiary. The parties hereto agree that the Owner Trustee is a third party beneficiary to this Agreement.

Section 8.15.   Limitation of Liability. Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by the Owner Trustee, not individually or personally but solely as Owner Trustee, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Issuing Entity is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Issuing Entity and (c) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Issuing Entity or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuing Entity under this Agreement or the other related documents.

Section 8.16.   Benefit of Agreement. The Note Insurer and any successor and assign shall be a third-party beneficiary to the provisions of this Agreement. To the extent that this Agreement confers upon or gives or grants to the Note Insurer any right, remedy or claim under or by reason of this Agreement, the Note Insurer may enforce any such right, remedy or claim conferred, given or

granted hereunder. Nothing in this Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Securityholders and the Note Insurer, any benefit or any legal or equitable right, remedy or claim under this Agreement.

IN WITNESS WHEREOF, the Depositor, the Issuing Entity, the Sponsor, the Indenture Trustee, the Master Servicer and the Securities Administrator have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

BEAR STEARNS ASSET BACKED SECURITIES I LLC, as Depositor

By: /s/ Baron Silverstein
Name: Baron Silverstein
Title: Vice President

GPMF TRUST 2007-HE1, as Issuing Entity

By: WILMINGTON TRUST COMPANY, not in its individual capacity, but solely as Owner Trustee

By: /s/ Dorri E. Wolhar
Name: Dorri E. Wolhar
Title: Financial Services Officer

EMC MORTGAGE CORPORATION, as Sponsor

By: /s/ Debbie Pratt
Name: Debbie Pratt
Title: Senior Vice President

CITIBANK, N.A., as Indenture Trustee

By: /s/ John Hannon
Name: John Hannon
Title: Vice President

LASALLE BANK NATIONAL ASSOCIATION, as Master Servicer and Securities Administrator

By: /s/ Rita Lopez
Name: Rita Lopez
Title: Vice President

| STATE OF NEW YORK | ) | |
|---|---|---|
| | ) | ss.: |
| COUNTY OF NEW YORK | ) | |

On the 6th day of March, 2007 before me, a notary public in and for said State, personally appeared Baron Silverstein, known to me to be a Vice President of Bear Stearns Asset Backed Securities I LLC, the limited liability company that executed the within instrument, and also known to me to be the person who executed it on behalf of said limited liability company, and acknowledged to me that such limited liability company executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

_____
Notary Public

[Notarial Seal]